UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXEI KOUVCHINOV,<br><br>    Plaintiff,<br>v.<br><br>PARAMETRIC TECHNOLOGY<br>CORPORATION, CDI CORPORATION,<br>LISA WALES, and CONNECTICUT<br>GENERAL LIFE INSURANCE CO.,<br><br>    Defendants. | Civil Action No. 04-12531 (MEL) |

**DEFENDANTS' STATEMENT OF UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Pursuant to U.S. District Court Local Rule 56.1, Defendants Parametric Technology Corporation ("PTC") and Lisa Wales ("Ms. Wales") submit this Statement of Undisputed Material Facts in support of their motion for Summary Judgment. The pleadings of record, the deposition testimony of the parties and witnesses, and the relevant documentary exhibits (all of which are attached to the accompanying Declaration of Guy P. Tully), establish the following undisputed material facts:

*Plaintiff's employment with PTC and his selection for layoff*

1. Plaintiff Alexei Kouvchinov was hired by Parametric Technology Corporation ("PTC") in 1994 as a computer software engineer. (Pl. MCAD Tr., p. 34-36)[1] Plaintiff held that position throughout his tenure at PTC. (Id.) In his role, Plaintiff supported the Product Data Management group at PTC. (Id., p. 41) Depending on the stage of a given software product,

---

[1] "(Pl. Tr. __, p.__)" refers to the transcript of Plaintiff's deposition taken in this matter. Plaintiff's deposition was taken over the course of 4 days, October 18, November 8, November 16 and December 19, 2005. Reference to the first day of his testimony will be indicated as (Pl. Tr. 1, p. __) and each subsequent day of testimony will be to Tr. 2, Tr. 3 and Tr. 4. Plaintiff was also deposed during the period of time he had a charge of discrimination pending before the Massachusetts Commission Against Discrimination (MCAD). "(Pl. MCAD Tr., p. __)" is a reference to the transcript of that deposition. Copies of excerpts from Plaintiff's deposition transcripts are attached to the Declaration of Guy P. Tully, filed herewith.

Plaintiff was responsible for, among other things, software development, software support and repairing database corruption errors (or "fixing bugs"). (Id., pp. 35-36)

2. On September 10, 2001, Ms. Wales, a PTC Human Resources generalist, notified Plaintiff of his selection for layoff along with approximately 500 other PTC employees, and reviewed with Plaintiff the severance package presented him that day. (Wales Tr. 1, pp. 20-22)[2]

3. Plaintiff, like others impacted by the reduction in force, was given a two-week notice period during which he remained an active employee of PTC but did not have to report to work. Thus, in Plaintiff's case, that two-week period ended on September 24, 2001. (Pl. MCAD Tr., pp. 38-40; Wales Tr. 1, pp. 24, 45) On October 15, 2001, Plaintiff signed a separation agreement that provided him severance as part of the reduction in force and also included a general release of all claims against PTC and its employees. (Pl. Tr. 3, p. 309, Ex. 30)[3]

***Plaintiff files a claim for short term disability benefits***

4. On September 17, 2001, i.e., after PTC notified Plaintiff of his layoff but prior to the effective date of his termination, Plaintiff sent to Ms. Wales a claim form for short-term disability ("STD") benefits with PTC. (Pl. Tr. 1, pp. 86-90, Ex.1) The medical certification portion of the claim form was completed by Plaintiff's treating physician, Dr. Leonard Freedberg. (Pl. MCAD Tr., pp. 63-65, Ex. 2) Prior to that date, Plaintiff had never taken a medical leave of absence from PTC. (Pl. MCAD Tr., p. 37) Nor had he ever been on disability with PTC. (Wales Tr. 1, p. 25)

5. Because he filed prior to the effective date of his termination, Plaintiff was still eligible to submit a claim for STD benefits. (Wales Tr. 2, p. 41). Ms. Wales forwarded Plaintiff's claim to PTC benefits specialist, Lisa Perry. (Perry Tr., pp. 19-20) Ms. Perry completed PTC's section of Plaintiff's STD claims form and forwarded it to PTC's STD plan

---

[2] "(Wales Tr.1, p. __)" refers to the transcript of the deposition of Ms. Wales taken on April 16, 2004. "(Wales Tr. 2, p. __)" refers to the transcript of the deposition of Ms. Wales taken on November 18, 2005. Excerpts from those transcripts are attached to the Tully Declaration.

[3] Accordingly, Plaintiff's layoff from PTC is not the subject of this litigation.

2

administrator, Defendant Connecticut General Life Insurance Company ("CIGNA"). (Perry Tr., pp. 29-30) PTC played no role in the determination of whether Plaintiff's claim would be approved, as PTC did not adjudicate claims. (Perry Tr., p. 44; Wales Tr. 2, pp. 26, 28) Rather, that decision rested entirely with CIGNA. (Id.; Wallace Tr., p. 81)[4]

6.  By letter dated October 5, 2001, Plaintiff learned from CIGNA case manager Angela Wallace that his claim had been approved, initially through October 12, 2001. (Pl. MCAD Tr., pp. 67-68, Ex. 3) In that letter, Plaintiff was advised that his STD claim would be "payable for a maximum of 12 weeks" as long as he remained "totally disabled from performing the duties of [his] occupation." (Id., Ex 3)

7.  In response to an inquiry by Ms. Perry on October 12, 2001 to CIGNA's Senior Clam Manager Scott Anderson as to whether Plaintiff's STD benefits had been extended beyond October 12th, Mr. Anderson replied by electronic mail that Plaintiff's benefits had been extended to October 26, 2001. (Anderson Tr., pp. 25-26, Ex. 74, p. 438)[5]

8.  Scott Anderson later confirmed that Plaintiff's STD benefits were thereafter extended through November 30, 2001. (Anderson Tr., p. 26, Ex. 74, p. 441)

*Plaintiff's pursuit of employment during his period of collecting STD benefits*

9.  Despite the fact that his application for STD benefits indicated that he was disabled from working, on September 25, 2001 (while Plaintiff's application for STD benefits was pending with CIGNA), Plaintiff sent an electronic mail message to John Busa, a Vice President in PTC's Software Solutions Group, and informed Mr. Busa that he was available to perform database repair work for PTC on an independent contractor basis. (Pl. MCAD Tr., p.

---

[4] "(Wallace Tr., p. __)" refers to the transcript of the deposition of CIGNA Claims Manager Angela Wallace taken on March 15, 2006. Excerpts from that transcript are attached to the Tully Declaration.

[5] "(Anderson Tr., p. __)" refers to the transcript of the deposition of CIGNA Senior Claims Manager Scott Anderson taken on March 15, 2006. Excerpts from that transcript are attached to the Tully Declaration.

3

48, Tr. 2, p. 119, Ex. 3) The language of Plaintiff's message to Busa was unequivocal: "I would like to propose my services for handling database corruptions for existing customers. I believe that I with [the] help of one other person I can guarantee the quality and timely response to all customers problems. I am confident that I can provide excellent service and contribute to the continuous success of the company I spent so many years with." (Id., Ex. 3)

10. When asked during his deposition to reconcile the conflict created between applying for STD benefits based on being totally disabled, and his message to Mr. Busa affirmatively representing himself capable of working, Plaintiff only claimed after the fact that he would not have taken the job had Busa offered it to him. (Pl. Tr. 2, p. 120) Plaintiff also confirmed that he understood that he could not simultaneously work and collect STD benefits. (Pl. MCAD Tr., p. 53)

11. During October and November 2001, i.e., the same period of time that Plaintiff's doctor continued to certify Plaintiff as being disabled from working and therefore entitled to STD benefits, Plaintiff concedes that he actively pursued discussions for employment with AR Consulting ("ARC") and Defendant CDI Corporation ("CDI"). (Pl. MCAD Tr., pp. 76-77, Tr. II, pp. 122-27, Tr. III, pp. 290-92, Ex. 5) Plaintiff admitted that he was offered a position by ARC, but declined the offer. (Pl. Tr. III, p. 292)

***Plaintiff's application for employment with CDI***

12. Plaintiff first learned in October 2001, that CDI might be looking to hire persons who could perform database repair services on a contract basis to PTC. (Pl. MCAD Tr., p. 77) In October or November 2001, while still receiving STD benefits, Plaintiff contacted CDI regarding this specific position at PTC. (Pl. Tr. 2, pp. 121-22, 126, Ex. 7). Plaintiff's primary contact at CDI at that point was Ellen Shea. (Id.)

4

13. Through a series of electronic mail messages on or about November 26, 2001, Plaintiff engaged in negotiations with Ms. Shea about the terms and conditions of his potential employment with CDI. (Pl. Tr. 2, pp. 123-35, Ex. 5)

14. On November 29, 2001, Plaintiff filled out an application for employment with CDI in connection with the PTC database repair project. (Pl. Tr. 1, pp. 41, 66, Ex. 7). That same day, Plaintiff signed an Employment Agreement with CDI that included the following termination provision:

> Your employment relationship between you and us hereunder may be terminated at any time at the will of either you or us, either before, on, or after the Reporting date, without the need for the terminating party to give a specific reason or cause to the other party for the termination. You acknowledge that, as our employee, you will be working in the temporary staffing business and <u>therefore your employment may be terminated when your assignment with our Customer ends</u> or at any earlier time at the discretion of our Customer or us..

(Pl. Tr. 2, p. 151, Ex. 8 (emphasis added)).

15. After signing the Employment Agreement, Plaintiff began the database repair assignment at PTC on December 4, 2001. (Pl. MCAD Tr., p. 88; Ex 8). Plaintiff admits that he and CDI discussed only one assignment: working on a specific database repair project at PTC. (Pl. Tr. 2, pp. 131-32)

***Plaintiff conceals both his return to work and his simultaneous pursuit of STD benefits***

16. In one of his earliest messages to Ms. Shea during the negotiation process, Plaintiff stated to her that he needed the start date for the PTC project to be December 18, 2001 (i.e., the day after his entitlement to STD benefits was to end). (Pl. MCAD Tr., pp. 51-52, Tr. 2, pp. 124-25, 130-32, Ex. 5) Indeed, Plaintiff admitted under oath that he lied to Ms. Shea at that time, stating that he could not start until December 18, 2001 because he was working for another company. (Pl. Tr., 2, p. 132)

5

17. Plaintiff also admitted that at the time he was pursuing employment through CDI, he did not tell CIGNA or his own doctor at any time prior to November 29, 2001 that he was negotiating an employment contract with CDI (Pl. Tr. 4, pp. 28-29), nor did he tell CIGNA or his doctor about his negotiations and job offer from ARC. (Pl. Tr. 4, p. 29)

18. During the period October 18, 2001 – November 20 or 25, 2001, Plaintiff had several conversations with the PTC project manager, Lee Lesburg. (Pl. Tr. 2, pp. 142-43) Although Plaintiff had seen Mr. Lesburg at PTC prior to Plaintiff's layoff in September 2001, he had never spoken to him. (Pl. Tr. 2, p. 142-143)

19. During the CDI interview process Plaintiff did not tell Mr. Lesburg that he was collecting STD benefits during the same period of time that Plaintiff was interviewing for the CDI job at PTC. (Pl. Tr. 3, p. 302)

20. When Plaintiff applied for employment at CDI, he lied about receiving STD benefits. (Pl. MCAD Tr., pp. 51, 77; Tr. 2, p. 127). In fact, when asked during his deposition if he had told CDI that he was receiving STD benefits at the time he applied for employment, Plaintiff responded "No, I'm not an idiot." (Pl. Tr. 2, pp. 126-27)

21. Plaintiff did not tell CIGNA, who was paying his disability benefits, that he was negotiating a contract of employment with CDI. (Pl. MCAD Tr., p. 78, Tr. 4, pp. 28-29)

22. Plaintiff could not remember if he ever told his treating physician, Dr. Freedberg, about the fact that he was negotiating an employment contract with CDI. (Pl. Tr. 4, p. 29) Plaintiff did not, at any time prior to December 7, 2001, tell Dr. Freedberg about Plaintiff's alleged telephone call to CIGNA on November 29, 2001 to advise CIGNA about his return to work. (Id. at 31) Plaintiff also failed to tell Dr. Freedberg about the e-mail inquiry to John Busa just one week after Dr. Freedberg certified Plaintiff as being disabled. (Freedberg Tr., p. 31)

6

23. On November 21, 2001 (i.e., just 8 days before Plaintiff made his alleged call to CIGNA to report his return to work), Plaintiff represented to Dr. Freedberg that he "couldn't even imagine working." (Freedberg Tr., pp. 17-18)

24. Prior to December 2001, Plaintiff never told Dr. Freedberg about his pursuit of employment opportunities or acceptance of a job. (Freedberg Tr., pp. 21-22) Dr. Freedberg also confirmed that Plaintiff never told him about the alleged call to CIGNA that Plaintiff now claims to have made on November 29, 2001 (Id. at 30), and that if he had, Dr. Freedberg would not have continued to certify Plaintiff as disabled. (Id., p. 22)

***Plaintiff's return to work at PTC as an employee of CDI***

25. After Plaintiff started working at PTC as an employee of CDI on December 4, 2001, Ms. Wales saw Plaintiff on the PTC premises. (Wales Tr. 1, p. 54, Tr. 2, p. 54) After speaking directly with Plaintiff, she learned he was performing database repair work for PTC as an employee of CDI. (Wales Tr. 2, p. 58) Recalling that Plaintiff previously had submitted a claim for STD benefits less than three months earlier, Ms. Wales asked PTC benefits specialist Lisa Perry to contact CIGNA to inquire about Plaintiff's status. (Id., p. 60)

26. That same day (December 4, 2001), Lisa Perry contacted CIGNA to inquire about Plaintiff's status. (Perry Tr., p. 43) Later that same day, Ms. Perry received an electronic mail response from CIGNA claims representative Angela Wallace in which Ms. Wallace advised Ms. Perry that Plaintiff's claim "was extended to 12-16-01 and referred to LTD." (Id., pp. 42-44, Ex. 32)

27. On December 6, 2001, Ms. Perry advised Ms. Wales that Ms. Wallace wanted to know if Plaintiff's job duties at PTC as an employee of CDI were the same as the duties he performed as an employee of PTC at the time of his layoff in September 2001. (Perry Tr., pp.

7

45-46, Ex. 33; Wales Tr. 2, pp. 71-72)

28.  Ms. Wales asked Lee Lesburg, the project manager for the work to be performed by Plaintiff, about the nature of the duties to be performed by Plaintiff, and understood that Plaintiff would be performing similar database repair work. (Wales Tr. 2, p. 72) Ms. Wales then communicated that information to Ms. Perry. (Id. at 72-73, 80, Ex. 33) Ms. Perry then passed that information along to Ms. Wallace by electronic mail message at 1:24 p.m. on December 6, 2001. (Perry Tr., pp. 46-48, Ex. 36)

29.  By electronic mail message dated December 6, 2001, Lisa Wales contacted Ed Raine, PTC's Vice President of Human Resources, and other members of management or those involved with the inquiry into Plaintiff's status, to apprise Mr. Raine of the fact that Plaintiff was working for CDI at PTC as a contract employee at the same time that CIGNA was reporting Plaintiff to be actively approved for STD benefits. (Wales Tr. 2, pp. 81-83, Ex. 34)

30.  Mr. Raine responded to Ms. Wales's message by electronic mail sent at 4:25 p.m. on December 6, 2001, in which Mr. Raine expressed his belief that Plaintiff was violating business ethics by simultaneously holding himself out to CDI as being able to work, yet continuing to represent himself to CIGNA as being disabled. He therefore recommended that PTC notify CDI that Plaintiff's services would no longer be needed at PTC. (Raine Tr., pp. 18-21, 34-35, Ex. 35)[6]

31.  Mr. Raine made his decision only <u>after</u> PTC received confirmation from CIGNA that Plaintiff was still collecting STD benefits and that his claim had been approved through December 16, 2001 and was in the process of being referred to CIGNA's LTD group. (Raine Tr., pp. 18-19, 34-35; Perry Tr., pp. 42-44; Exs. 32-36).

---

[6] "(Raine Tr., p. __)" refers to the transcript of the deposition of Edward Raine taken on March 3, 2006. Excerpts from the transcript of Mr. Raine are attached to the Tully Declaration.

*Plaintiff is terminated by CDI*

32.  Nancy Pugliese, the CDI representative who received the call from PTC, testified that while PTC may have mentioned something about Plaintiff being "on disability" while working, PTC did not state that Plaintiff's disability status was the reason that Plaintiff was no longer needed at PTC; rather, PTC advised her only that Plaintiff's services were no longer needed at PTC without any further explanation. (Pugliese Tr., pp. 46, 54) Ms. Pugliese further confirmed that at the time PTC called her to advise her that Plaintiff's services were no longer needed, PTC would not have known that CDI would subsequently terminate Plaintiff, as that subject was not something she had ever discussed with PTC. (Id., p. 60)

33.  At no point in time – even after Plaintiff's termination by CDI – did Plaintiff ever ask CIGNA to contact PTC to tell PTC about the alleged telephone call that Plaintiff claims to have made to CIGNA on November 29, 2001 to report his return to work and request that he no longer receive STD benefits. (Pl. Tr. III, pp. 296-97, Tr. 4, p. 29)

*The Termination of Plaintiff's STD benefits*

34.  By electronic mail message sent at 4:40 p.m. on December 6, 2001, Ms. Wallace notified Ms. Perry that Plaintiff's STD benefits would be terminated. (Perry Tr., pp. 46-49, Ex. 36)

35.  By letter dated December 10, 2001, CIGNA notified Plaintiff that his disability benefits were cancelled because he was actively employed. (Pl. Tr. 3, pp. 283-285, Ex. 28) Specifically, CIGNA advised Plaintiff that because he was working for CDI at PTC, they were unable to consider him disabled under their policies, and thus his claim was "closed." (Id.)

36.  Plaintiff never appealed CIGNA's decision to terminate his benefits on the grounds identified in the December 10, 2001 letter, despite the fact that he currently claims that

he reported his own return to work and requested that his benefits cease as of November 29, 2001. (Pl. MCAD. Tr., p. 112)

37.     Prior to this action being filed in Federal Court, Plaintiff, through counsel, sent a letter dated February 25, 2004 to CIGNA in which certain information was requested about Plaintiff's STD claim and the termination of his benefits. (Pl. Tr. 4, p. 24-26, Ex. 48) Included in the questions posed to CIGNA was question 3, which requested information as to "When, on what grounds and at whose request [Plaintiff's] disability benefits with CIGNA were terminated." (Dep.Ex. 48) The letter from Plaintiff's counsel also asked CIGNA as a second inquiry if it had any record of Plaintiff "contacting CIGNA to request termination of disability benefits in November or December of 2001." (Id.)

38.     CIGNA responded to the February 25, 2004 letter by letter dated March 8, 2004. (Wallace Tr., p. 68, Ex. 49, Pl. Tr. 4, p. 26) In its response to question 3, CIGNA made clear that the decision was not based on any alleged call from Plaintiff on November 29, 2001: "In response to your third request: Email from Lisa Perry at Parametric Technology Corp (sic) on December 6, 2001 reporting that [Plaintiff] returned to work on December 4, 2001." CIGNA responded "N/A" to the inquiry about any record of Plaintiff contacting CIGNA to request termination of benefits in November or December of 2001. (Dep. Ex. 49)

39.     Plaintiff did not, at any time after March 8, 2004, contact CIGNA to state that he disagreed with CIGNA's answer to question no. 3 posed by his counsel in the February 25, 2004 letter. (Pl. Tr. 4, pp. 26-27)

40.     On or about May 24, 2002, Plaintiff filed a claim of handicap discrimination with the Massachusetts Commission Against Discrimination (MCAD). (Pl. MCAD Tr., p. 115, Ex. 8) In a Determination rendered on or about November 15, 2004, the MCAD dismissed Plaintiff's charge of discrimination for Lack of Probable Cause. (Tully Dec. ¶11, Ex. O)

*Plaintiff's testimony about the basis of his claims*

41. The condition from which Plaintiff claims to have suffered and upon which his claim for STD benefits and his claims in Count I of his Complaint are based was depression. (Pl. Tr. 1, pp. 90-92, Ex. 1) However, according to Plaintiff, his alleged depression was only of a short duration; specifically, Plaintiff filed his claim for STD benefits on September 17, 2001 (Id.), and he claims to have called the STD carrier on November 29, 2001 – just 2½ months later – to report that he was returning to work. (Pl. MCAD Tr., pp. 48-50) Indeed, there has not been any period of time since September 1, 2001 when he was unable to care for himself or engage in daily living activities by himself. (Pl. Tr. 4, p. 15). When asked about any periods of time where he was physically or mentally unable to work, Plaintiff stated only the period of September to November 2001. (Pl. Tr. 4, pp. 22-23)

42. Plaintiff has no evidence that PTC regarded him as being disabled or that it knew about any record of impairment that rose to the level of a disability under the ADA or G.L. c. 151B. (Pl. Tr. 4, pp. 50-51) Indeed, Plaintiff has absolutely no proof that PTC took any action based on Plaintiff's alleged handicap/disability. Nor does Plaintiff know whether his claim of handicap discrimination is based on his actual alleged disability, his record of an alleged disability or PTC's alleged perception that he had a disability. (Id.)

43. According to Plaintiff, the entire basis of his Plaintiff's ERISA §510 claim in Count II and his handicap/disability claim in Count I is his belief that PTC told CDI that he was on long term disability. (Pl. Tr. 4, p.48) However, Plaintiff concedes that he has no personal knowledge of what was said during the conversation between PTC and CDI. (Pl. MCAD Tr., pp. 107-08)

44. Nancy Pugliese of CDI confirmed that, while PTC might have indicated on that

call that Plaintiff had been "on disability" while working there was no mention of him collecting LTD benefits or any suggestion by PTC that Plaintiff's disability status was the reason that Plaintiff's services were no longer needed. (Pugliese Tr., pp. 48, 54)

45.     As to the factual basis of his ERISA discrimination claim against Ms. Wales, Plaintiff testified only that he believed that Lisa Wales was not objective "because she didn't believe that I was disabled, that I had depression", and that Ms. Wales was not objective because Plaintiff utilized the services of an attorney in connection with an unrelated discrepancy about his benefits. (Pl. Tr. 3, pp. 314-316)

46.     As to the factual basis of his claim that PTC either expelled, disciplined or discriminated against him for exercising his right to seek benefits under the disability plan (as set forth in paragraph 28 of his Complaint), Plaintiff only stated "I think that I was fired from CDI because PTC had told them that I was on long term disability." (Pl. Tr. 4, pp. 48-49)

47.     Ms. Wales (i) did not discuss Plaintiff's disability claim with any employee of CDI (Wales Tr. 1, p. 69); (ii) did not make any recommendation to anyone about what should be done about Plaintiff's employment with CDI (Id., p. 70); (iii) is not the person who spoke to CDI about PTC's concerns about Plaintiff working on the PTC premises (Id.); (iv) did not share any skepticism she may have had about the timing of Plaintiff's STD claim in September 2001 with any other employee of PTC (Id., p. 100); (v) did not otherwise have an opinion about whether Plaintiff was disabled or the validity of his claim at the time he submitted his STD claim form in September 2001 (Wales Tr. 2, pp. 43-44); (vi) was not the person who made the decision about what, if any, action would be taken relative to Plaintiff's continued presence at PTC after December 4, 2001 (Id.); (vii) confirmed that PTC did not adjudicate claims for benefits (Id., pp. 26, 28-29); and (viii) had no direct responsibility for processing or monitoring the status of

Plaintiff's claim for STD benefits (Id., pp. 52, 60).

48.  When questioned about the factual basis of the claim in Count IV against Ms. Wales, Plaintiff testified only that Ms. Wales "was negligent in the investigation" of his status in December 2001 because she "never asked me whether I had received any money [from CIGNA] while working at PTC." (Pl. Tr. 4, pp. 46-48)

49.  When questioned about the basis of his Count IV claim against PTC, Plaintiff stated only that he believed that PTC provided false information to CDI by telling CDI he was on long term disability. (Pl. Tr. 4, pp. 45-46)  When asked to identify the improper motive referenced in paragraph 34 of his Complaint, Plaintiff stated only "I already mentioned, long term disability." (Id.)  When asked to provide the factual basis for his claim in paragraph 34 that PTC acted "with actual malice" Plaintiff stated only "PTC could have said that they just didn't need me. Why would they provide the information about the disability?" (Id.)

50.  When asked about the basis of his claim of a negligent investigation by Ms. Wales and PTC, Plaintiff stated only that "Nobody asked me whether I was receiving benefits from CIGNA." (Pl. Tr. 4, p. 42)  While Plaintiff testified that Ms. Wales could have asked Plaintiff whether he had called CIGNA to report his return to work, he admitted that he could have simply told this to Ms. Wales himself, but that he did not do so. (Pl. Tr. 4, p. 43)  Plaintiff never asked CIGNA to contact PTC after he learned of CDI's termination decision, to confirm

that he had made his alleged call to notify CIGNA of his return to work.[7] (Id.) Plaintiff further admitted that there were no other facts upon which he is basing his negligence claim. (Id.)

    Respectfully submitted,

    PARAMETRIC TECHNOLOGY CORPORATION
    and LISA WALES,

    By their attorneys,

    /s/ Guy P. Tully
    Guy P. Tully, BBO #555625
    Jackson Lewis LLP
    75 Park Plaza
    Boston, MA 02116
    (617) 367-0025

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2006, a copy of the foregoing was served by electronic mail and through the ECF system on Plaintiff's counsel.

    /s/ Guy P. Tully

---

[7] Plaintiff himself has no independent evidence or written record of having made such a call. Rather, he claims to have made the call from the Odessa restaurant and has no notes of the alleged call. (Pl. MCAD Tr., pp. 48-49)