# EXHIBIT A

1

Volume I
Pages 1 to 121
Exhibits 1 to 10

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

Docket No. 02-BEM-02308

- - - - - - - - - - - - - - -x
ALEXEI KOUVCHINOV,                    :
            Complainant,              :
                                      :
                                      :
        v.                            :
                                      :
CDI INFORMATION TECHNOLOGY            :
SERVICES, PARAMETRIC                  :
TECHNOLOGY CORPORATION and            :
LISA WALES,                           :
            Respondents.              :
- - - - - - - - - - - - - - -x

        DEPOSITION THROUGH AN INTERPRETER OF ALEXEI
KOUVCHINOV, a witness called on behalf of the
Respondents Parametric Technology Corporation and
Lisa Wales, taken pursuant to Rule 30 of the
Massachusetts Rules of Civil Procedure, before Susan
J. Cataldo, Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jackson Lewis LLP,
75 Park Plaza, Boston, Massachusetts, on Thursday,
April 15, 2004, commencing at 11:22 a.m.

PRESENT:

        Legal Services Center
            The Hale and Dorr Legal Services Center
            of Harvard Law School
            (by James Budreau, Esq.)
            122 Boylston Street,
            Jamaica Plain, MA 02130,
            for the Complainant.

        Littler Mendelson (by Amy Nash, Esq.)
            225 Franklin Street, Boston, MA 02110, for
            the Respondent CDI Information
            Technology Services.



34

1   right?

2        A.    Yes.    That's correct.

3        Q.    Did you hold the title of software engineer

4   your entire tenure at PTC?

5        A.    Could you repeat.

6              THE INTERPRETER:   Could you repeat the

7   question.

8        Q.    Sure.   Let me just back up.   When you were

9   hired at PTC in 1994, what job were you hired into?

10       A.    Software engineer.

11       Q.    Okay.   So your job title stayed the same

12  the whole period of time?

13       A.    Yes.

14       Q.    Okay.   And would you describe generally for

15  me what it is that a software engineer did at PTC?

16       A.    If I understood correctly, you asked what

17  my work was at PTC.

18       Q.    Yes.

19       A.    Okay.   I worked mostly at PDM, Product Data

20  Management, and I worked while it was in development

21  stage, and after development of software I worked to

22  support this product.   Also, I was responsible for

23  repair database corruption.

24       Q.    I'm sorry.   Did you say responsible for

1  repairing database corruption?

2     A.    Yeah.

3     Q.    Is that also referred to generally as

4  debugging?

5     A.    Yeah, sometimes you have to debug.

6     Q.    Okay.

7     A.    And I would like to point out the tool for

8  repair while it was in the stage of development I

9  worked on it, and after development was over I still

10 write some program stuff to keep PDM server working

11 from more kind of corruption, but this PDM server

12 was never sent to customer.  I used not only

13 software which was sold, but use -- but all software

14 which was produced exactly for database program.

15    Q.    So were you -- if I understand you

16 correctly, were you in the research and development

17 group at Parametric?

18    A.    Yes.

19    Q.    Okay.  And from 1994 to September of 2001,

20 were your job duties basically the same that whole

21 period of time?

22    A.    Roughly, yes, but it's not the same.  Look,

23 the development stage is completely different when

24 it's just in support.

36

1      Q.    Right.   That I understand.

2      A.    And while it was in development, I did

3    project, and afterward were running regression test.

4    If test comes okay, we submit it in the system, and

5    it was several revs of PDM and PDM servers also as

6    Pro-ENGINEER, but from one point of view, I don't

7    remember exact date, I was told that no more

8    development in PDM, just fixing bugs.   You

9    understand what does it mean, fixing bugs, fixings

10   program software engineer errors.

11     Q.    Right.

12     A.    And so far while PDM was in use, customer

13   became -- customers became to complain about

14   corruption in database, so we have to develop tool

15   to repair database if it's already corrupt.   This

16   part never stopped because even if wasn't submitted

17   in the system, it was in development.   I can say it

18   was in develop for while I was working, because you

19   need to fix database corruption.

20     Q.    Okay.

21     A.    Okay.   Then I -- I described as much as I

22   can.

23     Q.    Okay.   Thank you.   I appreciate that.   Do

24   you recall who your supervisors were during your

37

1    employment at Parametric?

2        A.    Yeah.    There are several of them.

3        Q.    Can you tell me who they were, please?

4        A.    Eugene Boyarski.

5        Q.    Jim?

6        A.    Eugene Boyarski, Lily Polenov.

7        Q.    That's your ex-wife?

8        A.    Yeah.    She was manager for a while, and

9    unfortunately I don't remember several -- at least

10   two of them.

11       Q.    Was there a Sergey Denisenko?

12       A.    Sergey Denisenko was the last one, but

13   there was two more, but I don't remember.

14       Q.    So at the time that your employment with

15   PTC ended Mr. Denisenko was your supervisor?

16       A.    Yeah.    He was manager of PDM.

17       Q.    Okay.    Mr. Kouvchinov, at any point in time

18   before September 10, 2001, had you taken a medical

19   leave of absence at Parametric?

20       A.    No.

21       Q.    And during what period of time before

22   September 10, 2001, had you been in Russia?    You

23   said you had just been in Russia?

24       A.    It was my vacation, and it was about one

38

1  month I was in Russia and Kyrgyz, and I came back to

2  the United States September 8 or September 9, but I

3  don't remember what day did I fly back to the United

4  States, but it was two or three days before I have

5  to ready.

6      Q.   Okay.  And then you came back to work on

7  September 10th; is that right?

8      A.   Yeah.  It was first time after vacation

9  when I came to PTC.

10     Q.   All right.  And will you describe for me

11 what happened that day?

12     A.   First of all, several officers arrived, and

13 really -- and I met several people and they told me

14 that PDM -- people from PDM were laid off, and

15 afterward I spoke with my new manager -- who he told

16 me that he was my manager.  I was told that he is my

17 manager, and he just informed me that I laid off.

18 I'm laid off.

19     Q.   Do you recall who the Human Resources

20 manager was?

21     A.   Wait a moment.  It was not -- this man was

22 not from Human Resources, to my knowledge, because I

23 know him as a software engineer.  But during my

24 conversation with this manager, who was very short

1  period of time, and he never was before my manager,

2  and I can say he was my manager just for one day.

3      Q.   Okay.

4      A.   During our conversation, Lisa Wales was

5  present --

6           MR. TULLY:  That's Lisa Wales, W-a-l-e-s.

7  Thank you.

8      A.   -- during my conversation.

9      Q.   Okay.  And did you and Ms. Wales discuss

10  anything during that meeting?

11     A.   We discussed several things, of course.

12  First of all, she gave me several papers regarding

13  laid off.

14     Q.   Okay.  Anything else you recall discussing

15  with her?

16     A.   I was told that I have two hours to pick up

17  my stuff.

18     Q.   Okay.

19     A.   And also I was told, I remember this, even

20  if I would be laid off on September 24th, I

21  shouldn't go to PTC again.

22     Q.   Okay.  So you were told that September 10th

23  was the last day that you were supposed to be

24  present at PTC?

40

1     A.   Yes, it's correct.

2     Q.   But your formal last day was actually going

3   to be September 24th?

4     A.   Yes, it's correct.

5     Q.   Okay.  And did you report to PTC on

6   September 10th?  Did you show up there prepared to

7   work?

8     A.   Yes.

9     Q.   All right.  Did you have any other

10  conversations with Ms. Wales between September 10th

11  and September 24th?

12    A.   Yes.

13    Q.   Do you recall those conversations?

14    A.   Just in general just regarding my laid off.

15  That's it.  In general, because I had a lot of

16  questions which I wanted to have answered, so I

17  called her several times.

18    Q.   With questions about the packet of

19  documents that she had given you?

20    A.   Yeah, it's correct.

21    Q.   Okay.  Did you talk to anybody else at PTC

22  about the layoff?

23    A.   Yes.

24    Q.   Do you recall who?

41

1      A.    It was several people who I met on
2  September 10th at PTC.  All of them already knew
3  that PDM, all the people from PDM laid off.
4      Q.    Okay.  So it was the whole PDM group that
5  had been laid off?
6      A.    To my knowledge, yes, except one person.
7      Q.    And who was that?
8      A.    She was my co-worker, and to my knowledge,
9  I'm not sure, she started to work with another group
10 in PTC, but I'm not sure.
11     Q.    Okay.  During the time period 1994 to
12 September 10, 2001, did you work for only the PDM
13 group?
14     A.    Yes.  At least officially, yes.
15     Q.    Okay.
16     A.    I did some projects which are not directly
17 to PDM, but it was only a few of them.  Most time I
18 worked with PDM.
19          MR. TULLY:  It's 20 to 1:00.  This could
20 take a while given the pace here.
21          MR. BUDREAU:  It's up to you.
22          MR. TULLY:  You want a little short break
23 for lunch?
24          (Discussion off the record)

48

1  worked longer with PDM corruption.  I was at the

2  very beginning to the end, and this job I did at

3  least for five years or more.  It was very familiar

4  job.  For me, just was routine.  I know everything

5  about this problem.  It's like washing dishes, and

6  even I'm not -- I wasn't completely sure.  I wanted

7  to try it anyway.

8       Q.    Okay.  And did you ever notify your

9  short-term disability provider, CIGNA, of your

10 belief during that time period that you could work

11 on familiar tasks?

12      A.    After I sign it for offer, I called CIGNA.

13 I came to restaurant, I sign and called CIGNA and

14 told them that I want to stop my disability.  I

15 spoke with some representative of CIGNA.

16      Q.    Who was it that you spoke with?

17      A.    It was just on duty.  I couldn't reach my

18 manager -- my caseworker.

19      Q.    And who was your caseworker?

20      A.    You know, it Wallace.  It's not -- it

21 sounds, but spelling is different.  It's not Wales

22 from PTC, but it's nearly the same last name.  I

23 don't remember, but the first name was different.

24      Q.    Okay.  So you say you spoke to somebody on

49

1    duty, and what is it you told them?

2        A.    I told them that I'm going to start work

3    and I want to stop my disability benefit.

4        Q.    And when did you make that call?

5        A.    29th, after I signed it, the offer.

6        Q.    Where did you make the call from?

7        A.    From restaurant Odessa.

8        Q.    Okay.  Now, you had already been paid, is

9    that right, by CIGNA for the period ending November

10   30?

11       A.    Yes, it's correct.

12       Q.    And did you send CIGNA a check back for the

13   day -- for November 30th?

14       A.    No.

15       Q.    How come?

16       A.    I just -- the check was already deposited.

17       Q.    I understand that, but did you try to send

18   any money back to them for the day that you

19   shouldn't have been collecting benefits?

20       A.    My job should start on December 30.

21       Q.    I understand that, but you said -- you just

22   told me under oath that in your mind you could work

23   as of November 29th; is that right?

24       A.    I wanted to try, yes.

50

Q.   Why didn't you try to send money back to CIGNA for November 30th that you got paid for?

A.   While I spoke with representative told me that -- remain his idea that if I receive any checks after, I shouldn't take them, but I didn't receive any checks after.

Q.   Okay.  It was a man that you spoke to?

A.   Yeah.  I don't -- I'm not 100 percent, but it look like, but I'm not sure.

Q.   You don't remember the conversation, as you sit here today?

A.   I remember conversation.  At least I remember the main idea of representative.  His idea was that I should not -- should not -- that I shouldn't be overlap between when I started work and disability.  So for CIGNA representative, the main concern was that I shouldn't deposit -- I shouldn't cash the check if I receive any.

Q.   Did you understand their concern?

A.   And the second --

Q.   I'm sorry.  Go ahead.

A.   And the second, I was suggested to go to a doctor.

Q.   The CIGNA representative told you to go to

51

1   your doctor?

2       A.    Yeah.

3       Q.    Did you do so?

4       A.    Yeah.  I came to the doctor on December

5   18th.  It was nearly impossible to change

6   appointment.

7       Q.    Okay.  And when you saw your doctor on

8   December 18th, did he change his diagnosis of you?

9       A.    Look, at that period of time, I was very

10  depressed on December 9th, and I asked CDI to start

11  work with December 18th.

12      Q.    Why that day?

13      A.    Because on 17th I supposed to see a doctor.

14      Q.    I thought you said you were supposed to see

15  the doctor on the 18th?

16      A.    No, 17th.  I believe it's 17th.  I just

17  made a mistake.

18      Q.    Okay.  And is that where you told CDI why

19  you wanted to start on December 17th?

20      A.    No.  CDI -- under any circumstances I don't

21  want CDI to know about my disability.

22      Q.    So you lied to them; is that right?

23      A.    Yeah, I lied to CDI.  I pretend that I have

24  now a job and ask two weeks, two weeks.  They wanted

52

1    me to start on December 3rd.  I wanted to start on

2    December 18th.

3        Q.    Isn't it true, Mr. Kouvchinov, that your

4    short-term disability benefits were going to expire

5    on December 18th?

6        A.    I didn't -- I didn't know that.

7        Q.    You didn't know that?

8        A.    Look, what I knew it was, according to the

9    letter from CIGNA, short-term disability is 12

10   weeks.  After seven days of waiting period, if I

11   remember correctly, I didn't count, and I didn't

12   know the exact date when my short-term disability

13   should be ended.

14       Q.    So you don't remember getting a letter from

15   CIGNA telling you when your short-term disability

16   would end?

17       A.    To my knowledge, I received a letter which

18   says that my disability status September 17th, to my

19   knowledge, and it would be 12 weeks with seven days

20   waiting period.  I believe you have letter, this

21   letter, and I do not remember, and I'm not sure that

22   the end of disability was printed in this letter,

23   but we can check.

24       Q.    (Not through the interpreter) All right.

53

1    Did you understand after September 17th when you

2    filed your claim for short-term disability benefits,

3    did you understand that you were not supposed to be

4    working at the same time that you were collecting

5    short-term disability benefits?

6        A.    Yes.

7        Q.    (Not through the interpreter) You

8    understood that CIGNA would not let you do that,

9    right?

10       A.    I was pretty sure that I could not get

11   disability benefits if I work.

12       Q.    All right.  And at the time that you filed

13   your claim in September for short-term disability

14   benefits, who did you file it with at PTC?

15       A.    I took a form -- if I remember correctly,

16   there are three parts with this form.  One of them

17   was filled by me.  I wrote it.  Another part was

18   wrote by doctor, and the third part was wrote by PTC

19   person.  To my knowledge, if I remember correctly,

20   it was Perry, last name was Perry, but I'm not sure.

21       Q.    I'm sorry.  What was the last name?

22       A.    Perry.

23       Q.    Perry, okay.

24       A.    But you have this paper, and you can't see

63

1    A.    I was told that PTC already hired several

2  people to repair database corruption, and I also was

3  told that several firms maybe would do the same job,

4  so I told him maybe my condition would be better

5  because maybe I ask less than he already have.

6  Really, it was just -- first of all, I'm not sure

7  that people were already employed.  I didn't know it

8  for sure.

9        I -- from logic point of view, I knew that

10 sooner or later PTC has to repair customer

11 databases.  We did repair for several years, and

12 they could not just tell the customer, "Okay.  We

13 will not repair database corruption any more."  They

14 can postpone for months but no too long.  It's my

15 opinion, and I knew that several people most of them

16 my co-workers at PTC, were looking for a job. And

17 afterward, and really I don't know when, but several

18 people were employed by PTC.  I don't know exactly

19 when.

20           MR. TULLY:  Mark that Exhibit 2, please.

21               (Document marked as Kouvchinov

22               Exhibit 2 for identification)

23     Q.    Okay.  Mr. Kouvchinov, I'm going to show

24 you now what's been marked as Exhibit No. 2.  This

64

1    appears to be a short-term disability benefits form.

2    It's two pages, but I will tell you when I copied it

3    it was a front and a back.  Just so you understand,

4    the back side of the front page is actually the

5    second page.

6           Is any of the handwriting on either one of

7    these pages yours?

8        A.    Yes.

9        Q.    Okay.  Can you show me where, please.

10       A.    (Indicating)

11       Q.    Okay.  The top third of the second page; is

12   that right?

13       A.    Yes.

14       Q.    Okay.  And is that your signature in the

15   middle of the page?

16       A.    Yes.

17       Q.    Okay.  So is it everything above your

18   signature is your handwriting on the second page?

19       A.    It's -- I wrote that.

20       Q.    Yes.  That's what I'm asking.  Okay.  Now,

21   you've listed on the top of the second page the date

22   that you plan to return to work as November 17,

23   2001.  Do you see that?

24       A.    Yes, I see it.

65

1      Q.    Okay.  How did you know on September 17,

2   2001, that you expected to return to work on

3   November 17th?

4      A.    You know, this document I fill out and ask

5   my doctor what should I put in this, and he told me

6   that, okay, put it.

7      Q.    Okay.  So that date came from your doctor;

8   is that right?

9      A.    Yes.  That's correct.

10      Q.    All right.  And then do you recognize,

11   Mr. Kouvchinov, the writing below your signature to

12   the bottom, is that Dr. Freedberg's?

13      A.    Yeah, I know, but I don't recognize his

14   handwriting, but I know that he wrote that.

15      Q.    Okay.  And then on the front page, first

16   page, do you recognize this handwriting?

17      A.    You mean this (indicating)?

18      Q.    Yes, the stuff up here on the top half.

19      A.    Excuse me.

20      Q.    This handwriting in here (indicating).

21      A.    I do not believe that this Dr. Freedberg.

22      Q.    Okay.  That's fine.  At the bottom it looks

23   like this was completed by a Lisa Perry?  Is that

24   who you had referenced earlier today?

67

1     A.    Yes, I think I understand what.

2     Q.    Okay.  And do you recall reading that

3  language at the time you submitted this claim form?

4     A.    Yes, I think more likely that I read it.

5     Q.    Okay.

6     A.    99 percent.

7     Q.    Okay.  And do you believe that if you did

8  read it at that time that you would have understood

9  it?

10    A.    Yes, the main idea I would.

11    Q.    Okay.

12          MR. TULLY:  Mark that.

13               (Document marked as Kouvchinov

14               Exhibit 3 for identification)

15    Q.    Okay.  I'm going to show you now what's

16  been marked as Exhibit No. 3, and this is a letter

17  addressed to you dated October 5, 2001, from Angela

18  Wallace of CIGNA.  Have you seen this letter before?

19    A.    Yes, I did.

20    Q.    And was the address listed for you here

21  your old address in West Roxbury?

22    A.    Yes, it is.

23    Q.    Okay.  If you turn to the second page,

24  please, the first full paragraph which begins,

68

1   "Based on the last information," this says that your

2   benefits were approved through October 12, 2001, do

3   you see that, and then the language in bold asks you

4   to have your doctor complete the form and send it

5   back to CIGNA to extend your benefits beyond

6   October 12, do you see that?

7       A.   Yes.

8       Q.   Okay.  Do you know if your doctor did

9   submit some additional information to CIGNA?

10      A.   I think, but wait a moment.  I would like

11  to make a comment.  Okay?

12      Q.   Sure.

13      A.   Angela Wallace called me several times, and

14  I believe I definitely told her all information

15  about my doctor, and I believe she contacted him,

16  because it's unlikely that I faxed, because a few

17  technical point of view, I don't have fax machine.

18  I should go somewhere else, and it's unlikely that I

19  faxed her anything.  I believe that doctor faxed.

20      Q.   Okay.  Now, there is not a form -- the form

21  that's referenced in the letter is not attached to

22  this exhibit.  Do you recall what the form looked

23  like?

24      A.   The form -- the form should be attached to

76

1    remember that.  I tried to keep it secret.

2        Q.    Okay.  And, as far as you know, are the

3    only people at PTC who knew about your STD claim in

4    addition to Chris Ciapilla and Lily Polenov were

5    Lisa Wales and Lisa Perry; is that right?

6        A.    It depends what time, because I believe

7    after December 10th somebody else would know.

8        Q.    No.  I'm talking specifically between

9    September 17th and November 29th.

10       A.    It looks like it's true, because, to my

11   knowledge, I didn't tell anybody else.

12       Q.    Okay.

13       A.    And...

14       Q.    Okay.  When were you first contacted by CDI

15   about the possibility of working for CDI?

16       A.    I heard about that from a friend of mine,

17   Fedor Finkle.  He's also former employee of PTC.

18       Q.    I'm sorry.  What was the name?

19       A.    Fedor Finkle.

20       Q.    Okay.  Phillip?

21       A.    Fedor.

22            THE INTERPRETER:  F-e-d-o-r.

23       A.    Fedor.

24       Q.    Okay. So Mr. Finkle told you about CDI?

77

1      A.    Yes, and I believe it was in October, last

2   October or November, but maybe I'm not sure, but I

3   am for sure that he told me that one firm is going

4   to hire several persons for database corruption and

5   conversion from PDM to Intralink.

6      Q.    Okay.  And did you contact CDI, or did they

7   call you?

8      A.    I believe probably more likely that Finkle

9   provide me e-mail, and I sent my resume.  Look, I do

10  not remember for sure, but more likely it goes to

11  usual way.  He gave me e-mail, and I sent it to CDI.

12     Q.    All right.  And at some point did you speak

13  to somebody at CDI about working?

14     A.    Yes.  They contact me and tell me I am

15  willing to work for CDI or not.

16     Q.    All right.  And it's true, isn't it, that

17  at that point in time you did not tell CDI that you

18  were collecting short-term disability benefits?

19     A.    No.  No.  No.  I never disclose that I was

20  on disability.

21     Q.    All right.  And at that point in time when

22  you had your first conversation with CDI about the

23  possibility of working at Parametric again, did you

24  tell anybody at CIGNA that you had interviewed with

78

1    CDI?

2        A.    No, but interview was most likely -- they

3    called me I believe more likely in the end of

4    November and just was any calls from any company.    I

5    got several calls, not only from CDI, but I sent my

6    resume to several places, and I received several

7    calls, and I do not remember exactly when it

8    happened.

9        Q.    Okay.  But you actually interviewed with

10   CDI, correct?

11       A.    Yes, I was interviewed in CDI.

12       Q.    And you never told CIGNA about that, did

13   you?

14       A.    No.  No.

15       Q.    How come?

16       A.    I just did not tell them.

17       Q.    Is it something you think they should have

18   known?

19       A.    I have no opinion about that.

20       Q.    Okay.  At the time that you interviewed

21   with CDI, did you tell anybody in the PTC benefits

22   department that you were interviewing for work?

23       A.    No.  To my knowledge, no.

24            MR. TULLY:  Mark that.

88

1       A.    Exactly.  It was exactly the same job.

2       Q.    Okay.  The only difference was you were

3  supporting a different organization within PTC; is

4  that right?

5       A.    Okay.  Really I don't care which

6  organization we were responsible for PDM corruption.

7  For me it was PTC.  I don't know if Global Service

8  is independent or part of PTC.  I believe, and I

9  believe you know better than me, that GSO is part of

10 PTC.  I don't know anything else about GSO.

11      Q.    Okay.  All right.  So you said you started

12 then at CDI on December 4th, right?

13      A.    Yes.

14      Q.    Am I correct that on December 4th you

15 reported to work at PTC, right?

16      A.    What does it mean I "reported"?

17      Q.    That's where you drove to to go to work?

18      A.    Yes.  I drove my car, and I parked and

19 came -- the difference is just it was another

20 building and another place.

21      Q.    Okay.  Do you recall, Mr. Kouvchinov, being

22 asked to register your car that you parked at PTC?

23      A.    I don't remember.

24      Q.    Do you recall that they -- that you were

107

1      A.    One more time.  I did not know was
2  Parametric informed or not, but I did believe that
3  everything would be okay because my payment is
4  stopped.
5      Q.    I under --
6      A.    It means -- wait a moment.  Let me answer.
7  It means I'm not receiving any benefits from CIGNA.
8      Q.    All right.  And Parametric wouldn't know
9  that, would they?
10     A.    Maybe yes, maybe no, but let me explain one
11 more --
12     Q.    What's the basis for you saying "maybe
13 yes"?
14     A.    I don't know.
15     Q.    That's all I'm asking you, sir.
16     A.    Okay.  I don't know.
17     Q.    And, again, you don't know precisely what
18 Lisa Wales may have said to anybody else at PTC
19 about your being on short-term disability or being
20 wrong in saying that you were on long-term
21 disability, do you?
22     A.    I cannot prove it.
23     Q.    Okay.  And you can't even tell me the name
24 of the person who you believe Ms. Wales spoke to,

108

1    can you?

2         A.    No, I cannot.  I cannot -- I cannot tell

3    the name which --

4         Q.    Right.  And you cannot tell me, sir, can

5    you, whether or not Lisa Wales had a conversation

6    with anybody at CDI about your disability status?

7         A.    I cannot prove that she spoke with CDI

8    directly.

9         Q.    All right.  And, as far as Parametric is

10   concerned, why are you suing Parametric in this

11   case?

12        A.    Because they misinformed CDI, and I was

13   fired because I was, according to PTC, on long-term

14   disability.

15        Q.    Well, that's not true, is it?  That's not

16   what you said before, is it?  Didn't you say in your

17   charge of discrimination that Ms. Pugliese told you

18   that the reason you were fired was because they had

19   nowhere else to put you, if you couldn't work at

20   PTC?

21             THE INTERPRETER:  Could you repeat the very

22   last part.

23        Q.    If you couldn't work at PTC, there was

24   nowhere else for them to put you?

112

1    disability.  It's absolutely clear.

2         Q.    Okay.  Who at PTC said that to CDI?

3         A.    I have no idea who.

4         Q.    Okay.  And what exactly was said between

5    PTC and CDI?

6         A.    I don't know what exactly was told -- what

7    kind of conversation was between CDI and PTC.

8         Q.    Okay.  Is there anybody else at PTC who you

9    think is responsible for the wrongdoing by

10   Parametric?

11        A.    I think somebody, but I don't know who

12   personally.

13        Q.    Now, you got a letter from CIGNA notifying

14   you that your benefits had been stopped, right?

15        A.    Yes.  Could you give me a copy of it.

16        Q.    No, not yet.  Did you ever challenge that

17   decision by CIGNA?

18        A.    No.  I was so bad that I could not even

19   stand to fight.  I was just in trouble situation.

20        Q.    Is that why you didn't appeal it because

21   you said you were in too bad a shape?

22        A.    Yeah.  Yeah.  After I was fired from CDI, I

23   was in terrible condition.  I just read the letter.

24   I cannot do anything.

115

1    strength?

2        A.    It was -- this thought cross my mind,

3    but --

4        Q.    Do you understand the oath you took today

5    to tell the truth?

6        A.    Wait a moment.  I'm telling the truth.  I

7    did not want to do anything.  You know, I just

8    cannot do.  And one of the reasons why I did not do

9    it is because I called them and told them to stop

10   paying, and it was unlogic to ask.

11       Q.    That's what I said to you.  Now I see that

12   you're changing your answer.

13             MR. BUDREAU:  Objection.

14       A.    No, I'm not.  I'm not.

15       Q.    I'm going to show you what's been marked as

16   Exhibit No. 8 and ask if you recognize that as a

17   copy of your charge of discrimination.

18       A.    (Witness reviews document)  Yeah, I

19   remember this.

20       Q.    Is that your signature on the last page?

21       A.    Yes, it's mine.

22       Q.    And how about on the third page, this page

23   here (indicating)?

24       A.    Yes, it's my signature.

Life Insurance Company of North America
INA Life Insurance Company of New York



Any person who knowingly and with intent to defraud any insurance company or other person files a statement containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## INSTRUCTIONS FOR FILING A CLAIM

**THIS FORM IS FOR SHORT TERM DISABILITY BENEFITS ONLY.**
**YOUR CLAIM WILL BE SUBJECT TO DELAY OR RETURN IF THESE INSTRUCTIONS ARE NOT FOLLOWED.**

To the Claimant:
A. Complete the Claimant section on the reverse of this form.
B. Have the Attending Physician complete and sign the appropriate section on the reverse of this form.
C. Return the fully completed form to your Employer/Administrator who will submit the form to the assigned Claim Office.

To the Employer/Administrator:
A. Give the form to the Claimant for completion of the Claimant and Physician statements.
B. Complete Employer's/Administrator's section.
C. Submit completed form to the assigned Claim Office.

## TO BE COMPLETED BY THE EMPLOYER/ADMINISTRATOR

| NAME OF EMPLOYEE/ASSOCIATION MEMBER (Last Name) | (First Name) | (Middle Initial) | DATE OF BIRTH | SOCIAL SECURITY NO. | SEX |
|---|---|---|---|---|---|
| Kouvchinov | Alexei | | | | ☒M ☐F |

| ADDRESS (Street) | (City) | (State) | (Zip Code) | |
|---|---|---|---|---|
| 4881 Washington St #1 West Roxbury MA | | | 02132 | (617)-469-1963 |

OCCUPATION: MAD Software Engineer    Hrs/wk 40

PLEASE CHECK THE APPROPRIATE BLOCKS REGARDING THE INSURED'S EMPLOYMENT STATUS.

☒ Exempt   ☐ Management   ☐ Supervisory   ☐ Union Local # _____   ☒ Salaried   ☐ Full-time
☐ Non-Exempt   ☐ Non-Management   ☐ Non-Supervisory   ☐ Non-Union   ☐ Hourly   ☐ Part-time

| BASIC EARNINGS PER WEEK | DATE OF LAST CHANGE IN EARNINGS | DATE HIRED/MEMBER OF ASSOCIATION | EFFECTIVE DATE OF INSURANCE |
|---|---|---|---|
| $1098.35 | 11-01-00 | 08-15-94 | 11-15-94 |

WAS INSURANCE ISSUED ON THE BASIS OF A STATEMENT OF PHYSICAL CONDITION?   ☐ Yes ☒ No   If Yes, Attach Copy

EMPLOYEE'S/MEMBER'S CONTRIBUTIONS WERE MADE ON: 100% pd by PTC   ☐ Pre-Tax Basis   ☐ Post-Tax Basis

| LAST DATE WORKED | # of Hours: | DATE RETURNED TO WORK | PREMIUM PAID THROUGH DATE | % OF INSURED'S CONTRIBUTION TO PREMIUM |
|---|---|---|---|---|
| 09/10/01 | 8 | part of reduction | current | 100% pd by PTC |

PLEASE LIST ALL BENEFITS THAT THE INSURED IS RECEIVING OR ELIGIBLE TO RECEIVE AS A RESULT OF HIS/HER DISABILITY (E.G. SALARY CONTINUANCE, SICK PAY, STATE DISABILITY, WORKERS' COMPENSATION, ETC.).

| BENEFIT | GROSS WEEKLY AMOUNT | DATE BEGAN | PAID THRU DATE |
|---|---|---|---|

REDACTED

KOUVCHINOV
2
STC 4/15/04

| HAS EMPLOYEE/MEMBER BEEN LAID OFF? | ☐ Yes ☒ No | IF YES, DATE 09/24/01 | REASON |
|---|---|---|---|
| OR TERMINATED? | ☒ Yes ☐ No | | PTC has reduced it's workforce. Alexei was part of this reduction |

## EMPLOYER'S/ADMINISTRATOR'S CERTIFICATION

| NAME OF EMPLOYER/ASSOCIATION | DIVISION |
|---|---|
| Lisa Perry | HR/Benefits |

| ADDRESS (Street) | (City) | (State) | (Zip Code) | TELEPHONE # |
|---|---|---|---|---|
| 140 Kendrick Street Needham MA | | | 02494 | (781)-370-6913 |

THIS IS TO CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| SIGNATURE OF AUTHORIZED REPRESENTATIVE | DATE SIGNED |
|---|---|
| Lisa A Perry | 9-21-01 |

CL500385 3-94

The issuance of this blank is not an admission of the existence of any insurance nor does it recognize the validity of any claim and is without prejudice to the Company's legal rights in the premises.

RESP00020

| DATE OF ACCIDENT OR BEGINNING OF SICKNESS | DATE FIRST UNABLE TO WORK | DATE YOU PLAN TO RETURN | LIST STATES IN WHICH YOU MAY BE LIABLE FOR FILING TAX RETURNS. |
|---|---|---|---|
| 09/17/01 | 09/17/01 | 11/17/01 | MA |

DESCRIBE IN YOUR OWN WORDS WHAT IS WRONG WITH YOU (IF ACCIDENT, DESCRIBE CIRCUMSTANCES AND ADVISE WHETHER IT OCCURRED AT WORK)

depressed, can not concentrate low energy and feel hopeless.

HAVE YOU HAD THE SAME OR SIMILAR CONDITION IN THE PAST? IF SO, PLEASE DESCRIBE IN DETAIL.

last year less severe.

PLEASE LIST ANY HOSPITALS, CLINICS OR PHYSICIANS THAT TREATED YOU FOR YOUR ILLNESS OR INJURY.

| NAME | COMPLETE ADDRESS | TREATMENT PERIOD |
|---|---|---|
| L Freedberg | 2000 Washington St #322 Newton, MA 02462 | current |

PLEASE DESCRIBE YOUR JOB DUTIES IN DETAIL. WHAT PERCENTAGE OF YOUR JOB REQUIRES PHYSICAL LABOR?

software engineer   0% physical labor

PLEASE LIST ALL BENEFITS YOU ARE RECEIVING OR ELIGIBLE TO RECEIVE UNDER ANY OTHER GROUP INSURANCE, GOVERNMENT PLAN OR AUTOMOBILE MANDATORY NO-FAULT COVERAGE.

| BENEFIT | GROSS WEEKLY AMOUNT | DATE BEGAN | PAID THRU DATE |
|---|---|---|---|
| None | | | |

## CLAIMANT'S CERTIFICATION

THIS IS TO CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| SIGNATURE OF EMPLOYEE/ASSOCIATION MEMBER | DATE SIGNED |
|---|---|
| *Alexei Trouvelnikov* | 09/17/01 |

### AUTHORIZATION TO RELEASE INFORMATION

I authorize any Health Care Provider, Insurance Company, Employer, Person or Organization to release any information regarding medical, dental, mental, alcohol or drug abuse history, treatment or benefits payable, including disability or employment related information, to any CIGNA company, the Plan Administrator, or their employees and authorized agents for the purpose of validating and determining benefits payable. This data may be extracted for use in audit or statistical purposes. I understand that I or my authorized representative will receive a copy of this authorization upon request. This authorization or a photostatic copy of the original shall be valid for the duration of the claim.

| SIGNATURE OF EMPLOYEE/ASSOCIATION MEMBER | DATE SIGNED |
|---|---|
| *Alexei Trouvelnikov* | 09/17/01 |

### TO BE COMPLETED BY ATTENDING PHYSICIAN

DIAGNOSIS AND CONCURRENT CONDITIONS, INCLUDING ICD-9 OR DSM-III CODE.

Major Depression 296.33                    REDACTED

IS CONDITION DUE TO PREGNANCY? ☐ Yes ☒ No   IF "YES", PLEASE PROVIDE THE FOLLOWING INFORMATION IF APPLICABLE.

| APPROXIMATE DATE PREGNANCY COMMENCED | ESTIMATED DATE OF CONFINEMENT | DATE OF DELIVERY | TYPE OF DELIVERY |
|---|---|---|---|
| | | | |

COMPLICATIONS   None

IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT? ☐ Yes ☒ No

| DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED | DATE PATIENT FIRST CONSULTED YOU FOR THIS CONDITION. |
|---|---|
| approx July 2001 | 9/17/01 |

DATES OF SERVICE — INCLUDE DATE OF NEXT APPOINTMENT (IF PREVIOUS FORM SUBMITTED TO THIS CARRIER, YOU NEED SHOW ONLY DATES SINCE LAST REPORT.)

9/17/01 — next appointment 10/10/01

HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION? ☒ Yes ☐ No   IF "YES", WHEN AND DESCRIBE

Milder form in 2000 x few months

PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?   ☒ Yes ☐ No

HAS PATIENT BEEN HOSPITAL CONFINED? ☐ YES ☒ NO   IF YES, CONFINED FROM _____ THRU _____

NAME AND ADDRESS OF HOSPITAL

NATURE OF SURGICAL PROCEDURE, IF ANY

☐ INPATIENT   ☐ OUTPATIENT   DATE PERFORMED _____

| PATIENT WAS CONTINUOUSLY TOTALLY DISABLED — (UNABLE TO WORK) | IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK. |
|---|---|
| From: 9/17/01   Thru: still disabled | Hopefully by November 2001 |

REMARKS: WE ARE INTERESTED IN ANY INFORMATION THAT WOULD BE HELPFUL TO YOUR PATIENT FOR EVALUATION OF THIS CLAIM.

| DATE | PHYSICIAN'S NAME (PRINT) | SIGNATURE |
|---|---|---|
| 9/18/01 | Leonard Freedberg, M.D. | *signature* |

DEGREE  M.D.

TAX IDENTIFICATION NUMBER

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|
| 2000 Washington St #322 | Newton, MA | | 02462 | 617-332-2047 |

Angela Wallace
Case Manager
CIGNA Disability Management Solutions

KOUVCHINOV
3
SJC   4/15/64

# REDACTED

October 5, 2001

Routing  212E
12225 Greenville Ave.
Dallas, TX  75243-9382
Telephone 1.800.352.0611 x 8734
Facsimile  860.731.3533

ALEXEI KOUVCHINOV
4881 WASHINGTON ST. #1
WEST RONBURY, MA 02132

RE:   Claimant           : ALEXEI KOUVCHINOV
      SSN
      Policyholder       : PARAMETRIC TECHNOLOGY CORP.
      Policy Key         : 2034160
      Administered by    : Connecticut General Life Insurance Company

Dear Mr. Kouvchinov:

We are pleased to advise you that your claim for Short-Term Disability benefits have been approved.  Your first check is being sent under separate cover in the amount of **$1014.33** representing benefits due for the period of **09/24/01** through **09/30/01**.

The captioned disability account provides benefits at **100% of your Basic Weekly Earnings**. Benefits commence following a waiting period of **7 days** due to sickness.

As long as you remain totally disabled from performing the duties of your occupation, benefits will be payable for a maximum of **12 weeks**.  Checks will be sent at weekly intervals at the end of each benefit period.

Your disability benefits are currently considered taxable income for Social Security (FICA) Tax, Federal Income (FIT) Tax, and in some cases, State Tax purposes.  FICA taxes are mandatory and are automatically deducted from disability income benefits issued during the six calendar months immediately following the month in which you last worked.

Federal Income Taxes may be deducted from your Disability income benefits on an entirely voluntary basis.  Should you wish to have all or a portion of your FIT taxes due on your Disability Income benefits withheld from your Disability Income check, you will need to complete a Federal Tax Withholding Form (W-4S), which you may obtain through our office or your local IRS office, and submit it to our office in order for withholding to commence on future checks.  The law requires that you designate on the Form W-4S the amount you want withheld and that the amount be no less than $20.00 per week and expressed in whole dollars.

October 5, 2001
Page 2

You may cancel or change your deduction amount at any time by completing another Form W-4S.

Based on the last information provided by your doctor, your benefits were approved through October 12, 2001. I am unable to provide benefits beyond that date without additional medical documentation. **Please have your attending physician complete the enclosed form and return it back to our office if you wish to claim benefits beyond this date.** You may return this form via fax to 860.731.3533, or by mail with the enclosed envelope. If you should return to work before this date, notify us immediately to avoid an overpayment of benefits. **Please note that a doctor's slip or note that you cannot return to work is not sufficient.**

Please review your insurance information available from your employer to determine if you are eligible for additional benefits.

Should you have any additional questions, please do not hesitate to contact this office. My office hours are 8:00 am to 4:30 pm central standard time. It has been our pleasure to be of service to you.

Sincerely,


Angela Wallace
Case Manager



Cc: Parmetric Technology
     140 Kendrick St.
     Needham, MA  02494
     Attn:  Lisa Perry

'57 FAX 781 398 5735 _ _ . _ PTC _ _ _ _ @004



Kouvchino J
8
SSC 4/15/04

### The Commonwealth of Massachusetts
### Commission Against Discrimination
### One Ashburton Place , Boston, MA 02108
### Phone: (617) 994-6000 Fax: (617) 994-6024

| | |
|---|---|
| MCAD DOCKET NUMBER: 02BEM02308 | EEOC/HUD CHARGE NUMBER: 16CA202589 |
| FILING DATE: 05/24/02 | VIOLATION DATE: 09/24/01 |

Name of Aggrieved Person or Organization:
Alexei Kouvchinov
182 Church St.
West Roxbury, MA 02132
Primary Phone: (617)323-1296 ext. _____

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
Parametric Technology Corporation
Attn: Human Resources
140 Kendrick St.
Needham Heights, MA 02494
Primary Phone: (888)727-6832 ext. _____

No. of Employees:          25+

Work Location: Needham, MA

Cause of Discrimination based on:
Disability, Other mental, nervous or emotional problem.

The particulars are:
I, Alexei Kouvchinov, the Complainant believe that I was discriminated against by Parametric
Technology Corporation, on the basis of Disability. This is in violation of M.G.L. 151B Section 4
Paragraph 16 and ADA.

See Attached

I swear or affirm that I have read this complaint and that it is true to the best of my knowledge, information
and belief.

_____
(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS DAY of 7/10/2002.

NOTARY PUBLIC: _____

SIGNATURE NOTARY PUBLIC:_____
MY COMMISSION EXPIRES:_____

MCAD Docket Number 02BEM02308, Complaint

.2 13:57 FAX 781 398 5735        PTC                                     ☒ 005

C0213 02167

## LEGAL SERVICES CENTER
## CENTRO DE SERVICIOS LEGALES

16CA 202488

The Hale and Dorr Legal Services Center of Harvard Law School
22 Boylston Street
Jamaica Plain, Massachusetts 02130-2246
(617) 522-3003
FAX: (617) 522-0715

Mitchell Jay Notis
Attorney-at-Law
Clinical Instructor



May 24, 2002

By Hand

Clerk
Massachusetts Commission Against Discrimination
One Ashburton Place
Room 600
Boston, MA 02108

Re: FILING OF NEW CHARGE OF DISCRIMINATION; Alexei Kouvchinov vs. CDI Information
Technology Services, Parametric Technology Corporation and Lisa Wales

Dear Sir/Madam:

Please find enclosed for filing an original and seven copies of a new charge of discrimination in
the above-captioned matter. Please note that I am counsel for the Charging Party in this matter, and
accordingly all correspondence and contact with the Charging Party should be through me at the above
address and phone number.

Please find enclosed an additional copy of the charge. I would appreciate it if you would date
stamp this copy with the date that the Charge was filed, and return it to my messenger.

Thank you for your cooperation in these matters.

Very truly yours,

Mitchell Jay Notis

CC: Alexei Kouvchinov

·57 FAX 781 398 573F ___ PTC ___                              ☒005

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| affected by the Privacy Act of 1974: See Privacy Act Statement before g this form. | ☐ FEPA<br>☐ EEOC | |

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION                    and EEOC

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.)<br>Mr. Alexei Kouvchinov | HOME TELEPHONE (Include Area Code) |
|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>182 Church Street, West Roxbury, MA 02132 | DATE OF BIRTH<br>7-16-56 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>CDI Information Technology Services | NUMBER OF EMPLOYEES; MEMBERS<br>more than 100 | TELEPHONE (Include Area Code)<br>781-356-3000 | |
|---|---|---|---|
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>25 Braintree Hill Park, Ste. 206, Braintree, MA 02184 | | | COUNTY<br>Norfolk |
| NAME    Parametric Technology Corporation<br>and Lisa Wales (as an employee and individually) | | TELEPHONE NUMBER (Include Area Code)<br>1-888-727-6832 | |
| STREET ADDRESS        CITY, STATE AND ZIP CODE<br>140 Kendrick Street, Needham, MA 02414 (both for PTC and Ms. Wales) | | | COUNTY<br>Norfolk |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)        LATEST (ALL)
12/7/02

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ AGE
☐ RETALIATION   ☐ NATIONAL ORIGIN   ☒ DISABILITY   ☒ OTHER (Specify)
perceived disability

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

PLEASE SEE ATTACHED SHEETS

REDACTED

RECEIVED
MAY 2 4 2002
COMMISSION AGAINST DISCRIMINATION

| want this charge filed with both the EEOC and the State or local Agency, any. I will advise the agencies if I change my address or telephone umber and I will cooperate fully with them in the processing of my harge in accordance with their proceedures.        YES | NOTARY - (When necessary for State and Local Requirements)<br>NOTARY: _____ |
|---|---|
| delcare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br>Alexei Kouvchinov: _Alexei Kouvchinov_ |
| DATED: 05/24/02   _Alexei Kouvchinov_<br>Alexei Kouvchinov<br>Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year)<br>DATED: 5/24/02 |

EOC FORM 5 (Test 10/94)                    MY COMMISSION EXPIRES: 2/20/2009

Continuation Page to Charge of Discrimination

My name is Alexei Kovchinov.  I am a 45-year-old male.  For
several years I have suffered from clinical depression.  Over the
years, the severity of my depression has varied.  On December 7,
2001 I was terminated from my job with CDI Information Technology
Services ("CDI"), where I had started working several days
earlier. During the time I worked for CDI, I was not suffering
from clinical depression, and I was fully able to work.  During
the few days I worked for CDI, I performed my job in a
satisfactory manner. I was terminated because CDI found out about
my disability, my depression, and fired me due to my disability
and/or its perception of my disability, in violation of MGL
Chapter 151B, 42 U.S. Code section 2000e, and the Americans With
Disabilities Act.

I was employed by respondent Parametric Technology
Corporation (hereinafter, "PTC") as a software engineer from
August 15, 1994, until September 24, 2001.  My main
responsibility was to repair Product Data Management databases,
an area in which I am an expert.  On September 10, 2001, I was
informed by my manager at PTC that I would be laid off on
September 24 due to a reduction in force.  Lisa Wales from the
PTC Human Resources Department gave me the paperwork regarding my
layoff, and brought me to the meeting in which I was informed of
my being laid off. On September 17, 2001, I applied for and later
received short-term disability insurance benefits in relation to
a recurrence of my clinical depression.  I was terminated from my
employment at PTC while on short-term disability leave related to
my depression.  I recuperated from this particular recurrence of
my disability, my depression, by late November 2001.  I received
my last disability benefit payment on November 30.

On December 3, 2001, I was hired to work for Respondent CDI
Information Technology Services ("CDI").  CDI had a contract with
PTC, my former employer, to provide software consultations.  My
first assignment as a CDI employee, was to repair Product Data
Management databases for PTC, the same function I had previously
performed for PTC when I was a PTC employee. Pursuant to an
agreement between my new employer CDI and my former employer PTC,
I was to perform my work for PTC, at the offices of PTC.

While working for CDI at PTC's offices on December 4, 2001,
I encountered PTC employee Lisa Wales, who knew me from my former
work as a PTC employee, and who had been involved in my layoff in
her capacity as an employee in the Human Resources Department.
Through her position and prior interaction with me while I had
been a PTC employee, Ms. Wales knew about my disability (clinical
depression), my short-term disability claim, and the termination
of my employment with PTC.  When she ran into me at PTC on

1

Continuation Page to Charge of Discrimination

December 4, 2001, Ms. Wales asked me why I was present at PTC,
and I explained why I was there. I worked at PTC the remainder of
the week.

     On the evening of Friday, December 7, 2001, Nancy Pugliese
of CDI telephoned me at home. Ms. Pugliese told me that CDI had
terminated my employment. When I asked Ms. Pugliese why my
employment was terminated, Ms. Pugliese said that I had "been on
long term disability with PTC," and that I was being terminated
because of it. Ms. Pugliese then asked me words to the effect of
why had I not disclosed my disability (or possibly, I am not
sure, why I had not disclosed information that I was "on"
disability) to CDI when I was hired, and I explained that no one
had asked me about these issues. Clearly, Ms. Wales and/or other
PTC employees had contacted CDI and improperly informed them of
my disability and/or perceived disability, as well as my having
taken a medical leave of absence and having received disability
benefits due to my disability.

     I further explained to Ms. Pugliese that I had been on leave
and receiving short-term disability benefits when working for
PTC, but that my disability and my receipt of benefits had both
ended by November 30. I also informed Ms. Pugliese that Mr. Lee
Lesburg of PTC's Global Services Department had interviewed me
before I took the job with CDI, and that Mr. Lesburg had approved
my working for CDI at PTC, knowing that I had previously been a
PTC employee. Ms. Pugliese told me to contact PTC and that, if I
"straightened out" the "problem" with PTC, then CDI would hire me
back.

     The following week, I telephoned Mr. Peter Altieri, Director
of Human Resources at PTC. Mr. Altieri was Lisa Wales' superior.
I explained the situation, and Mr. Altieri told me that he would
get back to me in a few days. After four days with no word, I
tried to reach Mr. Altieri. When I was finally able to contact
Mr. Altieri, Mr. Altieri told me that I would have to "deal with
CDI". I left messages for Nancy Pugliese and another CDI
employee who knew me, but they would not return my phone calls.
CDI would not rehire me.

     The actions of CDI taken against me as set forth above, in
terminating my employment, constitute illegal discrimination
against me on the basis of a real or perceived disability. CDI's
actions against me constitute intentional discrimination on the
basis of a real or perceived disability. Ms. Wales' actions as
set forth above constitute aiding and abetting in illegal and
intentional discrimination against me on the basis of a real or

2

### Continuation Page to Charge of Discrimination

perceived disability.  PTC is liable and responsible for the actions of Ms. Wales set forth herein, and for the actions of any other PTC employees who were involved in improperly informing CDI of my disability and the other matters set forth in this charge, as people aiding and abetting illegal discrimination.  The actions of CDI, PTC and Ms. Wales were intentional, knowing and willful, in violation of MGL Chapter 151B, 42 U.S. Code section 2000e, and the Americans With Disabilities Act.

As a result of the actions taken against me by CDI, PTC and Ms. Wales; I have suffered much financial harm, as well as emotional pain and suffering.

I demand that I be awarded damages against CDI, PTC and Ms. Wales, in an amount to compensate me for lost back pay, lost front pay, injury to my career, punitive damages, emotional pain and suffering, lost benefits, attorneys fees, interest, lost future earning capacity, and such other and further relief as the Massachusetts Commission Against Discrimination finds to be appropriate.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _24_ DAY OF MAY, 2002.

Alexei Kouvchinov

3