# **EXHIBIT D**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA NO. 04 12531 MEL

VOL. III

```
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
ALEXEI KOUVCHINOV,                                     *
          Plaintiff,                                   *
                                                       *
v.                                                     *
                                                       *
PARAMETRIC TECHNOLOGY CORPORATION,                     *
CDI CORPORATION, LISA WALES and                        *
CONNECTICUT GENERAL LIFE INSURANCE                     *
CO.,                                                   *
          Defendants.                                  *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
```

CONTINUED INTERPRETED DEPOSITION OF
ALEXEI KOUVCHINOV, taken pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Susan L. Prokopik,
Registered Merit Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Littler Mendelson, P.C., One
International Place, suite 2700, Boston,
Massachusetts, on Wednesday, November 16, 2005,
at 10:09 a.m.

**KACZYNSKI REPORTING**
**72 CHANDLER STREET, SUITE 3**
**BOSTON, MASSACHUSETTS 02116**
**(617) 426-6060**

1          Before calling CIGNA, you know, I

2     called them many times.  It was always a problem

3     for me because you always talking to new people.

4     You always have to repeat the whole history

5     again.  You always need to try to get an answer.

6     So what's the use to call CIGNA if -- so what's

7     the use to call CIGNA if PTC and CDI are not

8     listening?

9  Q.  Okay.  I understand that.

10 A.  And another one.

11 Q.  No.  I understand there may have been no use to

12     calling CIGNA.  All I want you to say is to

13     answer the question which is, you didn't call

14     CIGNA to have them straighten out the issue of

15     the receipt of short-term disability benefits,

16     correct?

17 A.  I didn't call.

18 Q.  Okay.  At some point in time did you receive a

19     letter from CIGNA informing you that your

20     benefits had been terminated?

21 A.  I probably received it.

22          MR. CREVIER:  28, please.

23          (12/10/01 letter marked Exhibit No.

24     28.)

 1   Q.   Mr. Kouvchinov, I hand you what I had marked as

 2        Deposition Exhibit No. 28.

 3   A.   Do I have to read it?

 4   Q.   This is a copy of the letter that you received

 5        from CIGNA in which they informed you that you

 6        could not receive short-term disability benefits

 7        beyond November 30, 2001; is that correct?

 8   A.   November 30th?

 9   Q.   Yes.

10   A.   I would like to read this.

11   Q.   Go ahead.  Please tell me when you're finished

12        reading, Mr. Kouvchinov.

13   A.   Yes.  I finished reading this but I don't

14        understand everything --

15   Q.   Okay.

16   A.   -- completely.  I understand the gist.

17   Q.   Is this a letter that you had received

18        previously?

19   A.   Yes.

20   Q.   And it's a letter from CIGNA to you dated

21        December 10, 2001, correct?

22   A.   Yes.

23   Q.   In which CIGNA informs you that your short-term

24        -- that your disability benefits were ended as of

1      November 30, 2001.

2  A.   This letter informs me --

3               THE WITNESS:   Could I read?

4  Q.   Sure.

5  A.   "We have carefully reviewed your claim for

6       long-term disability under Parametric Technology

7       Corp.'s group insurance plan and advise you that

8       we cannot consider you totally disabled and as

9       such eligible to receive benefits beyond November

10      30, 2001."

11 Q.   And in the next paragraph, it discusses the

12      short-term disability policy, correct?

13 A.   It says "short-term disability."  Definition of

14      disability as follows.

15 Q.   I'm going to take you further down the first page

16      of Exhibit 28 in a paragraph that starts, "At

17      this time short-term disability benefits are

18      denied."  So is it your understanding at the time

19      that you read this letter that you were not going

20      to receive any more short-term disability

21      benefits?

22 A.   Yes.

23 Q.   And doesn't this letter in the immediately

24      preceding paragraph communicate that CIGNA was

1           THE WITNESS:  Read?

2    Q.   We discussed this during this deposition.  Do you

3         remember that?

4    A.   Yes, I do.

5    Q.   And we discussed your having sent your resume and

6         interview with CDI, correct?  And you interviewed

7         with people in order to get the job with CDI

8         where you would work at PTC?

9              THE INTERPRETER:  And PTC?  I lost it.

10             MR. CREVIER:  Read the question,

11        please.  Could you?

12             (Question read.)

13   A.   Could you repeat it, please?

14   Q.   Sure.  We've discussed your attempts after the

15        onset of your disability to obtain employment at

16        CDI and PTC, correct?

17   A.   Yes.

18   Q.   Did you attempt to get a job anywhere else

19        between the time when you first started your

20        disability and when you started work for CDI?

21   A.   Yes.

22   Q.   Where?

23   A.   I negotiated at a minimum with one other company.

24   Q.   What was that company?

1  A.  This company -- the name of the company either

2      IRC.

3  Q.  IRC?

4  A.  ARC or ACR.  I talked about this company in the

5      previous deposition.  At the previous deposition.

6      This is a company that -- that is connected with

7      Uri Varvak and Eugene Boyarsky.  This company was

8      responsible for repair of database corruption for

9      PTC.

10 Q.  Okay.  So sometime between September and November

11     of 2001, you negotiated to work at a company that

12     was either called ARC or ACR, correct?

13 A.  Yes.  But I'm not sure about the names.

14 Q.  Okay.  And one of the persons with whom this

15     company was associated last name is Varvak.

16     V A R V A K, correct?

17 A.  Yes.

18 Q.  There was another person associated with this

19     company.  What was his name again?

20 A.  Eugene Boyarsky.  Eugene Boyarsky is a former

21     employee of PTC.  Varvak I think is still working

22     there.

23 Q.  And when did you have this discussion with Mr.

24     Varvak or Mr. Boyarsky?

292

1   A.   As far as I recall, it was either October or

2        November of 2001.

3   Q.   And what was the result of those conversations

4        with Mr. Varvak and Mr. Boyarsky?

5   A.   No result.

6   Q.   You didn't get the job?

7   A.   No.

8   Q.   Did you provide them with a resume?

9   A.   No.  They knew me very well.  This is people with

10       whom I worked together at PDM.

11  Q.   And do you know why you didn't get the job with

12       ACR or ARC as it may have been?

13  A.   I wouldn't -- I didn't accept the offer.

14  Q.   What was their offer?

15  A.   I don't remember exactly.  It's the same job as

16       in PTC.  This company was doing -- was doing

17       database repairs.  And as far as I understand,

18       they were in direct competition with CDI.

19  Q.   And is the reason that you didn't accept the

20       position with ARC or ACR is because you couldn't

21       come to financial terms?

22  A.   I don't remember now.  I don't remember all the

23       details.  Possibly.

24  Q.   Subsequent to your termination by CDI, did you

296

```
1        that Mr. Crevier marked.  It's the December 10th
2        letter from CIGNA.  Did I understand your
3        testimony correctly that you did not immediately
4        read this letter when you got it?
5   A.   Yes.
6   Q.   About how much time passed after you received
7        this letter before you read it?
8   A.   Probably two weeks.
9   Q.   Okay.
10  A.   Because I read it already after I seen a doctor.
11       As far as I remember, after I seen a doctor on
12       December -- on December 17th.
13  Q.   Did you review this document with your doctor?
14  A.   No.
15  Q.   Okay.  And if I understand you correctly, you did
16       not attempt to correct the statement by CIGNA in
17       here that they were contacted on December 6th
18       that you had returned to work at PTC on December
19       4?
20  A.   I didn't answer this letter.
21  Q.   All right.  And you didn't attempt to call Angela
22       Wallace to discuss this letter with her?
23  A.   No.
24  Q.   Did you not see this letter as an opportunity for
```

1    CIGNA to clarify to both PTC and CDI that you

2    claim to have called in to stop your benefits on

3    November 30th?

4  A.  As I already said, after I was terminated from

5    CDI, I felt myself very poorly, very extremely

6    poorly.  And I had no strength at all.

7  Q.  Okay.  But --

8  A.  And no desire at all to fight -- to fight back.

9    I made several attempt, attempts, and after

10   having seen the futility, I just stopped thinking

11   about that.

12  Q.  Okay.  But as of December 10, 2001, you said

13    earlier under oath that you were still waiting to

14    hear from Peter Altieri; isn't that correct?

15  A.  Absolutely.  As far as I can recall, I called on

16    Monday to Peter Altieri after December 7th.

17  Q.  Okay.

18  A.  In other words, I called Peter Altieri.

19  Q.  All right.

20  A.  Just a minute.

21           It was just -- it was exactly December

22    10th.

23  Q.  What was exactly December 10th?

24  A.  It was Monday on December 10th.  And up to the

1    A.   Yes.

2    Q.   Okay.

3                MR. CHURCHILL:  This is Exhibit 24?

4                MR. TULLY:  What did -- that's not what

5         I said?

6                MR. CHURCHILL:  I thought you said 4.

7                MR. TULLY:  24.

8                MR. CHURCHILL:  24.

9                MR. TULLY:  24.

10   Q.   Did you draft this E-mail to Mr. Lesburg after he

11        interviewed you for the CDI position?

12   A.   Yes.  Quite logical.  But there is a possibility

13        that I had sent it even before.  But very small

14        possibility.

15   Q.   Okay.  At any point in time during your

16        conversations with Mr. Lee Lesburg in October or

17        November of 2001, did you advise Mr. Lesburg that

18        you had filed a claim for short-term disability

19        benefits?

20   A.   No.

21   Q.   Do you have any reason to believe that Mr.

22        Lesburg knew that you had filed a claim for

23        short-term disability benefits?  I'm going to

24        limit it to the October and November time period.

1    Have you found out?

2  A.  Yes.  My lawyer filed a case.  Filed a case.

3  Q.  Who is your attorney?

4  A.  Larry Olstein.  You have correct spelling because

5      I wrote it down correctly in the first

6      deposition.

7  Q.  Thank you.

8              MR. TULLY:  Mark that, please.

9              (Separation Agreement and General

10     Release marked Exhibit No. 30.)

11 Q.  Mr. Kouvchinov, looking at Exhibit No. 30, I ask

12     if you recognize at least the first three pages

13     of this as a separation agreement and general

14     release you signed in connection with your layoff

15     from PTC.

16 A.  Yes.

17 Q.  Is that your signature on the third page?

18 A.  Yes.

19 Q.  Dated October 15, 2001, correct?

20 A.  Yes.

21 Q.  Looking at paragraph five on page two, do you see

22     the last sentence that says, "I further affirm

23     that I have no known workplace injuries"?

24              THE INTERPRETER:  I don't have -- yeah.

KACZYNSKI REPORTING

314

1                 And the claim in question is your

2       September 17, 2001 STD claim.  What's the factual

3       basis for claiming that Lisa Wales questioned the

4       legitimacy of your claim?

5    A.  Having read her deposition, it was done

6       approximately the same time when my deposition

7       with you.  One would see if you read the

8       deposition that she didn't believe -- she didn't

9       believe in my disability.  In my disability.

10   Q.  So you're relying on her deposition testimony,

11      correct?

12   A.  Yes.  That's correct but one -- we don't have a

13      question before us.  We don't have a question

14      before me?

15   Q.  Have you answered the one I just asked?

16   A.  Yes.  I did.

17                 THE WITNESS:  I would like to speak

18      with my attorney.

19                 MR. TULLY:  Okay.

20                 (Off the record.)

21                 (Recess.)

22   Q.  I've been advised we need to stop by five so I'll

23      wrap up here quickly.

24                 If you could turn to page four of the

1    complaint.  Paragraph 28 reads, "PTC, CDI and

2    Wales expelled, disciplined or discriminated

3    against Kouvchinov for exercising his right to

4    seek benefits under the plan in violation of 29

5    USC Section 1140 and the terms of the plan."

6          What is the factual basis of your claim

7    that Lisa Wales expelled, disciplined or

8    discriminated against you?

9  A.  I have -- I believe that Lisa Wales wasn't

10    objective because she didn't believe that I was

11    disabled, that I had a depression.  And also, I

12    think that her not being objective because I

13    called -- called her and asked when my benefits

14    will be reinstated, which were mistakenly

15    terminated on December 10th.

16          I called -- I called her and another

17    person.  I think the last name was Perry.  And

18    asked them when my benefits will be reinstated.

19    She promised me that it will be done within a

20    day.  And one of the benefits was my medical

21    insurance.  After I hadn't received the answer,

22    and considering that it was very important for

23    me, I asked my attorney to call on my behalf.  I

24    think that after that -- one thing.  My benefits

```
 1        were immediately reinstated on the same day when

 2        my attorney called.

 3                 And I believe that beginning with this

 4        moment, her treating me became not objective

 5        because I asked for the help of the attorney.

 6   Q.   What day was that?

 7   A.   I don't remember now but I think 14th or 15th.

 8        September 14th or 15th.

 9   Q.   Okay.  So on what day did Lisa Wales discriminate

10        against you for exercising your right to seek

11        benefits?

12                 MR. CHURCHILL:  Objection.

13   A.   As far as I can remember reading her deposition,

14        she had a lot of doubts about my depression.

15                 MR. TULLY:  She had a lot of what?

16                 THE INTERPRETER:  Doubts.

17                 MR. TULLY:  Okay.

18   A.   And as far as I can remember from her deposition,

19        she showed with documents to the legal department

20        of PTC.  That's in my opinion is not a necessary

21        procedure.

22   Q.   We'll come back to that.  We have to stop in a

23        minute but I want to ask you one more thing.  If

24        you could turn to page five of the complaint.
```