# EXHIBIT F

1

```
                              Volume I
                              Pages 1 to 102
                              Exhibits 1 to 11
```

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

Docket No. 02-BEM-02308

- - - - - - - - - - - - - - - -x
ALEXEI KOUVCHINOV,                :
        Complainant,              :
                                  :
                                  :
    v.                            :
                                  :
CDI INFORMATION TECHNOLOGY        :
SERVICES, PARAMETRIC              :
TECHNOLOGY CORPORATION and        :
LISA WALES,                       :
        Respondents.              :
- - - - - - - - - - - - - - - -x

     DEPOSITION OF LISA WALES, a witness called on behalf of the Complainant, taken pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure, before Susan J. Cataldo, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Jackson Lewis LLP, 75 Park Plaza, Boston, Massachusetts, on Friday, April 16, 2004, commencing at 10:12 a.m.

PRESENT:

    Legal Services Center
        The Hale & Dorr Legal Services
        Center of Harvard Law School
        (by James Budreau, Esq.)
        122 Boylston Street,
        Jamaica Plain, MA 02130,
        for the Complainant.

    Littler Mendelson (by Amy Nash, Esq.)
        225 Franklin Street, Boston, MA 02110, for
        the Respondent CDI Information
        Technology Services.

1  Q. Had you had familiarity with him as a
2  worker prior to September 10 --
3  A. No.
4  Q. -- 2001?
5  A. No.
6  Q. You had never heard his name in the
7  company?
8  A. I'd seen his name on the reduction in force
9  list.
10 Q. Were you involved in the layoff in
11 September of 2001?  Were you involved in that
12 process?
13 A. Involved in the -- yes.
14 Q. And what did you do relative to that
15 particular layoff?  That layoff involved how many
16 employees?
17 A. 500.
18 Q. And how many of those were from
19 Massachusetts?
20 A. I don't remember.
21 Q. And what role did you play in that layoff
22 process?
23 A. Collecting names, setting up times to do
24 conversations, working with our legal department,

21

1  working with the managers, working with security,
2  working with our outplacement services, ensuring
3  packages were correct.
4      Q.   When you say "security," what was -- what
5  did you do with security?  What role was security
6  going to play in the termination of employees?
7      A.   We would ask a manager if they potentially
8  thought a employee was at risk or a security risk,
9  and if they were we would take appropriate action.
10     Q.   And back in September of 2001, were there
11  any employees identified as security risks?
12     A.   Yes.
13     Q.   All right.  Was Alex identified as a
14  security risk?
15     A.   No.
16     Q.   In preparation for this layoff process, was
17  Alex's name given to you as a potential person to be
18  terminated?
19     A.   Yes.
20     Q.   And in preparation for meeting with
21  Mr. -- with Alex, what did -- did you review his
22  personnel file or his background at all?
23     A.   No.
24     Q.   Can you tell me what happened during the

1  meeting with Alex?
2      A.   Yes.  We met with Jayante Mukhopoda.  His
3  responsibility was to tell Alex that his termination
4  -- you know, his employment with PTC would be
5  ending.  My role as the Human Resources
6  representative was to go through the severance
7  package with him, answer any questions he may have
8  and then I became his contact.
9      Q.   And was he asked to leave the premises on
10 that day, September 10th?
11     A.   Yes.
12     Q.   And is that the policy of PTC?
13     A.   Yes.
14     Q.   And what was his reaction to you telling
15 him that he was going to be terminated?
16     A.   I didn't tell him he was terminated.
17     Q.   But you met with him at some point?
18     A.   Yes.  Surprised, I mean...
19     Q.   And any other observations?
20     A.   You know, I unfortunately have been
21 involved in 200 terminations, so I don't remember
22 his specific reaction, but most likely surprise.
23     Q.   And did you have contact with him after
24 September 10th?

1  the reduction in force and had been notified on
2  September 10th.
3      Q.   And the purpose for -- did you have a
4  purpose for telling her that?
5      A.   From an administrative standpoint, it was
6  going to be difficult for her, if his disability had
7  been approved, to keep his benefits going in our HR
8  system.
9      Q.   So it was a concern about continuation of
10 benefits?
11     A.   (Witness nods)
12     Q.   Any other conversations regarding the
13 timing of his claim and the appropriateness of his
14 claim?
15     A.   I let him -- no, I mean, he was entitled to
16 submit a claim.  He was still an employee through
17 the 24th.
18     Q.   You didn't think that it was odd at that
19 time that he had submitted a claim just after he had
20 been given notice of termination?
21     A.   I don't -- I don't think -- I don't
22 adjudicate claims, so --
23     Q.   I understand that.
24     A.   I did think it was odd, for sure.

25

1    Q.    Did you have that communication -- did you
2  have that discussion with Lisa Perry at all?
3    A.    Yeah.
4    Q.    Can you tell me what you said, what you and
5  Lisa said about that?
6    A.    I let her know that he had been notified on
7  Monday and that a claim showed up in my mailbox for
8  short term disability on Thursday.
9    Q.    And did she say anything back to you?
10   A.    She said, "We'll give it to CIGNA.  They
11 determine if claims are approved, not us."
12   Q.    Did she have any further conversation?
13 Did you and Lisa Perry have any further conversation
14 about the timing of the claim or anything that
15 you -- any concerns you might have had about the
16 timing of the claim?
17   A.    We just thought it was odd that after he
18 had been notified he was submitting a claim after
19 never having a prior history.
20   Q.    And when you say he never had a prior
21 history, what do you mean by that?
22   A.    He didn't -- Lisa checked, and he
23 didn't -- had never been on disability at PTC prior.
24   Q.    Okay.  So Lisa checked his whatever file,

54

1  Q. Did you receive any information after
2  September 2001, after September 10, 2001, that would
3  have caused you to be concerned about the
4  appropriateness of his disability claim?
5  A. Yes.
6  Q. Okay. Can you tell me what that was?
7  A. I saw him on our campus.
8  Q. And are you referring to December 4th of
9  2001?
10 A. I am.
11 Q. Prior to that, had you received any
12 information?
13 A. About his claim?
14 Q. About the appropriateness of his claim?
15 A. No.
16 Q. So on December 4th, why don't you tell me
17 what happened that day.
18 A. I walked through our kitchenette across
19 from my office, and I saw Alexei sitting there
20 eating lunch, and I asked him what he was doing
21 there, and he told me he was contracting and working
22 for Lee Lesburg and Global Services.
23 Q. And what was his demeanor that day?
24 A. He seemed fine.

69

1   MR. BUDREAU: Could we have that marked as
2   an exhibit, please.
3           (Document marked as Wales
4           Exhibit 10 for identification)
5   Q. So during this period of time, did you
6   contact CIGNA again directly to ask them about
7   what it meant that he had only been paid through
8   November 30, '01?
9   A. No.
10  Q. And did you discuss with Alex at any time
11  in 2001 what his responsibilities were for
12  terminating his short-term disability claim?
13  A. No.
14  Q. Did Lisa Perry, to your knowledge, talk
15  with CIGNA about whether Alex had terminated his
16  disability claim?
17  A. Can you repeat the question.
18  Q. Do you know whether or not Lisa Perry spoke
19  to CIGNA about whether Alex terminated his
20  disability claim?
21  A. I don't know.
22  Q. Did you talk to CDI at all, anybody from
23  CDI, about this issue?
24  A. No.

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

70

1    Q.    Do you know whether or not Lisa Perry did?
2    A.    I don't know if she did.
3    Q.    What were the internal discussions, if you
4  know, about what should be done with Alex regarding
5  his supposed overlap of STD benefits and his working
6  at CDI?
7    A.    What were the internal discussions?
8    Q.    Yes.
9    A.    Between?
10   Q.    Let me rephrase that.
11   A.    Thanks.
12   Q.    Did you make a recommendation to anyone
13  about what should be done about Alex's employment
14  with CDI?
15   A.    No.
16   Q.    Were you involved in any discussions with
17  Ed Raine about what he wanted to do with Alex as an
18  employee with CDI?
19   A.    No.  But when you say "discussion," can you
20  clarify.
21   Q.    Through e-mail or --
22   A.    Can you repeat the question.
23   Q.    Sure.  Did you have any e-mail or verbal
24  discussions with or communications with Ed Raine or

1  time, did you notify anybody on that distribution
2  list about any skepticism you might have had about
3  Mr. Kouvchinov's underlying claim for STD?
4      A.   No.
5      Q.   And you were not the person who made the
6  decision about what, if any, action was going to be
7  taken relative to Mr. Kouvchinov's continued
8  presence at PTC after December 4th, were you?
9      A.   No.
10     Q.   Okay.  Earlier today I believe Mr. Budreau
11 asked you some questions about why you had notified
12 Aaron von Staats of the fact that Mr. Kouvchinov had
13 filed a claim for short-term disability benefits, do
14 you recall that?
15     A.   I do.
16     Q.   Is part of the reason you may have notified
17 Aaron von Staats of that fact is because you had
18 received a phone call from an attorney representing
19 Mr. Kouvchinov?
20     A.   Yes.
21          MR. TULLY:  Okay.  That's all I have.
22              (Whereupon, the deposition was
23              concluded at 1:14 p.m.)
24