**EXHIBIT G**

# In The Matter Of:

*Alexei Kouvchinov  v.*
*Parametric Technology Corporation, et al.*

---

*Lisa Wales*
*Vol. 1, November 18, 2005*

---

Doris O. Wong Associates, Inc.
Professional Court Reporters
50 Franklin Street
Boston, MA  02110
(617) 426-2432

Original File WALES.V1, 115 Pages
Min-U-Script® File ID: 3514146722

**Word Index included with this Min-U-Script®**

**Page 25**

[1]  A: Yes.
[2]  Q: And is it fair to say that you always
[3]  strove to be thorough in your work?
[4]  A: Yes.
[5]  Q: Were you ever accused by anybody whether an
[6]  employee or a manager of being unfair?
[7]  A: No.
[8]  Q: Were you ever accused of being not
[9]  thorough?
[10] A: No.
[11] Q: Did you have any responsibilities for
[12] training?
[13] A: Training who?
[14] Q: For conducting any training classes at PTC?
[15] A: No.
[16] Q: Did you do any one-on-one training?
[17] A: Yes.
[18] Q: In what way?
[19] A: A manager would come to me about a problem,
[20] and I would coach them and advise them on how to
[21] handle it.
[22] Q: Did you ever do any training with
[23] employees?
[24] A: Not that I can recollect.

**Page 26**

[1]  Q: So the training you did was with managers?
[2]  A: Mostly, yes.
[3]  Q: Were you ever accused of wrongdoing at PTC?
[4]  A: No.
[5]  Q: Did you ever receive any warnings?
[6]  A: No.
[7]  Q: When you worked as a benefits specialist,
[8]  what were your duties?
[9]  A: Benefits administration of 401(k) plans,
[10] HCRA/DCRA plans, health insurance, disability
[11] claims, answering employee questions and clarifying
[12] their benefits.
[13] Q: With respect to disability claims, what
[14] duties did you perform?
[15] A: Claims would come in to us. We'd answer
[16] any questions the person might have on how you go
[17] out on disability, the length of pay they would
[18] receive, how long disability goes, were they
[19] eligible for it.
[20]     They'd give us the claim. We'd sign our
[21] employer section and then it would go off to the
[22] disability carrier for them to adjudicate it.
[23] Q: Who was the disability carrier?
[24] A: CIGNA.

**Page 27**

[1]  Q: And was that true during the whole time you
[2]  worked as a benefits specialist?
[3]  A: Yes.
[4]  Q: How many disability claims were you
[5]  involved with when you worked as a benefits
[6]  specialist?
[7]  A: 20, 25 perhaps.
[8]  Q: Did any of those claims involve mental
[9]  disabilities?
[10] A: Some could have.
[11] Q: Do you remember if any did?
[12] A: Maybe one or two.
[13] Q: Do you recall specifically any cases that
[14] involved mental disabilities?
[15] A: No.
[16] Q: Is it fair to say that the overwhelming
[17] majority of claims were for physical disabilities?
[18] A: Physical or maternity leave.
[19] Q: So is it fair to say that the overwhelming
[20] majority of claims were for physical disabilities or
[21] maternity leave?
[22] A: Yes, that's fair to say.
[23] Q: Were the majority of the claims for
[24] maternity leave?

**Page 28**

[1]  A: Most of them were.
[2]  Q: Based on your experience there, did CIGNA
[3]  ever allow a claim in the absence of evidence of
[4]  disability?
[5]  MR. TULLY: Objection. You can answer.
[6]  A: Can you repeat the question?
[7]  Q: Yes. Based on your experience there when
[8]  you were working as a benefits specialist, to your
[9]  knowledge did CIGNA ever allow a claim for
[10] disability benefits in the absence of evidence of
[11] disability?
[12] MR. TULLY: Objection.
[13] A: That would have been CIGNA's call. They're
[14] the ones who actually process the claims and
[15] adjudicate them, so that wouldn't have been
[16] something that we would have done in our benefits
[17] department. I'm not aware of how their processes go
[18] about, you know, adjudicating the claims.
[19] Q: What did you know about how CIGNA processed
[20] claims?
[21] A: We would send the claim off to CIGNA. They
[22] would work directly with the employee and their
[23] physician to determine if they met the criteria and
[24] then they'd let us know back so that we could turn

Page 29

[1] them off on their payroll and then they would cut
[2] them checks directly. But the real nitty-gritty
[3] specifics was handled by the disability carrier
[4] CIGNA directly.
[5]    **Q:** So were you ever called upon to give an
[6] opinion or your input about whether somebody was
[7] disabled?
[8]    **A:** No.
[9]    **Q:** Did you ever become aware of any situations
[10] where you thought somebody who was getting benefits
[11] wasn't disabled?
[12]    **A:** When I was a benefits specialist?
[13]    **Q:** Yes.
[14]    **A:** No.
[15]    **Q:** And more generally at the time you worked
[16] at PTC, were you aware of any occasions when someone
[17] received benefits when you thought they weren't
[18] disabled?
[19]    **A:** No. Generally speaking?
[20]    **Q:** Yes.
[21]    **A:** No.
[22]    **Q:** You know Alex Kouvchinov, do you not?
[23]    **A:** I do.
[24]    **Q:** When did you first meet Alex?

Page 30

[1]    **A:** September 10, 2001.
[2]    **Q:** What was the reason that you met him on
[3] that date?
[4]    **A:** I was the HR person involved in his
[5] separation.
[6]    **Q:** Was he being laid off?
[7]    **A:** He was.
[8]    **Q:** And you had never met Mr. Kouvchinov before
[9] that time?
[10]    **A:** No.
[11]    **Q:** Did you have occasion before then to work
[12] on any issues involving Mr. Kouvchinov individually?
[13]    **A:** No.
[14]    **Q:** So you weren't involved in any issues about
[15] performance problems or anything like that?
[16]    **A:** No.
[17]    **Q:** So on September 10th, did you meet in
[18] person with Mr. Kouvchinov?
[19]    **A:** Yes.
[20]    **Q:** Who else was there?
[21]    **A:** Jayantha Mukohopady.
[22]    **Q:** And who was he or she?
[23]    **A:** He was the director of the group that Alex
[24] was in.

Page 31

[1]    **Q:** Which group was that?
[2]    **A:** One of the MCAD groups. I don't remember
[3] his exact title.
[4]    **Q:** What does MCAD stand for in this context?
[5]    **A:** Mechanical computer-aided design.
[6]    **Q:** And that was a subgroup within SSG?
[7]    **A:** Yes.
[8]    **Q:** All right. And after September 10th, were
[9] there any other occasions when you had any
[10] face-to-face interactions with Mr. Kouvchinov?
[11]    **A:** After September 10th? I'm going to have to
[12] remember. Can I take a bathroom break for a second?
[13] Is that okay?
[14]    **Q:** Absolutely.
[15] (Recess taken)
[16]    **Q:** Ms. Wales, I'm going to hand you a
[17] calendar. I'm not going to mark it as an exhibit
[18] because it's just a calendar for 2001 just to kind
[19] of make it easier to refer to dates because we'll be
[20] discussing a number of dates and it's I think easier
[21] to have a reference point like this. On the
[22] left-hand column there's the 2001 calendar.
[23]       So the question I asked before we broke was
[24] after September 10, 2001, were there any other

Page 32

[1] occasions when you had face-to-face interactions
[2] with Mr. Kouvchinov?
[3]    **A:** Yes.
[4]    **Q:** And how many other occasions were there?
[5]    **A:** Two.
[6]    **Q:** And when were those?
[7]    **A:** December 4, 2001, and I don't remember the
[8] date of the second one.
[9]    **Q:** Was it before or after December 4th?
[10]    **A:** To the best of my recollection, I believe
[11] it was after.
[12]    **Q:** Other than face-to-face interactions with
[13] Mr. Kouvchinov, did you ever have occasion to talk
[14] on the phone with Alex?
[15]    **A:** Yes.
[16]    **Q:** On how many occasions?
[17]    **A:** Once or twice.
[18]    **Q:** Were those after September 10th?
[19]    **A:** Yes.
[20]    **Q:** And when were those occasions?
[21]    **A:** You want exact dates?
[22]    **Q:** As best you can recall.
[23]    **A:** Well, as his HR representative, he could
[24] have called me with questions on his separation

Page 41

[1]  A: Again that's not my determination to make
[2] because CIGNA, the carrier, adjudicates the claims,
[3] not PTC.
[4]  Q: When you say it was odd, why was it odd?
[5]  A: We had notified him on September 10th that
[6] he was no longer an employee, and he never mentioned
[7] to me before or had no knowledge that he was even
[8] thinking about going on short-term disability. On
[9] the same token, he still was eligible to apply for
[10] it through September 24th.
[11]  Q: Isn't it fair to say that you were
[12] skeptical of his claim?
[13]  MR. TULLY: Objection.
[14]  A: I just thought the timing of it was odd.
[15] I'm not a doctor. I wouldn't pretend to even be
[16] able to diagnose someone. I just thought the timing
[17] of it was strange.
[18]  Q: Did you think it was out of the ordinary?
[19]  MR. TULLY: What are we talking about?
[20] What was out of the ordinary? The timing or the —
[21]  MR. CHURCHILL: His claim.
[22]  MR. TULLY: His claim of depression?
[23]  MR. CHURCHILL: I'll rephrase it.
[24]  MR. TULLY: Thanks.

Page 42

[1]  Q: Did you think that his claim — the fact
[2] that he was filing this claim a week after he had
[3] been notified that he was being laid off was out of
[4] the ordinary?
[5]  A: It wasn't everyday practice. We didn't see
[6] that happen very often by any means or at least in
[7] my specific case, so the timing was strange.
[8]  Q: And did you reach any conclusions in your
[9] mind about Mr. Kouvchinov's honesty?
[10]  A: In regards to?
[11]  Q: Based on the fact that he submitted this
[12] claim.
[13]  A: No, because it's again not my — it wasn't
[14] my job to adjudicate the claim. It was just my job
[15] to hand it to the benefits specialist.
[16]  Q: Did you reach any conclusions about his
[17] integrity?
[18]  A: No.
[19]  Q: And did you in your mind have any views
[20] about whether in fact he was or was not disabled?
[21]  A: No.
[22]  Q: So you didn't conclude that he was not
[23] disabled?
[24]  A: I wouldn't have the authority to conclude

Page 43

[1] that. The claim would be — CIGNA would determine
[2] if he was or was not disabled.
[3]  Q: So is it fair to say that in your mind, you
[4] reached no conclusion about whether or not he was
[5] disabled?
[6]  A: No conclusion about whether he was not
[7] disabled?
[8]  Q: Whether he was disabled.
[9]  A: Whether he was disabled? It's fair to say
[10] I didn't have an opinion on it? Is that what you're
[11] asking me?
[12]  Q: Yes.
[13]  A: That's fair.
[14]  Q: Did you believe that he was depressed?
[15]  A: Again it's not something that I would have
[16] had an opinion on.
[17]  Q: So you had no views about whether or not he
[18] was in fact depressed?
[19]  A: You know, I didn't know him up until
[20] September 10th. I hadn't met him before. I'm not a
[21] doctor. I think depression comes in all forms so it
[22] wouldn't have been fair for me to label him as
[23] depressed or not.
[24]  *Q. All right. Is it fair to say that you had

Page 44

[1] no reason to question the validity of his claim?
[2]  A: It wasn't my role to question the validity
[3] of his claim. The only — as I mentioned before,
[4] what was odd to me was just the timing of it, of
[5] when it came.
[6]  Q: Can you repeat my question, please?
[7]  *(Question read)
[8]  Q: Is that fair to say?
[9]  A: That I had no reason to claim the
[10] validity —
[11]  Q: That you had no reason to question the
[12] validity of his claim.
[13]  A: I didn't have reason to — it is a fair
[14] statement to say I didn't — can you repeat the
[15] question one more time?
[16]  MR. CHURCHILL: Just so it's clear, can you
[17] read the question back, please.
[18]  *(Question read)
[19]  A: Yes, it's fair to say I had no reason.
[20]  Q: You said that you took the claim form and
[21] you brought it to Ms. Perry?
[22]  A: Yes.
[23]  Q: And did you do that immediately?
[24]  A: Probably. I don't remember.

Page 49

[1] issues with respect to his Cobra coverage?
[2]  A: No.
[3]  Q: Did you ever become aware in 2001 of any
[4] issues that he was having with respect to his Cobra
[5] coverage?
[6]  A: No.
[7]  Q: Whose responsibility was it to deal with
[8] issues of Cobra coverage in SSG?
[9]  A: Lisa Perry.
[10]  Q: And to your understanding, were her
[11] responsibilities limited in scope to SSG at that
[12] time?
[13]  A: No.
[14]  Q: What was the scope of her responsibilities
[15] in terms of what units she worked for?
[16]  A: All of the units for the United States.
[17]  Q: Let me show you what's been marked as
[18] Exhibit 3, K Exhibit 3, which is a one-page
[19] document.
[20]  A: Okay.
[21]  Q: Do you recognize this document?
[22]  A: I do.
[23]  Q: Is it fair to say this is a one-page E-mail
[24] from Mr. Kouvchinov to John Busa?

Page 50

[1]  A: Yes.
[2]  Q: And what position did Mr. Busa have at that
[3] time?
[4]  A: He was either a vice-president or a senior
[5] vice-president within SSG.
[6]  Q: When did you first see this document?
[7]  A: I don't remember the exact date but
[8] sometime after the 25th of September.
[9]  Q: Did you see it in September of 2001?
[10]  A: I could have.
[11]  Q: Did you see it before December 4, 2001?
[12]  A: Yes.
[13]  Q: How did it come to your attention?
[14]  A: I ran into John in the hallway. He was one
[15] of the VPs or SVPs that I supported, and he just
[16] mentioned he received an E-mail from Alex.
[17]  Q: Tell me what he said to you and what you
[18] said to him on that occasion.
[19]  A: He just said, "Oh, I received an E-mail
[20] from Alex wanting to know if I wanted to hire him to
[21] do some bug fixing and I told him I wasn't
[22] interested." And I said, "Oh, okay. Thank you."
[23]  Q: Do you recall anything else that you said
[24] to him or he said to you?

Page 51

[1]  A: I don't.
[2]  Q: When was this meeting?
[3]  A: It was in the hallway sometime after the
[4] 25th.
[5]  Q: Do you recall more specifically when it
[6] was?
[7]  A: I don't.
[8]  Q: Did you ask Mr. Busa why he was bringing
[9] this to your attention?
[10]  A: I didn't.
[11]  Q: Did you wonder why he was bringing it to
[12] your attention?
[13]  A: No. Sometimes if employees that had been
[14] laid off contacted managers they might let us know
[15] but no, I didn't.
[16]  Q: You knew at the time that Alex had
[17] submitted a claim for disability benefits; is that
[18] right?
[19]  A: Yes.
[20]  Q: Didn't you think it odd that he was looking
[21] for work while he had filed a claim for disability
[22] benefits?
[23]  A: Did I think it was odd at the time? It
[24] probably crossed my mind that yeah, it was strange

Page 52

[1] that when you're out on disability, you're not
[2] supposed to be working.
[3]  Q: Did you take any action as a result?
[4]  A: No.
[5]  Q: Why not?
[6]  A: That wasn't my place to do that.
[7]  Q: What do you mean it wasn't your place?
[8]  A: I wasn't out to get him. I just noted that
[9] from John, you know, if he was approved by CIGNA for
[10] disability, that's their call to make, not mine, not
[11] PTCs.
[12]  Q: Well, didn't you feel an obligation to
[13] notify CIGNA that he was looking for a job?
[14]  A: I never had conversations with CIGNA. That
[15] wasn't my role. That would have gone through the
[16] benefits specialist.
[17]  Q: Well, didn't you feel you had an obligation
[18] to notify Lisa Perry what was going on?
[19]  A: I don't remember. I mean I'm not even — I
[20] don't even remember the day I spoke to John about
[21] this. I don't know at the time if his claim had
[22] been approved. I didn't know when it had been
[23] approved to.
[24]  Q: Did you ever learn that his claim was

Page 53

[1] approved?
[2]　**A:** I did.
[3]　**Q:** How did you learn that?
[4]　**A:** Lisa Perry confirmed it.
[5]　**Q:** When did she confirm that to you?
[6]　**A:** December 4th.
[7]　**Q:** Were you given a copy of this E-mail?
[8]　**A:** Yes.
[9]　**Q:** Did you provide a copy to Ms. Perry?
[10]　**A:** I don't remember.
[11]　**Q:** What did you do with your copy?
[12]　**A:** Kept it in my inbox, my E-mail.
[13]　**Q:** So it was forwarded to you via E-mail?
[14]　**A:** Yes.
[15]　**Q:** Did you forward that E-mail on to anybody
[16] else?
[17]　**A:** Not that I remember, no.
[18]　**Q:** Under the short-term disability plan that
[19] was in effect at that time, was an employee who was
[20] receiving benefits allowed to look for work?
[21]　**A:** I don't see why not. I don't remember the
[22] exact plan.
[23]　**Q:** Under the plan, was an employee who was
[24] receiving benefits able to work at the same time?

Page 54

[1]　**A:** No.
[2]　**Q:** Ever?
[3]　**A:** The plan as I remember it was when you are
[4] disabled, you are not able to work therefore you
[5] receive disability pay. So if you're unable to work
[6] you're on disability. You can't.
[7]　**Q:** Did you ever look at the plan during 2001?
[8]　**A:** No.
[9]　**Q:** Had you ever looked at the plan?
[10]　**A:** I probably had when I was in benefits, but
[11] I don't remember the exact details.
[12]　**Q:** Other than the conversation that you had on
[13] September 17th with Mr. Kouvchinov's attorney,
[14] during 2001, did you ever have any other
[15] conversations with his attorney?
[16]　**A:** No.
[17]　**Q:** On December 4th of 2001, that was a
[18] Tuesday; is that right?
[19]　**A:** Yes.
[20]　**Q:** You were working as a human resources
[21] representative at the time?
[22]　**A:** Yes.
[23]　**Q:** And was your work location still Building
[24] C?

Page 55

[1]　**A:** Yes.
[2]　**Q:** I'm going to ask if you don't mind, can you
[3] draw a schematic of the different buildings so we
[4] can see Buildings A, B and C?
[5]　**A:** Sure. I'm not an artist.
[6]　**Q:** Understood.
[7]　**A:** (Witness complies)
[8]　**MR. CHURCHILL:** Can we mark this as Exhibit
[9] A-31.
[10]　(Document marked as Exhibit A-31
[11] for identification)
[12] (Recess Taken)
[13]　**Q:** So the picture that you drew has now been
[14] memorialized as Exhibit 31.
[15]　**A:** Thanks.
[16]　**Q:** When you saw Mr. Kouvchinov on December
[17] 4th, what time of day was it?
[18]　**A:** Lunchtime. Any time between 11:30 and
[19] 12:30 maybe.
[20]　**Q:** And where did you see him?
[21]　**A:** I saw him in Building C.
[22]　**Q:** Where in Building C?
[23]　**A:** Oh, in the kitchenette outside my office.
[24]　**Q:** How close to your office was the

Page 56

[1] kitchenette?
[2]　**A:** Very close, maybe five feet away.
[3]　**Q:** Was that right next door to your office?
[4]　**A:** Across the hall.
[5]　**Q:** So the kitchenette was right across from
[6] your office?
[7]　**A:** Yes.
[8]　**Q:** What did employees use the kitchenette for?
[9]　**A:** To eat lunch, to hang out on a break.
[10] There's soda there, a refrigerator, a microwave,
[11] coffee.
[12]　**Q:** About how many chairs roughly were there in
[13] the kitchenette?
[14]　**A:** Perhaps six or seven. I don't know.
[15]　**Q:** So roughly speaking, how big was the room
[16] in terms of feet by feet?
[17]　**A:** Ten by fifteen. I don't know. Sorry.
[18]　**Q:** Was there one table in there or multiple
[19] tables?
[20]　**A:** I think there was probably two tables.
[21]　**Q:** Were there other locations in Buildings A,
[22] B and C where employees could eat lunch?
[23]　**A:** Yes.
[24]　**Q:** How many other locations were there?

Page 57

[1] A: I don't know the exact amount, but each
[2] building had little kitchenettes and there was a
[3] main cafeteria. Can I show you where it is on the
[4] drawing?
[5] Q: Yes, please.
[6] A: It's like right over here (pointing).
[7] Q: In Building A or B?
[8] A: I think technically it's probably Building
[9] A: Its sort of in between them. So that was the
[10] main cafeteria where most people ate.
[11] Q: And then there was a kitchenette in each
[12] building?
[13] A: More than one. There were several on each
[14] floor.
[15] Q: How many floors was Building C?
[16] A: Three floors.
[17] Q: And what about A and B?
[18] A: Three as well.
[19] Q: And there was at least one kitchenette on
[20] each floor?
[21] A: Yes.
[22] Q: Was anybody else in the kitchenette with
[23] Mr. Kouvchinov when you saw him?
[24] A: I believe he was sitting by himself.

Page 58

[1] Q: Was anybody else in the room?
[2] A: I don't remember.
[3] Q: Why were you in the kitchenette?
[4] A: I think I walked through to go to the
[5] bathroom.
[6] Q: So did you just see him in there or did you
[7] actually walk in the kitchenette for some other
[8] reason and then you saw him?
[9] A: You have to walk through the kitchenette to
[10] get to the bathroom, so I walked through, saw him.
[11] Q: What was he doing?
[12] A: I think he was eating his lunch.
[13] Q: Did you say anything to him?
[14] A: I recognized him and I asked him what he
[15] was doing here.
[16] Q: And what did he say?
[17] A: He said he was contracting through CDI for
[18] someone in Global Services.
[19] Q: Did you ask him any other questions?
[20] A: No, not that I can remember. I just wanted
[21] to know why he was in that kitchenette.
[22] Q: Were you surprised to see him there?
[23] A: Yes.
[24] Q: Were you afraid of him when you saw him in

Page 59

[1] there?
[2] A: Was I physically afraid of him?
[3] Q: Yes.
[4] A: No.
[5] Q: What was his demeanor when you saw him?
[6] A: We spoke very briefly. How should I
[7] characterize his demeanor? He just seemed to be
[8] eating his lunch. I don't know what else to say.
[9] He just seemed to be there.
[10] Q: When he saw you, did he appear nervous?
[11] A: Not that I remember.
[12] Q: Do you remember anything else that you said
[13] to him or he said to you?
[14] A: No.
[15] Q: Did you ask him anything about disability
[16] benefits?
[17] A: No.
[18] Q: Why not?
[19] A: I was not — I wouldn't have handled the
[20] disability benefits. Lisa Perry would have done
[21] that in benefits, so that's not a question that I
[22] asked him.
[23] Q: At the time you saw him, what was your
[24] understanding about his employment status at PTC?

Page 60

[1] A: That he was no longer an employee of PTC.
[2] Q: What was your understanding about what had
[3] happened with respect to his claim for disability
[4] benefits?
[5] A: I think I had to check with Lisa to see if
[6] he was receiving disability benefits.
[7] Q: So at the time you saw him, you had no
[8] understanding whether he was or —
[9] A: You know, I believe that he was on the
[10] disability benefits but I needed to check with her
[11] if I remember correctly.
[12] Q: At the time, what caused you to believe
[13] that he had been on disability benefits?
[14] A: Because back in September he had applied
[15] for them.
[16] Q: Did you learn at some point between the
[17] date of his application and December 4th that his
[18] claim had been allowed?
[19] A: I might have but again once, I handed it
[20] off to Lisa Perry in benefits. It's really not in
[21] my scope of my position.
[22] Q: Regardless of how you learned, is it your
[23] memory that when you saw him that day, you were
[24] under the impression that he was collecting

Lisa Wales — Vol. 1, November 18, 2005
Case 1:04-cv-12531-MEL   Document 47   Filed 06/05/2006   Page 9 of 11
Alexei Kouvchinov v. Parametric Technology Corporation, et al.

Page 69

[1] with Mr. Aviv?
[2]  A: Not that I remember.
[3]  Q: Did you make any notes of your conversation
[4] with Mr. Kouvchinov in the lunch room?
[5]  A: Not that I remember.
[6]  Q: What did you do next?
[7]  A: What did I do next that day on December
[8] 4th?
[9]  Q: What did you do next with respect to your
[10] investigation of this issue?
[11]  A: I needed to wait to hear from Lisa Perry.
[12] She had confirmed that Alexei was approved for
[13] short-term disability benefits through December 16th
[14] I believe it is and then I made —
[15]  Q: Let me ask you about that first. Did
[16] Ms. Perry tell you this over the phone or in person?
[17]  A: I believe she told me this over the phone
[18] and might have sent me an E-mail.
[19]  Q: What day was this?
[20]  A: To the best of my memory, this was sometime
[21] between December 4th and 6th.
[22]  Q: Do you remember the date?
[23]  A: I don't remember if it was the 4th or 5th
[24] or 6th. I'm sorry.

Page 70

[1]  Q: Do you recall anything else that you said
[2] to Ms. Perry or that she said to you during this
[3] phone conversation?
[4]  A: At some point she just wanted me to verify
[5] that his job duties were the same.
[6]  Q: Was that during this phone conversation?
[7]  A: It could have been a follow-up
[8] conversation.
[9]  Q: Did Ms. Perry show you any documentation
[10] with respect to the extension of Mr. Kouvchinov's
[11] benefits?
[12]  A: Not at that time, no.
[13]  Q: So other than telling you that his benefits
[14] had been approved through December 16th, did she
[15] give you any other details about the status of his
[16] benefits?
[17]  A: She said that he was being referred to
[18] long-term disability.
[19]  Q: Anything else?
[20]  A: Not that I can remember, no.
[21]  Q: During the week of December 4th, did you
[22] ever meet in person with Ms. Perry as part of your
[23] investigation?
[24]  A: I might have. She sat over in the HR area

Page 71

[1] so I would go over there frequently so it's
[2] possible.
[3]  Q: But you don't have any specific memory of
[4] meeting with her in person?
[5]  A: No.
[6]  Q: What did you do next as part of your
[7] investigation?
[8]  A: I believe I made my supervisor, the
[9] vice-president, the senior vice-president of our HR
[10] team aware of the situation so that they could
[11] ultimately make a decision.
[12]  Q: How did you make them aware?
[13]  A: I sent an E-mail. And first let me
[14] clarify. First I sent a voice mail and then I sent
[15] an E-mail to them.
[16]  Q: When did you send the voice mail?
[17]  A: Sometime on the morning of December 6th.
[18]  Q: When did you send the E-mail?
[19]  A: Around noontime on December 6th.
[20]  Q: You testified a minute ago that at some
[21] point you had a conversation with Ms. Perry about
[22] Alex's duties, whether he was performing the same
[23] duties?
[24]  A: Yes.

Page 72

[1]  Q: Was this a conversation that she initiated
[2] with you or did you initiate it with her?
[3]  A: She initiated it with me.
[4]  Q: And so what did she say to you and what did
[5] you say to her?
[6]  A: She said, "Lisa, could you check to see if
[7] he's performing similar job duties?"
[8]  Q: Did she tell you why she was asking that?
[9]  A: CIGNA was asking her.
[10]  Q: Did she tell you anything else about why
[11] she was asking that or why CIGNA was asking?
[12]  A: No.
[13]  Q: What did you say to her?
[14]  A: "Yes, I'll find out for you. I believe
[15] that he is."
[16]  Q: On that issue, what did you then do to find
[17] out what duties he was performing?
[18]  A: I already knew that Lee Lesberg confirmed
[19] that he was going to be doing similar database
[20] repair work.
[21]  Q: So after Lisa asked about that issue, did
[22] you conduct any further investigation about what
[23] duties Alex was performing?
[24]  A: Well, it's all a software position job so

Page 77

[1] **A:** I do.
[2] **Q:** Have you seen it before?
[3] **A:** I have.
[4] **Q:** When did you first see it?
[5] **A:** I don't remember if I saw — well, Lisa
[6] Perry gave me this information and I remember seeing
[7] this document from the last deposition.
[8] **Q:** Did you see this document during the week
[9] of December 4th?
[10] **A:** I probably did.
[11] **Q:** Sitting here today, do you have any memory
[12] of having seen it that week?
[13] **A:** I'm sure I did. It's just difficult to say
[14] because it was so long ago.
[15] **Q:** This is an E-mail from Angela Wallace to
[16] Lisa Perry; is that right?
[17] **A:** That's correct.
[18] **Q:** And it's dated December 4, 2001?
[19] **A:** Yes.
[20] **Q:** And it indicates that it was sent at 4:12
[21] p.m.?
[22] **A:** Yes.
[23] **Q:** And did you know who Ms. Wallace was as of
[24] December 4th — strike that. As of December 4th,

Page 78

[1] were you aware — did you know who Ms. Wallace was?
[2] **A:** Well, no, I didn't — did I know that she
[3] was our representative at CIGNA?
[4] **Q:** Had you ever heard her name before?
[5] **A:** No, I hadn't.
[6] **Q:** Now this E-mail doesn't indicate when
[7] Mr. Kouvchinov's benefits were extended, does it?
[8] **A:** It says Alexei Kouvchinov was extended to
[9] 12/16 and referred to LTD.
[10] **Q:** It doesn't indicate when the decision to
[11] extend his benefits was made?
[12] **A:** No, it does not.
[13] **Q:** And it doesn't say what basis CIGNA relied
[14] on to extend the benefits?
[15] **A:** Can you clarify?
[16] **Q:** It doesn't say what information CIGNA
[17] relied on when making the decision to extend
[18] benefits?
[19] **A:** That's correct.
[20] **Q:** And it doesn't indicate that Alex was told
[21] about the extension, does it?
[22] **A:** No, it doesn't.
[23] **MR. CHURCHILL:** Mark this as Exhibit 33,
[24] please.

Page 79

[1]
[2]        (Document marked as Exhibit A-33
[3] for identification)
[4] **Q:** Showing you now what's been marked as
[5] Exhibit 33, do you recognize this document?
[6] **A:** I do.
[7] **Q:** Is this an E-mail that you sent to Lisa
[8] Perry on December 6, 2001?
[9] **A:** Yes.
[10] **Q:** And it indicates that you sent it at 11:46
[11] a.m.; is that right?
[12] **A:** That's true.
[13] **Q:** Your E-mail was in response to one from her
[14] to you is that right?
[15] **A:** Yes.
[16] **Q:** And her E-mail appears below yours?
[17] **A:** Yes.
[18] **Q:** When you testified a moment ago that
[19] Ms. Perry had asked you about what duties
[20] Mr. Kouvchinov was performing and you got back to
[21] her at some point, does this document reflect her
[22] question to you and your response to her?
[23] **A:** Does this document reflect —
[24] **Q:** The question that she posed to you?

Page 80

[1] **A:** About the job duties so I understand your
[2] question?
[3] **Q:** I'm sorry. I can take it more slowly. You
[4] testified a minute ago that Ms. Perry asked you at
[5] some point to confirm what duties Mr. Kouvchinov was
[6] performing; is that right?
[7] **A:** Yes, that's correct.
[8] **Q:** And you got back to her at some point?
[9] **A:** Yes.
[10] **Q:** And you indicated to her that she was
[11] performing very similar duties to what he had done
[12] before?
[13] **A:** Yes.
[14] **Q:** Does this document reflect those
[15] communications?
[16] **A:** Yes.
[17] **Q:** In your E-mail you say Alexei's current
[18] manager. Do you see that?
[19] **A:** Yes.
[20] **Q:** Who was his current manager?
[21] **A:** Lee Lesberg, I believe.
[22] **Q:** Was it your understanding that Mr. Lesberg
[23] was supervising what Mr. Kouvchinov was doing?
[24] **A:** That was my understanding, yes.

Alexei Kouvchinov v.
Parametric Technology Corporation, et al.
Case 1:04-cv-12531-MEL    Document 47    Filed 06/05/2006    Page 11 of 11
Lisa Wales
Vol. 1, November 18, 2005

Page 81

[1] Q: Mr. Kouvchinov was working at PTC; is that
[2] right?
[3] A: Physically at PTC?
[4] Q: Yes.
[5] A: Yes.
[6] Q: When you saw Mr. Kouvchinov in the lunch
[7] room on December 4th, he told you that he was
[8] contracting through CDI; is that right?
[9] A: Yes.
[10] Q: Did you know who CDI was at that time?
[11] A: No.
[12] Q: When did you learn what CDI was?
[13] A: Within my investigation, Lee Lesberg
[14] confirmed that CDI was an agency they used.
[15] MR. CHURCHILL: Can you mark this as
[16] Exhibit 34, please.
[17]     (Document marked as Exhibit A-34
[18] for identification)
[19] Q: Showing you now what's been marked as
[20] Exhibit 34, is this an E-mail that you sent on
[21] December 6, 2001, to various PTC officials?
[22] A: Yes.
[23] Q: And you sent it at twelve noon; is that
[24] right?

Page 82

[1] A: Yes.
[2] Q: Can you identify the people you sent it to
[3] and what their titles were at that time?
[4] A: Yes. Richard Bellingham, senior
[5] vice-president of HR, Edward Raine, vice-president
[6] of HR, Nicole Pitchon, HR business partner, Chris
[7] Cimitile, HR business partner, Don Aviv, security
[8] manager/supervisor, Aaron von Staats, head legal
[9] counsel, Lisa Perry, benefits specialist, Evelyn
[10] Flaherty, director of benefits, and myself, HR
[11] representative.
[12] Q: In the beginning of your E-mail you say:
[13] "Hi all. As a follow-up to my voice mail." Do you
[14] see that?
[15] A: Yes.
[16] Q: Is the voice mail referred to there the
[17] voice mail that you left earlier on December 6,
[18] 2001?
[19] A: Yes.
[20] Q: Was that voice mail the first time that you
[21] reported to these people the results of your
[22] investigation?
[23] A: Yes.
[24] Q: And what did you indicate in your voice

Page 83

[1] mail?
[2] A: The same things I indicated here in my
[3] E-mail.
[4] Q: Why did you both leave a voice mail and
[5] then send an E-mail?
[6] A: Sometimes people are faster to get to their
[7] voice mail than their E-mail, sort of a common
[8] practice that we used.
[9] Q: Did you literally read what was in your
[10] E-mail in your voice mail?
[11] A: Word for word?
[12] Q: Yes.
[13] A: No.
[14] Q: Had you already drafted the E-mail?
[15] A: I don't remember.
[16] Q: Is it fair to say that your voice mail and
[17] then this E-mail were your report to these officials
[18] about the results of your investigation?
[19] A: Yes.
[20] Q: And you understood they were going to rely
[21] on what you put in this report, did you not?
[22] A: To make their decision?
[23] Q: Yes.
[24] A: Yes.

Page 84

[1] Q: Directing your attention to the last
[2] paragraph on this first page, it starts: "Lisa
[3] Perry confirmed today that CIGNA extended Alexei's
[4] claim through 12/16/01." Do you see that?
[5] A: I do.
[6] Q: Does that refresh your memory about when
[7] you learned from Ms. Perry that Mr. Kouvchinov's
[8] benefits had been extended through 12/16?
[9] A: It does.
[10] Q: And you learned that on December 6, 2001;
[11] is that right?
[12] A: Yes.
[13] Q: Did you receive any voice mails in response
[14] to your voice mail of December 6, 2001?
[15] A: I might have.
[16] Q: Do you remember receiving any?
[17] A: I probably did. I don't remember
[18] specifically if I did from anyone.
[19] Q: When you prepared this E-mail, weren't you
[20] referring to some notes?
[21] A: Was I referring to some notes? You mean
[22] like when I gathered my data?
[23] Q: When you were drafting this E-mail, weren't
[24] you relying on notes that you had prepared?