**EXHIBIT L**

```
                                               1

                                    Volume I
                                    Pages 1 to 50
                                    Exhibits 62 - 73

           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
ALEXEI KOUVCHINOV,              :
        Plaintiff,              :
                                :
      vs.                       : Civil Action
                                : No. 04 12531 MEL
PARAMETRIC TECHNOLOGY           :
CORPORATION, CDI CORPORATION,   :
LISA WALES, and CONNECTICUT     :
GENERAL LIFE INSURANCE CO.,     :
        Defendant.              :
                                :
- - - - - - - - - - - - - - - -x
```

　　　　DEPOSITION OF LEONARD E. FREEDBERG, M.D., a witness called on behalf of the Defendants Parametric Technology Corporation and Lisa Wales, taken pursuant to the Federal Rules of Civil Procedure before Carol H. Kusinitz, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Dr. Leonard Freedberg, 2634 Washington Street, Newton, Massachusetts, on Tuesday, March 7, 2006, commencing at 3:30 p.m.

PRESENT:

　　Hale and Dorr Legal Services Center
　　　　(by Stephen Churchill, Esq.)
　　　　Harvard Law School, 122 Boylston Street,
　　　　Jamaica Plain, MA 02130, for the Plaintiff.

　　Jackson Lewis LLP (by Guy P. Tully, Esq.)
　　　　75 Park Plaza, Boston, MA 02116,
　　　　for the Defendants Parametric Technology
　　　　Corporation and Lisa Wales.

　　Also Present:  Alexei Kouvchinov

　　　　　　　　* * * *

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

1   Q.   Did you have any understanding in October
2   of 2001, looking at your notes or the typewritten
3   summary of your notes, as to what, if anything, Mr.
4   Kouvchinov may have been doing to secure employment
5   or pursue employment opportunities?
6   A.   He was -- if my memory serves me right, he
7   was looking for work.  He looked for work for at
8   least a few years after I initially saw him.
9   Q.   Would that be true during the time period
10  that he was collecting short-term disability
11  benefits?
12  A.   I don't think he was able then to look, but
13  once he felt a little better, he was able to look
14  for work.
15  Q.   I'd like to draw your attention to November
16  21, 2001.  If I'm reading this correctly, you're
17  saying objectively he appeared less depressed.  "In
18  morning isn't good, groggy, decreased concentration
19  and working, can't imagine working."  What does that
20  mean?
21  A.   Let me look at the original note.  It
22  doesn't quite make sense.
23       (Reviewing document) The transcriptionist
24  transcribed it wrong.  What it should say is -- it

18

1   should just say, "Can't imagine working."
2   　　　Q.　　So the "and working" there --
3   　　　A.　　"Decreased concentration and decreased
4   memory" is what the note says.
5   　　　Q.　　"Can't imagine working."
6   　　　A.　　Right.
7   　　　Q.　　That's Mr. Kouvchinov telling you he can't
8   imagine working, or you suggesting that you can't
9   imagine him working?
10  　　　A.　　No.  This was him feeling so bad that he
11  couldn't even imagine working.
12  　　　Q.　　Okay.  Now, do you recall, Doctor, that Mr.
13  Kouvchinov did submit an application for short-term
14  disability benefits with CIGNA?
15  　　　A.　　Yes.
16  　　　Q.　　You assisted him in that regard; is that
17  right?
18  　　　A.　　I filled out my part of it, yes.
19  　　　　　　　　(Document marked as Exhibit 65
20  　　　　　　　　　for identification)
21  　　　Q.　　Looking at what's been marked as Exhibit
22  65, I'll represent to you that this is part of a
23  page from Mr. Kouvchinov's application for
24  short-term disability benefits.  Is any of the

1  changed at any point -- sorry, in any way as of this
2  point?
3      A.   It was major depression compared to his
4  initial diagnosis, which was dysthymia.
5      Q.   Now, the third page, in box No. 7, the
6  "Extent of Disability," it says, "When was patient
7  able to go to work?" you have indicated that he is
8  still disabled, correct?
9      A.   Yes.
10     Q.   Would it be fair to say that this date you
11 had no medical reason to think that Mr. Kouvchinov
12 could return to work?
13     A.   Yes.
14     Q.   And again, your, I assume, complete
15 understanding of Mr. Kouvchinov's condition, again,
16 was limited to what he confided in you, correct?
17     A.   Yes, and what I observed.
18     Q.   At any point in time, Doctor, prior to
19 December 2001, according to your notes, did Mr.
20 Kouvchinov ever disclose to you that he had been
21 pursuing employment opportunities or had accepted a
22 job anywhere?
23     A.   Prior to December 2001?
24     Q.   Right.

1    A.    I don't think so.
2    Q.    If he had done so, I assume that you would
3    have immediately notified CIGNA of that fact?
4         MR. CHURCHILL:  Objection.
5    Q.    Is that correct?  Or at least you would not
6    have continued to represent him as being disabled?
7         MR. CHURCHILL:  Objection.
8    A.    Yes.
9    Q.    Has your diagnosis of Mr. Kouvchinov
10   changed at any point in time since you've been
11   seeing him since June of 2000?
12   A.    No -- well, yes.  It changed from dysthymia
13   to major depression.
14   Q.    Is his current diagnosis still major
15   depression?
16   A.    Yes.
17   Q.    How does his back injury factor into the
18   diagnosis?
19   A.    It's a separate diagnosis.
20   Q.    When is the first time that Mr. Kouvchinov
21   told you that he had gone back to work, according to
22   your records?
23   A.    December 17th of 2001.
24   Q.    Did your -- your notes don't seem to

1   Q.   And as far as even as late as November
2  28th, when you received the phone call from CIGNA,
3  you had no knowledge that he had returned to work or
4  was in the process of returning to work?
5       MR. CHURCHILL:  Objection.
6   A.   No.
7   Q.   Do you have any understanding today as to
8  when Mr. Kouvchinov actually returned to work?
9   A.   No.
10  Q.   Did Mr. Kouvchinov ever tell you at any
11 point in time that he had called CIGNA to request
12 that they stop paying him benefits?
13  A.   No.
14  Q.   Based upon what you know his condition was,
15 at least as of November 28th, 2001, do you think it
16 would be medically possible for Mr. Kouvchinov to
17 return to work on November 30th?
18       MR. CHURCHILL:  Objection.
19  A.   It seems highly unlikely.
20  Q.   How about during the first week of
21 December?  The same?
22       MR. CHURCHILL:  Objection.
23  A.   Well, I think it may be possible, starting
24 to be possible by then.  He was improving on

1   November 21st. Maybe by early December. I don't
2   know when he went back to work, though, so...
3       Q.  Did you and he, during your sessions, ever
4   discuss the nature of work that he could target to
5   try to -- if he wanted to return to work at some
6   point? Is there any recommended process that he
7   follow in terms of tasks that he target?
8       A.  No. I don't recall any such discussion.
9       Q.  Did you ever have a question in your mind
10  as to whether or not Mr. Kouvchinov was faking his
11  symptoms?
12      A.  No.
13      Q.  So you believed he was not faking his
14  symptoms?
15      A.  Yes. I believed he was absolutely not
16  faking his symptoms.
17      Q.  So I assume that you were not aware that
18  Mr. Kouvchinov was seeking to return to work or
19  holding himself out as able to return to work one
20  week after you filled out the STD form in September
21  of 2001?
22          MR. CHURCHILL: Objection.
23      A.  I had no knowledge of that.
24      Q.  I assume you had no knowledge that he was