UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXEI KOUVCHINOV,       )<br>          Plaintiff,                         )<br>                                           )<br>v.                                       )<br>                                           )<br>PARAMETRIC TECHNOLOGY         )<br>CORPORATION, CDI CORPORATION, )<br>LISA WALES, and CONNECTICUT    )<br>GENERAL LIFE INSURANCE CO.,    )<br>          Defendants.                   ) | Civil Action No. 04-12531 (MEL) |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Alex Kuvshinov[1] opposes the summary judgment motion of defendants Parametric Technology Corporation ("PTC") and Lisa Wales.

### Introductory Statement[2]

After many successful years at PTC, Kuvshinov arrived at work on September 10, 2001 to the news that he was being laid off in two weeks. He became severely depressed (he had a history of depression) and filed a claim for short term disability benefits. He directed his claim to Wales, a human resources representative, who reviewed it before forwarding it on to PTC's benefits department. His claim was then sent to CIGNA, the claims administrator, who allowed his claim, meaning that he was deemed totally disabled.

While on disability, Kuvshinov began the process of getting back to work. Ultimately, in the last week of November 2001, he signed a contract with a placement agency

---

[1] The plaintiff changed his name to Alex Kuvshinov through a petition to this Court.
[2] Kuvshinov is filing, concurrently with this opposition, a Statement of Facts and a Declaration of Stephen Churchill, with exhibits.

– CDI Corporation – to return to work at PTC.[3] On the same day that he signed the contract, he called CIGNA to report that he was going back to work. He did not receive his next check, thereby confirming to him that his call had worked.

On December 4, 2001, Kuvshinov returned to PTC. Wales saw him in a lunchroom across the hall from her office, and she asked him what he was doing there. He explained that he had a placement there. Wales proceeded to conduct a perfunctory investigation, concluding incorrectly that Alex was "double dipping" by receiving disability benefits while working. She relayed this to PTC managers, who then terminated Kuvshinov's placement.

Wales's conclusion that Kuvshinov was engaged in unethical conduct was not only wrong, it was biased. As discussed in more detail below, there is substantial evidence that Wales distrusted Kuvshinov following his claim for disability benefits, either because she viewed him as unreliable in light of his mental condition or because she thought his claim was a sham. In either event, her treatment of him departed significantly from her normally fair and careful treatment of PTC employees. Had she treated him in an unbiased manner, he would not have been terminated.

Kuvshinov brings three claims. First, he brings claims of discrimination against PTC under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and M.G.L. c. 151B. Second, he brings claims of intentional interference with advantageous relations against PTC and Wales. Third, he brings claims of negligence against PTC and Wales.[4] Because there are genuine issues of material fact with respect to each claim, and

---

[3] Although PTC previously took the position that Kuvshinov was an independent contractor, it concedes for purposes of summary judgment that Kuvshinov can demonstrate that he was an employee. (Defendants' Memorandum, p.3 n.3).
[4] All other claims have been voluntarily dismissed.

2

because each claim is supported by evidence in the summary judgment record, the defendants' motion for summary judgment should be denied.

## Argument

**I. Because Kuvshinov Was "Disabled," And Because The Evidence Permits An Inference Of Discrimination, The Defendants Are Not Entitled To Summary Judgment On His Discrimination Claims.**

Discrimination cases often devolve into a "relentless survey of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 … (1973), and its main sequels," but this overly formulaic exercise is unnecessary. *Candelario Ramos v. Baxter Healthcare Corp. of Puerto Rico, Inc.*, 360 F.3d 53, 56 (1st Cir. 2004). Whether a summary judgment record creates "a jury issue on improper motive depends simply on analyzing the sworn testimony and documents … and deciding what commonsense inferences they permit." *Id.* If, as is common, a plaintiff does not have "direct evidence of animus, it may yet be possible to infer it circumstantially, depending on the facts." *Id.*

PTC and Wales raise two fundamental challenges to Kuvshinov's claims of discrimination. First, they argue that Kuvshinov cannot prove that he is disabled. (Defendants' Memorandum, pp.7-9). Second, they argue that there is insufficient evidence to infer that his termination was caused by discrimination. (Defendants' Memorandum, pp.9-15). As discussed in more detail below, both arguments are without merit given the totality of the evidence in the summary judgment record. Before addressing that evidence, there are three threshold points to make.

First, Kuvshinov need not show that discrimination was the sole cause of his termination. Instead, under Massachusetts law, he need show only that it "contributed significantly to" his termination or was a "material and important ingredient in causing it to

3

happen." *Cariglia v. Hertz Equipment Rental Corp.*, 363 F.3d 77, 84 (1st Cir. 2004) (citation & internal quotes omitted). Under federal law, he need show only that it "ma[de] the difference in the employer's decision." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-1077 (11th Cir.), *cert. denied,* 520 U.S. 1228 (1997) (providing extensive analysis of causal burden under ADA).

Second, Kuvshinov is entitled to relief if PTC discriminated against him, regardless of whether that discrimination was intentional or based on unthinking stereotypes or attitudes. The evidence in this case supports an inference that PTC treated Kuvshinov differently and worse based on his claim for disability benefits. He need not show that PTC harbored a conscious, overt discriminatory animus. The "ultimate question," after all, is whether Kuvshinov "was treated disparately 'because of [disability]'…regardless of whether the employer consciously intended to base [its actions] on [disability], or simply did so because of unthinking stereotypes or bias." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 58 (1st Cir. 1999), *citing Robinson v. Polaroid Corp.*, 732 F.2d 1010, 1015 (1st Cir. 1984) (other citations omitted). As observed by another circuit's court of appeals, "[U]nwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination." *Hopkins v. Price Waterhouse*, 825 F.2d 458, 469 (D.C.Cir.), *aff'd in relevant part*, 490 U.S. 228 (1989). A number of legal commentators have observed that the predominant form of discrimination now is not the type of overt and blatant discrimination prevalent in earlier decades but a more complex type of stereotyping that is based on "a host of subtle cognitive phenomena which can skew perceptions and judgments." *Thomas*, 183 F.3d at 61 (citations omitted). Discrimination, therefore, is neither rare nor a thing of the

4

past. It is an ongoing problem in the workplace, albeit a problem that is subtle and often difficult to detect.

Third, Kuvshinov need not have personal knowledge of all evidence supporting his claims. PTC repeatedly relies on Kuvshinov's deposition testimony to argue that he has insufficient evidence to support his claims. (Defendants' Memorandum, pp.7, 9-11, 16). There is no rule or other legal authority that limits a plaintiff's evidence of discrimination (or of intentional interference or negligence) to facts that the plaintiff is able to recite during his deposition.[5] Nor would such a rule be appropriate. The proof of legal claims is for lawyers to marshal, and it asks too much of a plaintiff to require that he articulate during his deposition all evidence supporting his claim.

### A.    There Is Sufficient Evidence To Find That Kuvshinov Was "Disabled."

There is sufficient evidence for a reasonable jury to find that Kuvshinov was disabled as of December 2001. The ADA and chapter 151B both define "disability" as, among other things, "a physical or mental impairment that substantially limits one or more … major life activities." 42 U.S.C. § 12102(2); M.G.L. c. 151B, § 1(17). Under both statutes, "major life activities" include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); M.G.L. c. 151B, § 1(20).[6] To be "substantially" limiting under the ADA, an impairment must be "permanent or long term." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198

---

[5] There is a rule that a plaintiff may not create a genuine issue of material fact by submitting an affidavit that contradicts clear and unambiguous deposition testimony, *Gillen v. Falmouth Ambulance Service, Inc.*, 282 F.3d 11, 26 (1st Cir. 2002) (citation omitted), but that rule addresses an entirely different issue – i.e., not whether a plaintiff is limited to evidence he can identify during his deposition, but whether he can clearly contradict himself without an appropriate explanation.

[6] Although the U.S. Supreme Court has questioned whether working qualifies as a "major life activity" under federal law, the First Circuit has ruled that it will be considered a major life activity until the Supreme Court rules otherwise. *Guzman-Rosario v. United Parcel Serv., Inc.*, 397 F.3d 6, 10-11 (1st Cir. 2005) (citations omitted). Under both the ADA and chapter 151B, "working" means a class or a broad range of jobs. *Id.*; *New Bedford v. Mass. Comm'n Against Discrimination*, 440 Mass. 450, 463-65 (2003).

(2002). Although a condition that is "brief or foreseeably temporary" might not qualify, "substantially" limiting "may encompass conditions that are 'potentially long-term, in that their duration is indefinite and unknowable.'" *Guzman-Rosario*, 397 F.3d at 10 (citations omitted).

Records and testimony from Kuvshinov's treating psychiatrist, Leonard Freedberg, M.D.,[7] provide ample evidence that Kuvshinov had a mental impairment that substantially limited, for a period of years, his ability to learn and work, among other things. Kuvshinov first entered treatment with Dr. Freedberg in June of 2000, when he presented with a prior history of depression and was diagnosed with dysthymia (a form of depression). (Stipulation as to Records of Leonard E. Freedberg, M.D. ("Freedberg Stipulation") [H] at Exh. 3).[8] He returned to Dr. Freedberg on September 17, 2001, shortly after his layoff from PTC. (Freedberg Stipulation [H] at Exh. 5). Not surprisingly, Dr. Freedberg testified that Kuvshinov's layoff likely exacerbated his depression. (Freedberg Depo. [Z], p.34). At that point, Kuvshinov's sleep, concentration, energy, and interest had decreased. (Freedberg Stipulation [H] at Exh. 5). He was diagnosed as suffering from "severe depression" with "severe psychomotor retardation," and he was recommended for short-term disability. (Freedberg Stipulation [H] at Exh. 5). Although Kuvshinov showed some improvement over the next two months (Freedberg Stipulation [H] at Exh. 5), as of December 17, 2001, following Kuvshinov's second termination from PTC, Kuvshinov appeared to Dr. Freedberg "like a person who could not possibly work." (Freedberg Depo. [Z], p.40). Since that time, Dr. Freedberg has continued to treat Kuvshinov. (Freedberg Depo. [Z], pp.13-14). Although

---

[7] Dr. Freedberg graduated from Harvard Medical School in 1971, finished his psychiatric residency in 1975, has been in private practice as a psychiatrist since about 1977, and is board certified in psychiatry. (Deposition of Leonard Freedberg ("Freedberg Depo.") [Z], p.5).
[8] For record citations, the letter in brackets – e.g., [H] – refers to the exhibits attached to the Declaration of Stephen Churchill.

6

he hoped that Kuvshinov would be able to return to work, he has "felt less and less hopeful that he could ever return to work … [b]ecause of chronic depression." (Freedberg Depo. [Z], pp.40-41).

That Kuvshinov attempted to return to work in December 2001 does not mean that his impairment had disappeared. According to Dr. Freedberg, Kuvshinov was still depressed at that time. (Freedberg Depo. [Z], pp.30-31). Although it may have been slightly early for Kuvshinov to attempt re-employment, it was not impossible and was not medically contraindicated. (Freedberg Depo. [Z], pp.35-36). Indeed, returning to work is recognized as helping to alleviate depressive symptoms. Elizabeth M. Ginexi & George W. Howe, *Depression and Control Beliefs in Relation to Reemployment: What are the Directions of Effect?* 5 J. Occupational Health Psychol. 323, 323 (2000). Kuvshinov testified that what enabled him to consider a return to work at PTC was his thorough familiarity with the work he would be doing; based on his mental condition, however, he was unable to learn anything new. (Deposition of Alex Kuvshinov ("Kuvshinov Depo.") MCAD [S], pp.44-48). As a result, notwithstanding his attempt to return to work, he was still limited in his ability to work and learn.

The cases PTC and Wales cite regarding temporary impairments are inapplicable to this case. (Defendants' Memorandum, p.9 n.6). *Sanders v. Arneson Prod., Inc.*, 91 F.3d 1351 (9th Cir. 1996), the only case involving a mental impairment, involved a plaintiff who suffered from psychological troubles for less than four months, with his psychiatrist testifying that the plaintiff suffered "no long-term residual effects" beyond that time. *Sanders*, 91 F.3d at 1354. The other three cases cited by the defendants involved discrete recovery periods for physical impairments. (Defendants' Memorandum, p.9 n.6). In

contrast, this case involves an impairment that has limited Kuvshinov's ability to work and learn for years. His impairment cannot fairly be described as a discrete, temporary condition, like a broken bone; it is better described as a condition whose "duration is indefinite and unknowable." *Guzman-Rosario*, 397 F.3d at 10.

In short, a reasonable jury could find, based on Dr. Freedberg's records and testimony and on Kuvshinov's testimony, (1) that Kuvshinov has a mental impairment that began in September 2001 and has continued for over four years, and (2) that his impairment has been substantially limiting given its adverse effect on his ability to work and learn. A reasonable jury, therefore, could find that Kuvshinov was "disabled" as of December 2001.

### B.     There Is Sufficient Evidence To Infer That Kuvshinov Would Not Have Been Terminated Absent Discriminatory Bias.

It is well settled under both federal and Massachusetts law that an employer's reliance on a pretextual justification for challenged employment actions is sufficient to permit a finding of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-49 (2000); *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 498 (2001). This rule follows from the principle that "the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147. "Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Id.* (citations omitted). That evidence of pretext constitutes circumstantial evidence does not diminish its weight, for "'[c]ircumstantial evidence is not only sufficient, but may

8

also be more certain, satisfying and persuasive than direct evidence.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted).[9]

Pretext can be demonstrated by evidence that the employer's story is weak, implausible, or otherwise problematic. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (plaintiff can "establish pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'") (citation omitted). Pretext also can be demonstrated by an employer's deviation from established policies or practices. *Brennan v. GTE Government Systems Corp.*, 150 F.3d 21, 29 (1st Cir. 1998) ("[d]eviation from established policy or practice may be evidence of pretext") (citation omitted); *Dartt v. Browning-Ferris Industries, Inc.*, 427 Mass. 1, 16 (1998) ("evidence that [the employer] may have deviated from its normal management procedures when it summarily terminated [the plaintiff] could support a reasonable inference that [the employer] had terminated [the plaintiff] because of his perceived handicap"). Both types of pretext evidence appear in this case.

PTC first justified its December 2001 termination of Kuvshinov by claiming that its "actions were based solely on its assessment that it was unethical for Kouvchinov to be actively working while simultaneously receiving disability benefits." (Position Statement

---

[9] The analysis of Kuvshinov's claim of disability discrimination is effectively the same as the analysis of his claim of ERISA discrimination. In either case, causation can be proven through circumstantial evidence, including evidence of pretext. *See Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37-38 (1st Cir. 1995) (noting similarity). The principal difference concerns motive: the disability discrimination claim alleges that PTC treated him differently and worse based on disability; the ERISA discrimination claim alleges that PTC treated him differently and worse based on his claim for disability benefits. With respect to Kuvshinov's ERISA discrimination claim, it is important to note that ERISA prohibits two types of actions: (1) discrimination against one who has exercised a right under ERISA, and (2) discrimination to interfere with an employee's right to obtain benefits under an ERISA-regulated plan. 29 U.S.C. § 1140. *See Borneman v. Principal Life Ins. Co.*, 291 F.Supp.2d 935, 958 (S.D. Iowa 2003) (explaining distinction). Although most cases of ERISA discrimination involve the latter, Kuvshinov's case involves the former.

9

[BB], p.1). As discussed in more detail below, this justification relies on an allegation that is false – in fact, Kuvshinov never received disability benefits for any period he was working. As important, PTC knew before terminating Kuvshinov that this allegation was false. What really happened, based on all of the evidence, is best explained by bias. Wales normally acted one way – i.e., demonstrating fairness and thoroughness – but she acted in a substantially different way after Kuvshinov's claim. As a result of her bias towards him, she jumped to the false conclusion that he was "double dipping" and failed to carry out the more careful investigation that she otherwise would have conducted.[10] A more careful investigation, conducted without hostile assumptions about Kuvshinov, would have prevented his termination.

Kuvshinov initially filed his September 2001 claim with Wales, who reviewed it and then forwarded it to PTC benefits specialist Lisa Perry. (Deposition of Lisa Wales ("Wales Depo.") I [B], pp.22-23, 40-44). Although Wales claims that she formed no conclusions about Kuvshinov's honesty, integrity, or disability as a result of his claim (Wales Depo. II [C], pp.42-44), there is substantial evidence to the contrary. First, she testified that she thought his claim "odd" and that the timing of it was "strange." (Wales Depo. I [B], pp.24-25; Wales Depo. II [C], pp.40-42). Later on, she "thought the claim could have been skeptical" and she "possibly" had doubts about whether or not his claim was real. (Wales Depo. I [B], pp.85-87). Even though they did not have responsibility for deciding whether Kuvshinov's claim was meritorious (Wales Depo. I [B], p.25; Wales Depo. II [C], pp.40-43), Wales commented to Perry on the timing of Kuvshinov's claim, and Perry checked to see if

---

[10] Although Wales's superior, Vice President of Human Resources Edward Raine, allegedly made the decision to terminate Kuvshinov, he relied exclusively on Wales's investigation. (Deposition of Edward Raine ("Raine Depo.") [D], pp.21, 34). Given this undisputed fact, PTC cannot avoid liability by claiming that Raine was unbiased, because an employer is liable for a decision that relies on information provided by one harboring a discriminatory animus. *Cariglia,* 363 F.3d at 87.

Kuvshinov had any earlier claims for disability. (Wales Depo. I [B], pp.25-26; Deposition of Aaron von Staats ("von Staats Depo.") [K], pp.10-13). Wales also took it upon herself to notify PTC's legal department about Kuvshinov's claim – something she had never done before. (Wales Depo. I [B], pp.44-47).[11]

There is substantial evidence not only that Wales developed a bias towards Kuvshinov based on his claim for disability benefits, but that her bias led her to the erroneous allegation that he was breaching ethical standards. As a starting point, it is undisputed that Kuvshinov did not receive disability benefits for the same period he was working, so Wales's allegation was false. Kuvshinov was paid disability benefits only through November 30, 2001. (Wales Depo. II [C], pp.89-93; Deposition of Angela Wallace ("Wallace Depo.") [O], pp.66-67; Depo. Exh. 36 [Q]). He did not start working at PTC until December 4, 2001. (Kuvshinov Depo. MCAD [S], p.88).

Wales knew this allegation was false as of late Thursday, December 6, 2001, or early Friday, December 7, 2001. (Wales Depo. II [C], pp.92-93). Kuvshinov worked at PTC on that Friday, and it was not until he returned home from work that CDI called to tell him that PTC was terminating his assignment. (Kuvshinov Depo. II [T], pp.134-35, 140-41; Kuvshinov Depo. III [U], p.274). Indeed, PTC did not contact CDI to terminate Kuvshinov's placement until that Friday. (Position Statement [BB], p.4). As a result, Wales knew prior to the time that Kuvshinov was terminated that he had not received benefits beyond November 30, 2001, but she failed to share that information with others at PTC.

---

[11] Although Wales later suggested, initially in response to questions from her attorney and then again during her second deposition, that she notified the legal department only after she was contacted by an attorney representing Kuvshinov (Wales Depo. I [B], pp.98-100; Wales Depo. II [C], pp.46-48), the PTC attorney she consulted, Aaron von Staats, did not corroborate her testimony. (von Staats Depo. [K], pp.10-13, 17-18, 21). For example, von Staats testified that Wales came to him to ask if Kuvshinov could file a claim for benefits given his layoff status, not simply to notify him that she had been contacted by Kuvshinov's attorney. (von Staats Depo. [K], pp.10-13). Wales's own investigation report also appears to contradict her testimony: her report suggests that she met with von Staats before Kuvshinov's attorney called. (Depo. Exh. 34 [R]).

In other situations, Wales was a careful, detail-oriented, and fair human resources employee. Edward Raine, PTC's Vice President of Human Resources as of December 2001, testified that to his recollection Wales "was always highly regarded with respect to her performance." (Raine Depo. [D], pp.6-7, 14). Her performance review for the period October 1, 2000 through September 30, 2001 specifically highlighted how she had "thoroughly investigated" some visa cases. (Performance Review Discussion and Summary Questions [E]). A Senior Benefits Specialist sent an e-mail to Wales's supervisor in January 2001, noting among other things how Wales had been "generous with her time [and] patient in her approach to training new people." (Message from Katherine Paradise to Peter J. Altieri [F]). Wales testified that her performance reviews "were really quite good," adding that she "did a good job at [her] job and took pride in it and worked hard." (Wales Depo. II [C], p.23). She further testified that she always strove to be fair and thorough. (Wales Depo. II [C], p.24-25). When summarizing her procedure for investigating a performance issue, she noted the importance of giving the employee a fair opportunity to know what was expected of him or her. (Wales Depo. II [C], pp.20-22). Indeed, she saw herself as an advocate for employees. (Wales Depo. I [B], pp.15-16; Wales Depo. II [C], p.23).

Not only was Wales normally a fair and careful human resources representative, but it was PTC's practice and policy to treat its employees fairly and consistently. For example, when testifying about how the company handled employees with performance problems, she said that "[e]veryone was treated the same way and we were consistent." (Wales Depo. II [C], p.20). Raine testified that in most situations when an employee was accused of doing something wrong, PTC would give the employee an opportunity to explain his or her side of the story. (Raine Depo. [D], pp.16-17). More generally, he testified that it was PTC's

12

practice to be fair to its employees. (Raine Depo. [D], p.17). PTC's written policies corroborate this testimony, as follows: "An employee who has a performance-related problem must be made aware of the issue, be counseled as to how to correct the problem and be treated in a fair manner." (Training and Development: Performance Improvement [G]).

      Wales's investigation of Kuvshinov consisted of asking him why he was at PTC, getting limited information from Perry about the status of his claim, speaking to a security supervisor (about issues unrelated to Kuvshinov's disability status), and speaking to Kuvshinov's on-site supervisor to confirm details about his assignment. (Wales Depo. II [C], pp.61-75). These minimal efforts fell far short of her normal standards and deviated from PTC's policies and practices. Although she normally acted as an advocate for employees, she clearly was not acting as an advocate for Kuvshinov. Most remarkably, even though PTC had a practice and policy of treating employees fairly, ensuring that they knew what was expected of them, and giving them an opportunity to provide their perspective, she never told him about her investigation or asked for his side of the story. (Wales Depo. II [C], p.99). She never called CIGNA herself to investigate the status of his claim even though she had experience as a benefits specialist. (Wales Depo. II [C], pp.8, 74, 100). She never determined why CIGNA extended his benefits. (Wales Depo. II [C], p.100). She never determined when CIGNA made that decision. (Wales Depo. II [C], pp.76-78). She never reviewed the short term disability policy to see what it required of employees. (Wales Depo. II [C], p.100). She never determined when Kuvshinov actually received his last disability benefit check. (Wales Depo. II [C], p.100). She never determined if Kuvshinov himself had requested that his benefits be extended. (Wales Depo. II [C], pp.100-101). She never determined if Kuvshinov knew that his benefits had been extended. (Wales Depo. II [C],

13

p.101).  She never determined if Kuvshinov knew he was supposed to contact CIGNA about his return to work.  (Wales Depo. II [C], p.101).  And she never determined if Kuvshinov had attempted to contact CIGNA.  (Wales Depo. II [C], p.101).  Her failure to get additional information is particularly egregious given her admission that she did not know how CIGNA handled disability claims.  (Wales Depo. II [C], p.28).

What little Wales did know, meanwhile, would have signaled to an unbiased investigator that Kuvshinov was not engaged in unethical behavior.  Most significant, why would Kuvshinov, who was assigned to a different building than Wales, have chosen to eat lunch on his first day back at PTC in a lunch room directly across from Wales's office, knowing that Wales was one of the few people at PTC with knowledge of his disability claim and given that there were numerous other lunchrooms at the PTC facility?  (Wales Depo. II [C], pp.54-57, 61).  Wales never thought about that.  (Wales Depo. II [C], pp.101-102).  And why would Kuvshinov, upon running into Wales that day, not have appeared nervous or guilty?  (Wales Depo. II [C], pp.59, 102-103).  Evidently, Wales did not think about that, either.

The most plausible explanation for Wales's deviation from her normal standards of diligence and fairness was that she was predisposed to believe that Kuvshinov was untrustworthy based on his claim for disability benefits.  Indeed, what other explanation could there be?  She was so convinced that he was untrustworthy, unbalanced, or unethical that she ignored plain evidence to the contrary and failed to take basic investigatory steps that would have revealed the truth.  Even when she learned that he was not "double dipping," she

did not share that critical fact with Raine, even though she knew that Raine was relying on her investigation. (Wales Depo. II [C], pp.87, 93).[12]

Wales's biased investigation adversely affected Kuvshinov. Raine testified that he would have called for a further investigation if there were any doubts that Kuvshinov had committed an intentional wrong. (Raine Depo. [D], pp.25-26, 30-31). A minimally more diligent investigation would have demonstrated that Kuvshinov had not, in fact, received disability benefits at the same time he was working. It also would have demonstrated that he did not request that his benefits be extended and that he did not know his benefits had been extended. (Wallace Depo. [O], pp.54-55, 66; Deposition of Scott Anderson ("Anderson Depo.") [X], pp.16-17, 20-21; Kuvshinov Depo. III [U], pp.267-68; Depo. Exh. 4 [N]; Depo. Exh. 74 [M]). Raine did not think there was any doubt about Kuvshinov's guilt, however, because Wales's investigation left the impression that there was no doubt. (Raine Depo. [D], p.26).

In short, a reasonable jury could find, based on a preponderance of the evidence, that Wales treated Kuvshinov differently and worse as a result of his application for disability benefits. There is an irony in the defendants' argument that Kuvshinov has insufficient evidence to prove discrimination: how can they argue that Wales was entitled to rely on weak circumstantial evidence to incorrectly infer Kuvshinov's guilt while at the same time argue that Kuvshinov is not entitled to rely on strong circumstantial evidence of discrimination?

---

[12] Wales testified that when she left PTC in September 2004 (more than two years after Kuvshinov's MCAD complaint), she "probably" threw away the notes she made during her investigation. (Wales Depo. II [C], pp.6, 84-85). This fact may warrant an inference that her notes contained information harmful to her and PTC. *See Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148 (1st Cir. 1996) ("When the evidence indicates that a party is aware of circumstances that are likely to give rise to future litigation and yet destroys potentially relevant records without particularized inquiry, a factfinder may reasonably infer that the party probably did so because the records would harm its case.") (citations omitted).

**II.   Because There Is Evidence That Wales Acted With Actual Malice, The Defendants Are Not Entitled To Summary Judgment On Kuvshinov's Claim For Intentional Inference With Advantageous Relations.**

To prove his claim for intentional interference with advantageous relations, Kuvshinov must prove that (1) he had an advantageous relationship with a third party, (2) PTC or Wales knowingly induced the third party to discontinue the relationship, (3) PTC or Wales acted with actual malice, and (4) he was harmed by the actions of PTC or Wales. *Shea v. Emmanuel College*, 425 Mass. 761, 764 (1997) (citations omitted). Actual malice "is any 'spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" *Id.*, quoting *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 476 (1992). A reasonable jury may find that the defendant's "personal animus" against the plaintiff is sufficient proof of actual malice, even where the animus is not based on a discriminatory bias. *DeCarlo v. Sullivan*, 981 F.Supp. 59, 61 (D.Mass. 1997). Actual malice also may be demonstrated where the defendant's fabrications resulted in the plaintiff's termination. *Mailhoit v. Liberty Mutual Bank & Trust Co.*, 24 Mass. App. Ct. 525, 527 (1987). Ultimately, "[w]hether the requisite malice exists for a defendant to be held liable under this cause of action 'depends on the evidence in each case and on what the trier of fact may reasonably infer from that evidence.'" *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 634-35 (1st Cir. 1996) (citation omitted).

Kuvshinov's claim against PTC alleges that PTC, through its agent Wales, induced CDI to terminate Kuvshinov. His claim against Wales is that she induced both PTC and CDI to terminate Kuvshinov. There is no dispute that Kuvshinov was terminated and that he suffered harm. The only disputed fact, therefore, is whether Wales acted with actual malice to cause Kuvshinov's termination. There is ample evidence that she did.

First, because Kuvshinov's claims of discrimination should go to a jury, so too should his claim for intentional interference. This is because unlawful discriminatory animus constitutes actual malice. *Speen*, 102 F.3d at 635 (citation omitted). In light of all the facts, as discussed above, it is reasonable to infer that Wales had a bias against Kuvshinov based on his claim for disability benefits.

Second, even in the absence of discriminatory animus, Wales's inexplicably perfunctory investigation demonstrates that she had a personal animus against Kuvshinov. Indeed, although she ordinarily had no involvement with contract workers at PTC or with benefits matters (Wales Depo. I [B], p.25; Wales Depo. II [C], pp.59, 75, 103), she took it upon herself to investigate Kuvshinov's situation. Despite her track record of fairness and thoroughness, and despite PTC's practice of giving employees notice of alleged performance problems and an opportunity to explain their side of the story, she never gave Kuvshinov an opportunity to explain his situation. Nor did she get the basic types of background facts necessary to confirm her belief that Kuvshinov was violating business ethics by "double dipping." Even worse, after obtaining information that flatly contradicted her beliefs – e.g., information that Kuvshinov never received benefits for any period after November 30, 2001 – she failed to provide that information to Raine, even though she knew that he was relying on her investigation to terminate Kuvshinov. (Wales Depo. I [B], pp.91-92; Wales Depo. II [C], p.83).

Third, Wales knowingly induced Kuvshinov's termination by making an allegation that she knew to be false, which permits an independent finding of actual malice. Before Kuvshinov was terminated, Wales learned that he had not received disability benefits for any period after November 30, 2001. (Wales Depo. I [B], pp.68, 90-91; Wales Depo. II [C],

17

pp.87, 89-93). She failed to inform Raine of this fact, so Raine ultimately concluded that Kuvshinov was receiving disability benefits. (Wales Depo. II [C], pp.87, 89-93; Raine Depo. [D], p.21). As a result, by inducing Kuvshinov's termination through a false allegation, Wales intentionally interfered with his relationship with PTC and CDI.

### III. Because The Defendants Owed A Duty To Kuvshinov And Breached That Duty, The Defendants Are Not Entitled To Summary Judgment On Kuvshinov's Negligence Claim.

To prove his claim for negligence, Kuvshinov must prove that (1) PTC or Wales owed him a legal duty, (2) PTC or Wales breached that duty, and (3) this breach proximately caused him injury. *O'Gorman v. Antonio Rubinaccio & Sons,* 408 Mass. 758, 760 (1990).

Wales and PTC owed Kuvshinov a duty of care to the extent they had a "special relationship." *Irwin v. Town of Ware*, 392 Mass. 745, 756 (1984). Although many factors determine the existence of such a special relationship, "[f]oremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." *Id.* Wales and PTC plainly could foresee the harm to Kuvshinov from conducting a negligent investigation. The defendants rely principally on one case, *O'Connell v. Bank of Boston*, 37 Mass. App. Ct. 513 (1994),[13] to support their claim that PTC and Wales owed no duty of care to Kuvshinov. Their reliance is misplaced. *O'Connell* cannot stand for the broad proposition that, in all cases, a person conducting an investigation owes a duty solely to the person who commissioned the investigation. *See, e.g., Irwin*, 392 Mass. at 774 (upholding claim of negligent investigation by member of public against police officer). Analysis of negligence claims requires an individualized consideration of the underlying facts and circumstances of

---

[13] *O'Connell* appears to be the first case in Massachusetts to address this issue. The other case cited by the defendants, *Dwan v. City of Boston*, 2002 U.S. Dist. LEXIS 5628, relies on *O'Connell*. *Id*. at *24.

a case, including the relationships of the parties and the various interests involved. *Id.* at 756-62; 65 C.J.S. *Negligence* § 10 (2006). Consideration of the facts and circumstances of this case supports Kuvshinov's claim.[14]

First, Wales testified that it was her job to act as an advocate for employees. (Wales Depo. I [B], pp.15-16; Wales Depo. II [C], p.23). There is no indication in *O'Connell* that the bank's investigation department had a similar relationship to the plaintiff. As a result, even if Wales's duty ran only to the persons on whose behalf she was conducting her investigation, her responsibilities as an employee advocate mean that she was conducting her investigation for both PTC and Kuvshinov.

Second, *O'Connell* justified its decision based on factors not relevant to this case. The *O'Connell* court refused to allow the plaintiff's claim for negligent investigation because, among other reasons, to do so might have endangered the community by affecting criminal investigations. *Id.* at 420 ("The law takes account of [the interests] . . . of the community, in having those reasonably suspected of crime subjected to the process of criminal laws for the common protection"). The *O'Connell* court preferred a cause of action for malicious prosecution as a legal remedy in that case because "the various interests and principles of social policy are reflected in the usual formula for malicious prosecution." *Id*. Because there is no community interest of safety at stake in Kuvshinov's case, this consideration is inapt.

Wales, while working as PTC's agent, breached her duty to Kuvshinov. As discussed above, Wales undertook an investigation that was characterized more by what she failed to

---

[14] Relying on *O'Connell* to provide a sweeping rule is particularly troublesome given its feeble foundation. *O'Connell* relies solely on *Deerfield Plastics Co. v. Hartford Ins. Co.*, 404 Mass. 484, 487 (1989). *Deerfield* addressed the question of which party bears the burden of proof in showing that a settlement in a worker's compensation case was reasonable or not. *Id.* at 485. The case simply does not hold, even in dicta, that an investigator never owes a duty of care to the person being investigated.

19

do than by what little she did do. Given the cursory nature of her investigation, particularly when combined with her failure to take into account evidence that her conclusion was wrong, a reasonable jury could find that she breached her duty to Kuvshinov. As discussed above, there is sufficient evidence to conclude that Kuvshinov would not have been terminated had Wales conducted a marginally more careful investigation.

## Conclusion

For these reasons, Kuvshinov respectfully requests that the Court deny the defendants' motion for summary judgment.

ALEXEI KOUVCHINOV
By his attorneys,

/s/ Stephen S. Churchill
Stephen S. Churchill (BBO# 564158)
Hale & Dorr Legal Services Center of
Harvard Law School
122 Boylston Street
Jamaica Plain, MA  02130
 (617) 390-2578

Dated: July 6, 2006