UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  | CIVIL ACTION |
|---|---|---|
|  |  | No. 04-CV-12531MEL |
| ALEXEI KOUVCHINOV, | ) |  |
| Plaintiff | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| PARAMETRIC TECHNOLOGY | ) |  |
| CORPORATION, CDI CORPORATION, | ) |  |
| LISA WALES, and CONNECTICUT | ) |  |
| GENERAL LIFE INSURANCE CO., | ) |  |
| Defendants | ) |  |

## PLAINTIFF'S STATEMENT OF FACTS

Pursuant to Local Rule 56.1, plaintiff Alexei Kouvchinov ("Kuvshinov")[1] submits the following facts in opposition to the motion for summary judgment of defendants Parametric Technology Corporation ("PTC") and Lisa Wales ("Wales").

**I.    Plaintiff's Statement of Disputed Material Facts**

<u>Background</u>

1.    Kuvshinov began working for PTC in 1994 as a software engineer. (Complaint ¶ 9; Amended Answer of Parametric Technology Corporation to Plaintiff's Complaint ("PTC's Answer") ¶ 9).

2.    On June 21, 2000, Kuvshinov was seen by Leonard Freedberg, M.D., for symptoms of depression and was diagnosed with dysthymia. (Depo. Exh. 63 [A]).[2]

---

[1] The plaintiff's legal name is Alex Kuvshinov. During the time relevant to his claims, his name was Alexei Kouvchinov. Thereafter, he petitioned to have his name changed from Alexei Kouvchinov, and the petition was granted by the United States District Court for the District of Massachusetts.

[2] The letter in brackets – e.g., [A] – refers to the designation of the exhibits attached to the Declaration of Stephen Churchill.

3.      On or about September 10, 2001, PTC notified Kuvshinov that pursuant to a corporate restructuring his employment would be terminated effective September 24, 2001.  (Complaint ¶ 11; PTC Answer ¶ 11).

4.      Kuvshinov was notified about his layoff in a meeting with Lisa Wales and a PTC manager.  (Deposition of Lisa Wales ("Wales Depo.") II [C], pp.29-31).

5.      During the meeting, Wales's role was to go through the severance package and answer any questions he had.  (Wales Depo. I [B], p.22).

Lisa Wales

6.      Wales worked at PTC from 1999 through January 4, 2004.  (Wales Depo. I [B], p.6).

7.      She has a bachelor's degree in psychology.  (Wales Depo. I [B], p.7).

8.      She worked as a benefits specialist from 1999 through September 2000. (Wales Depo. II [C], p.8).

9.      As a benefits specialist she handled 20-25 disability claims, "maybe one or two" of which involved mental disabilities.  (Wales Depo. II [C], p.27).

10.     When she worked as a benefits specialist, she had communications with CIGNA.  (Wales Depo. II [C], p.74).

11.     Wales was not aware of how CIGNA handled disability claims.  (Wales Depo. II [C], p.28).

12.     Throughout the time she worked at PTC, she was not aware of any occasions when someone received disability benefits when she thought they weren't disabled.  (Wales Depo. II [C], p.29).

13.     As of September 2000, she began working as a human resources representative.  (Wales Depo. II [C], p.8).

14.     In this position, she didn't work in benefits anymore.  (Wales Depo. II [C], pp.59, 75).

15.     In this position, she saw herself as an advocate for both managers and employees.  (Wales Depo. I [B], pp.15-16; Wales Depo. II [C], p.23).

16.     Wales received performance reviews during her employment at PTC, and she described those reviews as "really quite good."  (Wales Depo. II [C], p.23).

17.     Wales was highly regarded with respect to her performance.  (Deposition of Edward Raine ("Raine Depo.") [D], pp.13-14).

18.     Her performance review for the period October 1, 2000 through September 30, 2001 specifically highlighted how she had "thoroughly investigated" some visa cases.  (Performance Review Discussion and Summary Questions [E]).

19.     A Senior Benefits Specialist sent an e-mail to Wales's supervisor in January 2001, noting among other things how Wales had been "generous with her time [and] patient in her approach to training new people."  (Message from Katherine Paradise to Peter J. Altieri [F]).

20.     Wales always strove to be fair and thorough in her work.  (Wales Depo. II [C], pp.24-25).

21.     She was never accused of being unfair or not thorough.  (Wales Depo. II [C], pp.25).

### PTC Policies & Practices

22.    PTC had written policies with respect to human resources issues. (Wales Depo. II [C], pp.17-20).

23.    These policies, at least with respect to investigations, were designed so that everyone followed the same steps, and so everyone was treated the same way. (Wales Depo. II [C], p.20).

24.    When conducting an investigation of a performance issue, Wales would ensure that the employee knew what was expected of him or her, because "[i]t's only fair." (Wales Depo. II [C], p.20-23).

25.    When an employee was accused of doing something wrong, it was PTC's practice in most situations to give the employee an opportunity to provide his or her side of the story. (Raine Depo. [D], pp.16-17).

26.    It was PTC's practice to be fair to its employees. (Raine Depo. [D], p.17).

27.    PTC had a written policy stating: "An employee who has a performance-related problem must be made aware of the issue, be counseled as to how to correct the problem and be treated in a fair manner." (Training and Development: Performance Improvement [G]).

### Kuvshinov's Claim For Short Term Disability

28.    On September 17, 2001, Kuvshinov again was seen by Dr. Freedberg, who noted that Kuvshinov had been depressed for one to two months. Dr. Freedberg diagnosed Kuvshinov with severe depression, with profound psychomotor retardation. (Stipulation as to Records of Leonard E. Freedberg, M.D. ("Freedberg Stipulation") [H] at Exh. 5, p.A002).

29.     PTC had a short term disability ("STD") plan administered by Connecticut General Life Insurance Company ("CGLIC" or "CIGNA").[3]  (Complaint ¶ 12; PTC Answer ¶ 12).

30.     Under the STD policy, "total disability" was defined as follows: "You will be considered Totally Disabled, if because of an Injury or Sickness, you are unable to perform the essential duties of your occupation."  (Depo. Exh. 80 [I] at Policy, p.90).

31.     The STD Policy does not specifically require employees who return to work to notify CIGNA.  (Depo. Exh. 80 [I] at Policy).

32.     On or about September 17, 2001, after consulting with Dr. Freedberg, Kuvshinov applied for STD benefits.  (Complaint ¶ 12; PTC Answer ¶ 12; Depo. Exh. 1 [J]).

33.     He did so by having a friend leaving his claim form for Wales, who reviewed the form and saw that he was claiming to be disabled by depression.  (Wales Depo. II [C], pp.35-40).

34.     Wales thought that the timing of the claim was odd and strange.  (Wales Depo. I [B], pp.24-25; Wales Depo. II [C], pp.40-42).

35.     Wales forwarded Kuvshinov's claim to PTC benefits specialist Lisa Perry. (Wales Depo. I [B], pp.22-23, 40-44).

36.     Even though they did not have responsibility for deciding whether Kuvshinov's claim was meritorious (Wales Depo. I [B], p.25; Wales Depo. II [C], pp.40-43), Wales commented to Perry on the timing of Kuvshinov's claim, and Perry checked

_____

[3] CGLIC is, through intermediary corporations, a wholly-owned subsidiary of CIGNA Corporation. (Corporate Disclosure Statement of Connecticut General Life Insurance Company).  Because at relevant times the parties referred to CGLIC as CIGNA, the terms have been used interchangeably in this action. There is no dispute that CGLIC was the actual administrator of the STD policy.

to see if Kuvshinov had any earlier claims for disability.  (Wales Depo. I [B], pp.25-26; Deposition of Aaron von Staats ("von Staats Depo.") [K], pp.10-13).

37.    Wales also contacted an in-house attorney at PTC, Aaron von Staats, to discuss Kuvshinov's claim and to make sure he was aware of it given that Kuvshinov had been notified of his termination.  (Wales Depo. I [B], pp.44-47).[4]

38.    There were no other occasions when Wales referred a disability claim to PTC's legal department.  (Wales Depo. I [B], pp.46-47).

39.    Kuvshinov's claim for STD benefits was allowed.  (Depo. Exh. 27 [L]).

40.    On October 29, 2001, CIGNA extended his benefits through November 30, 2001, noting that Kuvshinov had estimated a potential return to work of November 17, 2001.  (Depo. Exh. 74 [M], p.441).

41.    Because benefits were paid in advance, Kuvshinov's benefit check for the period November 24, 2001 through November 30, 2001, the final period for which he was paid, was issued on November 23, 2001.  (Depo. Exh. 4 [N], p.0113).

42.    Kuvshinov ultimately received benefits for the period September 24, 2001 through November 30, 2001.  (Deposition of Angela Wallace ("Wallace Depo.") [O], pp.66-67; Depo. Exh. 4 [N]; Depo. Exh. 27 [L]; Depo. Exh. 28 [P]; Depo. Exh. 36 [Q]).

---

[4] Although Wales later suggested, initially in response to questions from her attorney and then again during her second deposition, that she notified the legal department only after she was contacted by an attorney representing Kuvshinov (Wales Depo. I [B], pp.98-100; Wales Depo. II [C], pp.46-48), the PTC attorney she consulted, Aaron von Staats, did not corroborate, and in fact appeared to contradict, her testimony. (von Staats Depo. [K], pp.10-13, 17-18, 21).  For example, von Staats testified that Wales came to him to ask if Kuvshinov could file a claim for benefits given his layoff status, not simply to notify him that she had been contacted by Kuvshinov's attorney.  (von Staats Depo. [K], pp.10-13).  Wales's own investigation report also appears to contradict her testimony: her report suggests that she met with von Staats before Kuvshinov's attorney called.  (Depo. Exh. 34 [R]).

### Kuvshinov's Return to Work

43.    On November 29, 2001, Kuvshinov signed a contract with CDI Corporation to work at PTC.  (Deposition of Alex Kuvshinov ("Kuvshinov Depo.") II [T], pp.150-52; Depo. Exh. 8 [W]).

44.    Kuvshinov was to perform the same work at PTC that he had performed prior to his layoff.  (Kuvshinov Depo. MCAD [S], pp.87-88).

45.    Later that day, Kuvshinov called CIGNA to report that he was returning to work.  (Kuvshinov Depo. MCAD [S], pp.48-49).

46.    Kuvshinov had other conversations with CIGNA that were not reflected in CIGNA's electronic claims notes.  (Kuvshinov Depo. MCAD [S], pp.74-75; Depo. Exh. 74 [M]).

47.    CIGNA did not issue a check on November 30, 2001, which would have been the issuance date for the period December 1, 2001 through December 7, 2001. (Depo. Exh. 4 [N]).

48.    Kuvshinov started his new assignment at PTC on December 4, 2001. (Kuvshinov Depo. MCAD [S], p.88).

49.    Also on December 4, 2001, CIGNA decided to extend Kuvshinov's benefits through December 16, 2001, but there is no evidence that Kuvshinov requested or knew about this extension.  (Wallace Depo. [O], pp.54-55, 66; Deposition of Scott Anderson ("Anderson Depo."), pp.16-17, 20-21; Kuvshinov Depo. III [U], pp.267-68; Depo. Exh. 4 [N]; Depo. Exh. 74 [M], p.448).

50.     On Kuvshinov's first day back at PTC, Wales ran into him at lunchtime in a kitchenette near her office on the second floor of Building C.  (Depo. Exh. 34 [R]; Wales Depo. II [C], p.55).

51.     The kitchenette was across the hall from her office.  (Wales Depo. II [C], p.56).

52.     There were a number of lunchrooms throughout PTC's facility.  (Wales Depo. II [C], p.56-57).

53.     Kuvshinov knew that Wales was one of several people at PTC who knew about his disability claim.  (Kuvshinov Depo. MCAD [S], p.76).

54.     When Wales saw Kuvshinov, he was sitting by himself and did not appear to be nervous or guilty.  (Wales Depo. II [C], pp.57-59, 102-103).

55.     Wales asked Kuvshinov what he was doing there but did not ask him anything about his disability claim.  (Wales Depo. II [C], pp.58-59).

56.     When she saw him, she was under the impression that he was receiving disability benefits.  (Wales Depo. II [C], p.60-61).

57.     Kuvshinov told Wales that he was taking a class, which she concluded would have been in another building.  (Wales Depo. II [C], p.61).

58.     On her own initiative, Wales began an investigation of Kuvshinov's situation, and she became the lead investigator on the issue.  (Wales Depo. II [C], pp.62-64).

59.     Wales ordinarily had no involvement with contract workers at PTC. (Wales Depo. II [C], p.103).

60.    As part of her investigation, Wales reviewed Kuvshinov's personnel file, which showed her that he had been a good employee.  (Wales Depo. II [C], pp.95-96).

61.    On Thursday, December 6, 2001, Wales learned that CIGNA had decided to extend Kuvshinov's disability claim through December 16, 2001.  (Wales Depo. II [C], p.84; Depo. Exh. 34 [R]).

62.    On Thursday, December 6, 2001, at noon, Wales sent an e-mail to various PTC officials, including Edward Raine, discussing the results of her investigation. (Wales Depo. II [C], pp.81-83; Depo. Exh. 34 [R]).

63.    Edward Raine was PTC's Vice President of Human Resources as of December 2001.  (Raine Depo. [D], pp.6-7).

64.    Wales understood that the PTC officials to whom she sent the e-mail would rely on it to make their decision.  (Wales Depo. II [C], p.83).

65.    Wales had concluded that Kuvshinov was "double dipping" – i.e., receiving disability benefits while working as a contractor at PTC.  (Wales Depo. I [B], p.85; Wales Depo. II [C], pp.87-89).

66.    Wales thought that Kuvshinov's claim for disability benefits "could have been skeptical" and "possibly" had doubts about whether his claim was real.  (Wales Depo. I [B], pp.85-87).

67.    After December 4, 2001, Wales did not obtain any information indicating that Kuvshinov had been paid disability benefits after November 30, 2001.  (Wales Depo. I [B], pp.68, 90-91).

68.    As part of her investigation, Wales (a) never reviewed the STD plan (Wales Depo. II [C], p.54); (b) never told Kuvshinov he was being investigated or asked

for his side of the story (Wales Depo. II [C], pp.99-100); (c) never called CIGNA (Wales Depo. I [B], pp.68-69; Wales Depo. II [C], p.100); (d) never determined why CIGNA had extended his benefits through December 16, 2001 (Wales Depo. II [C], p.100); (e) never determined when CIGNA made that decision (Wales Depo. II [C], pp.76-78); (f) never reviewed the disability policy to see what it required of employees (Wales Depo. II [C], p.100); (g) never determined when Kuvshinov received his last disability check (Wales Depo. II [C], p.100); (h) never determined if Kuvshinov had requested that his benefits be extended (Wales Depo. II [C], pp.100-101); (i) never determined if Kuvshinov knew that his benefits had been extended (Wales Depo. II [C], p.101); (j) never determined if Kuvshinov had attempted to contact CIGNA (Wales Depo. II [C], p.101); (k) never determined if Kuvshinov knew the correct protocol for terminating his disability benefits (Wales Depo. I [B], p.98; Wales Depo. II [C], p.101); (l) never wondered why Kuvshinov would have been eating lunch across from her office, in a different building than he was assigned to, if he was engaged in unethical conduct that she would have known about (Wales Depo. II [C], pp.54-57, 61,101-102).

69.    Wales understood that Kuvshinov might be terminated based on her investigation.  (Wales Depo. I [B], pp.91-92).

70.    Although Wales "most likely" kept notes of her investigation, she "probably" threw them away when she left PTC.  (Wales Depo. II [C], pp.84-85).

71.    Later than afternoon, Raine responded with his "thoughts."  (Raine Depo. [D], pp.18-19; Depo. Exh. 35 [Y]).

72.    Raine relied solely on Wales's investigation to make his recommendation. (Raine Depo. [D], pp.21, 34).

73.     Raine's understanding from Wales's investigation was that Kuvshinov was knowingly receiving STD benefits while working at PTC.  (Raine Depo. [D], p.21).

74.     If there had been any doubt about Kuvshinov's status, then Raine would have requested more information, but he concluded from Wales's investigation that there was no doubt.  (Raine Depo. [D], pp.25-26).

75.     It was important to Raine what Kuvshinov knew regarding his disability claim.  (Raine Depo. [D], pp.27-28, 30).

76.     If Raine had obtained additional information in any way throwing into doubt whether Kuvshinov had intentionally done something wrong, Raine would have requested further information to find out exactly what was going on.  (Raine Depo. [D], p.31).

77.     Raine made the decision to terminate Kuvshinov's assignment at PTC. (Raine Depo. [D], p.34).

78.     Later on December 6, 2001, CIGNA sent e-mails to PTC, notifying PTC that Kuvshinov's claim would be closed and that he had been paid only through November 30, 2001.  (Depo. Exh. 36 [Q]).

79.     Wales saw these e-mails on December 6, 2001 or early on December 7, 2001, but she did not share the information with Raine, even though she knew Raine was relying on her investigation.  (Wales Depo. II [C], pp.87, 89-93).

80.     PTC did not contact CDI to terminate Kuvshinov's placement until Friday, December 7, 2001.  (Position Statement [BB], p.4).

81.     CDI called Kuvshinov after he returned home from work on Friday, December 7, 2001, to tell him that his assignment was terminated.  (Kuvshinov Depo. II [T], pp.134-35, 140-41; Kuvshinov Depo. III [U], p.274).

82.     CDI told him that he needed to work things out with PTC.  (Kuvshinov Depo. II [T], p.155).

83.     Kuvshinov called a PTC human resources manager, who referred him to CDI.  (Kuvshinov Depo. II [T], p.156-67).

84.     On December 10, 2001, CIGNA notified Kuvshinov that it was terminating his benefits, effective November 30, 2001.  (Depo. Exh. 28 [P]).

<u>Additional Evidence of Disability</u>

85.     Kuvshinov first entered treatment with Dr. Freedberg in June of 2000, when he presented with a prior history of depression and was diagnosed with dysthymia (a form of depression).  (Freedberg Stipulation [H] at Exh. 3).

86.     He returned to Dr. Freedberg on September 17, 2001, shortly after his layoff from PTC.  (Freedberg Stipulation [H] at Exh. 5).

87.     Dr. Freedberg testified that Kuvshinov's layoff likely exacerbated his depression.  (Deposition of Leonard Freedberg, M.D. ("Freedberg Depo.") [Z], p.34).

88.     At that point, Kuvshinov's sleep, concentration, energy, and interest had decreased.  (Freedberg Stipulation [H] at Exh. 5).

89.     He was diagnosed as suffering from "severe depression" with "severe psychomotor retardation," and he was recommended for short-term disability. (Freedberg Stipulation [H] at Exh. 5).

90.    Although Kuvshinov showed some improvement over the next two months (Freedberg Stipulation [H] at Exh. 5), as of December 17, 2001, following Kuvshinov's termination from PTC and CDI, Kuvshinov looked to Dr. Freedberg "like a person who could not possibly work." (Freedberg Depo. [Z], p.40).

91.    Since that time, Dr. Freedberg continued to treat Kuvshinov up to the present. (Freedberg Depo. [Z], pp.13-14).

92.    Although he hoped that Kuvshinov would be able to return to work, he has "felt less and less hopeful that he could ever return to work … [b]ecause of chronic depression." (Freedberg Depo. [Z], pp.40-41).

93.    According to Dr. Freedberg, Kuvshinov was still depressed as of December 2001. (Freedberg Depo. [Z], pp.30-31).

94.    Although it may have been slightly early for Kuvshinov to attempt re-employment, it was not impossible and was not medically contraindicated. (Freedberg Depo. [Z], pp.35-36).

95.    Kuvshinov testified that what enabled him to consider a return to work at PTC was his thorough familiarity with the work he had been doing; based on his mental condition, he was unable to learn anything new. (Kuvshinov Depo. MCAD [S], pp.44-48).

<u>Procedural History</u>

96.    Kuvshinov filed a complaint of discrimination at the Massachusetts Commission Against Discrimination and the U.S. Equal Employment Opportunity Commission on or about May 24, 2002. (Depo. Exh. 9 [AA]).

97.    On September 10, 2002, PTC and Wales submitted a sworn position statement to the MCAD.  (Position Statement [BB]).

98.    PTC first justified its December 2001 termination of Kuvshinov by claiming that its "actions were based solely on its assessment that it was unethical for Kouvchinov to be actively working while simultaneously receiving disability benefits." (Position Statement [BB], p.1).

## II.    Plaintiff's Response to Defendant's Statement of Undisputed Material Facts

In addition to the facts set forth above, Kuvshinov responds to the Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 with the following additional facts.[5]

9.    Kuvshinov's message to Busa was authored by his friend.  (Kuvshinov Depo. II [T], p.120).  Kuvshinov allowed this message to be sent to Busa because he thought that making an effort to secure work would help alleviate his depression.  (Id.). Kuvshinov believed this because his psychiatrist, Dr. Freedberg, advised that he attempt to restore his usual routines in order to improve his mood.  (Id.).  Kuvshinov was unable to work on September 25, 2001 (Id., p.119), and he did not intend to accept any offers from Busa (Id., p.120).

10.    Kuvshinov explained his reasons for the letter to Busa as indicated above.

16.    Kuvshinov requested a start date of December 18, 2001, because he was next scheduled to see Dr. Freedberg on December 17, and a CIGNA representative encouraged him to see a doctor before returning to work.  (Kuvshinov Depo. MCAD [S],

---

[5] By not responding in detail to all of the defendants' alleged facts, Kuvshinov does not intend to concede that those alleged facts, or the characterization of them, are relevant, material, or accurate.  To the extent the defendants refer to any documents or deposition testimony, those documents speak for themselves and that testimony speaks for itself.

p.51).  Kuvshinov was not aware of the precise end-date of his STD benefits at the time

of this request.  (Id., p.52).  Kuvshinov told Shea at CDI that he was working for another

company because he was concerned for his privacy and did not want her to know about

his disability.  (Id., p.51).

17.     Kuvshinov does not remember whether he told Dr. Freedberg about his

negotiations with CDI or ARC specifically, but he did tell Dr. Freedberg that he was

looking for work.  (Kuvshinov Depo. IV [V], pp.29-30).

20.     Kuvshinov never lied to CDI by saying that he was not receiving STD

benefits.  (Kuvshinov Depo. MCAD [S], pp.51, 77; Kuvshinov Depo. II [T], p.127).

There is no evidence in the record that CDI asked Kuvshinov if he was on STD.  In fact,

Kuvshinov is "practically sure that the question was not posed."  (Kuvshinov Depo. II

[T], p.135).  For privacy reasons, Kuvshinov did not openly disclose this information.

(Kuvshinov Depo. MCAD [S], p. 51).

21.     Kuvshinov informed CIGNA of his new employment at CDI once he

formally accepted that position on November 29, 2001.  (Kuvshinov Depo. MCAD [S],

p.48).

22.     Kuvshinov did not have an appointment with Freedberg between

November 29, 2001, and December 7, 2001.  (Freedberg Stipulation [H] at Exh. 5).  His

next appointment with Dr. Freedberg was on December 17, 2001.  (Kuvshinov Depo.

MCAD [S], p. 51).  Kuvshinov does not remember discussing his negotiations with CDI

or Busa with Dr. Freedberg, but he does remember informing Dr. Freedberg that he was

looking for work.  (Kuvshinov Depo. IV [V], pp.29-30).

23.     On November 21, 2001, Dr. Freedberg met with Kuvshinov and noted that Kuvshinov "could not imagine working." (Freedberg Depo. [Z], p.18). Kuvshinov looked for work in hopes of improving his mental health (Kuvshinov Depo. II [T], p.120), and wanted to try working even if he felt he might not ultimately succeed in returning to work (Kuvshinov Depo. MCAD [S], p.48).

24.     Kuvshinov informed Dr. Freedberg that he was looking for work prior to December of 2001. (Kuvshinov Depo. IV [V], pp.29-30). Kuvshinov accepted his job with CDI and notified CIGNA on November 29, 2001. (Kuvshinov Depo. MCAD [S], p.48). His next scheduled appointment with Dr. Freedberg was December 17, 2001, and it was "nearly impossible to change appointments." (Id., p.51).

36.     Kuvshinov did not appeal CIGNA's December 10, 2001, decision to terminate his benefits because he had already asked CIGNA to terminate his benefits on November 29, 2001, and it would have been illogical for him to appeal. (Kuvshinov Depo. MCAD [S], p.115).

ALEXEI KOUVCHINOV
By his attorneys,

/s/ Stephen S. Churchill
Stephen S. Churchill (BBO# 564158)
Hale & Dorr Legal Services Center of
Harvard Law School
122 Boylston Street
Jamaica Plain, MA  02130
(617) 390-2578

Dated: July 6, 2006