UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
No. 04-CV-12531MEL

| | |
|---|---|
| ALEXEI KOUVCHINOV, | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| PARAMETRIC TECHNOLOGY | ) |
| CORPORATION, CDI CORPORATION, | ) |
| LISA WALES, and CONNECTICUT | ) |
| GENERAL LIFE INSURANCE CO., | ) |
|     Defendants | ) |

## DECLARATION OF STEPHEN CHURCHILL

I, Stephen Churchill, declare as follows.

1.      I am an attorney and clinical instructor at the Hale & Dorr Legal Services Center of Harvard Law School.  I represent plaintiff Alex Kuvshinov ("Kuvshinov") in this matter.

2.      Attached to this declaration are copies of deposition exhibits, deposition transcript excerpts, and documents produced in this matter.  To the best of my knowledge and belief, all of these copies are true and accurate copies of the originals.  Unless otherwise indicated, all of these exhibits were generated or produced during discovery in this case.

3.      Attached as Exhibit A is a copy of Deposition Exhibit 63,[1] from the deposition of Leonard Freedberg, M.D. ("Dr. Freedberg")

---

[1] All deposition exhibits in this case were marked sequentially, 1 through 84.  Exhibits might have been used for multiple depositions, but this declaration will indicate the first deposition during which the exhibit was marked.

4.     Attached as Exhibit B is an excerpt from the deposition of Lisa Wales ("Wales"), which was taken while the case was pending at the Massachusetts Commission Against Discrimination ("MCAD").

5.     Attached as Exhibit C is an excerpt from the deposition of Wales.

6.     Attached as Exhibit D is an excerpt from the deposition of Edward Raine ("Raine").

7.     Attached as Exhibit E is a document produced by PTC in response to a document request from Kuvshinov, requesting documents concerning Wales.

8.     Attached as Exhibit F is a document produced by PTC in response to a document request from Kuvshinov, requesting documents concerning Wales.

9.     Attached as Exhibit G is a document produced by PTC in response to a document request from Kuvshinov, requesting PTC policies.

10.     Attached as Exhibit H is a Stipulation as to Records of Leonard Freedberg, M.D., signed by all parties.

11.     Attached as Exhibit I is Deposition Exhibit 80, from the deposition of Angela Wallace ("Wallace").

12.     Attached as Exhibit J is Deposition Exhibit 1, from the deposition of Kuvshinov.

13.     Attached as Exhibit K is an excerpt from the deposition of Aaron von Staats ("von Staats").

14.     Attached as Exhibit L is Deposition Exhibit 27, from the deposition of Kuvshinov.

15.     Attached as Exhibit M is Deposition Exhibit 74, from the deposition of Lisa Perry.

16.     Attached as Exhibit N is Deposition Exhibit 4, from the deposition of Kuvshinov.

17.     Attached as Exhibit O is an excerpt from the deposition of Wallace.

18.     Attached as Exhibit P is Deposition Exhibit 28, from the deposition of Kuvshinov.

19.     Attached as Exhibit Q is Deposition Exhibit 36, from the deposition of Wales.

20.     Attached as Exhibit R is Deposition Exhibit 34, from the deposition of Wales.

21.     Attached as Exhibit S is an excerpt from the deposition of Kuvshinov, which was taken while the case was pending at the MCAD.

22.     Attached as Exhibit T is an excerpt from the second volume of the deposition of Kuvshinov.

23.     Attached as Exhibit U is an excerpt from the third volume of the deposition of Kuvshinov.

24.     Attached as Exhibit V is an excerpt from the fourth volume of the deposition of Kuvshinov.

25.     Attached as Exhibit W is Deposition Exhibit 8, from the deposition of Kuvshinov.

26.     Attached as Exhibit X is an excerpt from the deposition of Scott Anderson.

27.    Attached as Exhibit Y is Deposition Exhibit 35, from the deposition of Wales.

28.    Attached as Exhibit Z is the transcript from the deposition of Dr. Freedberg.

29.    Attached as Exhibit AA is Deposition Exhibit 9, from the deposition of Kuvshinov.

30.    Attached as Exhibit BB is the position statement filed with the MCAD by PTC in response to Kuvshinov's charge of discrimination.

Signed under the penalties of perjury this 6th day of July, 2006.


/s/ Stephen S. Churchill
Stephen S. Churchill

**EXHIBIT A**

EXHIBIT

63

3/7/06   e H |<

ALEXEI KOUVCHINOV

JUNE 21, 2000:  INITIAL EVALUATION

The patient is an almost 44-year-old divorced man with
depression.  About four years ago, he had an "ugly divorce"
from his wife and in that context, became depressed, saw a
doctor in Brighton who gave him Prozac 20 mg daily, and he
took that for about two years.  It was very helpful without
any side effects and the patient went off it successfully
about two years ago and was fine for a long time.  However,
over the past few months, he again has had some symptoms of
depression.  He saw that doctor again and restarted Prozac,
20 mg daily and also Ambien 5 mg, used sparingly, generally
twice weekly for insomnia.  The patient has again responded
positively to Prozac, but is switching to me because I am
covered by his insurance whereas the other doctor was not
and his insurance now is a $500.00 deductible.

The patient grew up in Russia, and he is an only child whose
parents are dead.  He has two Master's Degrees in Computer
Science and is working approximately 60 hours weekly as a
Software Engineer, work which he enjoys very much.  He has
no medical problems and has never had a substance abuse
problem.  He says he drinks alcohol approximately once
weekly but denied that it was a problem.  His only child is
a 7-year-old son whom he says he sees very frequently and
with whom he has a good relationship.  There is no family
history of any mental disorder.  The patient lives by
himself usually but often has a girlfriend, although he has
not been serious about anybody since his divorce, and he has
pleasurable activities, including chess, which he plays
evidently at a very high level of competency.

He emigrated from Russia seven years ago and although his
English is imperfect, and he struggles with that, he says
that he is very glad that he moved here.

The patient was a casually dressed man who made good eye
contact and his speech is remarkable for a heavy Russian
accent.  He did have some misunderstanding of English which
generally was easily clarified with some explanation, he has
trouble with idiomatic expressions.  He is definitely not
psychotic, incompetent, despairing or suicidal.  Even at the
worst of his depressions, he says that he does not get at
all suicidal.

My diagnosis is dysthymia.

I am happy to continue his Prozac and Ambien.  I explained
the office coverage arrangement and gave him my card and
encouraged him to call me as needed.  He has no interest in

ALEXEI KOUVCHINOV          -2-

JUNE 21, 2000:  INITIAL EVALUATION

any kind of counseling and would like to have as few
appointments as possible.  He therefore will call me in
about six months when he is running out of Prozac if he
continues to need it at that time.  There is no primary care
doctor to whom to write a letter.

                    Leonard E. Freedberg, M.D.

LEF/MWTS:dmb

0130

**EXHIBIT B**

# In The Matter Of:

*Alexei Kouvchinov   v.*
*CDI Information Technology Services, et al.*

---

*Lisa Wales*
*Vol. 1, April 16, 2004*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File WALES.V1, 102 Pages*
*Min-U-Script® File ID: 0716949068*

# Word Index included with this Min-U-Script®

Page 6

[1] referring to Mr. Kouvchinov, Alexei Kouvchinov, as
[2] Alex, if that's okay with you?
[3]   **A:** That's fine.
[4]   **Q:** Okay. So if I'm referring to Alex, that's
[5] who I'm referring to. Where are you presently
[6] working?
[7]   **A:** I'm not.
[8]   **Q:** Are you on some sort of leave, or can you
[9] tell me why you're not working?
[10]   **A:** I had a baby in October, so I decided to
[11] stay home.
[12]   **Q:** And where was your last place of
[13] employment?
[14]   **A:** PTC.
[15]   **Q:** And how long had you been working for PTC?
[16]   **A:** A little over five years.
[17]   **Q:** Do you remember when your start date was?
[18]   **A:** I started as a contractor, and then went
[19] full time in April of 1999.
[20]   **Q:** And when did you start as a contractor?
[21]   **A:** September 21, 1998.
[22]   **Q:** And your last date of employment with PTC
[23] was when?
[24]   **A:** January 5, 2004.

Page 7

[1]   **Q:** Can you give me a little bit of background
[2] on yourself, your educational background. Did you
[3] go to college?
[4]   **A:** I did.
[5]   **Q:** Where did you go?
[6]   **A:** Connecticut College.
[7]   **Q:** And what did you study there? What sort of
[8] degree did you get?
[9]   **A:** I have a BA in psychology and a minor in
[10] women's studies.
[11]   **Q:** And did you go on for any additional
[12] education?
[13]   **A:** No.
[14]   **Q:** Before PTC in 1998, where were you working?
[15]   **A:** I worked at State Street Bank and Trust
[16] Company.
[17]   **Q:** What were you doing there?
[18]   **A:** I worked in their corporation actions
[19] department and then their corporate trust
[20] department.
[21]   **Q:** What sort of job is that?
[22]   **A:** Finance.
[23]   **Q:** And prior to that?
[24]   **A:** I was in school when

Page 8

[1]   **Q:** When you were contracted to work for PTC,
[2] what was your role or your job?
[3]   **A:** HR assistant.
[4]   **Q:** And has that been the first time that you
[5] had worked in Human Resources?
[6]   **A:** Yeah. I had worked for my father. He owns
[7] his own company, but more as an office manager, so
[8] yes.
[9]   **Q:** And when you began work with PTC in their
[10] Human Resource department, what sort of training did
[11] PTC give you in that area, if any?
[12]   **A:** On-the-job training.
[13]   **Q:** Can you define, back in September of '98
[14] when you came on as a contractor, what role did you
[15] play in the Human Resource department? What were
[16] your duties?
[17]   **A:** I would do anything from offer letters,
[18] basic inquiries from employees, process
[19] terminations, a couple of exit interviews,
[20] fundamental HR tasks.
[21]   **Q:** Back then, how many employees worked at
[22] PTC?
[23]   **A:** 5,100 worldwide.
[24]   **Q:** How many in your location that your Human

Page 9

[1] Resource office had responsibility for?
[2]   **A:** Well, there are about 2,500 employees in
[3] the U.S., probably 1,200 that we could interact with
[4] but didn't on a daily basis obviously.
[5]   **Q:** So was this the center for the U.S. Human
[6] Resource department for PTC?
[7]   **A:** Yes.
[8]   **Q:** And at that time who was the head of the
[9] department?
[10]   **A:** Carl Ockerbloom.
[11]   **Q:** And was Lisa Perry working at that time?
[12]   **A:** No.
[13]   **Q:** Now, at some point were you promoted within
[14] that department?
[15]   **A:** I moved to a benefit specialist role in
[16] about January of 1999.
[17]   **Q:** And was that as a full-time employee at
[18] that point?
[19]   **A:** No, I was still contracting.
[20]   **Q:** And when you say "benefits specialist,"
[21] what sort of benefits did you have responsibility
[22] for?
[23]   **A:** Administration of 401Ks, employee stock
[24] purchase plan, disability, health insurance, HCRA or



**Page 14**

[1] schedule, you know, 100 percent, but it was based on
[2] your length of service with the company, and I
[3] believe long-term disability was paid at 66 and two
[4] thirds.
[5] **Q:** In terms of the benefits, the type of
[6] coverage or the scope of coverage, do you know
[7] what — whether or not a person who was disabled
[8] short term or long term, whether or not they could
[9] perform any work outside of — if they are made
[10] eligible for disability? Is that question clear?
[11] **A:** It's not.
[12] **Q:** Okay. Are you aware — back in 2001, the
[13] type of coverage offered by PTC for employees of
[14] PTC, do you know whether or not an employee who was
[15] found to be eligible for disability, whether or not
[16] they could perform any other work outside of that
[17] disability claim or in addition?
[18] **A:** When you use the word "eligible," everyone
[19] who qualified was eligible for disability.
[20] **Q:** Whether someone was approved for
[21] disability? Is that —
[22] **A:** No —
[23] **Q:** — a better term?
[24] **A:** — you could not work.

**Page 15**

[1] **Q:** Do you have — were there different types
[2] or different levels of disability packages offered
[3] to different classifications of employees at PTC?
[4] **A:** Everyone was offered — no.
[5] **Q:** It's the same package for everybody?
[6] **A:** (Witness nods)
[7] **Q:** In terms of the scope of benefits?
[8] **A:** (Witness nods)
[9] **Q:** You have to answer "yes" or "no."
[10] **A:** Oh, sorry. Same package, yes.
[11] **Q:** When you worked with employees back in
[12] 2001, when a person was hired and — or when a
[13] person — excuse me. Strike that. When a person
[14] was eligible for disability benefits, how did you
[15] introduced them to that information?
[16] **A:** In 2001 I was not a benefits specialist. I
[17] moved to a different role, so I would direct them to
[18] the special — benefits specialist to go through it.
[19] **Q:** When did you stop your role as a benefits
[20] specialist?
[21] **A:** September of 2000.
[22] **Q:** And what role did you change to at that
[23] point?
[24] **A:** Human Resources representative.

**Page 16**

[1] **Q:** What does that mean? Tell me the scope of
[2] your duties.
[3] **A:** Sure. Work with the employees, be an
[4] advocate for the employees, deal with issues
[5] around — basic things around writing a verification
[6] letter of employment; more serious things, if they
[7] had a problem with their manager, any concerns they
[8] may have; compensation-related matters; learning and
[9] development performance management. If people had a
[10] question, they would come to me as their Human
[11] Resources representative. I worked closely with
[12] managers, vice-presidents.
[13] **Q:** So if managers had a problem with an
[14] employee, they'd come to you?
[15] **A:** Yes.
[16] **Q:** And vice versa, if an employee had a
[17] problem with a manager, they'd come to you?
[18] **A:** Yes.
[19] **Q:** And you would try to facilitate a
[20] resolution to whatever the problem was?
[21] **A:** Yes.
[22] **Q:** Would that be a fair statement?
[23] **A:** Yes.
[24] **Q:** So you stopped your role as a benefits

**Page 17**

[1] specialist back in September of 2000?
[2] **A:** Yes.
[3] **Q:** So you approximately held that position
[4] from April of 1999 through September of 2000, would
[5] that be a fair —
[6] **A:** I held it from January but as contractor
[7] until...
[8] **Q:** Until May of 2000?
[9] **A:** No.
[10] **Q:** Excuse me. September of 2000?
[11] **A:** Correct. Yes.
[12] **Q:** And during that period of time, you handled
[13] approximately 50 or 60 benefit cases, 50 or 60 cases
[14] where people were eligible or were approved for
[15] benefits?
[16] **MR. TULLY:** Objection. You can answer.
[17] **A:** Can you clarify the question.
[18] **Q:** Okay. From the time that you began working
[19] as a benefits specialist to the time that you
[20] stopped working as a benefits specialist, how many
[21] disability claims were you involved in?
[22] **A:** Approximately 20 or 25.
[23] **Q:** Were there additional cases above and
[24] beyond that where people were not approved for

Alexei Kouvchinov v.                                      Lisa Wales
CDI Information Technology Services, et al.          Vol. 1, April 16, 2004
Case 1:04-cv-12591-MEL   Document 63-3   Filed 07/06/2006   Page 5 of 14

Page 22

[1] meeting with Alex?

[2]  A: Yes. We met with Jayante Mukhopoda. His
[3] responsibility was to tell Alex that his termination
[4] — you know, his employment with PTC would be
[5] ending. My role as the Human Resources
[6] representative was to go through the severance
[7] package with him, answer any questions he may have
[8] and then I became his contact.

[9]  Q: And was he asked to leave the premises on
[10] that day, September 10th?

[11]  A: Yes.

[12]  Q: And is that the policy of PTC?

[13]  A: Yes.

[14]  Q: And what was his reaction to you telling
[15] him that he was going to be terminated?

[16]  A: I didn't tell him he was terminated.

[17]  Q: But you met with him at some point?

[18]  A: Yes. Surprised, I mean...

[19]  Q: And any other observations?

[20]  A: You know, I unfortunately have been
[21] involved in 200 terminations, so I don't remember
[22] his specific reaction, but most likely surprise.

[23]  Q: And did you have contact with him after
[24] September 10th?

Page 23

[1]  A: Yes.

[2]  Q: And can you tell me the context and what
[3] happened during this next contact?

[4]  A: He called me I believe three days after
[5] that and asked if I had received his disability
[6] claim, that a friend of his had dropped it off in my
[7] mailbox, could I go check to see if it was there. I
[8] checked to see that it was there, let him know that
[9] I would give it to our benefits specialist, Lisa
[10] Perry. I didn't get involved in that process. He
[11] would have to work with her on that and if he had
[12] any questions related to his severance package he
[13] could contact me.

[14]  Q: So for purposes of his claim for
[15] disability, you received — your best memory today
[16] is that you received that three days later?

[17]  A: I believe it was September 13th or 14th.

[18]  Q: And you referred that to Lisa Perry. Did
[19] you have any further conversations with Lisa Perry
[20] about the disability claim at that point?

[21]  A: Yes.

[22]  Q: And can you tell me what those
[23] conversations were?

[24]  A: I let her know that Alexei had been part of

Page 24

[1] the reduction in force and had been notified on
[2] September 10th.

[3]  Q: And the purpose for — did you have a
[4] purpose for telling her that?

[5]  A: From an administrative standpoint, it was
[6] going to be difficult for her, if his disability had
[7] been approved, to keep his benefits going in our HR
[8] system.

[9]  Q: So it was a concern about continuation of
[10] benefits?

[11]  A: (Witness nods)

[12]  Q: Any other conversations regarding the
[13] timing of his claim and the appropriateness of his
[14] claim?

[15]  A: I let him — no, I mean, he was entitled to
[16] submit a claim. He was still an employee through
[17] the 24th.

[18]  Q: You didn't think that it was odd at that
[19] time that he had submitted a claim just after he had
[20] been given notice of termination?

[21]  A: I don't — I don't think — I don't
[22] adjudicate claims, so —

[23]  Q: I understand that.

[24]  A: I did think it was odd, for sure.

Page 25

[1]  Q: Did you have that communication — did you
[2] have that discussion with Lisa Perry at all?

[3]  A: Yeah.

[4]  Q: Can you tell me what you said, what you and
[5] Lisa said about that?

[6]  A: I let her know that he had been notified on
[7] Monday and that a claim showed up in my mailbox for
[8] short term disability on Thursday.

[9]  Q: And did she say anything back to you?

[10]  A: She said, "We'll give it to CIGNA. They
[11] determine if claims are approved, not us."

[12]  Q: Did she have any further conversation?

[13] Did you and Lisa Perry have any further conversation
[14] about the timing of the claim or anything that
[15] you — any concerns you might have had about the
[16] timing of the claim?

[17]  A: We just thought it was odd that after he
[18] had been notified he was submitting a claim after
[19] never having a prior history.

[20]  Q: And when you say he never had a prior
[21] history, what do you mean by that?

[22]  A: He didn't — Lisa checked, and he
[23] didn't — had never been on disability at PTC prior.

[24]  Q: Okay. So Lisa checked his whatever file,

Lisa Wales

Alexei Kouvchinov v.

Vol. 1, April 16, 2004          Case 1:04-cv-12531-MEL     Document 63-3     Filed 07/06/2006     Page 6 of 14     CDL Information Technology Services, et al.

---

Page 26

[1] Human Resource file, and determined that he had
[2] never been on disability before?
[3]   A: I believe she checked his benefits file.
[4]   Q: And did anyone go through his personnel
[5] file to see if he had any sort of — strike that.
[6] Do you know whether or not Lisa Perry reviewed his
[7] personnel file in making that determination?
[8]   A: I don't know that.
[9]   Q: And you didn't review his personnel file?
[10]   A: I don't remember reviewing it.
[11]   Q: Do you know whether or not at that time in
[12] September of 2001, do you know whether or not
[13] Mr. — whether or not Alex had any sort of history
[14] of depression or mental health issues?
[15]   A: No.
[16]   Q: And I'm assuming you hadn't spoken to
[17] Mr. — to Alex about that?
[18]   A: No.
[19]   MR. TULLY: Can you just clarify that
[20] answer. It's a little — he's saying "can I assume
[21] that you didn't" and you say no. I don't mean to
[22] be —
[23]   Q: Will you repeat the question.
[24]   Q: Sure. You did not speak with Alex about

---

Page 27

[1] whether he had a mental health history back in
[2] September —
[3]   A: No.
[4]   Q: — of 2001. Do you know whether or not
[5] Lisa Perry did?
[6]   A: I don't know.
[7]   Q: Now, at some point after that his
[8] disability was approved, correct?
[9]   A: Yes.
[10]   Q: And you were aware of that back in
[11] September of 2001 or October 2001?
[12]   A: Yes.
[13]   Q: And can you tell me how you became aware of
[14] that back in September or October of 2001?
[15]   A: Lisa Perry told me.
[16]   Q: And did you have any further discussions
[17] with her about the disability at that point?
[18]   A: No.
[19]   Q: Any further discussions about the
[20] appropriateness of CIGNA granting him disability
[21] benefits?
[22]   A: No.
[23]   Q: At any point in 2001, did you review Alex's
[24] personnel file?

---

Page 28

[1]   A: I might have. Probably. Yeah,
[2] I mean — yes.
[3]   Q: Okay. And when you reviewed his personnel
[4] file — do you have a present recollection of that
[5] today, having reviewed his file? Today do you have
[6] a recollection of actually having reviewed his
[7] personnel file back in 2001?
[8]   A: Yes, I reviewed his file.
[9]   Q: And in reviewing that file, did you see his
[10] performance reviews in that file?
[11]   A: They were there.
[12]   Q: Did you review them? You said you reviewed
[13] the file.
[14]   A: I looked at them but not closely.
[15]   Q: Did you make an observation that they were
[16] good reviews?
[17]   A: No.
[18]   Q: When you say "no," you didn't make an
[19] observation, would that be a fair statement? You
[20] didn't make an observation one way or the other as
[21] to whether they were good reviews?
[22]   A: That — yes.
[23]   Q: Did you observe that Mr. — excuse
[24] me — that Alex had worked a lot of overtime as an

---

Page 29

[1] employee of PTC?
[2]   A: I just — I don't remember. It was three
[3] years ago.
[4]   Q: If I showed you some documents, would that
[5] help you? Do you think that would help refresh your
[6] memory?
[7]   A: Sure.
[8]   Q: Let me start off with one document which is
[9] Respondents 00120.
[10]   A: (Witness reviews document)
[11]   Q: And is it fair to say that document
[12] identifies him as having worked on August 4th and
[13] August 5th of 2001 on Saturday and Sunday?
[14]   A: From what's here, yes.
[15]   Q: And this is signed by Sergey Denisenko; is
[16] that correct?
[17]   A: It appears on this document he signed it.
[18]   Q: Is there any reason to believe that this is
[19] not an accurate document?
[20]   A: No.
[21]   Q: Okay. And this is stating that — would
[22] it be fair to say that this is saying that Mr.
[23] Denisenko is asking that he be compensated in cash
[24] rather than in time for his overtime work?

---

**Page 38**

[1] definitions for each one of these categories ranging
[2] from CE, consistently exceeds expectation, through
[3] NA, not applicable?
[4] **A:** Yes.
[5] **Q:** And there's also an E, which means
[6] consistently meets and sometimes exceeds
[7] expectations?
[8] **A:** Yes.
[9] **Q:** Is it fair to say that in every category
[10] listed here, where it was not identified as being
[11] not applicable, that Alex either got an E rating or
[12] a CE rating?
[13] **A:** Could you repeat that question.
[14] **Q:** Sure. Is it fair to say that in most of
[15] these categories Alex's rating was either a CE or an
[16] E rating?
[17] **MR. TULLY:** Objection. You can answer.
[18] **MR. BUDREAU:** Sorry?
[19] **MR. TULLY:** I said, "Objection. You can
[20] answer."
[21] **A:** I see some CMs here.
[22] **Q:** Okay. How many CMs do you see?
[23] **A:** Six.
[24] **Q:** And how many CEs do you see?

**Page 39**

[1] **A:** Ten.
[2] **Q:** And not to belabor this, but there are
[3] another four or five Es in different categories,
[4] correct?
[5] **A:** Yes.
[6] **Q:** So his ratings were anywhere from CM to CE
[7] depending upon the category, correct?
[8] **A:** Yes.
[9] **Q:** And at the end, overall, on the last page
[10] it says, "Overall Performance Rating." Can you tell
[11] me what that is?
[12] **A:** Yes.
[13] **Q:** Would you tell me what that is.
[14] **A:** CE.
[15] **Q:** Now, when you were reviewing the personnel
[16] file back in 2001, did you review this document?
[17] **A:** I could have.
[18] **Q:** It was in his personnel file back in 2001,
[19] correct?
[20] **A:** Correct.
[21] **Q:** So you just don't have a present memory as
[22] to whether or not you reviewed it?
[23] **A:** If I reviewed at it, I glanced at it. I
[24] didn't study it.

**Page 40**

[1] **MR. BUDREAU:** If I could have this marked
[2] as an exhibit.
[3] (Document marked as Wales
[4] Exhibit 4 for identification)
[5] (Recess taken)
[6] **BY MR. BUDREAU:**
[7] **Q:** Back when Alex applied for his disability,
[8] were you aware of the basis for his claim?
[9] **A:** Yes.
[10] **Q:** And can you tell me what that was?
[11] **A:** The claim came to me. I believe it was
[12] depression.
[13] **Q:** And you said earlier that Alex had dropped
[14] off the claim in your mailbox a few days after or
[15] three days after his termination?
[16] **A:** Alex called me and said, "Please go check
[17] your mailbox. A friend of mine dropped off the
[18] claim."
[19] **Q:** And what date did you meet with Alex
[20] regarding his termination?
[21] **A:** September 10, 2001.
[22] **Q:** And was — do you remember if his claim was
[23] completely filled out at that point when it was
[24] dropped off in your mailbox?

**Page 41**

[1] **A:** He completed his part. The employer
[2] section was not completed.
[3] **Q:** Can you tell me if this is the document
[4] that you received?
[5] **A:** (Witness reviews document) Yes. This is
[6] the document.
[7] **Q:** Okay.
[8] **MR. TULLY:** Objection.
[9] **MR. BUDREAU:** And please identify the
[10] document for the record as Respondents 00021.
[11] **MR. TULLY:** Can I ask you a clarification.
[12] You can either do it now or later.
[13] **MR. BUDREAU:** Let's go off the record for a
[14] second.
[15] (Discussion off the record)
[16] **MR. BUDREAU:** Let's go back on the record.
[17] **Q:** The document in front of you is Respondents
[18] 00020 through 00021. The back page should be the
[19] front page. Now, you received these two pages,
[20] would that be correct?
[21] **A:** Yes.
[22] **Q:** And your statement was that the bottom
[23] portion had not been filled out when you received
[24] it, which was the employer's certification on Page

Lisa Wales
Vol. 1, April 16, 2004
Case 1:04-cv-12531-MEL    Document 63-3    Filed 07/06/2006    Page 8 of 14
Alexei Kouvchinov  v.
GDL Information Technology Services, et al.

Page 42

[1] 00020?

[2]    **A:** May I clarify.

[3]    **Q:** Sure.

[4]    **A:** This page (indicating).

[5]    **MR. TULLY:** If you can refer to the numbers
[6] here.

[7]    **A:** 21 was completed. 20 was left blank and
[8] needed to be completed by our benefits
[9] administrator.

[10]    **Q:** Okay. That's fine. Now, was this date
[11] stamped by you or your company when it was received?

[12]    **A:** Not to my knowledge.

[13]    **Q:** And referring to the Claimant's
[14] Certification which is about a third of the way
[15] down, do you see that, on Page 00021?

[16]    **A:** Yes.

[17]    **Q:** Okay. That was filled out in advance by
[18] Alex, correct?

[19]    **A:** Yes.

[20]    **Q:** Okay. And can you tell me what the date is
[21] on that?

[22]    **A:** 9/17/01.

[23]    **Q:** And would that change your memory as to
[24] when you received this document? Let me ask it

Page 43

[1] another way. Could your memory of when you received
[2] this document have been wrong?

[3]    **A:** Yes.

[4]    **Q:** And that you may have received it on the
[5] 17th of September instead the 13th or 14th of
[6] September?

[7]    **A:** Yes.

[8]    **MR. BUDREAU:** If we could have that marked
[9] as an exhibit. No. Let me continue on this for a
[10] moment.

[11]    **Q:** The section on Page 00021 which says, "To
[12] Be Completed By Attending Physician," that was
[13] already filled in when you received it?

[14]    **A:** Yes.

[15]    **Q:** And it says, "major depression" would that
[16] be correct, as the diagnosis?

[17]    **A:** Yes.

[18]    **Q:** And you read this document when you
[19] received it, would that be correct?

[20]    **A:** I glanced at this document.

[21]    **Q:** All right. And you said earlier that you
[22] glanced at it enough to know that it was a claim for
[23] depression?

[24]    **A:** Yes.

Page 44

[1]    **Q:** That the disability was based upon
[2] depression?

[3]    **A:** Yes.

[4]    **MR. BUDREAU:** Could you mark that document,
[5] please.

[6]    (Document marked as Wales
[7] Exhibit 5 for identification)

[8]    **Q:** Okay. At this point, around September 17,
[9] 2001, did you have conversations with anyone else
[10] other than Lisa Perry about Mr. — excuse me, about
[11] Alex's disability claim?

[12]    **A:** Yes.

[13]    **Q:** Who is that?

[14]    **A:** Aaron von Staats.

[15]    **Q:** Could you spell Aaron's last name?

[16]    **A:** v-o-n S-t-a-a-t-s.

[17]    **Q:** And the first name, is that E-r-i-n?

[18]    **A:** A-a-r-o-n.

[19]    **Q:** Sorry. And Aaron's position in PTC is
[20] what?

[21]    **A:** Head of our legal department.

[22]    **Q:** And what why did you go to the legal
[23] department with this?

[24]    **A:** Because Alexei had been notified of his

Page 45

[1] termination. I wanted to make Aaron aware of it.

[2]    **Q:** And were there — were there any
[3] conclusions that you reached about — strike that.
[4] Why did you want to make him aware of that?

[5]    **A:** It's often that HR and legal would work
[6] together because he was a terminated employee. I
[7] just wanted to make sure he knew this was going on.

[8]    **Q:** Were you concerned that his benefits may
[9] not be appropriate — that disability benefits might
[10] not be appropriate for someone who had already been
[11] laid off?

[12]    **A:** That wasn't my decision to make.

[13]    **Q:** So you didn't form any opinion of that?
[14] You just wanted to raise that issue with the legal
[15] department?

[16]    **A:** Could you rephrase that question.

[17]    **Q:** You didn't form — did you form any opinion
[18] as to whether or not Alex was entitled to request
[19] disability benefits at that time?

[20]    **A:** He was entitled to request them as still
[21] being employed through September 24th.

[22]    **Q:** So what was the legal concern that
[23] you — what was the concern that you had, then?

[24]    **A:** He was an employee who was part of the

Alexei Kouvchinov v.
CDI Information Technology Services, et al
Case 1:04-cv-12586-MEL Document 63-3     Filed 07/06/2006     Page 9 of 14

Lisa Wales
Vol. 1, April 16, 2004

Page 46

[1] reduction in force, so I wanted to make sure our
[2] legal department knew that he was submitting a claim
[3] in his two-week notice period.
[4]    Q: And, again, I'm asking why did you want to
[5] make sure that they knew that?
[6]    A: Because he was part of the reduction in
[7] force, and I often work with legal on these issues.
[8]    Q: And is there, again, a specific reason why
[9] you — would you have — did you — have you ever
[10] sent — has anybody else while you worked in the
[11] specialist — the benefits specialist position, has
[12] anybody else filed for a disability claim during
[13] their — the period of time that they were informed
[14] of their layoff and between that date and the date
[15] when they're actually terminated?
[16]    A: Are you asking when I worked in the
[17] benefits specialist role?
[18]    Q: Right.
[19]    A: No. There were no cases like that.
[20]    Q: Were there any cases that you're aware of
[21] after you left the benefits specialist role besides
[22] Alex's?
[23]    A: Not that I'm aware of.
[24]    Q: Were there any other disability claims

Page 47

[1] filed by PTC employees that you referred to the
[2] legal department?
[3]    A: Not to my knowledge.
[4]    Q: But your concern was not whether an
[5] employee would be entitled to benefits during that
[6] time, was it?
[7]    A: No.
[8]    Q: So it was some other concern?
[9]    A: We had just laid off Alex and worked
[10] closely with legal around that, and I just wanted to
[11] make sure that they knew he was a terminated
[12] employee but was also exercising his eligibility to
[13] submit a claim.
[14]    Q: Is there anybody else other than the legal
[15] department that you had discussions with about his
[16] claim back in September of 2001?
[17]    A: I think I let my manager know at the time
[18] and the vice-president of Human Resources.
[19]    Q: And who's that?
[20]    A: Ed Raine.
[21]    Q: And do you remember the conversation you
[22] had with Ed Raine?
[23]    A: No.
[24]    Q: Do you remember talking about the

Page 48

[1] disability itself and the type of disability —
[2]    A: No.
[3]    Q: — that he was claiming? When you were
[4] working with people who were approved for disability
[5] claims, what information did you provide them,
[6] generally? What was your routine for providing
[7] information to people who were approved for
[8] disability benefits?
[9]    MR. TULLY: I'm sorry. When are we
[10] talking? While she was in the benefits group?
[11]    MR. BUDREAU: While she was in the benefits
[12] group.
[13]    A: So can you repeat the question.
[14]    Q: While you were in the benefits group —
[15]    A: Yes.
[16]    Q: — what was your routine for providing
[17] information about the scope of the benefits, the
[18] employee's obligations, those sort of things? What
[19] information did you provide employees who were
[20] approved for disability claims?
[21]    A: So you're asking me the typical protocol?
[22]    Q: Yes. What you used.
[23]    A: Okay. An employee would submit a claim to
[24] the benefits group. We would complete the employer

Page 49

[1] section. We would send it off to the disability
[2] carrier. They would then decide if the person was
[3] approved or not. They would then directly
[4] communicate with the employee. They would copy us
[5] in a letter so we would know and could keep status
[6] of it. You know, turn off the person's payroll,
[7] when they were expected back. So when an employee
[8] was on disability, their main communication was with
[9] the disability carrier and not us.
[10]    Q: So your protocol was not to have further
[11] discussions about whatever obligations they might
[12] have under their disability policy? You did not
[13] have additional discussions about that? You did not
[14] have additional discussions about what their
[15] obligations might be for, let's say, terminating
[16] their disability coverage?
[17]    A: No.
[18]    Q: Okay. And was that a protocol that you
[19] just learned on the job, or was that a protocol that
[20] was used by PTC?
[21]    A: That was used by PTC.
[22]    Q: And do you know whether or not Lisa Perry
[23] used that protocol?
[24]    A: I don't know.

Lisa Wales
Vol. 1, April 16, 2004

Case 1:04-cv-12531-MEL     Document 63-3

Alexei Kouvchinov   v.
CDI Information Technology Services, et al.
Filed 07/06/2006     Page 18 of 24

Page 66

[1] **A:** Yes.
[2] **Q:** And you were the person who was
[3] investigating this matter for PTC, would that be a
[4] fair statement?
[5] **A:** Yes.
[6] **Q:** And as part of that, you were asking Lisa
[7] Perry, as well as other people, to give you any
[8] information that might assist you in your
[9] investigation, would that be a fair statement?
[10] **A:** Yes.
[11] **Q:** So Lisa Perry was aware you wanted updated
[12] information to assist in you making whatever
[13] recommendations you might make to Ed Raine or the
[14] higher-ups, correct?
[15] **A:** Yes.
[16] **Q:** Okay. And you got this document as part of
[17] that investigation, would that be correct?
[18] **A:** Yes.
[19] **Q:** So it says here that Alex was paid through
[20] 11/30/01, correct?
[21] **A:** Yes.
[22] **Q:** Did you have any other information that
[23] would suggest that he was paid after 11/30/01?
[24] **A:** I believe there was an e-mail stating he

Page 67

[1] was paid further than that and that he was being
[2] turned over to long-term disability.
[3] **Q:** Do you know if that e-mail stated that his
[4] benefits had been extended beyond that date or
[5] whether he had been paid?
[6] **A:** I don't.
[7] **MR. TULLY:** Do you want to make mark either
[8] one of these for clarity of the record?
[9] **MR. BUDREAU:** Absolutely.
[10] (Document marked as Wales
[11] Exhibit 8 for identification)
[12] **MR. BUDREAU:** The e-mail will be marked as
[13] an exhibit, the e-mail from Angela Wallace to Lisa
[14] Perry on December 6, 2001, stating that Alex was
[15] paid through 11/30/01, and there are additional sub
[16] e-mails on there also. And also Respondents
[17] Document 006 through 007 will be marked as an
[18] exhibit, and this is the document identified by Lisa
[19] Wales as an e-mail sent by her on December 6th to a
[20] number of individuals including Richard Bellingham.
[21] (Document marked as Wales
[22] Exhibit 9 for identification)
[23] **Q:** I'm going to show you this document. Have
[24] you seen this document?

Page 68

[1] **A:** Yes.
[2] **Q:** And did you see that document on or about
[3] December 4, 2001?
[4] **A:** Yes.
[5] **Q:** And this is an e-mail from Angela Wallace
[6] to Lisa Perry, correct?
[7] **A:** Yes.
[8] **Q:** And it's sent on December 4th, and can you
[9] tell me what it says?
[10] **A:** "Alexei Kouvchinov was extended to 12-16-01
[11] and referred to LTD."
[12] **Q:** So when you said earlier that you thought
[13] his payments had been extended into December, was
[14] this what you were referring to?
[15] **A:** His benefits had been extended.
[16] **Q:** So your testimony is that you had
[17] information that his benefits had been extended to
[18] 12/16/01, correct?
[19] **A:** Correct.
[20] **Q:** And at that point in December, between
[21] December 4th and afterwards, did you have any
[22] information that he had been paid after
[23] November 30, '01?
[24] **A:** No.

Page 69

[1] **MR. BUDREAU:** Could we have that marked as
[2] an exhibit, please.
[3] (Document marked as Wales
[4] Exhibit 10 for identification)
[5] **Q:** So during this period of time, did you
[6] contact CIGNA again directly to ask them about
[7] what it meant that he had only been paid through
[8] November 30, '01?
[9] **A:** No.
[10] **Q:** And did you discuss with Alex at any time
[11] in 2001 what his responsibilities were for
[12] terminating his short-term disability claim?
[13] **A:** No.
[14] **Q:** Did Lisa Perry, to your knowledge, talk
[15] with CIGNA about whether Alex had terminated his
[16] disability claim?
[17] **A:** Can you repeat the question.
[18] **Q:** Do you know whether or not Lisa Perry spoke
[19] to CIGNA about whether Alex terminated his
[20] disability claim?
[21] **A:** I don't know.
[22] **Q:** Did you talk to CDI at all, anybody from
[23] CDI, about this issue?
[24] **A:** No.

Lisa Wales
Vol. 1, April 16, 2004
Case 1:04-cv-12531-MEL     Document 63-3     Filed 07/06/2006     Page 18 of 14

Alexei Kouvchinov   v.
CDI Information Technology Services, et al.

Page 82

[1] about their submission of Alex's name to CDI?
[2] **A:** No.
[3] **Q:** So when you say you were aware that PTC
[4] employees had submitted Alex's name to CDI, how were
[5] you aware of that?
[6] **A:** How was I aware of that?
[7] **Q:** Yes.
[8] **A:** Alexei told me that Lesburg hired at him at
[9] CDI.
[10] **Q:** That's a different question.
[11] **A:** Okay. Sorry.
[12] **Q:** It may be my fault. Did any employees
[13] during your investigation tell you that they had
[14] submitted Alex's name to CDI for employment?
[15] **A:** Tell me directly, no. No.
[16] **Q:** Did you want to elaborate on that or —
[17] **A:** No, thank you.
[18] **Q:** You learned during your investigation that
[19] PTC employees had submitted Alex's name to CDI?
[20] **A:** Yes.
[21] **Q:** Okay. And do you know who those employees
[22] were that did that?
[23] **A:** Lee Lesburg.
[24] **Q:** Did you speak to Lee about that?

[1] **A:** About submitting Alex's name?
[2] **Q:** Right.
[3] **A:** I might have.
[4] **Q:** Did you speak to him about the
[5] circumstances which caused him to submit Alex's name
[6] to CDI as a potential employee?
[7] **A:** Just repeat the question. I'm sorry.
[8] **Q:** Sure. Did you speak to Lee Lesburg about
[9] why he submitted or what caused him to submit Alex's
[10] name to CDI for potential employment?
[11] **A:** Yes.
[12] **Q:** Okay. And what did he tell you?
[13] **A:** He needed a certain skill set to fix bugs,
[14] that Alex had.
[15] **Q:** Had those skills?
[16] **A:** Yes.
[17] **Q:** Did he tell you anything else?
[18] **A:** No.
[19] **Q:** So that's your complete memory of what Lee
[20] Lesburg told you about why he submitted Alex's name
[21] to CDI, correct?
[22] **A:** Yes.
[23] **Q:** So you had no information that Alex asked
[24] him to do that, would that be fair?

[1] **A:** Yes.
[2] **Q:** So just for clarity's sake, because
[3] sometimes it's my fault for the way I ask questions,
[4] you did not have — you did not have any information
[5] during your investigation that Alex had asked Lee
[6] Lesburg to submit his name to CDI?
[7] **A:** Yes.
[8] **Q:** And after your investigation, you didn't
[9] develop any new information that Alex had
[10] submitted — that Alex had requested Lee Lesburg to
[11] submit his name to CDI, is that true?
[12] **A:** Yes.
[13] **Q:** Okay. So if you had learned during your
[14] investigation or after your investigation that Alex
[15] had indeed called CIGNA to terminate his STD
[16] benefits, would that have changed your opinion that
[17] Mr. — that Alex had committed an ethical breach?
[18] **MR. TULLY:** Objection. You can answer.
[19] **Q:** Do you understand the question?
[20] **THE WITNESS:** Do I answer it?
[21] **MR. TULLY:** You can answer the question.
[22] **A:** Okay. Can you repeat the question.
[23] **Q:** Sure. If you had learned during your
[24] investigation or subsequent to your investigation

[1] that Alex had indeed notified CIGNA that he was
[2] terminating his short-term disability or any
[3] disability benefits that he was receiving —
[4] **A:** Uh-huh.
[5] **Q:** — would that have changed your opinion
[6] that he had committed an ethical breach, and I say
[7] in advance of December 4th?
[8] **MR. TULLY:** What in advance? If he had
[9] notified CIGNA prior to December 4th?
[10] **MR. BUDREAU:** Right.
[11] **A:** Yes.
[12] **Q:** Tell me what was the ethical breach that
[13] Alex committed?
[14] **A:** He was double-dipping.
[15] **MR. TULLY:** Objection. You can answer.
[16] **A:** He was double-dipping.
[17] **Q:** So it was your opinion he was getting both
[18] STD benefits and working at the same time?
[19] **A:** Yes.
[20] **Q:** Based upon your investigation?
[21] **A:** Yes.
[22] *Q. And did you also have an opinion at that
[23] time in December, between December 4th and December
[24] 6th, as to whether or not his original claim for

Alexei Kouvchinov v.
CDI Information Technology Services, et al.
Case No. 05-12393MLEE    Document 63-3    Filed 07/06/2006    Page 12 of 14

Lisa Wales
Vol. 1, April 16, 2004

Page 86

[1] disability was fraudulent?
[2] **MR. TULLY:** I'm sorry. Before you answer,
[3] can you read that back, please.
[4] *(Question read)
[5] **MR. TULLY:** Thank you.
[6] **A:** I don't adjudicate claims.
[7] **Q:** I understand that. I'm not asking you to
[8] adjudicate his claim. I'm asking whether or not you
[9] had an opinion.
[10] **A:** I thought it was strange that — I thought
[11] it was definitely interesting.
[12] **Q:** So did you have an opinion?
[13] **A:** Yes.
[14] **Q:** What was your opinion?
[15] **A:** That — I just thought it was very
[16] interesting that — could you repeat your original
[17] question. I'm sorry. I just want to make sure that
[18] I'm answering it correctly.
[19] **Q:** That's fair. Did you form an opinion
[20] during your investigation from the period of
[21] December 4th through December 6th that —
[22] **MR. BUDREAU:** Can you do me a favor and
[23] read back the question.
[24] *(Question read)

Page 87

[1] **A:** Yes, I did have an opinion.
[2] **Q:** Okay. And what was that opinion?
[3] **A:** I thought the claim could have been
[4] skeptical.
[5] **Q:** So you had doubts about whether or not his
[6] claim was real?
[7] **A:** Possibly.
[8] **Q:** Okay. Did you discuss that opinion with
[9] anyone —
[10] **A:** No.
[11] **Q:** — at that time?
[12] **A:** No.
[13] **Q:** Family members?
[14] **A:** My husband.
[15] **MR. TULLY:** You don't have to talk about
[16] anything you discussed with your husband, your
[17] lawyers, internal counsel at PTC.
[18] **MR. BUDREAU:** We can strike that from the
[19] response.
[20] **THE WITNESS:** Sorry.
[21] **Q:** Other than spouses —
[22] **A:** No.
[23] **Q:** — or your lawyers, do you know whether or
[24] not anybody else had an opinion as to whether

Page 88

[1] Mr. — whether or not Alex's original claim for
[2] disability was fraudulent at PTC?
[3] **A:** I don't know.
[4] **Q:** Did Lisa Perry say anything to you —
[5] **A:** No.
[6] **Q:** — about that subject? Ed Raine say
[7] anything to you —
[8] **A:** No.
[9] **Q:** — about that subject?
[10] **MR. TULLY:** While you're conferring, we're
[11] going to step out.
[12] **MR. BUDREAU:** Why don't we take a break.
[13] That's fine.
[14] (Recess taken from 12:37 p.m. to 12:52 p.m.)
[15] **BY MR. BUDREAU:**
[16] **Q:** Lisa, back in again 2001, the time period
[17] of early December after December 6th, just to give
[18] context, was it your understanding that Ed Raine and
[19] or someone else from PTC was going to speak to CDI
[20] and ask that Alex be removed from employment on the
[21] PTC project?
[22] **A:** Yes.
[23] **Q:** And that was based upon the information
[24] that you had supplied Ed Raine on December 6, 2001,

Page 89

[1] correct? The decision to ask CDI to remove Alex
[2] from employment back in that time period was based
[3] on the information that you'd supplied Mr. Raine on
[4] December 6th?
[5] **MR. TULLY:** Objection. You can answer.
[6] **A:** I provided the information. I didn't make
[7] the decision.
[8] **Q:** I understand that. Was there any
[9] other — was there anyone else who was investigating
[10] this issue, this issue of double-dipping, as you put
[11] it earlier, on behalf PTC?
[12] **A:** I was the lead person on it.
[13] **Q:** So you were the lead investigator, so to
[14] speak, on this?
[15] **A:** Yeah.
[16] **Q:** And it's your testimony today that you have
[17] no information or you had no information back in
[18] 2001 when this decision was being made — strike
[19] that.
[20] It's your testimony today that you had no
[21] information back in 2001 that Alex had actually
[22] received compensation from CIGNA after
[23] November 30, 2001, would that be correct? It's a
[24] long question.

Lisa Wales
Vol. 1, April 16, 2004
Case 1:04-cv-12531-MEL    Document 63-3    Filed 07/06/2006    Page 19 of 14
Alexei Kouvchinov   v.
CDI Information Technology Services, et al.

---

Page 90

[1] **A:** Yes. So you're asking me, did I know that
[2] he actually got cut a check after November 30th?
[3] **Q:** Right.
[4] **A:** I didn't know that, but I — that's not
[5] information I would necessarily be privy to. I
[6] mean, CIGNA would cut him the check, not PTC, and I
[7] can't imagine any insurance company would actually
[8] cut a check in advance.
[9] **Q:** But you never asked that question to CIGNA,
[10] correct?
[11] **A:** I never had any conversation with CIGNA.
[12] **Q:** And you never explored that question with
[13] Lisa Perry, correct?
[14] **A:** No.
[15] **Q:** But you did have an e-mail or information
[16] that was provided to you from Lisa Perry that he had
[17] only been paid through November 30th of 2001,
[18] correct?
[19] **A:** Yeah.
[20] **Q:** And you had that information during this
[21] period of investigation from December 4th through
[22] December 6th, correct?
[23] **A:** Yes.
[24] **Q:** And you received no additional information

---

Page 91

[1] during that investigation or after that
[2] investigation that would have changed that
[3] particular fact, that he had not been paid after
[4] November 30th of 2001?
[5] **A:** From CIGNA?
[6] **Q:** Right.
[7] **A:** Yes.
[8] **Q:** So you had not received any? You had not
[9] received any additional information that would have
[10] changed the fact that he had only received
[11] compensation through November 30, 2001?
[12] **A:** Lisa Perry provided me that e-mail.
[13] **Q:** Okay. But that's the only information that
[14] you had on that particular issue?
[15] **A:** That he actually got a check from CIGNA?
[16] **Q:** Right. After —
[17] **A:** Yeah.
[18] **Q:** Okay. Now, the contractors from — strike
[19] that. Based upon the information you provided Ed
[20] Raine on December 6, 2001, you understood that there
[21] was a possibility that Alex might have his
[22] employment terminated by CDI; is that correct?
[23] **A:** His employment with CDI as a contractor for
[24] them?

---

Page 92

[1] **Q:** Right. Right.
[2] **A:** Or working at PTC?
[3] **Q:** Well, let's start with PTC. You understood
[4] that based upon the information you provided Ed
[5] Raine that there was a possibility that Ed Raine
[6] would decide to terminate or to ask CDI to remove —
[7] **A:** Sure.
[8] **Q:** — Alex from —
[9] **A:** There's always a possibility of that.
[10] **Q:** Okay. And based upon the e-mail you
[11] received from Ed Raine on December 6th, you
[12] understood that that was the likely result of the
[13] information that you had provided, correct?
[14] **A:** Yes.
[15] **Q:** Okay. And, in fact, that's what happened,
[16] correct?
[17] **A:** Yes.
[18] **Q:** And did you learn that CDI did not offer
[19] Alex any additional employment —
[20] **A:** I did not —
[21] **Q:** — after that?
[22] **A:** — know that.
[23] **Q:** This could take a moment. You said earlier
[24] in your testimony that you had — that you majored

---

Page 93

[1] in psychology; is that correct?
[2] **A:** Yes.
[3] **Q:** So you have some experience, at least in
[4] terms of studying in academics, about the psychology
[5] of the mind in terms of in the context of
[6] depression?
[7] **A:** We touched upon it in school, you know, in
[8] some of my classes.
[9] **Q:** What is your understanding of depression
[10] generally? Do you have a sense of how depression
[11] can affect a person?
[12] **A:** I'm certainly not a doctor or medical
[13] expert, but I know people suffer from depression,
[14] mood swings, highs and lows, you know, feelings
[15] of — different feelings that, you know, that they
[16] can't deal with things, cope.
[17] **Q:** And when Alex worked at PTC, there's a
[18] statement in your response saying that Alex — well,
[19] strike that. There's a statement in your response
[20] to the MCAD charge by Alex that he never raised a
[21] disability claim with PTC in the past regarding his
[22] depression, would that be a fair —
[23] **A:** I believe that's in the PTC position
[24] statement.

---

**Page 98**

[1] still on disability, receiving payments whenever the
[2] check came through the mail and also contracting and
[3] working, which you're not supposed to do on
[4] disability, through CDI.
[5]    **Q:** And did you have again any information that
[6] Alex knew the correct protocols for terminating his
[7] disability?
[8]    **A:** That's not information I would have.
[9]    **Q:** Could you have inquired with Lisa Perry to
[10] find out that information for you?
[11]    **A:** Yes.
[12]    **MR. BUDREAU:** I don't have any further
[13] questions.
[14]    **MR. TULLY:** I might, actually.
[15]                 **CROSS EXAMINATION**
[16]                   **BY MR. TULLY:**
[17]    **Q:** Ms. Wales, at any point in time, were you
[18] contacted by an attorney claiming to represent
[19] Mr. Kouvchinov?
[20]    **A:** Yes.
[21]    **Q:** Do you recall approximately when that was?
[22]    **A:** Right around when Alexei had his disability
[23] claim put in my mailbox.
[24]    **Q:** Do you recall what it was that the person

**Page 99**

[1] who called was asking of you?
[2]    **A:** The attorney wanted to know just to make
[3] sure I got the disability claim and that I'd be
[4] handing it over to the appropriate people.
[5]    **Q:** Okay. Was there any practice that you had
[6] about what you were supposed to do internally if you
[7] were contacted by an attorney claiming to represent
[8] one of your current or former employees?
[9]    **A:** Yes. When an attorney contacted us, we
[10] were supposed to let our legal department know and
[11] refer the attorney to any type of conversations with
[12] our legal department and not Human Resources.
[13]    **Q:** Did you do that in this case?
[14]    **A:** I did.
[15]    **Q:** And who is it that you notified within the
[16] legal department?
[17]    **A:** Aaron von Staats.
[18]    **Q:** All right. And that's something you would
[19] have done, you said, in September, is that right?
[20]    **A:** Yes.
[21]    **Q:** At any point in time did you share with Ed
[22] Raine or anyone else on that e-mail distribution
[23] list, the distribution list on Exhibit 8, your
[24] e-mail, regarding Mr. Kouvchinov, at any point in

**Page 100**

[1] time, did you notify anybody on that distribution
[2] list about any skepticism you might have had about
[3] Mr. Kouvchinov's underlying claim for STD?
[4]    **A:** No.
[5]    **Q:** And you were not the person who made the
[6] decision about what, if any, action was going to be
[7] taken relative to Mr. Kouvchinov's continued
[8] presence at PTC after December 4th, were you?
[9]    **A:** No.
[10]    **Q:** Okay. Earlier today I believe Mr. Budreau
[11] asked you some questions about why you had notified
[12] Aaron von Staats of the fact that Mr. Kouvchinov had
[13] filed a claim for short-term disability benefits, do
[14] you recall that?
[15]    **A:** I do.
[16]    **Q:** Is part of the reason you may have notified
[17] Aaron von Staats of that fact is because you had
[18] received a phone call from an attorney representing
[19] Mr. Kouvchinov?
[20]    **A:** Yes.
[21]    **MR. TULLY:** Okay. That's all I have.
[22]       (Whereupon, the deposition was
[23] concluded at 1:14 p.m.)
[24]

**Page 101**

[1]                   **CERTIFICATE**
[2] I, LISA WALES, do hereby certify that I have
[3] read the foregoing transcript of my testimony, and
[4] further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]    Dated at __, this day of ,
[9] 2004.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

**EXHIBIT C**

# In The Matter Of:

*Alexei Kouvchinov    v.*
*Parametric Technology Corporation, et al.*

---

*Lisa Wales*
*Vol. 1, November 18, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA   02110*
*(617) 426-2432*

*Original File WALES.V1, 115 Pages*
*Min-U-Script® File ID: 3514146722*

# Word Index included with this Min-U-Script®

Page 5

[1] transcript is being made that any response to a
[2] question be oral as opposed to a gesture or an
[3] "um-hmm" or "umm-mmm," okay?
[4]    **A:** Okay.
[5]    **Q:** If you don't understand a question I ask,
[6] then you should ask me for clarification, okay?
[7]    **A:** Okay.
[8]    **Q:** Other than the deposition that you gave
[9] earlier in this case at the Massachusetts Commission
[10] Against Discrimination, have you ever been deposed
[11] before?
[12]    **A:** No, I have not.
[13]    **Q:** What is your address?
[14]    **A:** 3 Fader, F-a-d-e-r, Place, Marblehead,
[15] Mass.
[16]    **Q:** And are you currently employed?
[17]    **A:** No.
[18]    **Q:** Where were you last employed?
[19]    **A:** PTC.
[20]    **Q:** And PTC refers to Parametric Technology
[21] Corporation?
[22]    **A:** Yes.
[23]    **Q:** During the deposition we may say
[24] "Parametric" or "PTC" or "Parametric Technology

Page 6

[1] Corporation" and we all understand that's the same
[2] company?
[3]    **A:** That's fine with me, yes.
[4]    **Q:** What did you do to prepare for today's
[5] deposition?
[6]    **A:** I reviewed the transcript from the last
[7] deposition.
[8]    **Q:** Anything else?
[9]    **A:** I met with our attorney.
[10]    **Q:** Did you review any other documents?
[11]    **A:** No.
[12]    **Q:** And when did you last work for PTC?
[13]    **A:** My official termination date was January
[14] 2004.
[15]    **Q:** You started working there as a contractor
[16] in September 1998?
[17]    **A:** Yes.
[18]    **Q:** So from September 1998 through January
[19] 2004, you worked at PTC in one capacity or another?
[20]    **A:** Yes.
[21]    **Q:** And you worked as a contractor from
[22] September 1998 until when?
[23]    **A:** April 1999.
[24]    **Q:** And during that period of time when you

Page 7

[1] worked as a contractor, what duties did you perform?
[2]    **A:** I was an HR assistant so I did offer
[3] letters, employee inquiries, some exit interviews.
[4] I worked under an HR representative.
[5]    **Q:** Had you worked in human resources before
[6] that time?
[7]    **A:** A little for my father, more in an office
[8] manager type role but no, not a full HR position
[9] before that.
[10]    **Q:** Did you have any training in human
[11] resources issues before you started doing work at
[12] PTC?
[13]    **A:** No.
[14]    **Q:** And your undergraduate degree was in
[15] psychology; is that correct?
[16]    **A:** Yes.
[17]    **Q:** Once you started working full time — I'm
[18] sorry, as an employee of PTC in April of '99, what
[19] duties did you perform?
[20]    **A:** I was a benefits specialist.
[21]    **Q:** That was true as of January 1999; is that
[22] right?
[23]    **A:** That was true as of — yes, as a
[24] contractor, yes.

Page 8

[1]    **Q:** So from September 1998 until January 1999,
[2] you worked in human resources generally?
[3]    **A:** Yes, as an HR assistant.
[4]    **Q:** And then from January 1999 until September
[5] 2000, you worked as a benefits specialist?
[6]    **A:** Yes.
[7]    **Q:** And then what duties did you perform from
[8] September 2000 up until January 2004?
[9]    **A:** I was a human resources representative.
[10]    **Q:** Was that your actual title?
[11]    **A:** Yes. Sometimes our titles changed but
[12] employee relations representative/human resources
[13] representative is fine.
[14]    **Q:** And what were your duties in that position?
[15]    **A:** I worked with a business unit so it could
[16] be a plethora of things. Usually some routine,
[17] could be verification letters; or the non-routine,
[18] performance improvement plans, working with managers
[19] and vice-presidents, answering employee questions.
[20] If they had a concern about something, they could
[21] come to me and talk about it.
[22]    Performance management, learning and
[23] development, compensation issues, those types of HR
[24] generalist type duties.

Alexei Kouychinov v.
Parametric Technology Corporation, et al.
Case 1:04-cv-12531-MEL    Document 63-4    Filed 07/06/2006    Page 4 of 24
Lisa Wales
Vol. 1, November 18, 2005

Page 17

[1] resources professionals, no.
[2]   Q: When you worked as a human resources
[3] representative, did you ever have occasion to
[4] conduct investigations?
[5]   A: Yes.
[6]   Q: For what types of issues?
[7]   A: Can you clarify "investigations"?
[8]   Q: Well, when you said yes, that you had, what
[9] did you understand "investigations" to mean?
[10]   A: From my perspective, an investigation could
[11] be anything from an employee not showing up for work
[12] to a performance improvement plan to working with a
[13] manager on an employee who is terminating. It could
[14] be anything.
[15]   Q: Okay. So you did all of those types of
[16] things?
[17]   A: I did.
[18]   Q: Did you ever investigate any allegations of
[19] sexual harassment?
[20]   A: No.
[21]   Q: But you did investigate alleged performance
[22] problems; is that right?
[23]   A: Yes.
[24]   Q: As of 2001, did Parametric have an employee

Page 18

[1] manual or handbook?
[2]   A: No, not that I remember.
[3]   Q: Were there any written policies with
[4] respect to human resources issues?
[5]   A: Yes.
[6]   Q: And can you describe those policies?
[7]   A: There were quite a few, and we had what's
[8] called an intranet which is our internal Web site
[9] that employees could look at if they had any
[10] questions.
[11]     Off the top of my head, I don't remember
[12] the specific policies but obviously, you know,
[13] anything from, you know, harassment, any type of
[14] issue like that. It's been a long time. I
[15] apologize. I haven't worked there in a while.
[16]   Q: So the policies that were on the intranet
[17] were policies available to all employees?
[18]   A: Yes. So an employee referral program for
[19] example. You know, policies around vacation, for
[20] example, were available.
[21]   Q: Were there any policies that related to how
[22] human resources employees were supposed to perform
[23] their duties?
[24]   A: Supposed to perform their duties? Can you

Page 19

[1] clarity?
[2]   Q: Sure. Were there any policies with respect
[3] to the conduct of investigations?
[4]   A: There could have been. I don't remember.
[5] Do you mean how would someone go about a plan?
[6]   Q: How would someone go about conducting an
[7] investigation?
[8]   A: Probably not that specific.
[9]   Q: Were there any written guidelines with
[10] respect to conducting investigations in the
[11] workplace?
[12]   A: There were some.
[13]   Q: And what were those?
[14]   A: I guess I'm just getting hung up on your
[15] use of "investigations" again just because I think
[16] that's a broad term. PTC had policies out there. I
[17] guess I'm not — I just need you to clarify I guess
[18] where you're going with this or what — they had —
[19] PTC had policies out there for people to look at and
[20] view and know what their — what they — I guess
[21] what their rights were as an employee, but if there
[22] was an — that's all. Does that answer your
[23] question?
[24]   Q: Well, what I'm asking about is aside from

Page 20

[1] the policies that were available to all employees,
[2] was there a set of policies that you could refer
[3] to —
[4]   A: Absolutely, yes.
[5]   Q: Let me just finish the question.
[6]   A: I'm sorry.
[7]   Q: Were there a set of policies that you could
[8] refer to as the human resources representative that
[9] would provide guidance about how to conduct an
[10] investigation?
[11]   A: There were some.
[12]   Q: And what were those?
[13]   A: For example how would you go about someone
[14] going on a performance improvement plan. We had
[15] certain steps that we followed so that everyone
[16] followed the same steps. Everyone was treated the
[17] same way and we were consistent.
[18]   Q: Were there any other policies like that?
[19]   A: There probably were. I'm just not thinking
[20] of specific ones off the top of my head.
[21]   Q: When you conducted an investigation of a
[22] performance issue, how would you go about conducting
[23] your investigation?
[24]   A: Generally speaking, a manager would come to

Lisa Wales

Alexei Kouvchinov v.

Vol. 1, November 18, 2005 Case 1:04-cv-12531-MEL    Document 63-4    Filed 07/06/2006 Parametric Technology Corporation, et al. Page 9 of 24

Page 21

[1] me with a problem about an employee's performance
[2] and I would pull the employee's file to see if there
[3] had been any past performance concerns. I'd meet
[4] with the manager. I'd want to know if he or she had
[5] set appropriate expectations for the employee, if
[6] they had just sort of let the employee go or if they
[7] were actually giving them guidance, checking in with
[8] them, really see like if this was a two-way street
[9] or if the employee had just kind of been thrown on
[10] his or her own.
[11]     I wanted to make sure that this wasn't
[12] going to be news to the employee. Had they talked
[13] about performance issues before? And if they had,
[14] we would set up — our first step would be like a
[15] verbal warning to the employee saying, "I'm
[16] concerned about your performance. Let's outline
[17] again what needs to be done, where you need to be,
[18] what kind of help can I provide you as your
[19] manager." We'd give them, you know, time for that.
[20] It's only fair.
[21]     And then the second step would be a written
[22] performance improvement plan with specific goals and
[23] objectives that had to be made in time frames. The
[24] manager would also be responsible for working with

Page 22

[1] the employee, making sure he or she could achieve
[2] these goals, that they were realistic goals for the
[3] scope of the job and then from there, determination
[4] would be made as to what to do further with the
[5] employee.
[6]     Q: All right. Would you ever meet with the
[7] employee?
[8]     A: Not generally speaking. That's really a
[9] conversation between the manager and the employee.
[10] I'm just here to guide the manager in the process.
[11] If the employee wanted to come to me with concerns
[12] after, I would have been available, absolutely.
[13]     Q: And when you said that you wanted to ensure
[14] that this was not news to the employee and give them
[15] a warning, you said that was only fair. Why was
[16] that fair?
[17]     A: If an employee hasn't been told what
[18] expectations are required of them, they'll be
[19] just blown out of the water and say, "Well, what do
[20] you mean? I didn't know you wanted me to do this."
[21]     So that's really sort of an employee
[22] advo — employee representative I should say way.
[23] You just can't — in human resources you need to
[24] think of both parties, the manager and the — you're

Page 23

[1] there to represent everyone, so to make sure that
[2] protocol was being followed and the manager was
[3] doing his or her job as well.
[4]     Q: So as a human resources representative, you
[5] were looking out for the interests both of the
[6] manager and the employee?
[7]     A: Yes.
[8]     Q: And so you would act as an advocate for the
[9] employee?
[10]     A: Yes.
[11]     Q: Did you receive any performance reviews
[12] while you were working at PTC?
[13]     A: For myself personally?
[14]     Q: Yes.
[15]     A: Yes.
[16]     Q: How would you describe your reviews that
[17] you got?
[18]     A: My reviews were really quite good. I did a
[19] good job at my job and I took pride in it and worked
[20] hard.
[21]     Q: Did you receive all of your reviews from
[22] Ms. Pitchon?
[23]     A: No.
[24]     Q: Did you receive any reviews from

Page 24

[1] Ms. Pitchon?
[2]     A: Yes.
[3]     Q: Who else did you receive reviews from?
[4]     A: John Kennedy. Peter Altieri, and that's it.
[5]     Q: And can you just briefly describe why you
[6] received reviews from them as opposed to
[7] Ms. Pitchon?
[8]     A: Yes. I worked for John when I worked in
[9] benefits, then I worked for Peter and then I worked
[10] for Nicole within HR. We had reorganizations and it
[11] was typical that you wouldn't always have the same
[12] manager, and I had been there for five years.
[13]     Q: When did you work for Peter?
[14]     A: September 2000 until probably May or June
[15] of 2001.
[16]     Q: And then you started working for
[17] Ms. Pitchon?
[18]     A: Yes.
[19]     Q: And did you work for her up until the time
[20] you left?
[21]     A: Yes.
[22]     Q: Is it fair to say that when you were
[23] conducting your work that you always strove to be
[24] fair?

Page 25

[1] **A:** Yes.
[2] **Q:** And is it fair to say that you always
[3] strove to be thorough in your work?
[4] **A:** Yes.
[5] **Q:** Were you ever accused by anybody whether an
[6] employee or a manager of being unfair?
[7] **A:** No.
[8] **Q:** Were you ever accused of being not
[9] thorough?
[10] **A:** No.
[11] **Q:** Did you have any responsibilities for
[12] training?
[13] **A:** Training who?
[14] **Q:** For conducting any training classes at PTC?
[15] **A:** No.
[16] **Q:** Did you do any one-on-one training?
[17] **A:** Yes.
[18] **Q:** In what way?
[19] **A:** A manager would come to me about a problem,
[20] and I would coach them and advise them on how to
[21] handle it.
[22] **Q:** Did you ever do any training with
[23] employees?
[24] **A:** Not that I can recollect.

Page 26

[1] **Q:** So the training you did was with managers?
[2] **A:** Mostly, yes.
[3] **Q:** Were you ever accused of wrongdoing at PTC?
[4] **A:** No.
[5] **Q:** Did you ever receive any warnings?
[6] **A:** No.
[7] **Q:** When you worked as a benefits specialist,
[8] what were your duties?
[9] **A:** Benefits administration of 401(k) plans,
[10] HCRA/DCRA plans, health insurance, disability
[11] claims, answering employee questions and clarifying
[12] their benefits.
[13] **Q:** With respect to disability claims, what
[14] duties did you perform?
[15] **A:** Claims would come in to us. We'd answer
[16] any questions the person might have on how you go
[17] out on disability, the length of pay they would
[18] receive, how long disability goes, were they
[19] eligible for it.
[20] They'd give us the claim. We'd sign our
[21] employer section and then it would go off to the
[22] disability carrier for them to adjudicate it.
[23] **Q:** Who was the disability carrier?
[24] **A:** CIGNA.

Page 27

[1] **Q:** And was it true during the whole time you
[2] worked as a benefits specialist?
[3] **A:** Yes.
[4] **Q:** How many disability claims were you
[5] involved with when you worked as a benefits
[6] specialist?
[7] **A:** 20, 25 perhaps.
[8] **Q:** Did any of those claims involve mental
[9] disabilities?
[10] **A:** Some could have.
[11] **Q:** Do you remember if any did?
[12] **A:** Maybe one or two.
[13] **Q:** Do you recall specifically any cases that
[14] involved mental disabilities?
[15] **A:** No.
[16] **Q:** Is it fair to say that the overwhelming
[17] majority of claims were for physical disabilities?
[18] **A:** Physical or maternity leave.
[19] **Q:** So is it fair to say that the overwhelming
[20] majority of claims were for physical disabilities or
[21] maternity leave?
[22] **A:** Yes, that's fair to say.
[23] **Q:** Were the majority of the claims for
[24] maternity leave?

Page 28

[1] **A:** Most of them were.
[2] **Q:** Based on your experience there, did CIGNA
[3] ever allow a claim in the absence of evidence of
[4] disability?
[5] **MR. TULLY:** Objection. You can answer.
[6] **A:** Can you repeat the question?
[7] **Q:** Yes. Based on your experience there when
[8] you were working as a benefits specialist, to your
[9] knowledge did CIGNA ever allow a claim for
[10] disability benefits in the absence of evidence of
[11] disability?
[12] **MR. TULLY:** Objection.
[13] **A:** That would have been CIGNA's call. They're
[14] the ones who actually process the claims and
[15] adjudicate them, so that wouldn't have been
[16] something that we would have done in our benefits
[17] department. I'm not aware of how their processes go
[18] about, you know, adjudicating the claims.
[19] **Q:** What did you know about how CIGNA processed
[20] claims?
[21] **A:** We would send the claim off to CIGNA. They
[22] would work directly with the employee and their
[23] physician to determine if they met the criteria and
[24] then they'd let us know back so that we could turn

Page 29

[1] them off on their payroll and then they would cut
[2] them checks directly. But the real nitty-gritty
[3] specifics was handled by the disability carrier
[4] CIGNA directly.
[5]    **Q:** So were you ever called upon to give an
[6] opinion or your input about whether somebody was
[7] disabled?
[8]    **A:** No.
[9]    **Q:** Did you ever become aware of any situations
[10] where you thought somebody who was getting benefits
[11] wasn't disabled?
[12]    **A:** When I was a benefits specialist?
[13]    **Q:** Yes.
[14]    **A:** No.
[15]    **Q:** And more generally at the time you worked
[16] at PTC, were you aware of any occasions when someone
[17] received benefits when you thought they weren't
[18] disabled?
[19]    **A:** No. Generally speaking?
[20]    **Q:** Yes.
[21]    **A:** No.
[22]    **Q:** You know Alex Kouvchinov, do you not?
[23]    **A:** I do.
[24]    **Q:** When did you first meet Alex?

Page 30

[1]    **A:** September 10, 2001.
[2]    **Q:** What was the reason that you met him on
[3] that date?
[4]    **A:** I was the HR person involved in his
[5] separation.
[6]    **Q:** Was he being laid off?
[7]    **A:** He was.
[8]    **Q:** And you had never met Mr. Kouvchinov before
[9] that time?
[10]    **A:** No.
[11]    **Q:** Did you have occasion before then to work
[12] on any issues involving Mr. Kouvchinov individually?
[13]    **A:** No.
[14]    **Q:** So you weren't involved in any issues about
[15] performance problems or anything like that?
[16]    **A:** No.
[17]    **Q:** So on September 10th, did you meet in
[18] person with Mr. Kouvchinov?
[19]    **A:** Yes.
[20]    **Q:** Who else was there?
[21]    **A:** Jayantha Mukohopady.
[22]    **Q:** And who was he or she?
[23]    **A:** He was the director of the group that Alex
[24] was in.

Page 31

[1]    **Q:** Which group was that?
[2]    **A:** One of the MCAD groups. I don't remember
[3] his exact title.
[4]    **Q:** What does MCAD stand for in this context?
[5]    **A:** Mechanical computer-aided design.
[6]    **Q:** And that was a subgroup within SSG?
[7]    **A:** Yes.
[8]    **Q:** All right. And after September 10th, were
[9] there any other occasions when you had any
[10] face-to-face interactions with Mr. Kouvchinov?
[11]    **A:** After September 10th? I'm going to have to
[12] remember. Can I take a bathroom break for a second?
[13] Is that okay?
[14]    **Q:** Absolutely.
[15] (Recess taken)
[16]    **Q:** Ms. Wales, I'm going to hand you a
[17] calendar. I'm not going to mark it as an exhibit
[18] because it's just a calendar for 2001 just to kind
[19] of make it easier to refer to dates because we'll be
[20] discussing a number of dates and it's I think easier
[21] to have a reference point like this. On the
[22] left-hand column there's the 2001 calendar.
[23]    So the question I asked before we broke was
[24] after September 10, 2001, were there any other

Page 32

[1] occasions when you had face-to-face interactions
[2] with Mr. Kouvchinov?
[3]    **A:** Yes.
[4]    **Q:** And how many other occasions were there?
[5]    **A:** Two.
[6]    **Q:** And when were those?
[7]    **A:** December 4, 2001, and I don't remember the
[8] date of the second one.
[9]    **Q:** Was it before or after December 4th?
[10]    **A:** To the best of my recollection, I believe
[11] it was after.
[12]    **Q:** Other than face-to-face interactions with
[13] Mr. Kouvchinov, did you ever have occasion to talk
[14] on the phone with Alex?
[15]    **A:** Yes.
[16]    **Q:** On how many occasions?
[17]    **A:** Once or twice.
[18]    **Q:** Were those after September 10th?
[19]    **A:** Yes.
[20]    **Q:** And when were those occasions?
[21]    **A:** You want exact dates?
[22]    **Q:** As best you can recall.
[23]    **A:** Well, as his HR representative, he could
[24] have called me with questions on his separation

Page 33

[1] package, but I know for a fact we spoke on September
[2] 17th.
[3]   Q: Do you recall any other occasions when you
[4] spoke on the phone?
[5]   A: I don't remember.
[6]   Q: And did you have any E-mail communications
[7] with Mr. Kouvchinov?
[8]   A: No, not that I remember.
[9]   Q: How long was your meeting with
[10] Mr. Kouvchinov on September 10th?
[11]   A: Approximately 40 minutes maybe.
[12]   Q: And was this one of a series of meetings
[13] you were having with employees with respect to
[14] layoffs?
[15]   A: For that day?
[16]   Q: No, not that day, generally around that
[17] time.
[18]   A: Just repeat the question one more time.
[19]   Q: I'll ask a different question. How many
[20] meetings did you have in or around September 2001
[21] with employees who were being laid off?
[22]   A: 40.
[23]   Q: So those were all employees in SSG?
[24]   A: Yes.

Page 34

[1]   Q: Were most of those meetings before
[2] September 10th?
[3]   A: Yes.
[4]   Q: Was September 10th the last meeting you
[5] had?
[6]   A: Forever or —
[7]   Q: I'll be more precise. Was September 10th
[8] the last meeting you had with an employee with
[9] respect to that layoff?
[10]   A: I don't remember.
[11]   Q: How would you describe Mr. Kouvchinov's
[12] demeanor during that meeting?
[13]   A: From what I can remember, I think he was
[14] surprised.
[15]   Q: Anything else?
[16]   A: You know I've done so many of them,
[17] everybody acts differently. It's hard for me to say
[18] what he was feeling.
[19]   Q: Do you recall if he appeared upset?
[20]   A: Probably a little bit, but he seemed to
[21] take it in stride if I remember correctly. It was
[22] over four years ago.
[23]   Q: And as of that time, 2001, did you find
[24] these meetings where you were telling employees they

Page 35

[1] were being laid off to be easy meetings, difficult
[2] or how would you describe them?
[3]   A: Difficult. None of them are easy.
[4]   Q: And why were they difficult?
[5]   A: In my opinion, you know, you're part of a
[6] process where a manager tells the employee that they
[7] no longer have a job and then you become, you know,
[8] their contact around separation benefits and it can
[9] be a big loss for people. Certainly not the
[10] highlight of my job.
[11]   Q: Is it fair to say it was one of the most
[12] difficult parts of your job?
[13]   A: Yes.
[14]   Q: Have you ever been terminated or laid off?
[15]   A: No.
[16]   Q: After the meeting that you had with
[17] Mr. Kouvchinov on September 10th, when is the next
[18] time you had any communications with him?
[19]   A: I believe September 17th.
[20]   Q: And that was the telephone call?
[21]   A: Yes.
[22]   Q: Did he call you or did you call him?
[23]   A: He called me.
[24]   Q: And what did he say to you and what did you

Page 36

[1] say to him?
[2]   A: He said, "Please check your mailbox. A
[3] friend of mine dropped off a short-term disability
[4] claim form in it. Can you make sure you have it?"
[5] And so I went and checked and it was there.
[6]   Q: Going back to the telephone call, did you
[7] say anything to Mr. Kouvchinov?
[8]   A: I said, "Do you mean your separation
[9] agreement?" And he said, "No, I mean a short-term
[10] disability claim." And I said, "Well, I'll go check
[11] my mailbox. Hold on."
[12]   Q: So did you actually go and check it while
[13] he was still on the phone?
[14]   A: Yes.
[15]   Q: So you went and checked your mailbox and it
[16] was in there?
[17]   A: Yes.
[18]   Q: And was it in an envelope or how was it in
[19] your box?
[20]   A: I believe it was in an envelope.
[21]   Q: Did you open the envelope and look inside?
[22]   A: Yes.
[23]   Q: And then what did you do?
[24]   A: I let him know that our benefits specialist

Page 37

[1] would take it from here, take the claim and work
[2] with CIGNA directly.
[3]   Q: Did he say anything else to you or did you
[4] say anything else to him?
[5]   A: I probably asked him if he had any other
[6] questions on the separation agreement. That was
[7] really my role as the HR representative. That's it.
[8]   Q: How long was the phone conversation?
[9]   A: Five minutes.
[10]   Q: And what did you then do with the claim?
[11]   A: I brought it to our benefits specialist.
[12]   Q: Is that Lisa Perry?
[13]   A: Yes.
[14]   Q: Where did Lisa work physically relative to
[15] you?
[16]   A: Building B.
[17]   Q: So she was in an entirely different
[18] building than you?
[19]   A: They're attached.
[20]   Q: But it was a different building?
[21]   A: Yes.
[22]   MR. CHURCHILL: Suzanne, do you have the
[23] original exhibits?
[24]   MS. SUPPA: Yes.

Page 38

[1]   Q: Ms. Wales, I'm showing you what was marked
[2] as Exhibit K-1, and just for the record we've agreed
[3] to mark the exhibits during this lawsuit all in
[4] numerical order so we started with 1 through —
[5]   MR. TULLY: 30 maybe.
[6]   Q: — 30 with respect to Mr. Kouvchinov's
[7] deposition, so any exhibits we mark today, the next
[8] one will be 31 just so you understand the numbering
[9] system.
[10]   A: Okay. Thank you.
[11]   Q: So I'm showing you what was marked as
[12] Exhibit K-1. Do you recognize that document?
[13]   A: Yes.
[14]   Q: And what is it?
[15]   A: It's a claim form.
[16]   Q: And is this the claim form that you found
[17] in your mailbox on September 17th?
[18]   A: Yes.
[19]   Q: There are two pages to this exhibit; is
[20] that right?
[21]   A: Yes.
[22]   Q: And can you describe the different sections
[23] on those two pages?
[24]   A: Yes. This section is filled out by our

Page 39

[1] benefits specialist.
[2]   Q: Remember that when you say "this" —
[3]   MR. TULLY: Describe it for her. Say the
[4] top or —
[5]   A: I'm sorry. The first part of the first
[6] page is the employee's information, where they live,
[7] date they were hired, and this is completed by our
[8] benefits specialist. The second part of the page is
[9] also completed by the benefits specialist. It's
[10] where she signs off. It gives other information.
[11]   And then the second page is completed by
[12] the employee submitting the claim and also their
[13] attending physician.
[14]   Q: So Mr. Kouvchinov's signature appears on
[15] Page 2; is that right?
[16]   A: Yes.
[17]   Q: And it's your understanding that all the
[18] handwriting above his signature is his?
[19]   A: That's my understanding.
[20]   Q: And it's your understanding that all of the
[21] handwriting below his signature is from his treating
[22] physician?
[23]   A: Yes.
[24]   Q: And when you saw this claim form on

Page 40

[1] September 17th, which information was completed?
[2]   A: The second page from what Alexei completed
[3] and his physician.
[4]   Q: And did you review that information?
[5]   A: I glanced at it.
[6]   Q: Did you note that Mr. Kouvchinov was
[7] claiming to be disabled based on depression?
[8]   A: As I said, I glanced at it. Make a note —
[9] I don't know what you mean by making a note.
[10]   Q: I didn't mean physically make a note. Did
[11] you see that he was claiming disability —
[12]   A: Yes, I did.
[13]   Q: — based on depression?
[14]   A: Yes.
[15]   Q: Now Mr. Kouvchinov submitted this claim
[16] seven days after he had been told that he was being
[17] laid off; is that right?
[18]   A: Yes.
[19]   Q: And is it fair to say that you questioned
[20] the legitimacy of this claim?
[21]   A: I wouldn't say it's fair to say that I
[22] questioned the legitimacy. I was certainly — the
[23] timing of the claim I thought was odd.
[24]   Q: Did you think it was suspect?

Alexei Kouvchinov v.
Parametric Technology Corporation et al
Case 1:04-cv-12531-MEL   Document 63-4   Filed 07/06/2006   Page 10 of 24
Lisa Wales
Vol. 1, November 18, 2005

**Page 41**

[1] **A:** Again that's not my determination to make
[2] because CIGNA, the carrier, adjudicates the claims,
[3] not PTC.
[4] **Q:** When you say it was odd, why was it odd?
[5] **A:** We had notified him on September 10th that
[6] he was no longer an employee, and he never mentioned
[7] to me before or had no knowledge that he was even
[8] thinking about going on short-term disability. On
[9] the same token, he still was eligible to apply for
[10] it through September 24th.
[11] **Q:** Isn't it fair to say that you were
[12] skeptical of his claim?
[13] **MR. TULLY:** Objection.
[14] **A:** I just thought the timing of it was odd.
[15] I'm not a doctor. I wouldn't pretend to even be
[16] able to diagnose someone. I just thought the timing
[17] of it was strange.
[18] **Q:** Did you think it was out of the ordinary?
[19] **MR. TULLY:** What are we talking about?
[20] What was out of the ordinary? The timing or the —
[21] **MR. CHURCHILL:** His claim.
[22] **MR. TULLY:** His claim of depression?
[23] **MR. CHURCHILL:** I'll rephrase it.
[24] **MR. TULLY:** Thanks.

**Page 42**

[1] **Q:** Did you think that his claim — the fact
[2] that he was filing this claim a week after he had
[3] been notified that he was being laid off was out of
[4] the ordinary?
[5] **A:** It wasn't everyday practice. We didn't see
[6] that happen very often by any means or at least in
[7] my specific case, so the timing was strange.
[8] **Q:** And did you reach any conclusions in your
[9] mind about Mr. Kouvchinov's honesty?
[10] **A:** In regards to?
[11] **Q:** Based on the fact that he submitted this
[12] claim.
[13] **A:** No, because it's again not my — it wasn't
[14] my job to adjudicate the claim. It was just my job
[15] to hand it to the benefits specialist.
[16] **Q:** Did you reach any conclusions about his
[17] integrity?
[18] **A:** No.
[19] **Q:** And did you in your mind have any views
[20] about whether in fact he was or was not disabled?
[21] **A:** No.
[22] **Q:** So you didn't conclude that he was not
[23] disabled?
[24] **A:** I wouldn't have the authority to conclude

**Page 43**

[1] that. The claim would be — CIGNA would determine
[2] if he was or was not disabled.
[3] **Q:** So is it fair to say that in your mind, you
[4] reached no conclusion about whether or not he was
[5] disabled?
[6] **A:** No conclusion about whether he was not
[7] disabled?
[8] **Q:** Whether he was disabled.
[9] **A:** Whether he was disabled? It's fair to say
[10] I didn't have an opinion on it? Is that what you're
[11] asking me?
[12] **Q:** Yes.
[13] **A:** That's fair.
[14] **Q:** Did you believe that he was depressed?
[15] **A:** Again it's not something that I would have
[16] had an opinion on.
[17] **Q:** So you had no views about whether or not he
[18] was in fact depressed?
[19] **A:** You know, I didn't know him up until
[20] September 10th. I hadn't met him before. I'm not a
[21] doctor. I think depression comes in all forms so it
[22] wouldn't have been fair for me to label him as
[23] depressed or not.
[24] *Q. All right. Is it fair to say that you had

**Page 44**

[1] no reason to question the validity of his claim?
[2] **A:** It wasn't my role to question the validity
[3] of his claim. The only — as I mentioned before,
[4] what was odd to me was just the timing of it, of
[5] when it came.
[6] **Q:** Can you repeat my question, please?
[7] *(Question read)
[8] **Q:** Is that fair to say?
[9] **A:** That I had no reason to claim the
[10] validity —
[11] **Q:** That you had no reason to question the
[12] validity of his claim.
[13] **A:** I didn't have reason to — it is a fair
[14] statement to say I didn't — can you repeat the
[15] question one more time?
[16] **MR. CHURCHILL:** Just so it's clear, can you
[17] read the question back, please.
[18] *(Question read)
[19] **A:** Yes, it's fair to say I had no reason.
[20] **Q:** You said that you took the claim form and
[21] you brought it to Ms. Perry?
[22] **A:** Yes.
[23] **Q:** And did you do that immediately?
[24] **A:** Probably. I don't remember.

Lisa Wales

Vol. 1, November 18, 2005

Case 1:04-cv-12531-MEL    Document 63-4

Alexei Kouvchinov   v.

Parametric Technology Corporation, et al.

Filed 07/06/2006    Page 11 of 24

Page 45

[1] **Q:** When you brought it to Ms. Perry, did you
[2] discuss it with her?
[3] **A:** Yes.
[4] **Q:** What did you say to her and what did she
[5] say to you?
[6] **A:** I just let her know that we had notified
[7] Alexei of his termination of employment prior and
[8] that he was now submitting this and wanted her to be
[9] aware of it.
[10] **Q:** Did you say anything else to her or did she
[11] say anything to you?
[12] **A:** She said, "Thanks. I'll work with CIGNA."
[13] I said, "Please" — that's it. "Here you go."
[14] **Q:** As of that time, how long had you worked
[15] with Ms. Perry?
[16] **A:** I'm not sure when she started at PTC. I
[17] don't know. Probably eight months. I'm not sure.
[18] I don't remember when she started.
[19] **Q:** And how often would you work with her in
[20] 2001?
[21] **A:** Occasionally, not — she wasn't someone I
[22] spoke to every day by any means.
[23] **Q:** I understand you can't give a precise
[24] answer, but approximately how often would you have

Page 47

[1] answer.
[2] **MR. CHURCHILL:** Thank you.
[3] **Q:** Did you say anything to Alex's attorney on
[4] the telephone?
[5] **A:** I just said that I received it and I'd be
[6] passing it on to our benefit's department and if he
[7] had further questions, he could contact our legal
[8] department.
[9] **Q:** So after that telephone conversation, what
[10] did you do next with respect to Alex's claim?
[11] **A:** I just notified our legal department.
[12] **Q:** And did you do that over the phone?
[13] **A:** Yes.
[14] **Q:** Who did you speak to?
[15] **A:** Aaron von Staats.
[16] **Q:** What was his position?
[17] **A:** He's the head of the legal department. I
[18] don't know his exact title.
[19] **Q:** And why were you contacting him?
[20] **A:** Whenever an attorney would contact us in
[21] HR, we would always contact our legal department and
[22] they would work directly. It wouldn't come through
[23] us. So I just wanted him to be aware that I was
[24] contacted by an attorney should he receive any phone

Page 46

[1] occasion to work with her?
[2] **A:** A couple times a month.
[3] **Q:** After you brought the claim form to
[4] Ms. Perry and had the discussion that you just had
[5] with her, when was the next time that you had
[6] communications with anybody about Mr. Kouvchinov's
[7] claim for disability?
[8] **A:** That day.
[9] **Q:** And what communication did you have next?
[10] **A:** Alex's attorney called me to ensure that I
[11] also got the disability form, so I called our legal
[12] counsel because whenever an attorney called us, we
[13] referred them directly to our legal department, and
[14] I just wanted to give them a heads up that I had
[15] been contacted by an attorney.
[16] **Q:** What was the name of Alex's attorney?
[17] **A:** I don't remember.
[18] **Q:** Did you make any notes of that
[19] conversation?
[20] **A:** No.
[21] **Q:** Did you say anything to the attorney?
[22] **MR. TULLY:** To whose attorney? If you're
[23] asking about PTC's attorney, don't disclose that.
[24] If he's asking about Alex's attorney, you can

Page 48

[1] calls.
[2] **Q:** Were you seeking any legal advice from
[3] Mr. von Staats?
[4] **A:** No.
[5] **Q:** When you took the claim to Ms. Perry, did
[6] you keep a copy of it for yourself?
[7] **A:** No.
[8] **Q:** When is the next time after your
[9] conversation with Mr. von Staats that you had
[10] communications with anybody about Mr. Kouvchinov's
[11] claim for disability benefits?
[12] **A:** About his claim for disability benefits?
[13] **Q:** Well, let me make it more broad. When was
[14] the next time you had communications with anybody
[15] about Mr. Kouvchinov?
[16] **A:** December 4, 2001.
[17] **Q:** Did you have any communications with
[18] anybody with respect to Mr. Kouvchinov's Cobra
[19] coverage?
[20] **A:** No.
[21] **Q:** Did Mr. Kouvchinov ever leave you any
[22] messages about his Cobra coverage?
[23] **A:** No.
[24] **Q:** And nobody ever discussed with you any

---

**Page 53**

[1] approved?

[2] **A:** I did.

[3] **Q:** How did you learn that?

[4] **A:** Lisa Perry confirmed it.

[5] **Q:** When did she confirm that to you?

[6] **A:** December 4th.

[7] **Q:** Were you given a copy of this E-mail?

[8] **A:** Yes.

[9] **Q:** Did you provide a copy to Ms. Perry?

[10] **A:** I don't remember.

[11] **Q:** What did you do with your copy?

[12] **A:** Kept it in my inbox, my E-mail.

[13] **Q:** So it was forwarded to you via E-mail?

[14] **A:** Yes.

[15] **Q:** Did you forward that E-mail on to anybody

[16] else?

[17] **A:** Not that I remember, no.

[18] **Q:** Under the short-term disability plan that

[19] was in effect at that time, was an employee who was

[20] receiving benefits allowed to look for work?

[21] **A:** I don't see why not. I don't remember the

[22] exact plan.

[23] **Q:** Under the plan, was an employee who was

[24] receiving benefits able to work at the same time?

---

**Page 54**

[1] **A:** No.

[2] **Q:** Ever?

[3] **A:** The plan as I remember it was when you are

[4] disabled, you are not able to work therefore you

[5] receive disability pay. So if you're unable to work

[6] you're on disability. You can't.

[7] **Q:** Did you ever look at the plan during 2001?

[8] **A:** No.

[9] **Q:** Had you ever looked at the plan?

[10] **A:** I probably had when I was in benefits, but

[11] I don't remember the exact details.

[12] **Q:** Other than the conversation that you had on

[13] September 17th with Mr. Kouvchinov's attorney,

[14] during 2001, did you ever have any other

[15] conversations with his attorney?

[16] **A:** No.

[17] **Q:** On December 4th of 2001, that was a

[18] Tuesday; is that right?

[19] **A:** Yes.

[20] **Q:** You were working as a human resources

[21] representative at the time?

[22] **A:** Yes.

[23] **Q:** And was your work location still Building

[24] C?

---

**Page 55**

[1] **A:** Yes.

[2] **Q:** I'm going to ask if you don't mind, can you

[3] draw a schematic of the different buildings so we

[4] can see Buildings A, B and C?

[5] **A:** Sure. I'm not an artist.

[6] **Q:** Understood.

[7] **A:** (Witness complies)

[8] **MR. CHURCHILL:** Can we mark this as Exhibit

[9] A-31.

[10] (Document marked as Exhibit A-31

[11] for identification)

[12] (Recess Taken)

[13] **Q:** So the picture that you drew has now been

[14] memorialized as Exhibit 31.

[15] **A:** Thanks.

[16] **Q:** When you saw Mr. Kouvchinov on December

[17] 4th, what time of day was it?

[18] **A:** Lunchtime. Any time between 11:30 and

[19] 12:30 maybe.

[20] **Q:** And where did you see him?

[21] **A:** I saw him in Building C.

[22] **Q:** Where in Building C?

[23] **A:** Oh, in the kitchenette outside my office.

[24] **Q:** How close to your office was the

---

**Page 56**

[1] kitchenette?

[2] **A:** Very close, maybe five feet away.

[3] **Q:** Was that right next door to your office?

[4] **A:** Across the hall.

[5] **Q:** So the kitchenette was right across from

[6] your office?

[7] **A:** Yes.

[8] **Q:** What did employees use the kitchenette for?

[9] **A:** To eat lunch, to hang out on a break.

[10] There's soda there, a refrigerator, a microwave,

[11] coffee.

[12] **Q:** About how many chairs roughly were there in

[13] the kitchenette?

[14] **A:** Perhaps six or seven. I don't know.

[15] **Q:** So roughly speaking, how big was the room

[16] in terms of feet by feet?

[17] **A:** Ten by fifteen. I don't know. Sorry.

[18] **Q:** Was there one table in there or multiple

[19] tables?

[20] **A:** I think there was probably two tables.

[21] **Q:** Were there other locations in Buildings A,

[22] B and C where employees could eat lunch?

[23] **A:** Yes.

[24] **Q:** How many other locations were there?

Page 57

[1] **A:** I don't know the exact amount, but each
[2] building had little kitchenettes and there was a
[3] main cafeteria. Can I show you where it is on the
[4] drawing?
[5] **Q:** Yes, please.
[6] **A:** It's like right over here (pointing).
[7] **Q:** In Building A or B?
[8] **A:** I think technically it's probably Building
[9] **A:** Its sort of in between them. So that was the
[10] main cafeteria where most people ate.
[11] **Q:** And then there was a kitchenette in each
[12] building?
[13] **A:** More than one. There were several on each
[14] floor.
[15] **Q:** How many floors was Building C?
[16] **A:** Three floors.
[17] **Q:** And what about A and B?
[18] **A:** Three as well.
[19] **Q:** And there was at least one kitchenette on
[20] each floor?
[21] **A:** Yes.
[22] **Q:** Was anybody else in the kitchenette with
[23] Mr. Kouvchinov when you saw him?
[24] **A:** I believe he was sitting by himself.

Page 58

[1] **Q:** Was anybody else in the room?
[2] **A:** I don't remember.
[3] **Q:** Why were you in the kitchenette?
[4] **A:** I think I walked through to go to the
[5] bathroom.
[6] **Q:** So did you just see him in there or did you
[7] actually walk in the kitchenette for some other
[8] reason and then you saw him?
[9] **A:** You have to walk through the kitchenette to
[10] get to the bathroom, so I walked through, saw him.
[11] **Q:** What was he doing?
[12] **A:** I think he was eating his lunch.
[13] **Q:** Did you say anything to him?
[14] **A:** I recognized him and I asked him what he
[15] was doing here.
[16] **Q:** And what did he say?
[17] **A:** He said he was contracting through CDI for
[18] someone in Global Services.
[19] **Q:** Did you ask him any other questions?
[20] **A:** No, not that I can remember. I just wanted
[21] to know why he was in that kitchenette.
[22] **Q:** Were you surprised to see him there?
[23] **A:** Yes.
[24] **Q:** Were you afraid of him when you saw him in

Page 59

[1] there?
[2] **A:** Was I physically afraid of him?
[3] **Q:** Yes.
[4] **A:** No.
[5] **Q:** What was his demeanor when you saw him?
[6] **A:** We spoke very briefly. How should I
[7] characterize his demeanor? He just seemed to be
[8] eating his lunch. I don't know what else to say.
[9] He just seemed to be there.
[10] **Q:** When he saw you, did he appear nervous?
[11] **A:** Not that I remember.
[12] **Q:** Do you remember anything else that you said
[13] to him or he said to you?
[14] **A:** No.
[15] **Q:** Did you ask him anything about disability
[16] benefits?
[17] **A:** No.
[18] **Q:** Why not?
[19] **A:** I was not -- I wouldn't have handled the
[20] disability benefits. Lisa Perry would have done
[21] that in benefits, so that's not a question that I
[22] asked him.
[23] **Q:** At the time you saw him, what was your
[24] understanding about his employment status at PTC?

Page 60

[1] **A:** That he was no longer an employee of PTC.
[2] **Q:** What was your understanding about what had
[3] happened with respect to his claim for disability
[4] benefits?
[5] **A:** I think I had to check with Lisa to see if
[6] he was receiving disability benefits.
[7] **Q:** So at the time you saw him, you had no
[8] understanding whether he was or —
[9] **A:** You know, I believe that he was on the
[10] disability benefits but I needed to check with her
[11] if I remember correctly.
[12] **Q:** At the time, what caused you to believe
[13] that he had been on disability benefits?
[14] **A:** Because back in September he had applied
[15] for them.
[16] **Q:** Did you learn at some point between the
[17] date of his application and December 4th that his
[18] claim had been allowed?
[19] **A:** I might have but again once, I handed it
[20] off to Lisa Perry in benefits. It's really not in
[21] my scope of my position.
[22] **Q:** Regardless of how you learned, is it your
[23] memory that when you saw him that day, you were
[24] under the impression that he was collecting

Lisa Wales

Vol. 1, November 18, 2005

Alexei Kouvchinov v.

Case 1:04-cv-12531-MEL    Document 63-4    Filed 07/06/2006    Parametric Technology Corporation, et al.
Page 14 of 21

---

Page 61

[1] disability benefits?

[2] **A:** I was, yes. I was under the impression he
[3] was collecting disability benefits.

[4] **Q:** But you didn't ask him about that at the
[5] time?

[6] **A:** No.

[7] **Q:** You don't recall if anybody else was in the
[8] room at the time?

[9] **A:** I don't. I don't recall.

[10] **Q:** Did you ask Mr. Kouvchinov where he was
[11] working, where physically he was working?

[12] **A:** I think he told me — I don't know if I
[13] asked him specifically if he was working. I think
[14] he said he was taking a Windchill class, a
[15] preparation class, which would have been in one of
[16] these buildings over here in our demo center.

[17] **Q:** When you say "one of these buildings" —

[18] **A:** Either Building A or B. Sorry.

[19] **Q:** What is Windchill?

[20] **A:** Windchill is one of PTC's product lines.
[21] It's a software that basically allows an enterprise
[22] to connect all their different parts. So here is an
[23] example. An enterprise has some data that they want
[24] to be able to share or they want to be able to not

---

Page 62

[1] just house it in one place.

[2] You can have people have different views of
[3] access to it, have folks have — be project managers
[4] on it, kind of keep everyone in the loop. Not
[5] everyone may be able to kind of touch it, but you
[6] can link an outside vendor to it as well.

[7] So it's really helpful when you have a
[8] customer who maybe has another vendor that they want
[9] to connect it to as well. I'm not really giving it
[10] justice. I'm not an engineer.

[11] **Q:** Okay. Now as of September 2001,
[12] Mr. Kouvchinov had worked at PTC for many years; is
[13] that right?

[14] **A:** I believe he did.

[15] **Q:** So did you wonder when you saw him on
[16] December 4th why he was taking the Windchill class?

[17] **A:** I wondered why he was there.

[18] **Q:** When you learned that he was taking the
[19] Windchill class —

[20] **A:** You know, let me — I think it was a
[21] Windchill class. I don't remember if that was
[22] specifically it or if it was a variety of different
[23] programs. I mean there's so many different software
[24] applications the company uses.

---

Page 63

[1] **Q:** But you recall he was taking some class?

[2] **A:** Some class, yes.

[3] **Q:** And did you wonder why it was he was taking
[4] a class since he had worked there for many years?

[5] **A:** Some employees at times would take classes
[6] if new software came or refreshers, so that thought
[7] didn't cross my mind.

[8] **Q:** What did you do after seeing
[9] Mr. Kouvchinov?

[10] **A:** I believe I called Lisa Perry to see if he
[11] was still receiving short-term disability benefits.

[12] **Q:** What did you say to her and what did she
[13] say to you during that phone conversation?

[14] **A:** If I remember correctly, I said, "I just
[15] saw Mr. Kouvchinov on campus. It's my understanding
[16] that he's unable to work at this time and receiving
[17] disability benefits. Have you heard from him? Can
[18] you look into this further?"

[19] **Q:** And what did she say?

[20] **A:** She said, "It's my understanding that he is
[21] still receiving benefits and will be but I'll need
[22] to check with CIGNA." And then she was going to
[23] contact CIGNA directly.

[24] **Q:** Do you recall anything else that you said

---

Page 64

[1] to her or she said to you?

[2] **A:** She was going to look into it. No, I
[3] don't.

[4] **Q:** Is it fair to say that with respect to this
[5] issue of Mr. Kouvchinov being back at PTC that you
[6] became the lead investigator on this issue?

[7] **A:** That's fair to say.

[8] **Q:** And after the conversation that you had
[9] with Ms. Perry, what did you do next as part of your
[10] investigation of this issue?

[11] **A:** Waited for her to get back to me. At the
[12] same time our security supervisor contacted me and
[13] said, you know, whenever — he knew that
[14] Mr. Kouvchinov had been part of the reduction in
[15] force and when you act — when you are taking a
[16] class as a contractor, which Alex had confirmed for
[17] me, you need to stay within the confines of the main
[18] cafeteria or where the classroom is and not venture
[19] out.

[20] You have to remember this was also after
[21] September 11th and we just had a policy that, you
[22] know, rift employees weren't supposed to be
[23] wandering the hallways. It was also after Edgewater
[24] Technology so we were just on a heightened alert.

**Page 65**

[1] Don, our security supervisor, just informed me that
[2] Alexei hadn't followed the normal protocol of
[3] registering his car, signing in, and he wanted to
[4] know why he was in that kitchenette, too.
[5]    **Q:** Who was the security manager?
[6]    **A:** His name is — I don't know if he's still
[7] there — Don Aviv.
[8]    **Q:** When did he call you?
[9]    **A:** I believe we spoke that day, December 4th.
[10]   **Q:** Do you remember what time of the day?
[11]   **A:** I don't.
[12]   **Q:** Did you speak in person or over the phone?
[13]   **A:** Over the phone.
[14]   **Q:** Do you know how he had learned that
[15] Mr. Kouvchinov was there?
[16]   **A:** I don't think Mr. Kouvchinov wanted to sign
[17] in at the front desk, so they contacted security if
[18] my memory serves me correctly.
[19]   **Q:** Is that what Mr. Aviv said to you?
[20]   **A:** Yes.
[21]   **Q:** What if anything did you say to Mr. Aviv
[22] during that telephone conversation?
[23]   **A:** I believe I said I ran into him in the
[24] kitchenette and that I'd have to look into it

**Page 66**

[1] further and get back to him.
[2]    **Q:** What did you do next?
[3]    **A:** Alex had told me that he was working as a
[4] contractor for the Global Services organization and
[5] I asked him who the manager was, and so I contacted
[6] the manager just to confirm the length of
[7] assignment, had the PO been approved, when was this
[8] to start, when was this to end.
[9]    **Q:** When did you ask Alex about this issue?
[10]   **A:** When we were in the kitchen.
[11]   **MR. TULLY:** I'm sorry. Did you say when
[12] did she ask Alex?
[13]   **MR. CHURCHILL:** Yes, Mr. Kouvchinov.
[14]   **MR. TULLY:** About?
[15]   **MR. CHURCHILL:** This issue.
[16]   **A:** When you say "this issue" —
[17]   **Q:** You said that you had asked Mr. Kouvchinov
[18] where he was working or who he was working for?
[19]   **A:** That was in -- I'm sorry. That was in my
[20] conversation in the kitchen.
[21]   **Q:** Around noon on December 4th?
[22]   **A:** Yes.
[23]   **Q:** And what did he tell you? What did
[24] Mr. Kouvchinov say to you in response to that

**Page 67**

[1] question?
[2]    **A:** That he was working as a contractor for Lee
[3] Lesberg in Global Services.
[4]    **Q:** Did Mr. Kouvchinov say anything else about
[5] what he was doing?
[6]    **A:** I believe he said he was fixing bugs but
[7] no, not the specifics.
[8]    **Q:** Did he tell you that he was in training
[9] classes?
[10]   **A:** I don't remember if he specifically said
[11] that.
[12]   **Q:** So at some point you called Mr. Lesberg?
[13]   **A:** Yes.
[14]   **Q:** Was that on Tuesday, December 4th?
[15]   **A:** I believe it was.
[16]   **Q:** Did you call him over the phone or speak to
[17] him in person?
[18]   **A:** Over the phone.
[19]   **Q:** What did you say to him and what did he say
[20] to you?
[21]   **A:** I just wanted to confirm what Alex had told
[22] me. I asked him when this assignment had started,
[23] how long it was going to be lasting, what he was
[24] going to be doing and that's pretty much it.

**Page 68**

[1]    **Q:** And what did he say to you?
[2]    **A:** He said that he was going to be fixing bugs
[3] for a three- to six-month assignment, the PO had
[4] been approved and that there was another employee
[5] also working for him.
[6]    **Q:** Who was that?
[7]    **A:** Sergey Densenko.
[8]    **Q:** Did you say anything else to Mr. Lesberg or
[9] did he say anything else to you?
[10]   **A:** No. I said, "Okay. Thank you for the
[11] information."
[12]   **Q:** Did he ask you why you were calling him?
[13]   **A:** I don't remember.
[14]   **Q:** Did you tell him why you were calling?
[15]   **A:** No, I just was there to do some fact
[16] finding.
[17]   **Q:** Is that what you told him?
[18]   **A:** No, I just had some questions and that was
[19] it.
[20]   **Q:** Did you make any notes of that
[21] conversation?
[22]   **A:** Did I make any notes of that conversation?
[23] Not that I remember.
[24]   **Q:** Did you make any notes of your conversation

Page 69

[1] with Mr. Aviv?

[2] **A:** Not that I remember.

[3] **Q:** Did you make any notes of your conversation

[4] with Mr. Kouvchinov in the lunch room?

[5] **A:** Not that I remember.

[6] **Q:** What did you do next?

[7] **A:** What did I do next that day on December

[8] 4th?

[9] **Q:** What did you do next with respect to your

[10] investigation of this issue?

[11] **A:** I needed to wait to hear from Lisa Perry.

[12] She had confirmed that Alexei was approved for

[13] short-term disability benefits through December 16th

[14] I believe it is and then I made —

[15] **Q:** Let me ask you about that first. Did

[16] Ms. Perry tell you this over the phone or in person?

[17] **A:** I believe she told me this over the phone

[18] and might have sent me an E-mail.

[19] **Q:** What day was this?

[20] **A:** To the best of my memory, this was sometime

[21] between December 4th and 6th.

[22] **Q:** Do you remember the date?

[23] **A:** I don't remember if it was the 4th or 5th

[24] or 6th. I'm sorry.

Page 71

[1] so I would go over there frequently so it's

[2] possible.

[3] **Q:** But you don't have any specific memory of

[4] meeting with her in person?

[5] **A:** No.

[6] **Q:** What did you do next as part of your

[7] investigation?

[8] **A:** I believe I made my supervisor, the

[9] vice-president, the senior vice-president of our HR

[10] team aware of the situation so that they could

[11] ultimately make a decision.

[12] **Q:** How did you make them aware?

[13] **A:** I sent an E-mail. And first let me

[14] clarify. First I sent a voice mail and then I sent

[15] an E-mail to them.

[16] **Q:** When did you send the voice mail?

[17] **A:** Sometime on the morning of December 6th.

[18] **Q:** When did you send the E-mail?

[19] **A:** Around noontime on December 6th.

[20] **Q:** You testified a minute ago that at some

[21] point you had a conversation with Ms. Perry about

[22] Alex's duties, whether he was performing the same

[23] duties?

[24] **A:** Yes.

Page 70

[1] **Q:** Do you recall anything else that you said

[2] to Ms. Perry or that she said to you during this

[3] phone conversation?

[4] **A:** At some point she just wanted me to verify

[5] that his job duties were the same.

[6] **Q:** Was that during this phone conversation?

[7] **A:** It could have been a follow-up

[8] conversation.

[9] **Q:** Did Ms. Perry show you any documentation

[10] with respect to the extension of Mr. Kouvchinov's

[11] benefits?

[12] **A:** Not at that time, no.

[13] **Q:** So other than telling you that his benefits

[14] had been approved through December 16th, did she

[15] give you any other details about the status of his

[16] benefits?

[17] **A:** She said that he was being referred to

[18] long-term disability.

[19] **Q:** Anything else?

[20] **A:** Not that I can remember, no.

[21] **Q:** During the week of December 4th, did you

[22] ever meet in person with Ms. Perry as part of your

[23] investigation?

[24] **A:** I might have. She sat over in the HR area

Page 72

[1] **Q:** Was this a conversation that she initiated

[2] with you or did you initiate it with her?

[3] **A:** She initiated it with me.

[4] **Q:** And so what did she say to you and what did

[5] you say to her?

[6] **A:** She said, "Lisa, could you check to see if

[7] he's performing similar job duties?"

[8] **Q:** Did she tell you why she was asking that?

[9] **A:** CIGNA was asking her.

[10] **Q:** Did she tell you anything else about why

[11] she was asking that or why CIGNA was asking?

[12] **A:** No.

[13] **Q:** What did you say to her?

[14] **A:** "Yes, I'll find out for you. I believe

[15] that he is."

[16] **Q:** On that issue, what did you then do to find

[17] out what duties he was performing?

[18] **A:** I already knew that Lee Lesberg confirmed

[19] that he was going to be doing similar database

[20] repair work.

[21] **Q:** So after Lisa asked about that issue, did

[22] you conduct any further investigation about what

[23] duties Alex was performing?

[24] **A:** Well, it's all a software position job so

[1] there's not really a variance so no, because I had
[2] already had that information from Lee.
[3] **Q:** So then how did you get back to Ms. Perry
[4] with respect to —
[5] **A:** I either sent her an E-mail or a voice
[6] mail.
[7] **Q:** So just to make sure I understand the
[8] chronology, when she called you on this issue, the
[9] issue of what duties he was performing, you said
[10] that you thought he was performing the same duties
[11] but that you would look into it?
[12] **A:** I think she — I'm not sure if she called
[13] or E-mailed to be honest which venue of
[14] communication it was, but I said I would double —
[15] well, I don't even think I said I would double check
[16] because I knew from Lee Lesberg that he was
[17] performing similar job duties. They don't have to
[18] be the exact same. But it's not like he was working
[19] on a construction site, for example. I mean it's
[20] software engineer database repair.
[21] **Q:** So in any event, however, she put this
[22] question to you whether it was on the phone or in an
[23] E-mail. You didn't conduct any further
[24] investigation; is that right?

[1] **A:** That's correct.
[2] **Q:** So what you did is you responded to her
[3] that it was your understanding he was performing
[4] similar duties to what he had done before?
[5] **A:** Yes.
[6] **Q:** Did you have an understanding about why
[7] CIGNA was asking that question?
[8] **A:** No.
[9] **Q:** Did you wonder why they were asking that
[10] question?
[11] **A:** No.
[12] **Q:** When you had worked as a benefits
[13] specialist, did you have communications with CIGNA?
[14] **A:** Yes.
[15] **Q:** Were those both in writing and over the
[16] phone?
[17] **A:** Yes.
[18] **Q:** And through E-mail?
[19] **A:** More voice mail, more over the phone, but
[20] probably some E-mail.
[21] **Q:** After you stopped being a benefits
[22] specialist, were there ever any occasions when you
[23] spoke to anybody at CIGNA?
[24] **A:** No.

[1] **Q:** Did you understand in 2001 that you were
[2] prohibited from contacting CIGNA?
[3] **A:** Was I prohibited from contacting CIGNA?
[4] **Q:** Yes.
[5] **A:** I never would have contacted them because
[6] it wasn't in the realm of my job.
[7] **Q:** But did you understand that — were you
[8] under the impression that you were not permitted to
[9] contact CIGNA?
[10] **A:** I don't think I was under the — I don't
[11] think "not permitted" was what I felt, but it just
[12] wasn't some that I would have done. That wasn't my
[13] role. I didn't work in benefits anymore.
[14] **Q:** After you sent the voice mail to various
[15] people at PTC, you said that you subsequently sent
[16] an E-mail to them?
[17] **A:** Yes.
[18] **Q:** And after you sent the E-mail, did you do
[19] anything else as part of your investigation?
[20] **A:** No.
[21] **Q:** After you sent the E-mail, did you have
[22] conversations with anybody about this issue?
[23] **A:** No, not that I remember.
[24] **Q:** Did you ever learn what happened as a

[1] result of your investigation in terms of
[2] Mr. Kouvchinov's employment?
[3] **A:** Yes.
[4] **Q:** When did you learn that?
[5] **A:** Either later on that day or early the next
[6] morning.
[7] **Q:** What did you learn?
[8] **A:** Ed Raine, the vice-president at the time,
[9] made the decision that because of the ethical
[10] concern around representing yourself as able to work
[11] yet collecting disability which means you are unable
[12] to work, PTC had the right to say to CDI they did
[13] not want to employ Mr. Kouvchinov any further and
[14] that from there, the business partner should advise
[15] Lee Lesberg, the manager who had hired
[16] Mr. Kouvchinov, that PTC didn't want him to be
[17] contracting through — PTC did not want him to be
[18] working at — working on site at PTC.
[19] **MR. CHURCHILL:** Can you mark this as A-32,
[20] please.
[21]     (Document marked as Exhibit A-32
[22] for identification)
[23] **Q:** Ms. Wales, I'm showing you what was marked
[24] as Exhibit 32. Do you recognize this document?

---

Page 77

[1]  A: I do.
[2]  Q: Have you seen it before?
[3]  A: I have.
[4]  Q: When did you first see it?
[5]  A: I don't remember if I saw — well, Lisa
[6] Perry gave me this information and I remember seeing
[7] this document from the last deposition.
[8]  Q: Did you see this document during the week
[9] of December 4th?
[10]  A: I probably did.
[11]  Q: Sitting here today, do you have any memory
[12] of having seen it that week?
[13]  A: I'm sure I did. It's just difficult to say
[14] because it was so long ago.
[15]  Q: This is an E-mail from Angela Wallace to
[16] Lisa Perry; is that right?
[17]  A: That's correct.
[18]  Q: And it's dated December 4, 2001?
[19]  A: Yes.
[20]  Q: And it indicates that it was sent at 4:12
[21] p.m.?
[22]  A: Yes.
[23]  Q: And did you know who Ms. Wallace was as of
[24] December 4th — strike that. As of December 4th,

---

Page 78

[1] were you aware — did you know who Ms. Wallace was?
[2]  A: Well, no, I didn't — did I know that she
[3] was our representative at CIGNA?
[4]  Q: Had you ever heard her name before?
[5]  A: No, I hadn't.
[6]  Q: Now this E-mail doesn't indicate when
[7] Mr. Kouvchinov's benefits were extended, does it?
[8]  A: It says Alexei Kouvchinov was extended to
[9] 12/16 and referred to LTD.
[10]  Q: It doesn't indicate when the decision to
[11] extend his benefits was made?
[12]  A: No, it does not.
[13]  Q: And it doesn't say what basis CIGNA relied
[14] on to extend the benefits?
[15]  A: Can you clarify?
[16]  Q: It doesn't say what information CIGNA
[17] relied on when making the decision to extend
[18] benefits?
[19]  A: That's correct.
[20]  Q: And it doesn't indicate that Alex was told
[21] about the extension, does it?
[22]  A: No, it doesn't.
[23]  MR. CHURCHILL: Mark this as Exhibit 33,
[24] please.

---

Page 79

[1]
[2]   (Document marked as Exhibit A-33
[3] for identification)
[4]  Q: Showing you now what's been marked as
[5] Exhibit 33, do you recognize this document?
[6]  A: I do.
[7]  Q: Is this an E-mail that you sent to Lisa
[8] Perry on December 6, 2001?
[9]  A: Yes.
[10]  Q: And it indicates that you sent it at 11:46
[11] a.m.; is that right?
[12]  A: That's true.
[13]  Q: Your E-mail was in response to one from her
[14] to you is that right?
[15]  A: Yes.
[16]  Q: And her E-mail appears below yours?
[17]  A: Yes.
[18]  Q: When you testified a moment ago that
[19] Ms. Perry had asked you about what duties
[20] Mr. Kouvchinov was performing and you got back to
[21] her at some point, does this document reflect her
[22] question to you and your response to her?
[23]  A: Does this document reflect —
[24]  Q: The question that she posed to you?

---

Page 80

[1]  A: About the job duties so I understand your
[2] question?
[3]  Q: I'm sorry. I can take it more slowly. You
[4] testified a minute ago that Ms. Perry asked you at
[5] some point to confirm what duties Mr. Kouvchinov was
[6] performing; is that right?
[7]  A: Yes, that's correct.
[8]  Q: And you got back to her at some point?
[9]  A: Yes.
[10]  Q: And you indicated to her that she was
[11] performing very similar duties to what he had done
[12] before?
[13]  A: Yes.
[14]  Q: Does this document reflect those
[15] communications?
[16]  A: Yes.
[17]  Q: In your E-mail you say Alexei's current
[18] manager. Do you see that?
[19]  A: Yes.
[20]  Q: Who was his current manager?
[21]  A: Lee Lesberg, I believe.
[22]  Q: Was it your understanding that Mr. Lesberg
[23] was supervising what Mr. Kouvchinov was doing?
[24]  A: That was my understanding, yes.

---

Page 81

[1] **Q:** Mr. Kouvchinov was working at PTC; is that
[2] right?
[3] **A:** Physically at PTC?
[4] **Q:** Yes.
[5] **A:** Yes.
[6] **Q:** When you saw Mr. Kouvchinov in the lunch
[7] room on December 4th, he told you that he was
[8] contracting through CDI; is that right?
[9] **A:** Yes.
[10] **Q:** Did you know who CDI was at that time?
[11] **A:** No.
[12] **Q:** When did you learn what CDI was?
[13] **A:** Within my investigation, Lee Lesberg
[14] confirmed that CDI was an agency they used.
[15] **MR. CHURCHILL:** Can you mark this as
[16] Exhibit 34, please.
[17]    (Document marked as Exhibit A-34
[18] for identification)
[19] **Q:** Showing you now what's been marked as
[20] Exhibit 34, is this an E-mail that you sent on
[21] December 6, 2001, to various PTC officials?
[22] **A:** Yes.
[23] **Q:** And you sent it at twelve noon; is that
[24] right?

Page 82

[1] **A:** Yes.
[2] **Q:** Can you identify the people you sent it to
[3] and what their titles were at that time?
[4] **A:** Yes. Richard Bellingham, senior
[5] vice-president of HR, Edward Raine, vice-president
[6] of HR, Nicole Pitchon, HR business partner, Chris
[7] Cimitile, HR business partner, Don Aviv, security
[8] manager/supervisor, Aaron von Staats, head legal
[9] counsel, Lisa Perry, benefits specialist, Evelyn
[10] Flaherty, director of benefits, and myself, HR
[11] representative.
[12] **Q:** In the beginning of your E-mail you say:
[13] "Hi all. As a follow-up to my voice mail." Do you
[14] see that?
[15] **A:** Yes.
[16] **Q:** Is the voice mail referred to there the
[17] voice mail that you left earlier on December 6,
[18] 2001?
[19] **A:** Yes.
[20] **Q:** Was that voice mail the first time that you
[21] reported to these people the results of your
[22] investigation?
[23] **A:** Yes.
[24] **Q:** And what did you indicate in your voice

Page 83

[1] mail?
[2] **A:** The same things I indicated here in my
[3] E-mail.
[4] **Q:** Why did you both leave a voice mail and
[5] then send an E-mail?
[6] **A:** Sometimes people are faster to get to their
[7] voice mail than their E-mail, sort of a common
[8] practice that we used.
[9] **Q:** Did you literally read what was in your
[10] E-mail in your voice mail?
[11] **A:** Word for word?
[12] **Q:** Yes.
[13] **A:** No.
[14] **Q:** Had you already drafted the E-mail?
[15] **A:** I don't remember.
[16] **Q:** Is it fair to say that your voice mail and
[17] then this E-mail were your report to these officials
[18] about the results of your investigation?
[19] **A:** Yes.
[20] **Q:** And you understood they were going to rely
[21] on what you put in this report, did you not?
[22] **A:** To make their decision?
[23] **Q:** Yes.
[24] **A:** Yes.

Page 84

[1] **Q:** Directing your attention to the last
[2] paragraph on this first page, it starts: "Lisa
[3] Perry confirmed today that CIGNA extended Alexei's
[4] claim through 12/16/01." Do you see that?
[5] **A:** I do.
[6] **Q:** Does that refresh your memory about when
[7] you learned from Ms. Perry that Mr. Kouvchinov's
[8] benefits had been extended through 12/16?
[9] **A:** It does.
[10] **Q:** And you learned that on December 6, 2001;
[11] is that right?
[12] **A:** Yes.
[13] **Q:** Did you receive any voice mails in response
[14] to your voice mail of December 6, 2001?
[15] **A:** I might have.
[16] **Q:** Do you remember receiving any?
[17] **A:** I probably did. I don't remember
[18] specifically if I did from anyone.
[19] **Q:** When you prepared this E-mail, weren't you
[20] referring to some notes?
[21] **A:** Was I referring to some notes? You mean
[22] like when I gathered my data?
[23] **Q:** When you were drafting this E-mail, weren't
[24] you relying on notes that you had prepared?

Page 85

[1] **A:** Most likely.

[2] **Q:** Because you wouldn't have done all this off
[3] the top of your head, would you?

[4] **A:** No.

[5] **Q:** What did you do with those notes?

[6] **A:** What did I do with the notes? I don't
[7] think I did anything with them. They would have
[8] just been in my notebook.

[9] **Q:** What's your notebook?

[10] **A:** Just a way to log calls that I received
[11] during the day.

[12] **Q:** Whatever happened to that notebook?

[13] **A:** Oh, when I left PTC, I probably threw it
[14] away. I was no longer working there.

[15] **MR. CHURCHILL:** Could you mark this as
[16] Exhibit 35, please.

[17]     (Document marked as Exhibit A-35
[18] for identification)

[19] (Recess taken)

[20] **Q:** Showing you again what was marked as
[21] Exhibit 35, do you recognize this document?

[22] **A:** Yes.

[23] **Q:** And this is a document from Ed Raine to the
[24] same recipients who you had sent your E-mail to

Page 86

[1] earlier that day on December 6th; is that right?

[2] **A:** Yes.

[3] **Q:** And this indicates that the E-mail was sent
[4] at 4:25 in the afternoon?

[5] **A:** Yes.

[6] **Q:** And you received this E-mail at or about
[7] 4:25 that afternoon; is that right?

[8] **A:** Yes.

[9] **Q:** You were at work that afternoon?

[10] **A:** Yes.

[11] **Q:** When you testified earlier that you learned
[12] that Mr. Raine had made a decision, was this what
[13] you were referring to?

[14] **A:** Yes.

[15] **Q:** Other than this E-mail, did you receive any
[16] other written communications from Mr. Raine about
[17] this issue of Mr. Kouvchinov's issue?

[18] **A:** No.

[19] **Q:** Did you have any discussions with him?

[20] **A:** Not that I remember.

[21] **Q:** Did you ever respond to this E-mail?

[22] **A:** I don't think so.

[23] **Q:** Mr. Raine was your boss's boss; is that
[24] right?

Page 87

[1] **A:** Yes.

[2] **Q:** Had you spoken with Mr. Raine back in
[3] September in connection with Mr. Kouvchinov's claim
[4] for disability benefits?

[5] **A:** I don't think so. I don't remember but I
[6] don't think I did.

[7] **Q:** Halfway down Mr. Raine's E-mail, there's a
[8] paragraph that begins: "From the facts written
[9] below." Do you see that?

[10] **A:** I do.

[11] **Q:** It says: "From the facts written below, it
[12] seems clear that Alexei has breached business ethics
[13] by claiming through STD while at the same time being
[14] able to perform work as a contractor for PTC."

[15] **MR. TULLY:** At PTC.

[16] **MR. CHURCHILL:** At PTC.

[17] **Q:** Did I read that correctly?

[18] **A:** Yes.

[19] **Q:** Now that indicated to you that Mr. Raine
[20] was relying on your investigation, didn't it?

[21] **A:** Yes.

[22] **Q:** Had you concluded as of December 6th that
[23] Mr. Kouvchinov had breached business ethics?

[24] **A:** Had I concluded that?

Page 88

[1] **Q:** Yes.

[2] **A:** Was it my opinion of that.

[3] **Q:** Had you concluded that?

[4] **A:** Concluded that? Well, ultimately it wasn't
[5] my decision to make, but my concern was that he was
[6] receiving disability benefits, being unable to work
[7] yet contracting at the same time and representing
[8] himself as working.

[9] **Q:** So you thought he was receiving disability
[10] benefits while he was at work?

[11] **A:** Yes.

[12] **Q:** And you thought that was wrong?

[13] **A:** Yes.

[14] **Q:** And why did you think that was wrong?

[15] **A:** Because when you're on disability, you're
[16] unable to work and you're receiving disability pay
[17] so that doesn't allow you to work somewhere else;
[18] receive disability pay from one group and then go
[19] work for someone else.

[20] **Q:** Did you conclude that Mr. Kouvchinov was
[21] double dipping?

[22] **A:** Double dipping? I think he was receiving
[23] compensation from two sources.

[24] **Q:** The reason I used double dipping is you

Page 89

[1] used that term during your first deposition?

[2] **A:** I did, yes. Double dipping, yeah. I guess

[3] the main concern was the ethical concern around

[4] misrepresenting yourself but was — yes, did I think

[5] he was receiving two different paychecks?

[6] **Q:** Yes.

[7] **A:** Yes.

[8] **MR. CHURCHILL:** Can you mark this as

[9] Exhibit 36, please.

[10]

[11]    (Document marked as Exhibit A-36

[12] for identification)

[13] **Q:** Showing you now what's been marked as

[14] Exhibit 36 which is a one-page E-mail chain, do you

[15] recognize this?

[16] **A:** I do.

[17] **Q:** Have you seen this before?

[18] **A:** Yes.

[19] **Q:** When did you first see this?

[20] **A:** I first saw this — I definitely saw it in

[21] the last deposition and I most — I probably saw it

[22] back in December of 2001.

[23] **Q:** The last part of this E-mail chain is an

[24] E-mail from Angela Wallace to Lisa Perry; is that

Page 90

[1] right? I'm looking at the top of the document.

[2] **A:** I'm sorry. Yes.

[3] **Q:** This was sent on December 6, 2001, at 5:39

[4] p.m.?

[5] **A:** Yes.

[6] **Q:** December 6th was a Thursday, right?

[7] **A:** Yes.

[8] **Q:** Ms. Wallace's E-mail to Ms. Perry indicates

[9] that Alex had been paid through November 30, 2001;

[10] is that right?

[11] **A:** Yes.

[12] **Q:** When did you learn that Mr. Kouvchinov had

[13] been paid only through November 30, 2001?

[14] **A:** Assuming I received this E-mail, I probably

[15] learned it the next day.

[16] **Q:** What hours did you normally work?

[17] **A:** Usually 8:30 to 5:30.

[18] **Q:** Did you ever work after 5:30?

[19] **A:** Sometimes, yes.

[20] **Q:** Did you ever check E-mail from home?

[21] **A:** Not in 2001.

[22] **Q:** When you learned that Mr. Kouvchinov had

[23] received benefits only through November 30, 2001,

[24] did that surprise you?

Page 91

[1] **A:** Well, what this says to me is that he was

[2] paid through 2001. I had already had information

[3] that his benefits were extended until 12/16/01. I

[4] don't know when CIGNA cuts their checks. It had

[5] just been Thanksgiving.

[6]    I have not really heard of an insurance

[7] company that pays too far in advance, so to me all

[8] this says is that yes, he received a check through

[9] the 30th. One could have been on the way.

[10] **Q:** When you say one could have been on the

[11] way, you mean a check for a period after November

[12] 30th?

[13] **A:** If CIGNA extended his benefits — which was

[14] the information I had — until 12/16/01, they were

[15] going to pay him through then. I don't know when

[16] their pay cycle is.

[17] **Q:** Well, but you knew that as of December 6th,

[18] CIGNA was telling PTC that Alex — well, strike

[19] that. Let me back up a bit. In two E-mails before

[20] the most recent one, there's an E-mail from Angela

[21] Wallace to Lisa Perry dated December 6, 2001, at

[22] 4:40 p.m. Do you see that?

[23] **A:** Yes.

[24] **Q:** And Ms. Wallace says to Ms. Perry: "Based

Page 92

[1] on this information, his claim is denied further

[2] benefits and will be closed."

[3] **A:** Okay.

[4] **Q:** So you knew that as of December 6, 2001, or

[5] the morning of December 7, 2001; is that right?

[6] **A:** Yep.

[7] **Q:** So you knew from this information both that

[8] and that he was paid through November 30th, 2001,

[9] that he wasn't — he was not going to receive any

[10] benefits for a period after November 30, 2001; isn't

[11] that right?

[12] **A:** My understanding was that they were closing

[13] this case based on the fact that he was working and

[14] they only pay to people who are unable to work. So

[15] my information had been that his benefits were

[16] extended until 12/16/01. He was going to long-term

[17] disability. If CIGNA decides to deny the claim to

[18] an employee, that's their position.

[19] **Q:** My question was different, though.

[20] **A:** Okay. Sorry.

[21] **Q:** You knew based on the information in these

[22] E-mails which you knew of as of late Thursday,

[23] December 6th, or early Friday, December 7th, that

[24] Mr. Kouvchinov was not going to get any benefits for

Page 93

[1] a period after November 30, 2001?

[2]   **A:** Based on this E-mail, yes.

[3]   **Q:** Did you convey this information to

[4] Mr. Raine?

[5]   **A:** I don't believe that I did.

[6]   **Q:** Why not?

[7]   **A:** Well, why would I? The previous

[8] information I had stated his benefits were going to

[9] be extended until 12/16 and this says to me that,

[10] you know, he just hadn't been paid a check yet. The

[11] benefits specifically worked through Lisa Perry and

[12] his decision had been made.

[13]   **Q:** What action had PTC taken in terms of

[14] communicating with CDI as of the morning of December

[15] 7th?

[16]   **A:** I'm not sure when the conversation was to

[17] CDI.

[18]   **Q:** Who from PTC communicated with CDI?

[19]   **A:** I believe it was supposed to be Lee

[20] Lesberg.

[21]   **Q:** Do you know who ultimately communicated?

[22]   **A:** I don't.

[23]   **Q:** Do you know what was said?

[24]   **A:** I don't.

Page 94

[1]   **MR. CHURCHILL:** Can we mark this as Exhibit

[2] 37, please.

[3]   (Document marked as Exhibit A-37

[4] for identification)

[5]   **Q:** Showing you now what's been marked as

[6] Exhibit 37, do you recognize this document?

[7]   **A:** I do.

[8]   **Q:** And this is an employee change record, is

[9] it not?

[10]   **A:** It is.

[11]   **Q:** And this is something that you completed

[12] with regard to Mr. Kouvchinov?

[13]   **A:** Yes.

[14]   **Q:** And the purpose of this was to put into

[15] PTC's records that Mr. Kouvchinov was not eligible

[16] for rehire; is that right?

[17]   **A:** Correct.

[18]   **Q:** And you completed this form on December 7,

[19] 2001?

[20]   **A:** Yes.

[21]   **Q:** And why did you complete this form?

[22]   **A:** In our database, there's a box for either

[23] eligible for rehire or not eligible, and based on Ed

[24] Raine's decision, it was decided that he's not a

Page 95

[1] candidate we would want to rehire because of the

[2] ethical concerns and misrepresentation.

[3]   **Q:** And did somebody ask you to complete this

[4] form or did you do it on your own initiative?

[5]   **A:** I would have been asked. I didn't have the

[6] authority, while I did the paperwork to make that

[7] ultimate decision.

[8]   **Q:** Who asked you to do it?

[9]   **A:** Most likely Ed Raine. I don't remember.

[10]   **Q:** At the bottom right-hand corner there's

[11] handwriting that appears to say "okay" and then some

[12] initials and 12/11/01. Do you see that?

[13]   **A:** Yes.

[14]   **Q:** Do you know whose initials those are?

[15]   **A:** I think it's Amanda Lotstein. She's

[16] probably the actual person who put it into the

[17] database.

[18]   **Q:** So your understanding of that notation is

[19] that she was saying it had been entered into the

[20] database?

[21]   **A:** Yes.

[22]   **Q:** When you were conducting your investigation

[23] during the week of December 4th, did you take any

[24] other steps beyond what you've already testified

Page 96

[1] about today?

[2]   **A:** No.

[3]   **Q:** Did you review his personnel file?

[4]   **A:** Yes, I did. I'm sorry. I reviewed that in

[5] December.

[6]   **Q:** When did you review that?

[7]   **A:** Sometime on the 4th or the 5th.

[8]   **Q:** Why did you review it?

[9]   **A:** I wanted to make sure — that was a common

[10] practice of ours, to look back at an employee's

[11] file. I wanted to just see if there had been — if

[12] I was missing anything or a past concern.

[13]   **Q:** Your review showed you that he was in fact

[14] a good employee, didn't it?

[15]   **A:** Yes.

[16]   **Q:** And you knew that Alex had become depressed

[17] in September 2001 after learning of his layoff, did

[18] you not?

[19]   **MR. TULLY:** Objection. You can answer.

[20]   **A:** I can answer? Okay. I knew he had

[21] submitted a claim about it.

[22]   **Q:** So you knew that Mr. Kouvchinov had claimed

[23] that he had become depressed as a result of his

[24] layoff; is that right?

Page 97

[1] MR. TULLY: Objection. You can answer.
[2] Q: That's what was in his claim, right?
[3] A: Yes.
[4] MR. TULLY: Hold on a minute. If you're
[5] going to refer to his claim, let's go back to the
[6] claim. You keep characterizing it as a result of
[7] his layoff. If we're going to have — the document
[8] speaks for itself obviously. With your
[9] clarification that it's what was represented on his
[10] claim form, that's fine.
[11] MR. CHURCHILL: That's fair enough.
[12] Q: You knew that a week after he had been
[13] notified of his layoff, Mr. Kouvchinov claimed that
[14] he had depressed?
[15] A: Based on the information on his claim form?
[16] Q: Yes.
[17] A: Yes.
[18] Q: And you knew as of December 2001 as far as
[19] you knew, he had never claimed to be depressed
[20] before; is that right?
[21] A: He never claimed to be —
[22] Q: He had never made a claim for disability
[23] benefits based on depression?
[24] A: I believe Lisa Perry confirmed that she had

Page 98

[1] not received a short-term disability claim from him
[2] before.
[3] Q: And you knew as of the week of December 4,
[4] 2001, that CIGNA had allowed his claim?
[5] A: Yes.
[6] Q: And particularly given your background as a
[7] psychology major, you understood that depression is
[8] not a black or white issue? It's a matter of
[9] degrees; is that true?
[10] MR. TULLY: Objection. You can answer.
[11] A: I'm not a doctor as I said before. I don't
[12] have any personal experience with depression. But
[13] it's not like a broken leg where it heals, something
[14] like that.
[15] Q: And it's not something where you just have
[16] it at a certain level or you don't have it at all?
[17] You can have degrees of depression?
[18] A: I think people probably could.
[19] Q: And you knew that certain types of events
[20] in one's life could make depression worse like the
[21] death of a loved one, right?
[22] A: Perhaps, yes, absolutely.
[23] Q: Or the loss of a job?
[24] A: Sure.

Page 99

[1] Q: As part of your investigation, you never
[2] advised Alex that he was under investigation, did
[3] you?
[4] A: I had no conversations with Alex.
[5] Q: So you didn't advise him that he was under
[6] investigation; is that right?
[7] A: No.
[8] Q: And why not?
[9] A: He wasn't an employee anymore. It wasn't
[10] my role to do that. I didn't have to do that.
[11] Q: Any other reason?
[12] A: I didn't have any contact with him. He
[13] didn't call me either.
[14] Q: Why would he have called you if he didn't
[15] know he was being investigated?
[16] A: I don't know.
[17] Q: You never asked for his side of the story,
[18] did you?
[19] A: At this point it was more of a short-term
[20] disability claim concern which again would have
[21] begun through benefits and not me.
[22] Q: So did you ask for his side of the story?
[23] A: Did I call him directly and ask him for his
[24] side of the story?

Page 100

[1] Q: Yes.
[2] A: No.
[3] Q: Did you ask Lisa Perry to get his side of
[4] the story?
[5] A: No, because she — no.
[6] Q: You never called CIGNA yourself?
[7] A: No.
[8] Q: And you never determined what basis CIGNA
[9] had for extending his benefits through December
[10] 16th, why they did that?
[11] A: Can you just —
[12] Q: You never found out why CIGNA had extended
[13] his benefits to December 16th?
[14] A: No.
[15] Q: And you never reviewed the short-term
[16] disability policy to see what it required of
[17] employees; is that correct?
[18] A: Right. Correct.
[19] Q: And you never determined when Alex actually
[20] received his last disability check; is that right?
[21] A: That's right. It wasn't my position.
[22] Q: And you never determined if Alex himself
[23] had requested that his benefits be extended through
[24] December 16th?

Page 101

[1]  **A:** No.
[2]  **Q:** And you never determined if Alex even knew
[3] that his benefits had been extended through December
[4] 16th, did you?
[5]  **A:** It would have fallen under the realm of the
[6] benefits, so no.
[7]  **Q:** Did you ever determine if Alex even knew he
[8] was supposed to contact CIGNA?
[9]  **A:** No.
[10]  **Q:** Did you ever determine if Alex had
[11] attempted to contact CIGNA?
[12]  **A:** No.
[13]  **Q:** And you don't know whether Alex had simply
[14] forgotten to contact CIGNA?
[15]  **A:** I don't know that.
[16]  **Q:** You testified earlier that you saw him
[17] across from your office in the kitchenette, right?
[18]  **A:** Yes.
[19]  **Q:** And did you ever wonder why he would have
[20] had lunch there right across from your office if he
[21] was trying to double dip?
[22]  **A:** Did I wonder why he would have lunch across
[23] from my office?
[24]  **Q:** He was working in Building A and B; is that

Page 102

[1] right?
[2]  **A:** Right.
[3]  **Q:** And he chose to have lunch in a different
[4] building right across the hall from your office?
[5]  **A:** Right. He could have had friends there.
[6] He used to work in Building C.
[7]  **Q:** Did you think about why he would have been
[8] there across from your office if he were double
[9] dipping?
[10]  **A:** No.
[11]  **Q:** You knew obviously that he knew — there's
[12] too many people knowing there. You knew about his
[13] disability claim?
[14]  **A:** I did.
[15]  **Q:** And you knew about that because he told you
[16] about it?
[17]  **A:** Yep.
[18]  **Q:** Did you wonder why when you saw Alex on
[19] December 4th he didn't look nervous or guilty?
[20]  **A:** Did I wonder why he didn't look nervous or
[21] guilty? Our conversation was so brief. I don't
[22] even remember — as I said before, he seemed
[23] ordinary.
[24]  **Q:** Did you wonder why if he were double

Page 103

[1] dipping he wasn't concerned when he saw you who
[2] would have known that he was double dipping?
[3]  **A:** He might have been concerned when he saw
[4] me, but I didn't read that on his face.
[5]  **Q:** He didn't show it in any way?
[6]  **A:** Not that I remember, no.
[7]  **Q:** Did you ever learn how much money Alex was
[8] earning as a result of his contracting through CDI?
[9]  **A:** No.
[10]  **Q:** Did you have any knowledge of with respect
[11] to contractors, what their hourly rate was for that
[12] type of work?
[13]  **A:** No. It's all over the place and I didn't
[14] service Global Services or work with — no.
[15]  **Q:** So you had no involvement in terms of
[16] contract workers at PTC?
[17]  **A:** No.
[18]  **Q:** Isn't it fair to say, Ms. Wales, that you
[19] did not conduct a diligent investigation of this
[20] issue?
[21]  **MR. TULLY:** Objection.
[22]  **A:** I disagree with that. I don't think that's
[23] a fair statement.
[24]  **Q:** Well, in retrospect, at a minimum don't you

Page 104

[1] think you should have talked to Alex to get his side
[2] of the story?
[3]  **A:** Not necessarily.
[4]  **Q:** Why?
[5]  **A:** I think I did a very good job investigating
[6] the situation. This was — first of all, it wasn't
[7] my decision. I was the fact finder on it. But I
[8] wasn't out to get anyone. I was just doing my job.
[9] I don't think it was necessary that I spoke with
[10] him.
[11]      I had facts from Lisa Perry from CIGNA
[12] directly that she contacted them on his disability.
[13] I saw him in the cafeteria. I had known from a
[14] security perspective he didn't follow the
[15] procedures.
[16]      I talked with the manager who had hired
[17] him, Lee Lesberg and I brought the facts to Ed Raine
[18] who ultimately made the decision.
[19]  **Q:** What harm would there have been to asking
[20] Mr. Kouvchinov what was going on?
[21]  **MR. TULLY:** Objection. Harm to who?
[22]  **MR. CHURCHILL:** To Mr. Kouvchinov.
[23]  **A:** I don't know. I mean we're talking about
[24] something that happened over four years ago.

**EXHIBIT D**

# In The Matter Of:

*Alexei Kouvchinov   v.*
*Parametric Technology Corporation, et al.*

---

*Edward Raine*
*Vol. 1, March 3, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File RAINE.V1, 38 Pages*
*Min-U-Script® File ID: 1553059515*

## Word Index included with this Min-U-Script®

Vol. 1, March 9, 2006
Case 1:04-cv-12531-MEL    Document 63-5    Filed 07/06/2006    Page 3 of 10
Edward d. Kaine    Alexei Kouvchinov    v.
Parametric Technology Corporation, et al.

Page 5

[1] have left as a senior manager.
[2] **Q:** Have you worked in human resources during
[3] your entire professional career?
[4] **A:** Yes, I have.
[5] **Q:** And when you went to — why did you leave
[6] Ryder System?
[7] **A:** I left because we outsourced the IT group
[8] to Anderson Consulting and IBM. In fact I actually
[9] spent six months with Anderson Consulting on the
[10] back end of an outsourcing agreement, but I hadn't
[11] left my office, so I don't really think about it as
[12] a different employer. That was the reason. And so
[13] basically my job was eliminated from Ryder.
[14] **Q:** And what were your positions at Nortel?
[15] **A:** I joined as a senior manager,
[16] organizational effectiveness, and then did that for
[17] about a year. And then roughly the last year and a
[18] half in Miami I was responsible for leading the HR
[19] function in Latin America. And then Nortel moved me
[20] to Boston, and my job here was to lead the HR
[21] function for a division, Software Division.
[22] **Q:** Why did you leave Nortel?
[23] **A:** I left because they were starting to go
[24] from 105,000 employees to 35,000, a significant

Page 7

[1] EMC?
[2] **A:** It would have been January 2nd, something
[3] like that, 2004.
[4] **Q:** When you were hired by PTC, who hired you?
[5] **A:** I'd been hired by Barry Cohen.
[6] **Q:** What was his position?
[7] **A:** He was the EVP for HR and marketing.
[8] **Q:** EVP stands for executive vice-president?
[9] **A:** It does.
[10] **Q:** What position were you hired into at PTC?
[11] **A:** Vice-president, Human Resources.
[12] **Q:** Who did you report to?
[13] **A:** To Barry Cohen.
[14] **Q:** Did you have the same position at PTC
[15] during your entire employment there?
[16] **A:** I had the same title. I had different
[17] roles.
[18] **Q:** When did your role change?
[19] **A:** The first year I was responsible for the
[20] Americas HR Business Partner Team. The second year,
[21] 2002, they asked me to take an ex-pat assignment to
[22] England, and I led the Europe and Asia Pacific HR
[23] teams.
[24]     The third year I was brought back and,

Page 6

[1] downturn in the business. And so... I was also
[2] told by the head of HR for Nortel that they were
[3] going to go to a transactional HR model, which means
[4] they wanted to just — they wouldn't let us spend
[5] time on the organizational development piece, which
[6] to me was not engaging from a career standpoint. So
[7] I agreed with my boss that I was going to look. So
[8] I left.
[9] **Q:** And when did you begin at PTC?
[10] **A:** 2001. I don't remember exactly. I think
[11] it was maybe March 2001, something like that.
[12] **Q:** And when exactly did you leave PTC?
[13] **A:** October 2003.
[14] **Q:** Why did you leave PTC?
[15] **A:** I was leading the HR function there and had
[16] been that year, 2003, really asked to reduce the HR
[17] budget by a third. So a downsizing. And after I
[18] had taken out a third of the function and a third of
[19] the budget, we were left with still more, and I
[20] said, "I'm not taking out the lower-level people.
[21] I'm taking myself out, because you can live with
[22] running the HR function with the people you've got."
[23] And they agreed. So I separated.
[24] **Q:** And when exactly did you start working for

Page 8

[1] after about a month, I then spent the rest of 2003
[2] leading the HR function, after my — I had had
[3] another boss by then, Rick Bellingham. So when Rick
[4] Bellingham left, I took over.
[5] **Q:** When did you start reporting to Rick
[6] Bellingham?
[7] **A:** Maybe some time — later in the year 2001.
[8] I don't remember exactly. But certainly — I think
[9] it was before I left for the European assignment.
[10] So I think it was the tail end of 2001.
[11] **Q:** What was his position?
[12] **A:** He would have been SVP, senior
[13] vice-president of Human Resources.
[14] **Q:** Was he a new hire to PTC?
[15] **A:** Yes, he was. Maybe he joined mid-year. I
[16] don't remember exactly.
[17] **Q:** So once Mr. Bellingham joined PTC, you
[18] began reporting to him?
[19] **A:** That's correct, yes.
[20] **Q:** And who did Mr. Bellingham report to?
[21] **A:** To Barry Cohen.
[22] **Q:** You testified earlier that during 2001,
[23] your duties —
[24]     (Interruption)

Edward Kaine
Vol. 1, March 30, 2006
Case 1:04-cv-12531-MEL     Document 63-5     Filed 07/06/2006     Page 4 of 16
Alexei Kouvchinov   v.
Parametric Technology Corporation, et al.

Page 13

[1] investigate. And, again, they would usually
[2] coordinate that with the HR manager, depending on
[3] what type of an issue it was.
[4]     **Q:** What types of issues would an HR generalist
[5] investigate?
[6]     **A:** I think — they could investigate pretty
[7] much anything. They were — it was whatever came
[8] up.
[9]     **Q:** So, for example, if a manager brought to an
[10] HR generalist's attention that the manager was
[11] having problems with an employee's performance, is
[12] that the kind of issue that an HR generalist would
[13] investigate?
[14]     **A:** Absolutely. A performance management
[15] issue, definitely.
[16]     **Q:** Were you familiar, back in 2001, with Ms.
[17] Wales' performance?
[18]     **A:** Yes.
[19]     **Q:** And what was your — what were your views
[20] about her performance back in 2001?
[21]     **A:** That was as expressed by her boss to me.
[22] So this was not my direct assessment. It was as
[23] relayed to me by her boss.
[24]     **Q:** Let me ask a preliminary question first

Page 14

[1] then. Did you ever work directly with Ms. Wales?
[2]     **A:** No.
[3]     **Q:** So whatever conclusions you have about her
[4] performance are based on feedback you received from
[5] others?
[6]     **A:** Correct.
[7]     **Q:** And primarily from Ms. Pitchon?
[8]     **A:** Yes.
[9]     **Q:** And what feedback did Ms. Pitchon give you
[10] about Ms. Wales' performance?
[11]     **A:** To my recollection, Lisa Wales was always
[12] highly regarded with respect to her performance.
[13] She had been with PTC some number of years — I'm
[14] not sure how many — but she was widely viewed as
[15] one of our strongest generalists.
[16]     **Q:** Were there any policies that governed the
[17] work of HR employees, including the HR generalists?
[18]     **A:** I'm not sure what you mean by policies.
[19]     **Q:** Were there any written policies that HR
[20] generalists would consult in the course of
[21] performing their duties?
[22]     **A:** Really, it would be the company policies
[23] that they would —
[24]     **Q:** That's what I meant. So were there company

Page 15

[1] policies governing HR functions?
[2]     **A:** Yes. There would have been, yes.
[3]     **Q:** And how was the — just describe how
[4] generally the company's policies were set out. In
[5] other words, was there one company policy manual?
[6] Were there multiple manuals that addressed different
[7] topics?
[8]     **A:** So we had no handbooks, no manuals or
[9] anything like that. So what we had would have been,
[10] again to my recollection, available on our intranet.
[11] And I don't recall exactly how it worked, but
[12] certainly the websites would have contained all the
[13] key policies available for all employees to see.
[14]     **Q:** And was there a table of contents for the
[15] policies?
[16]     **A:** I'm sure there was some way to navigate. I
[17] don't remember it specifically, but...
[18]     **Q:** Were there any policies that governed
[19] investigations?
[20]     **A:** Only in the context of something like a
[21] nondiscrimination-, nonharassment-type policy, where
[22] the company would set forth its intent to fully
[23] review and investigate any employee concerns.
[24]     **Q:** Other than in the context of discrimination

Page 16

[1] or harassment issues, were there any other policies
[2] that addressed investigations more generally?
[3]     **A:** Not that I remember.
[4]     **Q:** Were there occasions when an employee was
[5] accused of wrongdoing and those allegations were
[6] investigated?
[7]     **A:** When the employee was accused of —
[8]     **Q:** Let me ask another question. If an
[9] employee was accused of wrongdoing by a manager, for
[10] example, is that the kind of thing that an HR
[11] generalist would investigate?
[12]     **A:** It could have been, yes, the generalist or
[13] the manager.
[14]     **Q:** When you say the manager, do you mean the
[15] front-line manager?
[16]     **A:** No. The HR manager.
[17]     **Q:** The business partner?
[18]     **A:** Yes.
[19]     **Q:** And when an employee was accused of doing
[20] something wrong, was it PTC's practice to give the
[21] employee an opportunity to provide their side of the
[22] story?
[23]     **A:** Yeah, if an employee — if there was — I
[24] guess it would depend on what was happening. If it

Alexei Kouvchinov   v.
Parametric Technology Corporation
Case 1:04-cv-12563-NMG   Document 63-5     Filed 07/06/2006     Page 5 of 10

Edward Raine
Vol. 1, March 3, 2006

Page 17

[1] was clear what had happened, there was clear
[2] evidence or something, and the manager had it, then
[3] maybe it didn't require a whole lot of
[4] investigation. It depends on where we got involved
[5] in the situation.
[6]   But there may — but I would think that
[7] most situations would have required, you know, a
[8] review with the employee to understand their side of
[9] the story. But it really just depends on what kind
[10] of — what the nature and the severity of the
[11] situation was and how clear the facts were at the
[12] time.
[13]   Q: Well, it was PTC's practice to be fair to
[14] its employees, was it not?
[15]   A: Of course.
[16]   Q: Have you ever been deposed before?
[17]   A: Yes.
[18]   Q: On how many occasions?
[19]   A: Maybe two.
[20]   Q: And when was the most recent time?
[21]   A: About ten years ago.
[22]   Q: And what did you do to prepare for today's
[23] deposition?
[24]   A: I had one meeting with counsel, Mr. Tully.

Page 18

[1]   Q: Did you review any documents?
[2]   A: I did.
[3]   Q: What did you review?
[4]   A: Some of the e-mails that — certainly
[5] including my e-mail, and some, I don't know if it
[6] was all, of the deposition for Lisa Wales.
[7]   Q: All right. You had never met Mr.
[8] Kouvchinov until today; is that correct?
[9]   A: That's correct.
[10]   Q: When is the first time at PTC that you had
[11] any involvement with any issues involving Mr.
[12] Kouvchinov?
[13]   A: Well, I didn't even remember Mr.
[14] Kouvchinov's name, so it was only as a result of
[15] reviewing the e-mail, the e-mail that's involved in
[16] this case, that his name even appeared. So I can
[17] tell you that was the — it was that day only, when
[18] I received the e-mail and responded to it.
[19]   Q: Let me show you what was previously marked
[20] as Exhibit 35, which appears to be an e-mail from
[21] you to others dated Thursday, December 6th, 2001; is
[22] that correct?
[23]   A: That's correct.
[24]   Q: And the time that you sent the e-mail was

Page 19

[1] 4:25 in the afternoon?
[2]   A: Yes.
[3]   Q: And your e-mail was responding to an e-mail
[4] from Lisa Wales?
[5]   A: That's correct.
[6]   Q: And her e-mail was dated December 6th,
[7] 2001; is that right?
[8]   A: That's correct.
[9]   Q: And the time for her e-mail was 12:00 noon?
[10]   A: Yes.
[11]   Q: Is this the e-mail that you were referring
[12] to?
[13]   A: It was.
[14]   Q: So is it the case that the first time that
[15] you had any involvement with Mr. Kouvchinov's
[16] employment was when you received this December 6th
[17] e-mail from Ms. Wales?
[18]   A: Yes.
[19]   Q: Did you also receive a voice mail from Ms.
[20] Wales with respect to the issues addressed in this
[21] e-mail?
[22]   A: I may have. I did not recall it.
[23]   Q: Other than the e-mail from Ms. Wales that's
[24] in this exhibit, did you ever receive any other

Page 20

[1] e-mails from Ms. Wales about Mr. Kouvchinov?
[2]   A: Not to my knowledge.
[3]   Q: And other than the e-mail that you drafted
[4] to others on December 6th that appears in this
[5] exhibit, did you send e-mails to anybody else about
[6] Mr. Kouvchinov?
[7]   A: I don't believe so.
[8]   Q: All right. With respect to your e-mail of
[9] December 6th, did you look at or rely on any other
[10] information when preparing this e-mail, beyond what
[11] was in Ms. Wales' e-mail?
[12]   MR. TULLY: I'm sorry. Could you read the
[13] question back.
[14]   (Question read)
[15]   A: I don't remember, but I don't think so.
[16]   Q: All right. In the fourth full paragraph of
[17] your e-mail — I'll just read it. It says, "From
[18] the facts written below, it seems clear that Alexei
[19] has breached business ethics by claiming for STD
[20] while at the same time being able to perform work as
[21] a contractor at PTC." Did I read that correctly?
[22]   A: Yes.
[23]   Q: What business ethics did Mr. Kouvchinov
[24] breach?

Edward Kaine

Alexei Kouvchinov v.

Vol. 1, March 8, 2006    Case 1:04-cv-12531-MEL    Document 63-5    Filed 07/06/2006    Page 8 of 9    Parametric Technology Corporation, et al.

Page 21

[1] **A:** Well, from my perspective, he was on
[2] disability, and if on disability, it did not seem
[3] reasonable that he could be available to work at the
[4] same time.
[5] **Q:** When you say that he was on disability,
[6] what do you mean by that?
[7] **A:** Well, from the e-mail from Lisa Wales, it
[8] indicated that he was on disability. So...
[9] **Q:** Was it your understanding that he was
[10] receiving disability benefits while at the same time
[11] he was working at PTC?
[12] **A:** That was my understanding, yes.
[13] **Q:** And was it your understanding that Mr.
[14] Kouvchinov was knowingly receiving STD benefits
[15] while he was working at PTC?
[16] **A:** Well, that's the inference from this
[17] e-mail, yes.
[18] **Q:** With respect to the conclusions that you
[19] reached, as expressed in your e-mail, you were
[20] relying on Ms. Wales' e-mail; is that right?
[21] **A:** That's correct.
[22] **Q:** In fact, that's the only thing that you
[23] were relying on; is that right?
[24] **A:** That's correct.

Page 22

[1] **Q:** In the final paragraph of your e-mail,
[2] you — I'll just read it so it's in the record. It
[3] says, "Unless others have different opinions, my
[4] recommendation is for Chris Cimitile to discuss this
[5] situation with Lee Lesburg, explain our position on
[6] the business ethics, seek agreement, and have Lee
[7] notify the agency of PTC's decision." Did I read
[8] that correctly?
[9] **A:** Yes.
[10] **Q:** What happened after you made this
[11] recommendation with respect to Mr. Kouvchinov?
[12] **A:** I can honestly say I don't know.
[13] **Q:** Did you ever hear back from anybody after
[14] you sent this e-mail in terms of what happened with
[15] Mr. Kouvchinov?
[16] **A:** Not to my recollection.
[17] **Q:** And what was Chris Cimitile's position at
[18] that time?
[19] **A:** He was an HR business partner, manager,
[20] supporting another group, and as far as I can
[21] recall, that would have been the group that Lee
[22] Lesburg was working in.
[23] **Q:** So it was your understanding that the group
[24] that Mr. Kouvchinov was working in was a group

Page 23

[1] under — within Chris Cimitile's scope of
[2] responsibility?
[3] **A:** Yes. So a different group from where he'd
[4] worked previously. I'm inferring that because I
[5] don't remember clearly. It's because — that's the
[6] only reason I can explain why Chris Cimitile was
[7] involved.
[8] **Q:** And Chris Cimitile was a peer of Nicole
[9] Pitchon's, correct?
[10] **A:** That's correct, yes.
[11] **Q:** In your e-mail, why did you include Ms.
[12] Pitchon as a recipient?
[13] **A:** Because she was Lisa's boss.
[14] **Q:** Did Ms. Pitchon's responsibilities change
[15] at some point during 2001?
[16] **A:** Not to my recollection.
[17] **Q:** What was your understanding about the
[18] duties that Mr. Kouvchinov was performing?
[19] **A:** I had no idea.
[20] **Q:** What was your understanding at this time
[21] about how PTC's short-term disability policy defined
[22] totally disabled?
[23] **A:** No idea. It was up to — between the
[24] Benefits Department and the insurers.

Page 24

[1] **Q:** Did you learn at some point that Mr.
[2] Kouvchinov stopped working at PTC?
[3] **A:** I may have. I don't recall it.
[4] **Q:** After you sent this e-mail, what's the next
[5] thing you can remember, in any context, having
[6] anything to do with Mr. Kouvchinov?
[7] **A:** I have no — nothing.
[8] **Q:** So until you were contacted about this
[9] deposition, that was the next time?
[10] **A:** That's correct.
[11] **Q:** If you had known that Mr. Kouvchinov had
[12] not in fact received any disability benefits during
[13] the time he was working at PTC as a contractor,
[14] would that have changed your recommendation?
[15] **MR. TULLY:** Objection. You can answer.
[16] **A:** I would like you to repeat, please.
[17] **Q:** Sure. If you had learned that Mr.
[18] Kouvchinov was not in fact receiving disability
[19] benefits at the time that he was working at PTC as a
[20] contractor, would that have changed your
[21] recommendation?
[22] **MR. TULLY:** Objection. You can answer.
[23] **A:** Well, the issue for me is, was he on
[24] disability or not. The payments is not my — I

Alexei Kouvchinov v.
Parametric Technology Corporation, et al.
Case 1:04-cv-12558-NMG   Document 63-5   Filed 07/06/2006   Page 7 of 10
Edward Raine
Vol. 1, March 3, 2006

Page 25

[1] don't — I wasn't tracking that. If he was on
[2] disability and approved for disability, then that's
[3] the basis I make this decision. So if he was not
[4] disabled, then that would have been a different
[5] decision.
[6]   **Q:** So I had understood your earlier testimony
[7] to be that it was your understanding that he was
[8] actually receiving disability benefits while he was
[9] working at PTC; is that right?
[10]   **A:** Yes.
[11]   **Q:** And are you saying that, even if he had not
[12] actually received disability benefits for the same
[13] time he was working at PTC, that would not have
[14] changed your recommendation?
[15]   **A:** So — it's very clear to me he was on — if
[16] he was receiving the benefits, he was on disability.
[17] And if he was on disability, that was the basis for
[18] the decision. If he was not disabled, then this
[19] decision would not have come.
[20]   **Q:** What do you mean, if he was not disabled
[21] this decision would not have come?
[22]   **A:** Well, because the issue is representing
[23] yourself as being disabled and then being available
[24] to work at the same time. You can't have both.

Page 26

[1] It's one or the other.
[2]   **Q:** If you had learned that Mr. Kouvchinov had
[3] contacted the insurance company the week before he
[4] started working at PTC to notify him that he was
[5] returning to work, would that have changed your
[6] recommendation?
[7]   **MR. TULLY:** Objection. You can answer.
[8]   **A:** If there had been a doubt as to whether he
[9] was disabled or not, then I would have looked for
[10] more information. But there appeared to be no
[11] doubt.
[12]   **Q:** But my question was, if you had learned
[13] that Mr. Kouvchinov had contacted the disability
[14] company the week before he returned to PTC to report
[15] that he was going back to work, would that have
[16] changed your recommendation?
[17]   **A:** Not the fact of a call. It would have been
[18] the decision from the company, CIGNA, the insurer.
[19] The call itself would not have necessarily changed
[20] my opinion. It would have been what we are being
[21] told by the insurer. It's their responsibility to
[22] find out whether — make the determination — we
[23] weren't involved in the beginning; we're not
[24] involved in the end. We get told whether they're

Page 27

[1] available for work or not.
[2]   **Q:** But if Mr. Kouvchinov had contacted the
[3] insurance company to report he was going back to
[4] work, how would he have breached any business
[5] ethics?
[6]   **A:** Our point was, and it's clear from this
[7] e-mail that — I believe it's clear from this e-mail
[8] that it was reviewed by Lisa Wales with CIGNA as to
[9] his status that day. So that's what I cared about;
[10] we had checked.
[11]   **MR. TULLY:** I think he's asking you just a
[12] hypothetical — is that right, Steve?
[13]   **MR. CHURCHILL:** Yes.
[14]   **MR. TULLY:** He's just asking you a
[15] hypothetical question.
[16]   **A:** Well, we would have gone back to the
[17] insurer and said, "Double check." I mean, I wanted
[18] to know, was he claiming disability and making
[19] himself available to work at the same time. That
[20] decision is not — that's all I need to know.
[21]       And so it doesn't matter what I thought
[22] about whether he had made a call or not. It's what
[23] the doctors and the insurers come up with.
[24]   **Q:** But wasn't it important to you what Mr.

Page 28

[1] Kouvchinov knew about what was going on?
[2]   **A:** Well, of course. That's why we were
[3] contacting the insurance company to find out what
[4] the status was.
[5]   **Q:** So what Mr. Kouvchinov knew about his
[6] benefits was important in terms of your conclusion
[7] about him having breached business ethics; is that
[8] fair to say?
[9]   **MR. TULLY:** Objection.
[10]   **A:** At this point, this was — he was out on
[11] short-term disability. Because of the hands-off
[12] nature between the line HR clients we've been
[13] talking about and the Benefits Group and then the
[14] insurer, this was something that we put the burden
[15] back onto the group that makes the decisions.
[16]       So they make — CIGNA made the decision
[17] whether he was eligible. They needed to tell us
[18] whether it was time for him to be made available
[19] again. And that really is between Mr. Kouvchinov
[20] and CIGNA.
[21]       Now, yes, I would want to make sure that we
[22] understood where it stood, you know, what was
[23] happening; but we did — we would not have — we
[24] would not have brought — if he was still an

Edward Kaine
Vol. 1, March 3, 2006
Case 1:04-cv-12531-MEL     Document 63-5     Filed 07/03/2006     Page 2 of 10
Alexei Kouvchinov   v.
Parametric Technology Corporation, et al.

Page 29

[1] employee, we would not have brought him back to work
[2] until CIGNA said he was released to come back to
[3] work, which is the same principle that I would make
[4] this judgment, saying we need the insurer to tell us
[5] what the status is.
[6]     This is a medical situation. It's not
[7] something we deal with. We hand it off. There's a
[8] separation here.
[9]     Q: But what led to your recommendation was
[10] your conclusion that Mr. Kouvchinov had breached
[11] business ethics; is that right?
[12]     A: Yes.
[13]     Q: And in concluding that he had breached
[14] business ethics, you concluded that he had
[15] intentionally done something wrong; isn't that fair
[16] to say?
[17]     A: I didn't speculate as to motivation. It
[18] was a matter of fact. If he was on disability and
[19] showing up for work, there was an issue.
[20]     Q: Okay. So are you saying that it's possible
[21] that somebody could unintentionally breach business
[22] ethics?
[23]     A: I'm not saying anything. All I'm saying is
[24] I am making the decision based on what I believe to

Page 31

[1] not yet notified Mr. Kouvchinov that his benefits
[2] had been extended?
[3]     MR. TULLY: Objection.
[4]     A: Well, I'm going to say the same thing,
[5] because we would have — if we'd learned there was
[6] an issue, we would have gone back to CIGNA and said,
[7] "You've got to clear it up."
[8]     Q: Okay. So is it fair to say that if you had
[9] obtained additional information in any way throwing
[10] into doubt whether Mr. Kouvchinov had intentionally
[11] done something wrong, you would have requested
[12] further information to find out exactly what was
[13] going on?
[14]     A: That's a fair statement, yes.
[15]     Q: Do you know if PTC's disability plans
[16] allowed claimants to work?
[17]     A: I won't hold myself up as an expert on the
[18] short-term disability plans for PTC, but certainly
[19] if I am told that they are disabled, then we would
[20] not expect them to be working at PTC. So based on
[21] the — we would not be allowing an employee on
[22] disability to come back to work at the company
[23] unless they had been cleared to return to work.
[24]     So I read that that — if we were treating

Page 30

[1] be facts.
[2]     Q: If you learned that Mr. Kouvchinov did not
[3] know that his benefits had been extended to include
[4] the point of time when he was working at PTC, would
[5] that have made any — would that have changed your
[6] recommendation?
[7]     A: I find it somewhat strange that he wouldn't
[8] have known. So —
[9]     Q: Maybe it's strange, but if you had learned
[10] that he had not known, would that have changed your
[11] recommendation?
[12]     A: I would have — it would have forced me to
[13] go back and ask CIGNA to check again. So it all
[14] comes back to dependency on a decision from a third
[15] party.
[16]     So if we had reason to be concerned that
[17] there was an issue, we would have pushed it back,
[18] "Please check. Double check. Verify," because we
[19] were entirely dependent on their decision to feed
[20] our judgment.
[21]     Q: And what if CIGNA had reported, based on
[22] that request, that his benefits had been extended
[23] because they had contacted his doctor, not because
[24] they had contacted Mr. Kouvchinov, and that they had

Page 32

[1] one of our own employees and we wouldn't allow them
[2] to come back to work without a release from CIGNA,
[3] why would I think that someone who was receiving
[4] benefits from PTC should be able to go and work in
[5] another company?
[6]     Q: Did you know at that time what PTC's
[7] disability policy said about a claimant's ability to
[8] go back to work?
[9]     A: Not specifically.
[10]     Q: And did you know what the disability policy
[11] said at that time about what a claimant's
[12] obligations were about reporting any work to the
[13] insurance company?
[14]     A: I don't recall it.
[15]     Q: As of this time, the week that included
[16] December 6th, 2001, was Mr. Kouvchinov an employee
[17] of PTC?
[18]     A: He wouldn't have been — he would have
[19] been — looking at the dates here... (Reviewing
[20] document)
[21]     So I'm not sure what his last day was. It
[22] looks like, from the separation agreement, he was
[23] paid his full severance on November 9th, 2001. But
[24] the insurance plan he was out on obviously was

Page 33

[1] through a claim he had filed while at PTC. So the
[2] claim itself was being paid for by PTC. That was my
[3] understanding.
[4]   Q: What I'm asking, though, is, as of December
[5] 6th, 2001, was Mr. Kouvchinov an employee of PTC?
[6]   A: No.
[7]   Q: Who was he an employee of?
[8]   A: I don't know. I mean, I don't know what
[9] arrangement he had. He may have been a contractor
[10] with someone else. I have no idea.
[11]   Q: But it was your understanding that he was
[12] working at PTC in some capacity?
[13]   A: That's correct.
[14]   MR. CHURCHILL: Let me just take a minute.
[15]   MR. TULLY: Sure.
[16]   (Recess)
[17]          BY MR. CHURCHILL:
[18]   Q: Did you ever review Mr. Kouvchinov's
[19] personnel file?
[20]   A: I did not.
[21]   Q: And other than what was contained in Ms.
[22] Wales' e-mail December 6th, did you know anything
[23] about his employment history?
[24]   A: Not at all.

Page 35

[1] extended Mr. Kouvchinov's claim through December
[2] 16th, 2001? Do you see that?
[3]   A: I do. And that was what I relied on.
[4]   Q: Did you have any reason to doubt the
[5] integrity of the information that Ms. Wales provided
[6] to you at the time?
[7]   A: None whatsoever.
[8]   Q: Now, in terms of the concern about a breach
[9] of business ethics, if I understood you correctly,
[10] your concern was the fact that Mr. Kouvchinov was
[11] apparently holding himself out to CIGNA as being
[12] unable to work but simultaneously holding himself
[13] out to CDI and PTC as being able to work; is that
[14] correct?
[15]   MR. CHURCHILL: Objection.
[16]   A: That's correct.
[17]   Q: Now, whether Mr. Kouvchinov's actions were
[18] intentional or unintentional, is it fair to say that
[19] your concern — part of your concern was that PTC
[20] was not going to be a party to that relative to its
[21] carrier CIGNA?
[22]   MR. CHURCHILL: Objection.
[23]   A: Absolutely. Very simple. We weren't going
[24] to pay — you're either on disability or he was not.

Page 34

[1]   Q: Did you ever have any other occasions
[2] during your employment at PTC when you dealt with an
[3] employee issue that also involved disability
[4] benefits in some way?
[5]   A: Not to my recollection.
[6]   Q: Who made the decision that Mr. Kouvchinov
[7] could no longer work at PTC?
[8]   A: I would take responsibility for that.
[9]   MR. CHURCHILL: I have no further
[10] questions.
[11]   MR. TULLY: I have just a few.
[12]          CROSS EXAMINATION
[13]          BY MR. TULLY:
[14]   Q: Mr. Raine, if I understood your testimony
[15] today, you said that you relied entirely upon the
[16] information, in terms of this decision that was made
[17] relative to Mr. Kouvchinov, that you relied entirely
[18] upon the information that was contained in the
[19] e-mail from Lisa Wales; is that correct?
[20]   A: Correct.
[21]   Q: And looking at Page 2 of Exhibit 35, you
[22] would agree, wouldn't you, that the second-to-last
[23] paragraph, there is information there about Lisa
[24] Perry having confirmed with CIGNA that they had

Page 36

[1]   MR. TULLY: That's all I have.
[2]   MR. CHURCHILL: I have no further
[3] questions.
[4]   (Whereupon the deposition was
[5] concluded at 11:00 a.m.)

37

```
 1              C E R T I F I C A T E

 2        I, Edward Raine, do hereby certify that I have

 3   read the foregoing transcript of my testimony, and

 4   further certify under the pains and penalties of

 5   perjury that said transcript (with/without)

 6   suggested corrections is a true and accurate record

 7   of said testimony.

 8        Dated at __3 Pm___, this 27ᵗʰ day of MARCH,

 9   2006.

10

11                              __Raine_____

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**EXHIBIT E**

# Performance Review Discussion and Summary Questions

Both the employee and his/her manager may use this form as a guide to discuss and summarize the employee's past performance.

| Employee Name: Lisa Wales | Date of Hire (month – date – year) |
|---|---|
| Employee Title: HR Representative | Department: Human Resources |
| Supervisor Name: Peter Altieri | Review Period: 10/1/00 – 9/30/01 |

1. Describe the employee's major accomplishments and contributions during the review period (planned goals as well as unplanned contributions).

   **Planned Goals**

   • Project Leadership on new hire orientation: Developed a capable group of presenters and added an IT segment to the new hire experience.

   • MCAD College Recruitment: Received positive client feedback with a program that had limited resources and many last minute scheduling changes. Lisa made important to her because it was important to her clients.

   • Technical Support Compensation Analysis: Provided good support to allow project to progress successfully.

   **Unplanned Goals**

   • RIF: Performed very well in over 40 notification meetings. Assumed lead role on Canadian notifications across PTC. Strong Project leader around documentation production.

2. Summarize the employee's strengths and capabilities (skills, knowledge and experience).

   • Customer Service and her abilities to understanding client needs are strengths. Feedback from client base is consistently strong over a sustained period.

   • Lisa displays a tremendous ability to learn quickly and apply that knowledge to her work.

   • Successfully handles multiple tasks and priorities.

   • Willingness to partner with other PTC employees within and outside of HR to gain greater breadth and depth of knowledge.

3. Summarize any other actions the employee took to advance or support the group's direction (or PTC's direction). This could include helping out other team members within or outside the group, taking personal responsibility for outcomes, helping to keep others positive and focused, etc.

   • Involvement in Benefits knowledge transfer and ESPP #20 reconciliation.

   • Close management of visa cases that had the potential to become problematic. Lisa thoroughly investigated and planned for contingencies. This allowed the employee and management to focus on the work of providing service to customers, not dwelling on the visa matter.



PTC

CONFIDENTIAL

PTC00029

- Lisa actively engages in all PTC activities seeking to broaden her expertise and relationships in PTC. She is very inclusive and committed to ethical business behaviors.

4. Identify those factors that impacted the above this past year positively or negatively (issues internal to the employee, external factors, etc.). [Consider these factors as you plan goals and development for next year.]

Lisa is very task oriented and successfully executes on projects and deliverables. This focus is one of her many assets. At times however it can deter her from seeing a larger business case as it relates to HR solutions. I would encourage she be sure to adopt the most broad considerations of the business and human drivers when engaging in problem solving matters.

Delivered  12|10|01

Thank you for recognizing my contributions here and for your guidance in FY'01.

Best PTC08  12|15|01

CONFIDENTIAL

PTC00030

**EXHIBIT F**

**Subject: Lisa Wales**
      **Date:** Fri, 05 Jan 2001 17:59:32 -0500
      **From:** Katherine Paradise <kparadise@ptc.com>
**Organization:** ptc
      **To:** "Peter J. Altieri" <paltieri@int-mail.ptc.com>

Hello Peter-

I wanted to thank you again for "loaning" Lisa Wales to Benefits during
this rather bumpy transition.  I was very lucky to have her as my mentor
and coach when I started here at PTC, and I am grateful that she has
guided Lisa Perry as well.  I believe she has gone way above and beyond
in her absolute dedication not only to Benefits, but the Human Resources
Team as well.  My experience with her is that she is generous with her
time, patient in her approach to training new people, and an absolute
joy to work with.  I believe we are extremely lucky to have her on our
team and I would like to nominate her for an excellence award.  Her
dedication to PTC has shown what true giving and caring can be.  I hope
all of us in Human Resources can aspire to what Lisa already is; I know
I will.

Regards,
-Kate

Katherine Paradise <kparadise@ptc.com>
Senior Benefits Specialist
PTC
Human Resources

CONFIDENTIAL

PTC00035

**EXHIBIT G**

## SCOPE

This applies to all regular and temporary, full and part-time employees.

## PURPOSE

The Company holds to the highest standards for performance.  In an effort to achieve these high standards, managers are encouraged to clearly communicate performance expectations to employees and be willing to train and develop employees to achieve them.

An employee who has a performance-related problem must be made aware of the issue, be counseled as to how to correct the problem and be treated in a fair manner.  This Performance Improvement Policy should be used to facilitate this process.

## POLICY

Generally, each case may be different and the Company will handle each case individually, however, the Performance Improvement process should involve an investigation of the problem, a problem-solving discussion with the employee and a follow up discussion to see that progress is being made in correcting the problem.

The steps in the Performance Improvement process are intended to be used as a guideline. Any questions or concerns with this process should be discussed with your Human Resources Representative.

The Company retains the unilateral right to modify the terms of this policy. Nothing in this policy shall effect the Company's right to terminate employment without cause and without prior notice. Nothing in this policy shall be construed to constitute a contract of employment for any specified period or defined duration, or as a promise of specific treatment in a given situation.

## PROCEDURE

When an employee has a performance problem or poor work habit, he/she should be coached and counseled and given ample opportunity to improve before any decision is made to separate. The objective is to help the employee improve their performance and productivity. An employee generally should be spoken to informally first if performance problems arise.  A simple one on one conversation may be sufficient to correct a problem.

CONFIDENTIAL

**TRAINING AND DEVELOPMENT**
**Performance Improvement**
Effective Date: October 1, 1996
Page 2 of 3

Thereafter, Managers should follow the four step corrective process outlined below. Consult with your direct manager and Human Resources Representative for any questions or assistance.

Step 1:    INFORMAL COUNSELING SESSION (Tip-off):

• An employee generally should be spoken to informally first. A simple one on one conversation could potentially correct the problem.
• The manager will keep in his/her personal records the date the conversation took place as well as the topics covered in the conversation.

Step 2:    FORMAL VERBAL WARNING:

• All discussions should be documented on the Performance Counseling Worksheet and placed in employee's file.
• This record should summarize the major points of the warning. The record also needs to be copied to the functional Vice President and the Human Resources Representative.

Step 3:    FORMAL PERFORMANCE IMPROVEMENT PLAN

• The plan, according to the nature of the problem, may last 30, 60 or 90 days.
• The Performance Improvement Plan needs to be discussed with and reviewed by your Human Resources Representative. The performance improvement letter will become a part of the employee's personnel file.
• Employee, his/her manager and the Human Resources Representative (where available) are present at the disciplinary meeting.
• Employee must be asked to sign this letter. If the employee refuses to sign the letter, the manager must make a note "refused to sign" and sign it and offer the employee to write a rebuttal as a substitute to the signature. The manager must provide the appropriate Human Resources Representative with a copy of the rebuttal.

Step 4:    TERMINATION:

• If stated performance has not improved and/or the employee has committed an offense that warrants discharge, the employee may be terminated.
• No employee shall be terminated without the involvement of the functional Vice President and Human Resources Representative.
• Employee, his/her manager and Human Resources Representative (where available) should be present at the termination meeting.

CONFIDENTIAL

PTC100007

**TRAINING AND DEVELOPMENT**
**Performance Improvement**
Effective Date: October 1, 1996
Page 3 of 3

An employee's action or performance may be such that the Performance Improvement process is not appropriate and immediate discipline, up to and including immediate discharge, should occur. Any situation of this nature should be reviewed with the appropriate Human Resources Representative before any action is taken. These situations include, but are not limited to the following:

- Violation of company policy such as stealing
- Mistreatment of employees
- Inappropriate management behavior
- Gross negligence in performance of duties
- Unethical conduct
- Committing any act of dishonest, including without limitation falsifying personnel, employment application, time, production or other Company records.
- Engaging in or provoking any act of violence; or intentionally damaging or destroying Company property or the property of another individual.
- Engaging in any act of insubordination
- Possessing, using or selling or offering alcohol or unlawful drugs on Company property and/or during work time; reporting for work while under the influence of unlawful drugs or alcohol
- Possessing, using or transporting weapons of any kind on Company property or Company time
- Misuse of any Company property or removal of Company property from the premises without express authorization
- Stealing Company property or another individual's property
- Transmitting any design, customer list, patent, personnel list, plan, document or other trade secret or proprietary or confidential information from Company property or to an unauthorized individual
- Achieving improper personal gain arising from involvement in Company business
- Selling or offering any Company property for loan, lease or sale without prior written authorization
- Improperly using or abusing working time
- As described in the Attendance section, absenteeism and/or tardiness may also result in termination of employment as follows: Failing to report for work or call in for two consecutive working days; Chronic, excessive or a pattern of absenteeism or tardiness

CONFIDENTIAL

PTC100008

**EXHIBIT H**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXEI KOUVCHINOV,<br>Plaintiff,<br><br>v.<br><br>PARAMETRIC TECHNOLOGY<br>CORPORATION, CDI CORPORATION,<br>LISA WALES, and CONNECTICUT<br>GENERAL LIFE INSURANCE CO.<br>Defendants. | Civil Action No. 04-12531 MEL |

## STIPULATION AS TO RECORDS OF LEONARD E. FREEDBERG, M.D.

The parties, Plaintiff Alexei Kouvchinov, Defendant Parametric Technology Corporation, Defendant CDI Corporation, Defendant Lisa Wales and Defendant Connecticut General Life Insurance Company, hereby stipulate to the authenticity of the following documents prepared by Dr. Leonard Freedberg:

1.     Attending Physician Statement attached as Exhibit 1, beginning with the portion titled "To Be Completed By Attending Physician".

2.     Fax from Dr. Freedberg to Angela Wallace dated October 26, 2001 attached as Exhibit 2.

3.     Initial evaluation of Plaintiff by Dr. Freedberg dated June 21, 2000 attached as Exhibit 3.

4.     Handwritten clinical notes of Dr. Freedberg attached as Exhibit 4.

5.     Transcription of Dr. Freedberg's handwritten clinical notes and correspondence from Dr. Freedberg dated March 23, 2004 attached as Exhibit 5.

1

Accepted and Agreed,

ALEXEI KOUVCHNIOV                    CDI CORPORATION

By: _Stephen Churchill /P_          By: _Suzanne Suppa /P_
Stephen S. Churchill, (BBO# 564158)  Suzanne M. Suppa (BBO# 565025)
Hale & Dorr Legal Services Center of  Amy L. Nash (BBO# 647304)
Harvard Law School                   Littler Mendelson, P.C.
122 Boylston Street                  One International Place, Suite 2700
Jamaica Plain, MA 02130              Boston, MA 02110
(617) 390-2578                       (617) 378-6000


CONNECTICUT GENERAL LIFE             PARAMETRIC TECHNOLOGY
INSURANCE COMPANY                    CORPORATION and LISA WALES


By: _____       By: _Guy Tully /P_
David B. Crevier (BBO # 557242)      Guy P. Tully (BBO# 555625)
Crevier & Ryan, LLP                  Jackson Lewis, LLP
1500 Main Street, Suite 2020         75 Park Plaza
Springfield, MA. 01115-5727          Boston, MA 02116
(413) 787-2400                       (617) 367-0025

# EXHIBIT 1

| NING OF SICKNESS | | DATE YOU ARE TO RETURN TO WORK | LIST STATES IN WHICH YOU MAY BE LIABLE FOR FILING TAX RETURNS. |
|---|---|---|---|
| 09/17/01 | 09/17/01 | 11/17/01 | MA |

DESCRIBE IN YOUR OWN WORDS WHAT IS WRONG WITH YOU (IF ACCIDENT, DESCRIBE CIRCUMSTANCES AND ADVISE WHETHER IT OCCURRED AT WORK).

*depressed, can not concentrate low energy and feel hopeless.*

HAVE YOU HAD THE SAME OR SIMILAR CONDITION IN THE PAST? IF SO, PLEASE DESCRIBE DETAIL.

*last year less severe.*

PLEASE LIST ANY HOSPITALS, CLINICS OR PHYSICIANS THAT TREATED YOU FOR YOUR ILLNESS OR INJURY.

| NAME | COMPLETE ADDRESS | TREATMENT PERIOD |
|---|---|---|
| L Freedberg. | 2000 Washington St #322 Newton, MA 02462 | current |

PLEASE DESCRIBE YOUR JOB DUTIES IN DETAIL. WHAT PERCENTAGE OF YOUR JOB REQUIRES PHYSICAL LABOR?

*software engineer    0% physical labor*

PLEASE LIST ALL BENEFITS YOU ARE RECEIVING OR ELIGIBLE TO RECEIVE UNDER ANY OTHER GROUP INSURANCE, GOVERNMENT PLAN OR AUTOMOBILE MANDATORY NO-FAULT COVERA

| BENEFIT | GROSS WEEKLY AMOUNT | DATE BEGAN | PAID THRU DATE |
|---|---|---|---|
| None | | | |

### CLAIMANT'S CERTIFICATION

THIS IS TO CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| SIGNATURE OF EMPLOYEE/ASSOCIATION MEMBER | DATE SIGNED |
|---|---|
| *Alexei Tarverdin* | 09/17/01 |

### AUTHORIZATION TO RELEASE INFORMATION

I authorize any Health Care Provider, Insurance Company, Employer, Person or Organization to release any information regarding medical, dental mental, alcohol or drug abuse history, treatment or benefits payable, including disability or employment related information, to any CIGNA company the Plan Administrator, or their employees and authorized agents for the purpose of validating and determining benefits payable. This data may be extracted for use in audit or statistical purposes. I understand that I or my authorized representative will receive a copy of this authorization upon request. This authorization or a photostatic copy of the original shall be valid for the duration of the claim.

| SIGNATURE OF EMPLOYEE/ASSOCIATION MEMBER | DATE SIGNED |
|---|---|
| *Alexei Tarverdin* | 09/17/01 |

### TO BE COMPLETED BY ATTENDING PHYSICIAN

AGNOSIS AND CONCURRENT CONDITIONS, INCLUDING ICD-9 OR DSM-II CODE.

*Major Depression  296.33*

IS CONDITION DUE TO PREGNANCY? ☐ Yes ☒ No IF "YES", PLEASE PROVIDE THE FOLLOWING INFORMATION IF APPLICABLE.

| APPROXIMATE DATE PREGNANCY COMMENCED | ESTIMATED DATE OF CONFINEMENT | DATE OF DELIVERY | TYPE OF DELIVERY |
|---|---|---|---|
| | | | |

COMPLICATIONS *None*

IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT? ☐ Yes ☒ No

DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED *approx July 2001*

DATE PATIENT FIRST CONSULTED YOU FOR THIS CONDITION. *9/17/01*

DATES OF SERVICE — INCLUDE DATE OF NEXT APPOINTMENT (IF PREVIOUS FORM SUBMITTED TO THIS CARRIER, YOU NEED SHOW ONLY DATES SINCE LAST REPORT).

*9/17/01 — next appointment 10/10/01*

HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION? ☒ Yes ☐ No IF "YES", WHEN AND DESCRIBE

*Milder form in 2000 x few months*

PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION? ☒ Yes ☐ No

HAS PATIENT BEEN HOSPITAL CONFINED? ☐ YES ☒ NO IF YES, CONFINED FROM _____ THRU _____

NAME AND ADDRESS OF HOSPITAL

NATURE OF SURGICAL PROCEDURE, IF ANY

☐ INPATIENT ☐ OUTPATIENT DATE PERFORMED _____

PATIENT WAS CONTINUOUSLY TOTALLY DISABLED — (UNABLE TO WORK)

From: *9/17/01* Thru: *still disabled*

IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK.

*Hopefully by November 2001*

REMARKS: WE ARE INTERESTED IN ANY INFORMATION THAT WOULD BE HELPFUL TO YOUR PATIENT FOR EVALUATION OF THIS CLAIM.

| DATE | PHYSICIAN'S NAME (PRINT) | SIGNATURE |
|---|---|---|
| 9/18/01 | Leonard Freedberg M.D. | |

| DEGREE | SOCIAL SECURITY NUMBER | TAX IDENTIFICATION NUMBER |
|---|---|---|
| M.D. | 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 | |

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|
| 2000 Washington St #322 | Newton | MA | 02462 | 617-332-2047 |

# EXHIBIT 2

# FAX COVER SHEET

*NEWTON·WELLESLEY PSYCHIATRY, LLP*
*2000 Washington Street*
*Suite 322*
*Newton, MA 02462-1602*
*www.nwpsych.org*
*Telephone: 617.332.2047*
*Fax: 617.332.7341*

| SEND TO | | From | |
|---|---|---|---|
| Company name | *Cigua* | Dr. Freedberg | |
| Attention | A. Wallace | Date | 10/26/01 |
| Office location | | Office location | |
| Fax number | 860 731 2962 | Phone number | |

☐ Urgent    ☐ Reply ASAP    ☐ Please comment    ☐ Please review    ☐ For your information

Total pages, including cover:  3

**COMMENTS**

re Alexei Kovvchir

0133

OCT.25.2001    4:20PM    CIGNA   972 972 3329                                                     NO.599    P.2/3

# Disability Claim

Connecticut General Life Insurance Company
Life Insurance Company of North America
Insurance Company of North America
INA Life Insurance Company of New York
Subsidiaries of CIGNA Corporation



CIGNA

Any person who knowingly and with intent to defraud any insurance company or other person files a statement containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## ATTENDING PHYSICIAN'S STATEMENT OF DISABILITY (PLEASE PRINT)

The insured is responsible for having this form completed by any/all treating physician(s), without expense to the company. We must have comprehensive medical information in order to evaluate the insured's claim for Disability Benefits.

### THIS SECTION IS TO BE COMPLETED BY THE PATIENT/INSURED

| | |
|---|---|
| 1. NAME *Alexei Kourvelinou* | EMPLOYER NAME *PTC* |
| ADDRESS *488 Winchester St # 1* | SOCIAL SECURITY NUMBER |
| CITY *West Roxbury* STATE *MA* ZIP CODE *02132* | GROUP POLICY NUMBER *2 039160* |
| TELEPHONE | OCCUPATION *Software Eng.* | DATE OF BIRTH  Month |

### THE REMAINING SECTIONS OF THIS FORM ARE TO BE COMPLETED BY YOUR PHYSICIAN(S)

1. DIAGNOSIS (Including any complications)
   (a) Diagnosis (Include ICD-9 or DSM-IV Code)  *Major Depression    296.33*

   (b) Subjective symptoms  *depressed, cannot concentrate, low energy, feels hopeless*

   (c) Objective findings (Please attach copies of current X-rays, EKG's, Laboratory Data and any clinical findings as applicable.)
   *Severe low mood, feelings of hopelessness/helplessness/worthlessness — sleep disorder —*

   (d) Are symptoms consistent with the clinical findings?    ☒ Yes    ☐ No, explain

   (e) Is illness work related?    ☐ Yes    ☒ No

   (f) If Pregnancy please indicate:    LMP:            EDC:            Actual Delivery:

2. DATES OF TREATMENT

   ▪ Date patient first visited you for this accident/illness:    Month *9* Day *17* Year *01*

   ▪ Date patient first unable to work due to this accident/illness:    Month *9* Day *17* Year *01*

   ▪ List frequency & date patient was examined for this accident/illness:  *9/17/01 , 10/10/01 , 10/25/01*

   ▪ Date of last visit:  *10/25/01*    Month    Day    Year

3. NATURE OF TREATMENT (Including Surgery & Medications prescribed, if any)

   Hospitalization on:    Month    Day    Year    THROUGH    Month    Day    Year

   ▪ Surgery on:    Month    Day    Year    | Type of Surgery:

   Name and Address of Hospital:

                                                                                        0135

   ▪ Medications-type/dosage:  *Wellbutrin SR 150mg b.i.d.  + Serinta*

   ▪ Other treatment methods (describe)  *counseling*

GB-808066 (11/96)

OCT.25.2001   4:20PM    CIGNA   972 972 3329                        NO.598   P.3/3

4. **PHYSICAL LIMITATIONS / IF APPLICABLE:**  In an 8 hour day is your patient able to:

| | 0 hours | up to 2.5 hours | up to 5.5 hours | greater than 5.5 hours | Cardiac - If applicable (American Heart Association) |
|---|---|---|---|---|---|
| Climb | ☐ | ☐ | ☐ | ☐ | |
| Balance | ☐ | ☐ | ☐ | ☐ | ☐ Class 1 - No Limitation |
| Stoop | ☐ | ☐ | ☐ | ☐ | ☐ Class 2 - Slight Limitation |
| Kneel | ☐ | ☐ | ☐ | ☐ | ☐ Class 3 - Marked Limitation |
| Crouch | ☐ | ☐ | ☐ | ☐ | ☐ Class 4 - Complete Limitation |
| Crawl | ☐ | ☐ | ☐ | ☐ | |
| Reach | ☐ | ☐ | ☐ | ☐ | |
| Walk | ☐ | ☐ | ☐ | ☐ | Blood Pressure (last visit) _____ / ____ |
| Sit | ☐ | ☐ | ☐ | ☐ | |
| Stand | ☐ | ☐ | ☐ | ☐ | |

Please indicate the maximum level of ability (sedentary, light, medium, heavy) of your patient to:

_____ Lift    _____ Carry    _____ Push    _____ Pull

Sedentary = 10 lbs. maximum, walking occasionally.  Light = 20 lbs. maximum, 10 lbs. frequently.
Medium = 50 lbs. maximum, 25 lbs. frequently, up to 10 lbs. constantly.  Heavy = 100 lbs. maximum, 50 lbs. frequently, 20 lbs. constantly.

5. **MENTAL IMPAIRMENT/IF APPLICABLE:** Please complete the following (Incomplete information will delay claim processing):

Axis I: _Major Depression 296.33_

II: _____

III: _____

IV: _Moderate_

V: Current GAF: _37_    Highest GAF in past year: _63_

Additional Comments: _____

6. **COMPETENCY**
Do you believe this patient is competent to endorse checks and direct the use of the proceeds thereof?    ☒ Yes   ☐ No

7. **EXTENT OF DISABILITY**

|  | Patient's Regular Occupation | Any Occupation |
|---|---|---|
| When was patient able to go to work? | Mo.___ Day___ 19___ | Mo.___ Day___ 19___ |

_Still disabled_

8. **REHABILITATION**
(a)  Is patient a suitable candidate for further PHYSICAL / PSYCHOLOGICAL rehabilitation services?   ☒ Yes   ☐ No

If no, explain: _Should respond to Rx_

(b)  Can present job be modified to allow for handling with impairment?   ☐ Yes   ☒ No
(c)  Is patient a suitable candidate for VOCATIONAL rehabilitation services?   ☐ Yes   ☒ No

If no, when: _____

0134

9. **REMARKS**    _L Freedberg MD_

NEWTON-WELLESLEY PSYCHIATRY
2000 WASHINGTON STREET SUITE 322
NEWTON, MA 02462-1602

NEWTON-WELLESLEY PSYCHIATRY
2000 WASHINGTON STREET SUITE 322
NEWTON, MA 02462-1602

| DATE | PRINT NAME (ATTENDING PHYSICIAN) | SIGNATURE | DEGREE |
|---|---|---|---|
| TELEPHONE NUMBER | | PROVIDER TAX ID NUMBER | |
| STREET ADDRESS | | | |
| CITY OR TOWN | | STATE (OR PROVINCE) | ZIP CODE |

# EXHIBIT 3

ALEXEI KOUVCHINOV

JUNE 21, 2000:  INITIAL EVALUATION

The patient is an almost 44-year-old divorced man with
depression.  About four years ago, he had an "ugly divorce"
from his wife and in that context, became depressed, saw a
doctor in Brighton who gave him Prozac 20 mg daily, and he
took that for about two years.  It was very helpful without
any side effects and the patient went off it successfully
about two years ago and was fine for a long time.  However,
over the past few months, he again has had some symptoms of
depression.  He saw that doctor again and restarted Prozac,
20 mg daily and also Ambien 5 mg, used sparingly, generally
twice weekly for insomnia.  The patient has again responded
positively to Prozac, but is switching to me because I am
covered by his insurance whereas the other doctor was not
and his insurance now is a $500.00 deductible.

The patient grew up in Russia, and he is an only child whose
parents are dead.  He has two Master's Degrees in Computer
Science and is working approximately 60 hours weekly as a
Software Engineer, work which he enjoys very much.  He has
no medical problems and has never had a substance abuse
problem.  He says he drinks alcohol approximately once
weekly but denied that it was a problem.  His only child is
a 7-year-old son whom he says he sees very frequently and
with whom he has a good relationship.  There is no family
history of any mental disorder.  The patient lives by
himself usually but often has a girlfriend, although he has
not been serious about anybody since his divorce, and he has
pleasurable activities, including chess, which he plays
evidently at a very high level of competency.

He emigrated from Russia seven years ago and although his
English is imperfect, and he struggles with that, he says
that he is very glad that he moved here.

The patient was a casually dressed man who made good eye
contact and his speech is remarkable for a heavy Russian
accent.  He did have some misunderstanding of English which
generally was easily clarified with some explanation, he has
trouble with idiomatic expressions.  He is definitely not
psychotic, incompetent, despairing or suicidal.  Even at the
worst of his depressions, he says that he does not get at
all suicidal.

My diagnosis is dysthymia.

I am happy to continue his Prozac and Ambien.  I explained
the office coverage arrangement and gave him my card and
encouraged him to call me as needed.  He has no interest in

0129

ALEXEI KOUVCHINOV          -2-

JUNE 21, 2000:  INITIAL EVALUATION


any kind of counseling and would like to have as few
appointments as possible.  He therefore will call me in
about six months when he is running out of Prozac if he
continues to need it at that time.  There is no primary care
doctor to whom to write a letter.

<div align="center">Leonard E. Freedberg, M.D.</div>

LEF/MWTS:dmb

# EXHIBIT 4

Alexei - Kouvchinov

9/17/01
MES

off work x months –
depr (very) x (~2 months
sleep ↓↓ (ambien, [illegible]
some but not, don't work)
concentration ↓↓ ([illegible] 6-7
hrs to do what used to take 1-2 hrs
energy ↓, interest ↓
not suicidal
only meaning = work
half son ([illegible] father) 1 yr
ago + [illegible] but [illegible]
[illegible] in Kazakhstan in jail —
son + half-son = only relatives
medical (–)
ETOH – 1x/week
obj: severe depr —
not psychotic, but some
[illegible] – profound psychomotor
retardation –
plan: [illegible] (it's
worked [illegible] slowly)
[illegible]
[illegible]
likely to need long
term disability from work 1-2 mo
see in 3 wks /
[illegible]

10/10/01    no better
Meds    M/A, GI upset, + ↓ erection
Proza never did this — he is on
service (fluoxetine) am
    not working
    not drinking
    not suicidal
    sleep poor _____ (Restoril
    obj: _ u dep — not ssy lim/def.
    D/C Prozac
    tried _____ (start 10/15 —
    tried Serzone    _____
    all sm
    _____ in 2 wks/CEP

10/25/01    very _ better
Med    ↓↓ working
    appt ↓
    sleep _ _____
    when _/ am, _____ ↓P
    very little _____
    obj: less dep — not suicidal
    all sm
    2 wks/CEP

Wells
Serzone

0126

Abrei Hovvchine

11/8/01
MD

wells
smh

c/o _____ , _____
ch — 6PM = Sed time —
_____ : T _____ —
_____ less less
_____ : _____
7.5 - 30 _____ _____ — 15 _____ _____ —
_____
2 — _____

11/21/01
MD

wellsctin sid
smnth — Ti

_____ T

sleeping 5-6 _____
_____ improving
apetite improving
obj : less depressed
in AM _____ good,
s _____ 17, + _____ +
_____ , —
_____ even _____ _____
_____ try 1 _____ , 1 _____
_____ _____
_____ 17/ _____

12/17/01
MD

no Δ

— felt settle, ret
to work, laid off but
got job w/ contract
co — 4 days, of classes —
couldn't concentrate +
felt more depressed →

was filed + became
much more depressed.
In Sept was — up only
for son's birthday
no Etoh
obj: miserable + worried —
unkempt + look depressed —
not su/hm/des/hi
all sns
? MCAS (name given)
appt/EC

# EXHIBIT 5

# NEWTON-WELLESLEY PSYCHIATRY, LLP

2364 WASHINGTON STREET
NEWTON, MA 02462-1440

(617) 332-2047 • Fax: (617) 332-7341
www.nwpsych.org

LEONARD E. FREEDBERG, MD
WILLIAM BARRY GAULT, MD
BLAKE D. SMITH, MD

ROBERT T. BEATON, Ph.D
MARY E. COAKLEY, RN, CS
REBECCA S. COHEN, MD
ANNE L. FENTON, MD
JANICE K. FLETCHER, LICSW

DORENE GABELLI, LICSW
DAVID T. GOLDEN, MD
SHELLY ISAACS, Psy.D
KIMBERLIE E. KING, Ph.D
SUSAN L. LUCKMAN, LICSW
JUDITH L. SCHECHTMAN, Psy.D
CHARLES E. THOMPSON, LICSW
JEANNE W. YOZELL, LICSW

March 23, 2004

Hale and Dorr
Legal Services Center of Harvard Law  School
122 Boylston Street
Jamaica Plain, Ma 02130-2246

Attn:  Mitch Notis

Dear Mr. Notis:

Please find a transcript of all of my handwritten clinical notes, which I am sorry to say were rather illegible.

Sincerely yours,

Leonard E. Freedberg, M.D.
LEF/cp
Encl.

*ESTABLISHED 1988*

A 001

ALEXEI KOUVCHINOV

September 17, 2001 – Med visit off meds for months – depressed for one to two months – sleep decreased (Ambien, had some left over, does not work), concentration decreased (takes 6 to 7 hours to do what used to take 1 to 2 hours) – energy decreased, interest decreased, not suicidal, only precipitant was met half brother (same father) one year ago and within the last few months saw in Kurkistan in jail- son and half brother are only relatives.  Medical negative – alcohol once weekly –
Objectively – Severe depression, not psychotic/incompetent/suicidal, but some despair, profound psychomotor retardation.
Plan:  Prozac (it has worked, albeit slowly), Restoril, call as needed, likely to need short-term disability from work 1 to 2 months – see in 3 to 4 weeks.

October 10, 2001 – no better – headache, GI upset and decreased erections.. Prozac never did this. He is on generic fluoxetine.  Not working, not drinking, not suicidal, sleep poor, even on Restoril.
Objectively – Very depressed, not psychotic, incompetent, despairing, suicidal, discontinue Prozac – trial Wellbutrin, start 10/15  - side effects, risks and dosing discussed – trial Sonata- see in 2 weeks.

October 25, 2001 – taking Wellbutrin and Sonata, slightly better, decreased smoking, weight decreased, sleep around same – when with son mood is better, very little alcohol.
Objectively – less depressed, not suicidal.  Call as needed 2 weeks.

November 8, 2001- medication, taking Wellbutrin and Sonata, poor sleep, decreased energy, 6 p.m. best time.
Objectively – increased smiling, seems less depressed.
Plan – Trial Remorin 7:5 to 30 mg hs. Side effects and risks discussed. Call as needed two weeks.

November 21, 2001 – Med. Visit – Wellbutrin twice a day, Sonata 2, Remeron 1, sleeping 5 to 6 hours, Mood and appetite improving,
Objectively – Less depressed. In morning isn't good, groggy, decreased concentration and working, can't imagine working.
Plan - Try 1 Sonata, 1 Remeron, call as needed December 17th.

December 17, 2001 – Med – no change in meds. Felt better, returned to work, laid off, but got job with contract company, 4 days of classes, could not concentrate and felt more depressed, was fired and became more depressed, in bed for hours, up only for son's birthday. No alcohol.
Objectively – Miserable and worried, unkempt, looks depressed, not psychotic, incompetent, despairing, suicidal. Call as needed. Question MCAD (name given) appointment.

A 002

January 21, 2002 – Medication –Remeron 15 mg at bedtime, Wellbutrin 150 mg twice a day, Sonata 10 mg, 2 at night, no work, no money, less depressed, headache (has had before, question related to old head injury. )
Objectively – Less depressed, call as needed one month.

May 29, 2002 – Went off all medications, okay for a few months, now increased depressed, decreased sleep, increased alcohol, still no job, son 8 ½ is light of his life, sees almost daily
Objectively – Depressed without despair or suicidal ideation, not psychotic or incompetent, call as needed, restart meds (worked before). See as needed. Did not want appointment.

October 4, 2002 – Med. Visit – Off meds for two months and again increased depression and decreased sleep. No alcohol he says, no jobs, no dollars, living with friend.
Objectively – Depressed, not psychotic, incompetent, despairing, suicidal. Call as needed. Would not make appointment. Restart meds slowly. DON'T GO OFF WITHOUT CONSULTING.

March 17, 2003 – Med. Visit – Depressed, out of work, chronic pain secondary to slipped disk, (on meds and question shots).
Objectively – Depressed without psychosis/incompetency/despair/suicidal ideation. Restart slowly Wellbutrin, Sonata and Remeron. He is applying for disability. Call as needed, appointment.

March 31, 2003 – Med. Visit – no change.
Objectively – Less depressed, poor sleep, LF: take Remeron at once, don't split dose. Call as needed, 3 weeks.

March 19, 2004 – Med. Visit – Recently restarted Wellbutrin and needs Remeron to sleep. No job, dollars decreasing, son 10 okay, medical negative, says alcohol much less. Objectively – Worried, tense and moderately depressed without psychosis/incompetency/despair, suicidal ideation. Restart Remeron, prescribed Wellbutrin, call as needed, see within a few months.

Leonard E. Freedberg, M.D.

LEF/cp
Transcribed: 3/23/04

A 003

**EXHIBIT I**

Angela Wallace
Case Manager
Disability Management Solutions



**CIGNA** Group Insurance
Life · Accident · Disability

July 19, 2004

Routing D212
12225 Greenville Ave
Suite 1000
Dallas, TX 75243
Telephone  800-352-0611 ext 8734
Facsimile  860-731-3533

LEGAL SERVICES CENTER
C/O HUI SHI
122 BOYLSTON STREET
JAMAICA PLAIN, MA 02130

Re:      Claimant          : ALEXEI KOUVCHINOV
         Policy Name       : PARAMETRIC TECHNOLOGY CORP
         Policy Keys       : 2034160
         Company           : Connecticut General Life Insurance Company

Dear Ms. Shi:

We are in receipt of your most recent request dated July 2, 2004 requesting disability records for Alexei Kouvchinov. In response to your request you will find the following enclosed:

- copy of the Parametric Technology Corp disability policy
- copies of electronic communication.

Please note that a copy of the file was mailed to your office on March 8, 2004.  Therefore, including the emails you should have a complete copy of the file.

If you have any questions, please do not hesitate to call me.

Sincerely

Angela Wallace



EXHIBIT
80

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

**Wallace, Angela L    212**

| | |
|---|---|
| **From:** | Lisa Perry [lperry@ptc.com] |
| **Sent:** | Thursday, December 06, 2001 1:24 PM |
| **To:** | Wallace, Angela L    212 |
| **Subject:** | RE: Alexei Kouvchinov short term disability |

Angela,

I have been advised that Alexei is working on database repair for Pro/dbm which is very similar to what he did previously.  Thanks!

-Lisa

-----Original Message-----
From: Wallace, Angela L 212 [mailto:Angela.Wallace@cigna.com]
Sent: Thursday, December 06, 2001 11:08 AM
To: 'lperry@ptc.com'
Subject: RE: Alexei Kouvchinov short term disability

Is he performing his previous job duties?

> -----Original Message-----
> From: Lisa Perry [SMTP:lperry@ptc.com]
> Sent: Thursday, December 06, 2001 8:24 AM
> To:   Wallace, Angela L 212; Anderson, Scott K 212
> Subject:    Alexei Kouvchinov short term disability
> Importance:   High
>
> Good morning,
>
> I wanted to let you know that Alexei is working at PTC as a contractor
> through a temp agency.  The effective date of returning to work was
> 12/04/01.  Please let me know what will happen at this point.  Thanks and
> have a nice day!
>
> -Lisa

----------------------------------------------------------------------
--
CONFIDENTIALITY NOTICE: If you have received this e-mail in error, please
immediately notify the sender by e-mail at the address shown.  This e-mail
transmission may contain confidential information.  This information is
intended only for the use of the individual(s) or entity to whom it is
intended even if addressed incorrectly.  Please delete it from your files if
you are not the intended recipient.  Thank you for your compliance. )
Copyright 2001 CIGNA

+++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++

1

**Anderson, Scott K     212**

**To:**          lperry@ptc.com
**Subject:**     Alexei Kouvchinov

Lisa,

The STD claim for Alexei has been extended. At this time, benefits have been approved through 11/30/01. However, information received shows a potential return to work on 11/17/01. We will monitor his status, and if a return to work is possible, we will keep you advised. We will be checking his status in the middle of 11/01 for potential return to work.

Thanks, and if you have any questions, please let us know.

Scott Anderson
Senior Case Manager
Dallas Claims Office
(800)352-0611, ext 5609
local: (972)907-5609
net: 933-5609
fax: (860)731-2962

1

Angela Wallace
Case Manager
Disability Management Solutions



**CIGNA** Group Insurance
Life · Accident · Disability

March 8, 2004

Routing  D212
12225 Greenville Ave
Suite 1000
Dallas, TX 75243
Telephone  800-352-0611 ext 8734
Facsimile  860-731-3533

LEGAL SERVICES CENTER
C/O KATHERINE WIIK
122 BOYSTON STREET
JAMAICA PLAIN, MA 02130

Re:      Claimant       : ALEXEI KOUVCHINOV
            Policy Name   : PARAMETRIC TECHNOLOGY CORP
            Policy Keys    : 2034160
            Company      : Connecticut General Life Insurance Company

Dear Ms. Wiik:

We are in receipt of your most recent request dated March 4, 2004 requesting disability records for Alexei Kouvchinov.

- In response to your first request: see enclosed letters

- In response to your second request: N/A

- In response to your third request: Email from Lisa Perry at Parametric Technology Corp on December 6, 2001 reporting that Mr. Kouvchinov returned to work on December 4, 2001.

- Response to your fourth request: phone call to Lisa Perry on October 4, 2001 to verify the employee's employment status as of his last day worked.
  Email to Lisa Perry on 10-12-01 to report that the benefits were extended.
  Email from Lisa Perry, reported return to work.
  Phone call from Lisa Perry on 12-07-01, discussed the employee's return to work and an email that Mr. Kouvchinov emailed The president of PTC to report his availability for work as of September 25, 2001.

- In response to your fifth request: see enclosed medical documentation

CIGNA Group Insurance products and services are provided exclusively by underwriting subsidiaries of CIGNA Corporation, including Life Insurance Company of North America, CIGNA Life Insurance Company of New York, and Connecticut General Life Insurance Company. "CIGNA" is used to refer to these subsidiaries and is a registered service mark.

- In response to your sixth request: The decision to extend to December 16, 2001 was based on medical obtained from Mr. Kouvchinov's physician and was modified as the employee returned to work prior to that date.

- In response to your seventh request: Mr. Kouvchinov was paid disability benefits for the time period of September 24, 2001 to November 30, 2001.

If you have any questions, please do not hesitate to call me.

Sincerely


Angela Wallace

**CONNECTICUT GENERAL LIFE INSURANCE
COMPANY a CIGNA COMPANY (called CG)**

**CERTIFICATE RIDER**

No. CR 7SI012-2
CR 7SI013-1
CR 7SI014-1
CR 7SI015-1

Policyholder: PARAMETRIC TECHNOLOGY CORPORATION

Rider Eligibility: Each Employee

Policy No. or Nos. 2034160-07

Effective Date: January 1, 2002

You will become insured on the date you become eligible, if you are in Active Service on that date, or if you are not in Active Service on that date due to your health status. However, you will not be insured for any loss of life, dismemberment or loss of income coverage until you are in Active Service.

This certificate rider forms a part of the certificate issued to you by CG describing the benefits provided under the policy(ies) specified above.

The following is being added to THE SCHEDULE — Short Term Disability — in your certificate:

**Optimum Ability**

While benefits are payable, the greatest extent of work the Employee is able to do in his or her regular occupation. The Employee's ability to work is based on the following:

1. medical evidence submitted by the Employee;

2. consultation with the Employee's Physician;

3. evaluation of the Employee's ability to work by not more than three independent experts if required by the Insurance Company; and

4. an offer of employment that meets the Employee's capacity to do the work is made by an Employer.

There is no cost to the Employee for evaluation by an independent expert when required by the Insurance Company to determine Optimum Ability. The independent expert must be:

1. licensed, registered or certified as required by the laws of the state in which the evaluation is made; and

2. acting within the scope of that license, registration or certificate.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY a CIGNA COMPANY (called CG)**

**Disability Benefit Calculation**

The Weekly Benefit for any week the Employee is Disabled is the Gross Disability Benefit minus other income benefits and the Calculation for Optimum Ability.

The Calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings. 'Other Income Benefits' means any benefit listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for Dependents, or which the Employee's Dependents receive because of the Employee's entitlement to Other Income Benefits.

**Work Incentive Benefit Calculation**

An Employee may work for wage or profit while Disabled. In any week in which the Employee works and a Disability Benefit is payable, the Work Incentive Benefit Calculation applies. It is determined as follows:

For each week that Disability Benefits are payable, the amount of the Work Incentive Benefit equals (a) minus (b).

- (a) equals (i) minus (ii), but not more than the Gross Disability Benefit shown in the Schedule of Benefits.
- (i) is 100% of Indexed Covered Earnings.
- (ii) is the sum of Other Income Benefits including Disability Earnings.
- (b) equals the Calculation for Optimum Ability.

**Disability Status Review**

The Insurance Company will, from time to time, review the Employee's status and will require satisfactory proof of earnings and continued Disability.

No Disability benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a transitional work arrangement or other modified work arrangement and the Employee refuses to do so with good cause.

*Susan L. Cooper*

Corporate Secretary.

GM6000 R 7                    2                    CEP

———— THE SCHEDULE ————

The Schedule is a brief outline of your maximum benefits which may be payable under your insurance. For a full description of each benefit, refer to the section following the appropriate Schedule.

## SHORT TERM DISABILITY INSURANCE

**For You**

Short Term Disability Insurance provides weekly payments if you become disabled and cannot work. In order to qualify for Weekly Benefits, you must be Totally Disabled as a result of an Injury or a Sickness that is not work related.

**Weekly Benefit**

The amount of the Weekly Benefit on the day you become insured is determined from the following schedule based on your length of service on that day.

If you are Totally Disabled for a period of less than one week, your Weekly Benefit will be prorated.

| Length of Service | Weekly Benefit |
|---|---|
| More than 90 days but less than one year | 70% of weekly Base Earnings to no maximum amount |
| One year but less than three years | 70% of weekly Base Earnings for the first 6 weeks, then 100% for the remaining 6 weeks to no maximum amount |
| Three or more years | 100% of weekly Base Earnings to no maximum amount |

The amount of Weekly Benefit otherwise payable will be reduced by any amounts which you receive on your own behalf because of disability or Old Age benefits under the Federal Social Security Act. It will be assumed you are receiving such benefits in an amount CG estimates you are eligible to receive. This assumption will not be made if you give CG proof that:

- application for these benefits was made; and
- payments were denied.

**THE SCHEDULE**

**SHORT TERM DISABILITY INSURANCE**
**For You**

**Maximum Benefit Period**

You will receive Weekly Benefits for no more than 12 weeks any period of Total Disability.

**Day Benefits Start**

| | |
|---|---|
| **For Injury** | On the 8th* day after you become Totally Disabled |
| **For Sickness** | On the 8th* day after you become Totally Disabled |

*There is a 5 working day elimination period for Short Ter Disability. Sick days can be applied to this elimination peric When no sick days or insufficient sick days are available, unus vacation days may be used at your discretion. If neither si days nor vacation days are available, you will receive no bene payment during the elimination period.

You will be considered Totally Disabled on any day only if y are not in Active Service for any part of that day.

**Recovery of Overpayments**

If the Weekly Benefit for a week is overpaid, CG will have tl right to recover the amount overpaid by deducting that amou from any future payments.

**Changes in Amount of Weekly Benefit**

A change in the amount of your Weekly Benefit due to a chang in your Base Earnings will take place on the March 1 after tl change in Base Earnings has been made. If you are not in Activ Service on that day, no increase in Base Earnings will be consi ered effective until you return to Active Service for one full da

**Increases in Amount of Weekly Benefit**

If you are Totally Disabled when your amount of Weekly Bene would otherwise be increased, it will not be increased during th period of Total Disability.

**Reduction of Weekly Benefits Due to No-Fault Automobile Insurance**

The amount of Weekly Benefits payable will be reduced by amounts of work loss benefits payable under the mandatory pa of any automobile insurance policy written to comply with a "n fault" insurance law. CG will take into account any adjustme option chosen under such part by you.

14

**SHORT TERM DISABILITY INSURANCE**

**Weekly Benefits**

CG will begin paying Weekly Benefits in amounts determined from The Schedule when it receives due proof that:

- you became Totally Disabled while insured for Short Term Disability Insurance; and
- your Total Disability has continued from the day you became Totally Disabled through the Day Benefits Start as shown in The Schedule.

**Duration of Weekly Benefits**

CG will stop paying Weekly Benefits on the earlier of the following dates:

- the date you cease to be Totally Disabled;
- the date the Maximum Benefit Period shown in The Schedule has been reached.

**Successive Periods of Disability**

Separate periods of Total Disability resulting from the same or related causes will be considered one period of Total Disability unless separated by your return to Active Service for at least two consecutive weeks.

Separate periods of Total Disability resulting from unrelated causes will be considered one period of Total Disability unless separated by your return to Active Service for at least one full day.

**Disabilities Not Covered**

No Weekly Benefits will be paid if your Total Disability results, directly or indirectly, from:

- Injuries arising out of, or in the course of, any employment for wage or profit;
- Sickness which is covered under any workers' compensation or similar law.

No Weekly Benefits will be paid for a period of Total Disability when you are not under the care of a licensed physician.

GM6000 DIS 1
GM6000 DIS 2

15                              SDI1

## TERMINATION OF INSURANCE - EMPLOYEES

### Injury or Sickness (for Medical, Dental and Vision Insurance)

If your Active Service ends due to an Injury or Sickness, your insurance will be continued while you remain totally and continuously disabled as a result of the Injury or Sickness. However, the insurance will not continue past the date your Employer stops paying premium for you or otherwise cancels the insurance.

### Total Disability (for Short Term Disability Insurance)

If your Active Service ends due to Total Disability for which a Weekly Benefit is not payable, your insurance will be continued while you are unable to return to Active Service because of such disability. However, your insurance will not continue past the date your Employer stops paying premium for you or otherwise cancels the insurance.

If your Active Service ends due to a Total Disability for which a Weekly Benefit is or may become payable, your insurance will be continued and premium will be due for you while the Weekly Benefit is payable. If you stay disabled beyond the Maximum Benefit Period, your insurance will cease at the end of the Maximum Benefit Period and no further premium will be due for you. Your Short Term Disability Insurance will be reinstated as soon as: (a) you return to Active Service in a Class of Eligible Employees; and (b) your Employer again pays the premium for you.

## TERMINATION OF INSURANCE - CONTINUATION

### Special 31 Day Continuation

Upon payment of premium by your Employer, your insurance (except Life Insurance) will continue for 31 days after you:

- cease to be in a Class of Eligible Employees or cease to qualify as an Employee.
- terminate employment for any reason.

In no case will the insurance continue after you become insured under any other group policy for similar benefits or after the last day for which you have made any required contribution for the insurance.

**Hospital**

The term Hospital means:

- an institution licensed as a hospital, which: (a) maintains, on the premises, all facilities necessary for medical and surgical treatment; (b) provides such treatment on an inpatient basis, for compensation, under the supervision of Physicians; and (c) provides 24-hour service by Registered Graduate Nurses;

- an institution which qualifies as a hospital, a psychiatric hospital or a tuberculosis hospital, and a provider of services under Medicare, if such institution is accredited as a hospital by the Joint Commission on the Accreditation of Hospitals;

- an institution which: (a) specializes in treatment of mental illness, alcohol or drug abuse or other related illness; (b) provides residential treatment programs; and (c) is licensed in accordance with the laws of the appropriate legally authorized agency; or

- a Free-standing Surgical Facility.

The term Hospital will not include an institution which is primarily a place for rest, a place for the aged, or a nursing home.

**Hospital Confinement or Confined in a Hospital**

A person will be considered Confined in a Hospital if he is:

- a registered bed patient in a Hospital upon the recommendation of a Physician;

- an outpatient in a Hospital because of planned tests ordered by a Physician before inpatient admission to a Hospital;

- an outpatient in a Hospital because of chemotherapy treatment;

- receiving emergency care in a Hospital for an Injury on his first visit as an outpatient within 48 hours after the Injury is received;

- Partially Confined for treatment of mental illness, alcohol or drug abuse or other related illness. Two days of being Partially Confined will be equal to one day of being Confined in a Hospital.

The term Partially Confined means continually treated for at least 3 hours but not more than 12 hours in any 24-hour period.

**Infertility**

The term Infertility means the condition of a presumably healthy individual who is unable to conceive or produce conception during a period of one year.

**Optometrist**

The term Optometrist means a person practicing optometry within the scope of his license. It will also include a physician operating within the scope of his license when he performs any of the Vision Care services described in the policy.

### Physician

The term Physician means a licensed medical practitioner who is practicing within the scope of his license and who is licensed to prescribe and administer drugs or to perform surgery. It will also include any other licensed medical practitioner whose services are required to be covered by law in the locality where the policy is issued if he is:

- operating within the scope of his license; and
- performing a service for which benefits are provided under this plan when performed by a Physician.

### Psychologist

The term Psychologist means a person who is licensed or certified as a clinical psychologist. Where no licensure or certification exists, the term Psychologist means a person who is considered qualified as a clinical psychologist by a recognized psychological association. It will also include any other licensed counseling practitioner whose services are required to be covered by law in the locality where the policy is issued if he is:

- operating within the scope of his license; and
- performing a service for which benefits are provided under this plan when performed by a Psychologist.

### Reasonable and Customary Charge

A charge will be considered Reasonable and Customary if:

- it is the normal charge made by the provider for a similar service or supply; and
- it does not exceed the normal charge made by most providers of such service or supply in the geographic area where the service is received, as determined by CG.

To determine if a charge is Reasonable and Customary, the nature and severity of the Injury or Sickness being treated will be considered.

### Sickness - For Short Term Disability Insurance

The term Sickness means a physical or mental illness. It also includes pregnancy.

## DEFINITIONS

### Sickness - For Medical Insurance

The term Sickness means a physical or mental illness. It also includes pregnancy. Expenses incurred for routine Hospital and pediatric care of a newborn child prior to discharge from the Hospital nursery will be considered to be incurred as a result of Sickness.

### Skilled Nursing Facility

The term Skilled Nursing Facility means a licensed institution (other than a Hospital, as defined) which specializes in:

- physical rehabilitation on an inpatient basis; or
- skilled nursing and medical care on an inpatient basis;

but only if that institution: (a) maintains on the premises all facilities necessary for medical treatment; (b) provides such treatment, for compensation, under the supervision of Physicians; and (c) provides Nurses' services.

### Terminal Illness

A Terminal Illness will be considered to exist if a person becomes terminally ill with a prognosis of six months or less to live, as diagnosed by a Physician.

### Total Disability or Totally Disabled
### (For Short Term Disability Insurance)

You will be considered Totally Disabled, if because of an Injury or Sickness, you are unable to perform the essential duties of your occupation.

**EXHIBIT J**

Insurance Company of North America
Life Insurance Company of New York

CIGN

Any person who knowingly and with intent to defraud any insurance company or other person files a statement containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## INSTRUCTIONS FOR FILING A CLAIM

**THIS FORM IS FOR SHORT TERM DISABILITY BENEFITS ONLY.**
**YOUR CLAIM WILL BE SUBJECT TO DELAY OR RETURN IF THESE INSTRUCTIONS ARE NOT FOLLOWED.**

| To the Claimant: | A. Complete the Claimant section on the reverse of this form. |
| | B. Have the Attending Physician complete and sign the appropriate section on the reverse of this form. |
| | C. Return the fully completed form to your Employer / Administrator who will submit the form to the assigned Claim Office. |
| To the Employer / Administrator: | A. Give the form to the Claimant for completion of the Claimant and Physician statements. |
| | B. Complete Employer's / Administrator's section. |
| | C. Submit completed form to the assigned Claim Office. |

### TO BE COMPLETED BY THE EMPLOYER/ADMINISTRATOR

| NAME OF EMPLOYEE/ASSOCIATION MEMBER (Last Name) | (First Name) | (Middle Initial) | DATE OF BIRTH | SOCIAL SECURITY NO. | SEX |
|---|---|---|---|---|---|
| Kouvchinov | Alexei | | 07-16-56 | 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 | ☑M ☐ |

| ADDRESS (Street) | (City) | (State) | (Zip Code) | TELEPHONE # |
|---|---|---|---|---|
| 4881 Washington St #1 West Roxbury | MA | 02132 | (617)-469-1963 |

| POLICY NO. | OCCUPATION |
|---|---|
| 2034160 | MAD Software Engineer |

PLEASE CHECK THE APPROPRIATE BLOCKS REGARDING THE INSURED'S EMPLOYMENT STATUS.   Hrs/wk 40

☑ Exempt  ☐ Management  ☐ Supervisory  ☐ Union Local # _____  ☑ Salaried  ☐ Full-time
☐ Non-Exempt  ☐ Non-Management  ☐ Non-Supervisory  ☐ Non-Union  ☐ Hourly  ☐ Part-time

| BASIC EARNINGS PER WEEK | DATE OF LAST CHANGE IN EARNINGS | DATE HIRED/MEMBER OF ASSOCIATION | EFFECTIVE DATE OF INSURANCE |
|---|---|---|---|
| $1098.35 | 11-01-00 | 08-15-94 | 11-15-94 |

| WAS INSURANCE ISSUED ON THE BASIS OF A STATEMENT OF PHYSICAL CONDITION? | EMPLOYEE'S/MEMBER'S CONTRIBUTIONS WERE MADE ON: 100% pd by PTC |
|---|---|
| ☐ Yes ☑ No   If Yes, Attach Copy | ☐ Pre-Tax Basis  ☐ Post-Tax Basis |

| LAST DATE WORKED | DATE RETURNED TO WORK | PREMIUM PAID THROUGH DATE | % OF INSURED'S CONTRIBUTION TO PREMIUM |
|---|---|---|---|
| 09/10/01  # of Hours: 8 | part of reduction | current | 100% pd by PTC |

PLEASE LIST ALL BENEFITS THAT THE INSURED IS RECEIVING OR ELIGIBLE TO RECEIVE AS A RESULT OF HIS/HER DISABILITY (E.G. SALARY CONTINUANCE, SICK PAY, STATE DISABILITY WORKERS' COMPENSATION, ETC.).

| BENEFIT | GROSS WEEKLY AMOUNT | DATE BEGAN | PAID THRU DATE |
|---|---|---|---|
| | | | |

**K EXHIBIT**
**/**
sup 10/18/05

| HAS EMPLOYEE/MEMBER BEEN LAID OFF? | ☐ Yes ☑ No | IF YES, DATE | REASON |
|---|---|---|---|
| | | 09/24/01 | PTC has reduced it's work force. |
| OR TERMINATED? | ☑ Yes ☐ No | | Alexei was part of this reduction |

### EMPLOYER'S / ADMINISTRATOR'S CERTIFICATION

| NAME OF EMPLOYER/ASSOCIATION | DIVISION |
|---|---|
| Lisa Perry | HR/Benefits |

| ADDRESS (Street) | (City) | (State) | (Zip Code) | TELEPHONE # |
|---|---|---|---|---|
| 140 Kendrick Street Needham MA | 02494 | (781)-370-6913 |

THIS IS TO CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| SIGNATURE OF AUTHORIZED REPRESENTATIVE | DATE SIGNED |
|---|---|
| Lisa A Perry | 9-21-01 |

CL500385 3-94

The issuance of this blank is not an admission of the existence of any insurance nor does it recognize the validity of any claim and is without prejudice to the Company's legal rights in the premises.

RESP00020

| DATE OF ACCIDENT OR BEGINNING OF SICKNESS | DATE FIRST UNABLE TO WORK | DATE YOU PLAN TO RETURN | LIST STATES IN WHICH YOU MAY BE LIABLE FOR FILING TAX RETURNS. |
|---|---|---|---|
| 09/17/01 | 09/17/01 | 11/17/01 | MA |

DESCRIBE IN YOUR OWN WORDS WHAT IS WRONG WITH YOU (IF ACCIDENT, DESCRIBE CIRCUMSTANCES AND ADVISE WHETHER IT OCCURRED AT WORK).

depressed, can not concentrate low energy and feel hopeless.

HAVE YOU HAD THE SAME OR SIMILAR CONDITION IN THE PAST? IF SO, PLEASE DESCRIBE IN DETAIL.

last year less severe.

PLEASE LIST ANY HOSPITALS, CLINICS OR PHYSICIANS THAT TREATED YOU FOR YOUR ILLNESS OR INJURY.

| NAME | COMPLETE ADDRESS | TREATMENT PERIOD |
|---|---|---|
| L Freedberg | 2000 Washington St #322 Newton, MA 02462 | current |

PLEASE DESCRIBE YOUR JOB DUTIES IN DETAIL. WHAT PERCENTAGE OF YOUR JOB REQUIRES PHYSICAL LABOR?

software engineer  0% physical labor

PLEASE LIST ALL BENEFITS YOU ARE RECEIVING OR ELIGIBLE TO RECEIVE UNDER ANY OTHER GROUP INSURANCE, GOVERNMENT PLAN OR AUTOMOBILE MANDATORY NO-FAULT COVERAGE.

| BENEFIT | GROSS WEEKLY AMOUNT | DATE BEGAN | PAID THRU DATE |
|---|---|---|---|
| None | | | |

## CLAIMANT'S CERTIFICATION

THIS IS TO CERTIFY THAT THE FACTS AS INDICATED ABOVE ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

| SIGNATURE OF EMPLOYEE/ASSOCIATION MEMBER | DATE SIGNED |
|---|---|
| Alexei Stroutchevoi | 09/17/01 |

## AUTHORIZATION TO RELEASE INFORMATION

I authorize any Health Care Provider, Insurance Company, Employer, Person or Organization to release any information regarding medical, dental, mental, alcohol or drug abuse history, treatment or benefits payable, including disability or employment related information, to any CIGNA company, the Plan Administrator, or their employees and authorized agents for the purpose of validating and determining benefits payable. This data may be extracted for use in audit or statistical purposes. I understand that I or my authorized representative will receive a copy of this authorization upon request. This authorization or a photostatic copy of the original shall be valid for the duration of the claim.

| SIGNATURE OF EMPLOYEE/ASSOCIATION MEMBER | DATE SIGNED |
|---|---|
| Alexei Stroutchevoi | 09/17/01 |

## TO BE COMPLETED BY ATTENDING PHYSICIAN

DIAGNOSIS AND CONCURRENT CONDITIONS, INCLUDING ICD-9 OR DSM-III CODE.

Major Depression  296.33

IS CONDITION DUE TO PREGNANCY?  ☐ Yes  ☒ No   IF "YES", PLEASE PROVIDE THE FOLLOWING INFORMATION IF APPLICABLE

| APPROXIMATE DATE PREGNANCY COMMENCED | ESTIMATED DATE OF CONFINEMENT | DATE OF DELIVERY | TYPE OF DELIVERY |
|---|---|---|---|
| | | | |

COMPLICATIONS   NONE

IS CONDITION DUE TO INJURY OR SICKNESS ARISING OUT OF PATIENT'S EMPLOYMENT?  ☐ Yes  ☒ No

| DATE SYMPTOMS FIRST APPEARED OR ACCIDENT HAPPENED | DATE PATIENT FIRST CONSULTED YOU FOR THIS CONDITION. |
|---|---|
| approx July 2001 | 9/17/01 |

DATES OF SERVICE — INCLUDE DATE OF NEXT APPOINTMENT (IF PREVIOUS FORM SUBMITTED TO THIS CARRIER, YOU NEED SHOW ONLY DATES SINCE LAST REPORT).

9/17/01 — next appointment 10/10/01

HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?  ☒ Yes  ☐ No   IF "YES", WHEN AND DESCRIBE

Milder form in 2000 x few months

PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?   ☒ Yes  ☐ No

HAS PATIENT BEEN HOSPITAL CONFINED?  ☐ YES  ☒ NO   IF YES, CONFINED FROM _____ THRU _____

NAME AND ADDRESS OF HOSPITAL

NATURE OF SURGICAL PROCEDURE, IF ANY

☐ INPATIENT  ☐ OUTPATIENT   DATE PERFORMED

| PATIENT WAS CONTINUOUSLY TOTALLY DISABLED — (UNABLE TO WORK) | IF STILL DISABLED, DATE PATIENT SHOULD BE ABLE TO RETURN TO WORK. |
|---|---|
| From: 9/17/01   Thru: still disabled | Hopefully by November 2001 |

REMARKS: WE ARE INTERESTED IN ANY INFORMATION THAT WOULD BE HELPFUL TO YOUR PATIENT FOR EVALUATION OF THIS CLAIM.

SIGNATURE

| DATE | PHYSICIAN'S NAME (PRINT) | TAX IDENTIFICATION NUMBER |
|---|---|---|
| 9/18/01 | Leonard Freedberg, M.D. | |

| DEGREE | SOCIAL SECURITY NUMBER |
|---|---|
| M.D. | 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 |

| STREET ADDRESS | CITY OR TOWN | STATE OR PROVINCE | ZIP CODE | TELEPHONE |
|---|---|---|---|---|
| 2000 Washington St #322 | Newton, MA | 02462 | | 617-332-2047 |

**EXHIBIT K**

# In The Matter Of:

*Alexei Kouvchinov   v.*
*Parametric Technology Corporation, et al.*

---

*Aaron von Staats*
*Vol. 1, March 24, 2006*

---

*Doris O. Wong Associates, Inc.*

*Professional Court Reporters*

*50 Franklin Street*

*Boston, MA   02110*

*(617) 426-2432*

*Original File STAATS.V1, 24 Pages*
*Min-U-Script® File ID: 3323563494*

# Word Index included with this Min-U-Script®

Aaron von Staats
Parametric Technology Corporation, et al.
Case 1:04-cv-12591-MEL   Document 63-12   Filed 07/06/2006   Page 5 of 9
Vol. 1, March 24, 2006

Page 9

[1] that I was there.

[2] **Q:** And at the time you were at Palmer & Dodge,
[3] did you handle employment law cases?

[4] **A:** I did have some employment cases, yes, but
[5] that wasn't my only — I wasn't in the employment
[6] group. I was in the litigation group.

[7] **Q:** Directing your attention back to 2001, did
[8] you have discussions with anybody at PTC about
[9] Alexei Kouvchinov?

[10] **MR. TULLY:** Let me just interpose an
[11] objection. I think he's established that whenever
[12] he was consulted by anybody at PTC it was in his
[13] role as an attorney.

[14]   Now we did have an agreement, Steve, as to
[15] one limited area of inquiry. If you want to focus
[16] it to that, that's fine. Otherwise I'm going to
[17] have to interpose the objection and instruct him not
[18] to answer except in that limited area.

[19] **MR. CHURCHILL:** I understand that. I think
[20] this question anyways is just yes or no and I'm
[21] getting to that.

[22] **MR. TULLY:** It does get to the substance of
[23] any conversations he had with people the way you
[24] asked the question did you have any conversations

Page 10

[1] with somebody about a specific issue. So I mean
[2] that's the concern I have.

[3] **MR. CHURCHILL:** Okay.

[4] **Q:** Do you recall a conversation with Lisa
[5] Wales regarding Alex Kouvchinov?

[6] **MR. TULLY:** Are we still in the same time
[7] period?

[8] **MR. CHURCHILL:** Yes.

[9] **A:** In 2001?

[10] **Q:** Yes.

[11] **A:** Yes.

[12] **Q:** And what month was that in?

[13] **A:** I believe it was in September.

[14] **Q:** Where was that conversation?

[15] **A:** I don't recall if it was in person or over
[16] the telephone.

[17] **Q:** How long was it?

[18] **A:** I don't remember the full details of it,
[19] but if I were to guess, I would say five minutes or
[20] less.

[21] **Q:** And you don't recall whether it was in
[22] person or over the phone; is that right?

[23] **A:** I don't.

[24] **Q:** Did you take any notes during that

Page 11

[1] conversation?

[2] **A:** Not that I'm aware of.

[3] **Q:** Did you ever take any notes about that
[4] conversation?

[5] **A:** Not that I'm aware of unless I've already
[6] given them to somebody.

[7] **Q:** What did Ms. Wales say to you and what did
[8] you say to her during that conversation?

[9] **A:** I don't remember exactly what was said, but
[10] basically Lisa had called me or stopped by — I
[11] don't remember which — regarding an employee who
[12] had been included in the layoff that we had
[13] completed or were completing and wanted assistance
[14] in how to address a disability claim that the
[15] employee had submitted.

[16] **Q:** What was your understanding about why she
[17] felt the need to seek assistance?

[18] **A:** Because she had a question about the
[19] employee's status as an employee. The way our
[20] layoffs were conducted is that we provided employees
[21] two weeks of notice of termination so that there was
[22] a two-week period from the time they were notified
[23] of the layoff until the time their employment
[24] actually ended, that they were actually not come to

Page 12

[1] work anymore, so they were notified to stop coming
[2] to work at the time they were notified of the
[3] layoff, but there was a two-week period where they
[4] were still employed by the company and she was —
[5] her question was about whether the fact that the
[6] employee was no longer coming to work whether that
[7] impacted the process for filing a disability claim.

[8] **Q:** Did she indicate to you that she was
[9] uncertain whether Mr. Kouvchinov was eligible to
[10] make a claim?

[11] **A:** I don't recall her saying anything like
[12] that. It was just a question of given the fact that
[13] the layoff had already occurred and the employee was
[14] no longer actively working during this two-week
[15] notice period whether that had any bearing on how to
[16] process the claim.

[17] **Q:** What did you say to her?

[18] **A:** I don't recall what I said to her, but I do
[19] recall that we concluded that the claim should be
[20] processed like any other claim because the employee
[21] was still employed during that two-week tail period
[22] from the time of notice until the time of the actual
[23] termination date and — separation date, so that was
[24] the conclusion we reached.

---

Page 13

[1] **Q:** And did you convey that conclusion to her
[2] during this conversation you were describing or was
[3] that later?
[4] **A:** I believe it was during the same
[5] conversation.
[6] **Q:** Do you recall anything else that Ms. Wales
[7] said to you or that you said to her during this
[8] conversation?
[9] **A:** No.
[10] **Q:** Did Ms. Wales indicate to you in anyway
[11] that she was skeptical about the legitimacy of the
[12] claim?
[13] **A:** Not that I recall.
[14] **Q:** Did she show you the claim form?
[15] **A:** I don't believe so.
[16] **Q:** Did she show you any documents?
[17] **A:** I don't believe so. I don't remember again
[18] whether she called me or whether it was in person.
[19] **Q:** Back in that time frame, late 2001, what
[20] was your practice in terms of record keeping when
[21] you were consulted by somebody within PTC on a
[22] question?
[23] **A:** It would depend on the question and what
[24] the issue was, but you know I regularly give advice

---

Page 14

[1] to the HR department on employment matters and
[2] that's not the kind of thing that I would have kept
[3] a record of.
[4] **Q:** So there are times when you're consulted
[5] where you don't make a note of it or create a file?
[6] **A:** That's often the case.
[7] **Q:** During this conversation, did you direct
[8] Ms. Wales to take any particular steps?
[9] **A:** No, other than the conclusion we reached to
[10] process the claim in the normal course, and she had
[11] previously been in the benefits group so she was
[12] more familiar with actually how to do the mechanics
[13] of that than I was.
[14] **Q:** When she raised the question with you about
[15] the eligibility of applying for benefits, did you at
[16] that time consult with any other people or review
[17] any documents to answer that question?
[18] **A:** First of all the way you phrased the
[19] question, if you're phrasing it consulting when she
[20] contacted me, you said about eligibility to file a
[21] claim —
[22] **Q:** Let me ask the question again just so it's
[23] clear. During the conversation that we just were
[24] talking about when Ms. Wales came to you and told

---

Page 15

[1] you about this claim, during that conversation did
[2] you consult anybody else or consult any documents to
[3] answer the question that she was posing?
[4] **A:** No.
[5] *Q. In 2001, did you ever have any other
[6] discussions with anybody at PTC regarding
[7] Mr. Kouvchinov?
[8] **MR. TULLY:** Objection. I'm instructing you
[9] not to answer.
[10] **MR. CHURCHILL:** I think I'm entitled at
[11] least to that much, to know if he spoke to anybody
[12] regarding Mr. Kouvchinov. Whether I can get into
[13] the details of what the discussion was I recognize
[14] is a different matter, but if the answer is no
[15] then —
[16] **MR. TULLY:** But the area of inquiry we're
[17] getting into today is the September 17th
[18] conversation. We've already agreed to that. So to
[19] the extent you're asking beyond that, I'm objecting
[20] to it on both that ground and on the grounds that it
[21] would I think the way you asked the question still
[22] require disclosure of privileged information.
[23] **MR. CHURCHILL:** Okay.
[24] **Q:** Mr. von Staats, I assume you're refusing to

---

Page 16

[1] answer the question based on the instruction from
[2] counsel?
[3] **A:** I'm going to follow the advice of counsel.
[4] **MR. CHURCHILL:** I don't know that there's
[5] any other questions I can ask if I can't get that
[6] question first. Obviously if the answer —
[7] **MR. TULLY:** Read the question back, would
[8] you mind, please.
[9] *(Question read)
[10] **MR. TULLY:** I'm going to maintain my
[11] objection.
[12] **Q:** All right. Let me ask another question
[13] that probably will result in the same objection but
[14] just to make it clear, during 2001 did you have any
[15] other communications with anybody at PTC regarding
[16] Mr. Kouvchinov?
[17] **MR. TULLY:** Objection. Same objection.
[18] **Q:** And Mr. von Staats, are you refusing to
[19] answer the question based on the instruction from
[20] counsel?
[21] **A:** Yes.
[22] **Q:** All right.
[23] **MR. CHURCHILL:** Why don't we just take a
[24] quick break.

Alexei Kouvchinov v.   Aaron von Staats
Parametric Technology Corporation et al
Case 1:04-cv-12591-PMEL   Document 63-12   Filed 07/06/2006   Page 9 of 8   Vol. 1, March 24, 2006

Page 17

[1]   (Recess taken)
[2]   Q: With respect to the conversation that you
[3] testified about with Lisa Wales, when was that?
[4]   A: It was in September and it was in the
[5] two-week period between when Mr. Kouvchinov was
[6] notified that he was part of the layoff and before
[7] his last day of employment.
[8]   Q: Do you remember more specifically what the
[9] date was?
[10]   A: I don't.
[11]   Q: What did you do to prepare for today's
[12] deposition?
[13]   A: I met with Mr. Tully yesterday.
[14]   Q: Did you review any documents?
[15]   A: He showed me an E-mail.
[16]   Q: Did you review any deposition testimony?
[17]   A: I didn't read any deposition transcripts.
[18]   Q: Other than the communication that you
[19] described with Ms. Wales, did you have
[20] communications with anybody else at PTC regarding
[21] Mr. Kouvchinov during 2001?
[22]   MR. TULLY: Objection. It's the subject of
[23] the same objection I raised before, but I'm willing
[24] without waiving that objection to permit the witness

Page 18

[1] to answer the question and I'm not — I don't want
[2] my willingness to allow him to answer the question
[3] subject to the objection to be construed as me
[4] opening the door to any further inquiry about it.
[5] But I am prepared to permit you — Steve, with that
[6] understanding — to answer the question.
[7]   A: I believe I spoke to Lisa at some point
[8] maybe the same time or maybe a different
[9] conversation that Mr. Kouvchinov had retained an
[10] attorney.
[11]   Q: And what did she say to you and what did
[12] you say to her on that topic?
[13]   MR. TULLY: Objection. Same objection.
[14] You can answer.
[15]   A: I believe she just told me that an attorney
[16] had been retained and that I might receive a call
[17] from that attorney.
[18]   Q: And when was that communication with
[19] Ms. Wales?
[20]   A: I don't remember if it was part of the same
[21] meeting or same conversation where we discussed the
[22] other issue or if it was subsequent. If I were to
[23] guess, I would say it was a different conversation
[24] but I'm not sure.

Page 19

[1]   Q: And did you ever have any conversations
[2] with any attorneys representing Mr. Kouvchinov?
[3]   A: Not that I remember before today.
[4]   Q: During 2001, did you have discussions with
[5] anybody external to PTC about Mr. Kouvchinov?
[6]   MR. TULLY: Objection. Same objection.
[7]   A: Not that I recall.
[8]   Q: All right. Other than the communications
[9] that you've described with Ms. Wales, did you have
[10] any other communications with anybody at PTC during
[11] 2001 regarding Mr. Kouvchinov?
[12]   MR. TULLY: Objection. Same objection.
[13] You can answer.
[14]   A: I believe I received an E-mail that
[15] discussed Mr. Kouvchinov.
[16]   Q: Let me show you what's been marked as
[17] Exhibit 35.
[18]   MR. CHURCHILL: Guy, it's not the original
[19] exhibit but it's a copy as marked.
[20]   MR. TULLY: That's okay.
[21]   Q: And this exhibit contains two E-mails. Do
[22] you see that? One from Ed Raine to various
[23] officials dated December 6, 2001, and then one
[24] before that from Lisa Wales to various PTC officials

Page 20

[1] also dated December 6, 2001.
[2]   A: Um-hmm.
[3]   Q: Is one of these E-mails the E-mail that you
[4] were just referring to — strike that. You received
[5] both of these E-mails, did you not?
[6]   A: Based on the distributions on these two
[7] E-mails, I believe I received them both.
[8]   Q: And is one of these E-mails the one that
[9] you were just referring to when you said you
[10] received an E-mail?
[11]   A: Yes. Well, I consider this whole string as
[12] one E-mail so I was referring to sort of the Ed
[13] Raine response.
[14]   Q: Did you ever respond to these E-mails?
[15]   A: Not that I recall.
[16]   *Q. On December 6th or December 7th, 2001, did
[17] you have communications with anybody — other than
[18] these E-mails — anybody at PTC regarding
[19] Mr. Kouvchinov?
[20]   MR. TULLY: Objection. I'm going to
[21] instruct you not to answer that.
[22]   MR. CHURCHILL: Can read back the question
[23] again.
[24]   *(Question read)

Page 21

[1]    **Q:** Other than these two E-mails which are on
[2] Exhibit 35, on December 6, 2001, or December 7,
[3] 2001, did you have any communications with anyone at
[4] PTC regarding Mr. Kouvchinov.
[5]    **MR. TULLY:** Objection. Same objection.
[6] You can answer that.
[7]    **A:** Not that I recall.
[8]    **Q:** When you testified about the conversation
[9] that you had in September — the communications that
[10] you had with Ms. Wales in September 2001 and you
[11] said there was the issue of her asking about the
[12] claim and there was the issue of her having been
[13] contacted by an attorney and I think your testimony
[14] was something to the effect that if you had to
[15] guess, you would guess that the — there were two
[16] communications. Why does it seem to you that those
[17] were two different communications?
[18]    **A:** That's just how it sits in my memory.
[19]    **MR. CHURCHILL:** All right. I have no
[20] further questions.
[21]    **MR. TULLY:** All right. I don't have any.
[22] Thank you.
[23]    **MR. CHURCHILL:** Thank you very much.
[24]

Page 22

[1]    (Whereupon, the deposition was
[2] concluded at 3:02 p.m.)
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 23

**CERTIFICATE**

[1]
[2] I, AARON VON STAATS, do hereby certify that I
[3] have read the foregoing transcript of my testimony,
[4] and further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]    Dated at __, this day of ,
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 24

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                                      )
[3] I, Laura E. Antoniotti, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 24th day of March,
[7] 2006, at 2:30 p.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15] I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19] In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this 27th day of March,
[21] 2006.
[22]
[23]         Notary Public
[24]         My commission expires 4/18/2008

SUGGESTED CORRECTIONS

RE:  Kouvchinov v. Parametric, et al.
WITNESS:  Aaron C. von Staats, Vol. I

The above-named witness wishes to make the following changes to the
testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 11 | 24 | *actually ended, that they were actually not coming to* | *Mis-spoke* |

*A. C. von Staats* (signature)
*April 6, 2006*

Page 21

[1]  **Q:** Other than these two E-mails which are on
[2] Exhibit 35, on December 6, 2001, or December 7,
[3] 2001, did you have any communications with anyone at
[4] PTC regarding Mr. Kouvchinov.
[5]  **MR. TULLY:** Objection. Same objection.
[6] You can answer that.
[7]  **A:** Not that I recall.
[8]  **Q:** When you testified about the conversation
[9] that you had in September — the communications that
[10] you had with Ms. Wales in September 2001 and you
[11] said there was the issue of her asking about the
[12] claim and there was the issue of her having been
[13] contacted by an attorney and I think your testimony
[14] was something to the effect that if you had to
[15] guess, you would guess that the — there were two
[16] communications. Why does it seem to you that those
[17] were two different communications?
[18]  **A:** That's just how it sits in my memory.
[19]  **MR. CHURCHILL:** All right. I have no
[20] further questions.
[21]  **MR. TULLY:** All right. I don't have any.
[22] Thank you.
[23]  **MR. CHURCHILL:** Thank you very much.
[24]

Page 22

[1]  (Whereupon, the deposition was
[2] concluded at 3:02 p.m.)
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 23

**CERTIFICATE**

[2] I, AARON VON STAATS, do hereby certify that I
[3] have read the foregoing transcript of my testimony,
[4] and further certify under the pains and penalties of
[5] perjury that said transcript (with ~~without~~)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]  Dated at __, this day of , April
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 24

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                                )
[3]  I, Laura E. Antoniotti, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 24th day of March,
[7] 2006, at 2:30 p.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]  I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]  In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this 27th day of March,
[21] 2006.
[22]
[23]          Notary Public
[24]     My commission expires 4/18/2008

**EXHIBIT L**



**CIGNA** Group Insurance
Life · Accident · Disability

October 5, 2001

Routing  212E
12225 Greenville Ave.
Dallas, TX  75243-9382
Telephone 1.800.352.0611 x 8734
Facsimile  860.731.3533

ALEXEI KOUVCHINOV
4881 WASHINGTON ST. #1
WEST RONBURY, MA 02132

EXHIBIT
27
stp 11/16/05

RE:   Claimant         : ALEXEI KOUVCHINOV
      SSN              : 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
      Policyholder     : PARAMETRIC TECHNOLOGY CORP.
      Policy Key       : 2034160
      Administered by  : Connecticut General Life Insurance Company

Dear Mr. Kouvchinov:

We are pleased to advise you that your claim for Short-Term Disability benefits have been
approved.  Your first check is being sent under separate cover in the amount of **$1014.33**
representing benefits due for the period of **09/24/01** through **09/30/01**.

The captioned disability account provides benefits at **100% of your Basic Weekly Earnings**.
Benefits commence following a waiting period of **7 days** due to sickness.

As long as you remain totally disabled from performing the duties of your occupation, benefits
will be payable for a maximum of **12 weeks**.  Checks will be sent at weekly intervals at the
end of each benefit period.

Your disability benefits are currently considered taxable income for Social Security (**FICA**)
Tax, Federal Income (**FIT**) Tax, and in some cases, State Tax purposes.  FICA taxes are
mandatory and are automatically deducted from disability income benefits issued during the
six calendar months immediately following the month in which you last worked.

Federal Income Taxes may be deducted from your Disability income benefits on an entirely
voluntary basis.  Should you wish to have all or a portion of your FIT taxes due on your
Disability Income benefits withheld from your Disability Income check, you will need to
complete a Federal Tax Withholding Form (W-4S), which you may obtain through our office
or your local IRS office, and submit it to our office in order for withholding to commence on
future checks.  The law requires that you designate on the Form W-4S the amount you want
withheld and that the amount be no less than $20.00 per week and expressed in whole dollars.

October 5, 2001
Page 2

You may cancel or change your deduction amount at any time by completing another Form W-4S.

Based on the last information provided by your doctor, your benefits were approved through October 12, 2001. I am unable to provide benefits beyond that date without additional medical documentation. **Please have your attending physician complete the enclosed form and return it back to our office if you wish to claim benefits beyond this date.** You may return this form via fax to 860.731.3533, or by mail with the enclosed envelope. If you should return to work before this date, notify us immediately to avoid an overpayment of benefits. **Please note that a doctor's slip or note that you cannot return to work is not sufficient.**

Please review your insurance information available from your employer to determine if you are eligible for additional benefits.

Should you have any additional questions, please do not hesitate to contact this office. My office hours are 8:00 am to 4:30 pm central standard time. It has been our pleasure to be of service to you.

Sincerely,


Angela Wallace
Case Manager


Cc: Parmetric Technology
    140 Kendrick St.
    Needham, MA  02494
    Attn:  Lisa Perry

**EXHIBIT M**

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

(first record)     Add a New Incident Note     

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/03/2001 10:55:24 AM | Other | Narrative | WELCH, MELODEE | ICARE |

### ICARE Note Text

LEVEL: D2
ICD9: 311
OPT: 31.8
MAX: 365
DOD: 9/11/01
ESC: 11/7/01

(first record)     Add a New Incident Note     



EXHIBIT
74
3/10/06

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/04/2001 10:18:20 AM | Telephone Call | Narrative | ANDERSON, SCOTT | ICARE |

### ICARE Note Text

Spoke with Lisa at ER.
Asked for status of claim. Advised that we are evaluating right now. With termination of EE, it raises several questions. She agreed. Cx new of potential termination in July. On 9/10/01 (LDW) Cx was advised that he was terminated. Actual EE status remained until 9/24/01 however. COD is provided beginning 9/17/01.
Advised that we are clarifying medical with AP, and hope to reach decision by end of day 10/5/01. Will keep Lisa advised of status.
Cx does not speak clear English per Lisa.

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

     Add a New Incident Note     

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/04/2001 02:36:49 PM | Telephone Call | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

CALLED CX AT HOME AND LEFT A MESSAG FOR A RETURN CALL.

     Add a New Incident Note     

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/04/2001 02:40:00 PM | Medical/Disability Management | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

RECEIVED COMPLETED CLAIM FORM. MEDICAL ON CLAIM FORM INDICATED THAT THE CX WAS TREATED BY DR. LEONARD FREEDBERG FOR MAJOR DEPRESSION ON 9-17-01. THE CX IS TO F/U ON 10-10-01. THE CX HAS BEEN TREATED FOR DEPRESSION PREVIOUSLY IN NOVEMBER 2000. THE DR EXPECTS THE CX TO HE OUT OF WORK UNTILL NOV 2001.

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

 Add a New Incident Note 

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/04/2001 04:33:17 PM | Current Case Plan | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

CLAIM APPROVED BASED ON INFORMATION RECEIVED.WILL REQUEST RECORDS AND STAFF CLAIM.

 Add a New Incident Note 

tp://ic.group.cigna.com/ClaimCare/Notes/pgView.asp?NOTENUM=6

08/13/2004
435

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

    

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/04/2001 04:54:09 PM | Correspondence | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

AXED REQUEST FOR RECORD TO DR FREEDBERG.

    

Add a New Incident Note

//ic.group.cigna.com/ClaimCare/Notes/pgView.asp?NOTENUM=7

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

    Add a New Incident Note    

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/11/2001 08:29:48 AM | Correspondence | Narrative | ANDERSON, SCOTT | ICARE |

### ICARE Note Text

Request to AP.
Need updated medical certification and treatment plan. Faxed to AP today.

    Add a New Incident Note    

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/12/2001 02:26:09 PM | Correspondence | Narrative | ANDERSON, SCOTT | ICARE |

### ICARE Note Text

E-mail extension.

We have extended his benefits to 10/26/01 as of today. We have not yet received a response from his physician regarding our request for records. However, we have extended his benefits so that there is no interruption.

We will be following up for records by the end of next week (10/19/01).

Have a great weekend!

Scott Anderson

-----Original Message-----
From: Lisa Perry [SMTP:lperry@ptc.com]
Sent: Friday, October 12, 2001 11:09 AM
To: Wallace, Angela L 212; Anderson, Scott K 212
Subject: Re: kouvchinov

Angela,

Has Alexei Kouvchinov's short term disability been extended past 10/12/01?

Thanks and have a nice day!

-Lisa

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

     Add a New Incident Note     

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/18/2001 01:54:13 PM | Medical/Disability Management | Narrative | ANDERSON, SCOTT | ICARE |

### ICARE Note Text

Received medical records.
Cx being seen every 2 weeks in treatment. Last seen 10/10/01. Continues to have problems with depression. Claim is approved through 10/26/01 at this time. Diaried for request to AP on 10/24/01 to have MI form completed.

     Add a New Incident Note     

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

    Add a New Incident Note    

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 1 0/25/2001 06:04:32 PM | Correspondence | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

faxed ap form to dr freedberg.

    Add a New Incident Note    

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

    Add a New Incident Note    

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 10/29/2001 12:40:51 PM | Current Case Plan | Narrative | ANDERSON, SCOTT | ICARE |

## ICARE Note Text

Benefits extended through 11/30/01.
Will follow up for RTW date, as Cx estimates potential RTW 11/17/01.

    Add a New Incident Note    

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 11/15/2001 10:01:45 AM | Telephone Call | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

| CALLED DR. FREEDBERG AND LEFT A MESSAGE FOR A RETURN CALL. |
|---|

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

    

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 11/15/2001 03:45:38 PM | Telephone Call | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

RECEIVED VM MSG FROM DR. FREEDBERG. HE STATED THAT THE CX IS UNABLE TO RTW AT THIS TIME. HE STATED THAT THE CX IS STILL DEPRESSED AND IS TAKING WELBUTRIN. HE STATED THAT THE CX HAS NO ENERGY AND DOES NOTHING OTHER THAN HIS DAILY LIVING. HE STATED THAT THE CX IS DOING BETTER, HOWEVER HE DOESN'T FEEL THAT THE CX WILL RTW UNTIL DEC OR JAN.

    

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 1 1/15/2001 03:51:03 PM | Current Case Plan | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

| FILE WILL BE REFERRED TO MC FOR EVALUATION FOR CONTINUED DISABILITY. |
|---|

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

  <u>Add a New Incident Note</u>  

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 11/27/2001 03:23:58 PM | Medical/Disability Management | Narrative | JACKSON, BRENDA | ICARE |

### ICARE Note Text

PROVIDER INTERVIEW 11/27/01
OCCUPATION: MCAD Software Engineer

Provider made aware of occupation, duties and job level.

S_x__, L___, M____, H_____

AP WHO CERTIFIED THE DISABILITY: Dr. Freedberg
SPECIALTY: Psychiatrist
CONTACT PERSON AND TITLE: Dr. Freedberg
DIAGNOSIS & ICD-9 CODE: 296.33 MDD/severe/with Psychotic Features

ACTUAL DISABLING DIAGNOSIS/CONDITION: Low energy, poor concentration, depressed
DATE OF DISABILITY FOR THIS CONDITION: 9/11/01

LOV: 11/21/01
NOV: 12/17/01

OBJECTIVE FINDINGS AND DIAGNOSTICS TO SUPPORT THE DISABLING DIAGNOSIS:
According to AP the claimant is doing a little better but he is still depressed, his depression is worse in the AM, he continue to have difficult sleeping, low energy poor concentration. AP has notice that his English is getting worse; the claimant is from Russia. His psychosis has resolved, appetite improved and he is not suicidal. According to AP the claimant is divorced and has a 7-year-old son. The claimant has very little support and he isolates himself. AP reports the claimant has no particular stressors he has had family problems in the past and his is a recurrent depression and this one is the most severe. His GAF at this time is 45. His medication is Wellbutrin 150mg BID, Sonata 10mg qHs, Remeron 15-30mg qd. Dr. Freedberg reported the claimant next ffice visit is 12/17/01 and he will be discussing RTW by the first of the year. I reported to him I would discuss gradual RTW with his ER and discuss my finding when I call him back for an update on 12/18/01.
***see next note***********

  <u>Add a New Incident Note</u>  

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 11/27/2001 03:25:31 PM | Medical/Disability Management | Narrative | JACKSON, BRENDA | ICARE |

### ICARE Note Text

NCM Assessment
Medical supports functional impairments as evidenced by medical received.
Review of job description reveals sedentary work.
CCOG Duration guidelines for Major depression with psychotic features, 21 days for part-time RTW and 28 days for full-time RTW. Red flag indicators/ Prior episodes of disability Family dysfunction; limited coping resources (social)

ACTION PLAN:
Report the above to the CM
NCM will update with AP on 12/18/01
NCM will call ER to ask about part-time work.

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

  

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 11/27/2001 03:25:53 PM | Current Case Plan | Narrative | JACKSON, BRENDA | ICARE |

### ICARE Note Text

NCM Assessment
Medical supports functional impairments as evidenced by medical received.
Review of job description reveals sedentary work.
CCOG Duration guidelines for Major depression with psychotic features, 21 days for part-time RTW and 28 days for full-time RTW. Red flag indicators/ Prior episodes of disability Family dysfunction; limited coping resources (social)

ACTION PLAN:
Report the above to the CM
NCM will update with AP on 12/18/01
NCM will call ER to ask about part-time work.

  Add a New Incident Note  

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 12/04/2001 03:59:59 PM | Current Case Plan | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

CLAIM WILL BE REFERRED TO SCM FOR REVIEW OF LTD. NO FURTHER IMPACT CAN BE MADE AT THIS POINT. THE CX'S NEXT OV IS 12-18-01 AND THE STD TERM DATE IS 12-16-01. WILL PAY TO THE END OF STD AND REFER TO LTD FOR EVAL.

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 12/04/2001 05:10:49 PM | Telephone Call | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

RECEIVED CALL FROM LISA PERRY. SHE STATED THAT THE CX IS BACK AT WORK. SHE STATED THAT THE CX WAS AT WORK TODAY, SHE STATED THAT THE CX IS WORKING A CONTRACT POSITION. SHE STATED THAT SHE WILL CHECK WITH THE MANAGER TO VERIFY THE DATE HE RTW AND RETURN THE CALL.

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

      

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 12/07/2001 09:29:32 AM | Correspondence | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

RECEIVED EMAIL 12-601 FROM LISA PERRY AT PTC. THE CX RTW ON 12-4-01 AND IS WORKING HIS JOB AS CONTRACT LABOR.

      

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

    Add a New Incident Note    

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 12/07/2001 09:37:40 AM | Telephone Call | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

RECEIVED CALL FROM LISA PERRY AT PTC. SHE STATED THAT THE CX IS BACK AT WORK AND IS PERFORMING HIS SAME JOB DUTIES. SHE STATED THAT SHE WAS ADVISED BY THE VICE PRESIDENT OF THE COMPANY THAT THE CX SENT AN EMAIL ON 9-25-01 STATED THAT HE WAS AVAILABLE FOR WORK. I ADVISED HER THAT THE CX WAS CERTIFIED FOR DISABILITY AROUND THAT TIME AND THAT HIS CLAIM WOULD DENIED FURTHER BENEFITS.

    Add a New Incident Note    

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

     <u>Add a New Incident Note</u>     

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 12/07/2001 09:39:08 AM | Current Case Plan | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

**CLAIM DENIED FURTHER BENEFITS BEYOND 11-30-01. CX HAS RETURNED TO WORK THROUGH A TEMP AGENCY/CONSULTING FIRM.**

     <u>Add a New Incident Note</u>     

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 12/11/2001 10:52:21 AM | Current Case Plan | Narrative | ANDERSON, SCOTT | ICARE |

### ICARE Note Text

| Agree with denial. Cx doing H/O through temp agency. No additional benefits. OK to send letter to Cx. |
|---|

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

    Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 02/27/2004 04:36:43 PM | Current Case Plan | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

RECEIVED ATTORNEY'S REQUEST. SEE FILE.

    Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

### View the Details for an Incident Note

 

Add a New Incident Note

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 02/27/2004 04:36:56 PM | Correspondence | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

| FILE REQUESTED FROM COLD STORAGE. |
|---|

 

Add a New Incident Note

| EE: KOUVCHINOV, ALEXEI | SSN: 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 | DOI: 09/11/2001 | ER: PARAMETRIC TECHNOLOGY CORPORATION(DIS) | ID: 177273356450846 |
|---|---|---|---|---|
| WCC: | LTD: | STD: 203416007300 | ICMS: | Other: |

## View the Details for an Incident Note

    Add a New Incident Note          (last record)

| Date/Time Created | Subject | Detail | Author | Source |
|---|---|---|---|---|
| 02/27/2004 04:37:36 PM | Telephone Call | Narrative | WALLACE, ANGELA | ICARE |

### ICARE Note Text

CALLED KATHERINE WIIK AND LEFT A MSG FOR RTC. ALSO LEFT MSG THAT AUTH MUST CONTAIN SPECIFIC REQUESTS AND ALSO ADDRESSED TO CONN GEN LIF INSURANCE COMPANY OF NORTH AMERICA.

    Add a New Incident Note          (last record)

**EXHIBIT N**

*Explanation Of Benefits*

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS          TX 75243

Page        1

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

Certholder:  ALEXEI    KOUVCHINOV
Claimant:      ALEXEI    KOUVCHINOV
ID#: S017789712   Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                          CORPORATION
Account#: 2034160
Policy : 07                    Div:      002

ALEXEI   KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY       MA 02132

D212

**EXHIBIT**
**4**
~~see~~ 11/8/05

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 09/24/2001 - 09/30/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |
| DISABILITY INCOME | 10/01/2001 - 10/07/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:
FICA                    168.04

TOTAL PAYMENT $        2,028.66

Payments Issued:      10/04/2001
ALEXEI   KOUVCHINOV                    1,014.33

Messages:

*deposit 10/11/01*
*Oct 11 2001*

Total amount paid to date, including taxes, for this claim is $    2,196.70 for the period   09/24/2001 thru    10/07/2001

3232

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS            TX. 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

*Explanation Of Benefits*

Page        1

Certholder:  ALEXEI    KOUVCHINOV
Claimant:    ALEXEI    KOUVCHINOV
ID#:  SO17789712   Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                           CORPORATION
Account#: 2034160
Policy :   07              Div:      002

ALEXEI    KOUVCHINOV                                    D212
4881 WASHINGTON ST. #1
WEST ROXBURY         MA 02132

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 10/08/2001 - 10/12/2001 | 5 DAYS | 1098.35/WK | 784.55 | 60.02 |

Deductions:
FICA                      60.02

TOTAL PAYMENT $          724.53

Payments Issued:    10/05/2001
Messages:                                    ALEXEI    KOUVCHINOV          724.53

*deposit*   10/15/01

Total amount paid to date, including taxes, for this claim is $    2,981.25 for the period   09/24/2001 thru    10/12/2001

PARAMETRIC T
CONNECTICUT

ACCOUNT NO.
2034160

**SEVEN HUN

Pay To The (
    ALEXE
    4881
    WEST

CITBANK N.A
399 PARK AV
SW YORK

G2014B (7-27-98)

**Transaction Receipt**

This deposit/withdrawal is accepted subject to the terms of the Rules and Regulations
of the bank and to verification of the amount deposited/withdrawn.
Please retain this receipt until you receive your statement.

COMPLETE TRANSACTION INFORMATION IS SHOWN BELOW.

37 -388602

                                          62-20
                                           311

P

)01

Fleet

******724.5

0205.MO 10/15/01 14:32        0047223016
CHECKING DEP                      $724.5
28385 B3 156 81335 COOLIDGE CORNER
ONL:    $6,923.09   AVL:   $6,198.56

373886C                     0106

2446

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS          TX 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

*Explanation Of Benefits*

Page       1

Certholder:  ALEXEI   KOUVCHINOV
Claimant:    ALEXEI   KOUVCHINOV
ID#:  S017789712    Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                        CORPORATION
Account#:  2034160
Policy :   07                Div:        002

ALEXEI   KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY      MA 02132

D212

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 10/13/2001 - 10/19/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |
|  |  |  |  |  | -- |

Deductions:
FICA                                84.02

TOTAL PAYMENT $          1,014.33

Payments Issued:      10/12/2001
Messages:                                 ALEXEI   KOUVCHINOV                    1,014.33

de posit 10/22/01

Total amount paid to date, including taxes, for this claim is $      4,079.60 for the period   09/24/2001 thru      10/19/2001

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS            TX 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

*Explanation Of Benefits*

Page        1

Certholder:  ALEXEI   KOUVCHINOV
Claimant:    ALEXEI   KOUVCHINOV
ID#:  5017789712   Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                         CORPORATION

Account#: 2034160
Policy :   07              Div:      002

ALEXEI   KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY        MA 02132

D212

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 10/20/2001 - 10/26/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:
ICA              84.02

TOTAL PAYMENT $        1,014.33

Payments Issued:   10/19/2001
ALEXEI   KOUVCHINOV              1,014.33

Messages:

deposit 10/26/01

otal amount paid to date, including taxes, for this claim is $      5,177.95 for the period  09/24/2001 thru      10/26/2001

deposit 10/26/01

0108

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS          TX 75243

*Explanation Of Benefits*

Page     1

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734

Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

Certholder:  ALEXEI    KOUVCHINOV
Claimant:    ALEXEI    KOUVCHINOV
ID#:  SO17789712    Special ID#:
Account Name:   PARAMETRIC TECHNOLOGY
                CORPORATION
Account#: 2034160
Policy :  07              Div:     002

D212

ALEXEI    KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY      MA 02132

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| ISABILITY INCOME | 10/27/2001 - 11/02/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:
CA                    84.02

TOTAL PAYMENT $      1,014.33

Payments Issued:     10/26/2001
ALEXEI    KOUVCHINOV              1,014.33

Messages:

*lepost u Nov -06-01*

al amount paid to date, including taxes, for this claim is $    6,276.30 for the period   09/24/2001 thru    11/02/2001

*deposit Nov-06-2001*

0109

2444

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS                TX 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

*Explanation Of Benefits*

Page        1

Certholder:  ALEXEI   KOUVCHINOV
Claimant:    ALEXEI   KOUVCHINOV
ID#: S017789712  Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                        CORPORATION
Account#: 2034160
Policy :  07              Div:      002

ALEXEI   KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY      MA 02132

D212

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 11/03/2001 - 11/09/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:
FICA                      84.02

TOTAL PAYMENT $        1,014.33

Payments Issued:    11/02/2001
Messages:                                          ALEXEI   KOUVCHINOV              1,014.33

deposit Nov 08

Total amount paid to date, including taxes, for this claim is $      7,374.65 for the period   09/24/2001 thru      11/09/2001

deposit Nov 08

0110

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS                    TX 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

*Explanation Of Benefits*

Page          1

Certholder:   ALEXEI   KOUVCHINOV
Claimant:     ALEXEI   KOUVCHINOV
ID#:  SO17789712    Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
              CORPORATION

Account#: 2034160
Policy : 07                 Div:      002

D212

ALEXEI   KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY       MA 02132

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 11/10/2001 - 11/16/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:              84.02
ICA                                                    TOTAL PAYMENT $      1,014.33

                                        Payments Issued:      11/09/2001
                                        ALEXEI    KOUVCHINOV              1,014.33

Messages:

*deposit Nov 14*

Total amount paid to date, including taxes, for this claim is $     8,473.00 for the period   09/24/2001 thru    11/16/2001

*deposit Nov 14*

0111

:041

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS          TX 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

# Explanation Of Benefits

Page        1

Certholder:  ALEXEI    KOUVCHINOV
Claimant     ALEXEI    KOUVCHINOV
ID#:  SO17789712   Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                    CORPORATION

Account#: 2034160
Policy :   07              Div:      002

D212

ALEXEI   KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY    MA 02132

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 11/17/2001 - 11/23/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:
:ICA                    84.02

TOTAL PAYMENT $        1,014.33

Payments Issued:    11/16/2001
ALEXEI    KOUVCHINOV              1,014.33

Messages:

*deposit nov-19-2001*

otal amount paid to date, including taxes, for this claim is $      9,571.35 for the period   09/24/2001 thru    11/23/2001

*deposit Nov 19 2001*

1-800 352-0611 ext 8734

CIGNA COMPANIES
SUITE 1000
12225 GREENVILLE AVE
DALLAS          TX 75243

PARAMETRIC TECHNOLOGY

ANGELA L WALLACE
972-997-8734
Please direct any questions to the above analyst.
Be sure to provide your account and ID numbers
in all letters and telephone calls.

*Explanation Of Benefits*

Page        1

Certholder:  ALEXEI   KOUVCHINOV
Claimant:    ALEXEI   KOUVCHINOV
ID#: S017789712    Special ID#:
Account Name:  PARAMETRIC TECHNOLOGY
                         CORPORATION
Account#: 2034160
Policy :   07              Div:        002

ALEXEI   KOUVCHINOV                                    D212
4881 WASHINGTON ST. #1
WEST ROXBURY      , MA 02132

| Benefit Type | Payment Period | Duration | Benefit Rate | Benefit Payable | Less Deduction |
|---|---|---|---|---|---|
| DISABILITY INCOME | 11/24/2001 - 11/30/2001 | 7 DAYS | 1098.35/WK | 1098.35 | 84.02 |

Deductions:
A                        84.02

                                    TOTAL PAYMENT $        1,014.33

                                    Payments Issued:    11/23/2001
Messages:                           ALEXEI    KOUVCHINOV        1,014.33

deposit Nov 29

Total amount paid to date, including taxes, for this claim is $     10,669.70 for the period    09/24/2001 thru    11/30/2001

**EXHIBIT O**

```
 1              IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2
     ALEXEI KOUVCHINOV,            )
 3        Plaintiff,              )
                                   )
 4   vs.                          )  DOCKET NO. 04-12531 MEL
                                   )
 5   PARAMETRIC TECHNOLOGY        )
     CORPORATION, CDI CORPORATION )
 6   LISA WALES, and CONNECTICUT  )
     GENERAL LIFE INSURANCE CO.,  )
 7        Defendants.             )

 8                   -------------------------

 9                     ORAL DEPOSITION OF

10                      ANGELA WALLACE

11                      March 15, 2006

12                   -------------------------

13

14

15

16

17

18           ORAL DEPOSITION OF ANGELA WALLACE, produced as a

19   witness at the instance of the Plaintiff, and duly sworn,

20   was taken in the above-styled and numbered cause on the 15th

21   day of March, 2006, at 10:00 a.m., before Catherine Veccjo

22   Williams, CSR/RPR, in and for the State of Texas, reported

23   by machine shorthand, at the offices of Arlington Court

24   Reporting, Inc., 901 Avenue K, Grand Prairie, Texas 75050

25   pursuant to the Federal Rules of Civil Procedure.
```

9cbdd211-7bf3-4969-90ce-6e2d9af0f2df

**Page 54**

1  question back?

2      (Requested portion read back)

3      MR. TULLY:  I'm going to object.  I'm going to

4  say the document obviously speaks for itself.

5      MR. CHURCHILL:  I'm going to repeat the question

6  anyway.

7      Q.  (BY MR. CHURCHILL)  In this letter you were

8  notifying Mr. Kouvchinov that his disability benefits were

9  being terminated effective November 30th, 2001; is that

10  right?

11      MR. TULLY:  Objection.

12      MR. CREVIER:  Objection.  The document speaks

13  for itself.

14      MR. CHURCHILL:  So does the witness.

15      Q.  (BY MR. CHURCHILL)  You can still answer.

16      A.  Yes.

17      Q.  Was this the first time that you notified

18  Mr. Kouvchinov that his benefits had been terminated?

19      A.  I don't know.

20      MR. CHURCHILL:  Could we take a quick bathroom

21  break?  My morning coffee has caught up with me.  I'm not

22  going to be a whole lot longer.

23      (Brief break taken.)

24      Q.  (BY MR. CHURCHILL)  Showing you what was previously

25  mark as Exhibit 74, do you recognize this document?

**Page 55**

1      A.  Yes.

2      Q.  What is it?

3      A.  Printouts from the Unilynx System.

4      Q.  And is it your understanding that this exhibit

5  contains all of entries made in the Unilynx System for

6  Mr. Kouvchinov's claim?

7      MR. CREVIER:  Take your time and look at it,

8  and if you recall.

9      A.  Yes.  It appears to be the file documentation.

10      Q.  (BY MR. CHURCHILL)  I'm sorry?

11      A.  Yes.  It appears to be the file documentation.

12      Q.  And all the file documentation?

13      A.  As it appears.

14      Q.  You see at the bottom at the end of the string

15  there, there's an entry for what appears to be note number,

16  and on the first page it's note number equals 2.  Do you see

17  that?

18      A.  Yes.

19      Q.  And on this exhibit it continues through note

20  number 27; is that right?

21      A.  It starts with 2 and ends with 27.

22      Q.  And this is from the Unilynx system; is that

23  right?

24      A.  Yes.

25      Q.  Who had access to put information into Unilynx with

**Page 56**

1  respect to a claim?

2      A.  Specifically, I don't know.

3      Q.  Well, certainly the claim manager had access,

4  right?

5      A.  Yes.

6      Q.  And the senior case manager?

7      A.  Yes.

8      Q.  And the team leader?

9      A.  Yes.

10      Q.  Did a case manager have the authority to go in, or

11  the ability to go in, and edit entries?

12      A.  I don't remember.

13      Q.  All right.  With respect to page 1 of this

14  exhibit, just a walk through what appears on these forms, in

15  the box that says, "Date Time Created," is that the date and

16  time that the note entry was made?

17      A.  Yes, as it appears.

18      Q.  And then there's a subject box; is that right?

19      A.  Yes.

20      Q.  And then there's a detail box?

21      A.  Yes.

22      Q.  And then the author box identifies the person who

23  made the note; is that right?

24      A.  Yes.

25      Q.  And the source says, "eye care," what does that

**Page 57**

1  mean?

2      A.  I don't know.

3      Q.  Who is Melody Welch?

4      A.  She works in our intake department.

5      Q.  All right.  At the left, in the box, where it says

6  "eye care note text," the first entry says, "level D-2."

7      A.  Yes.

8      Q.  What does that mean?

9      A.  It's the level of the claim.

10      Q.  What does D-2 mean?

11      A.  I don't know.

12      Q.  The next entry says, "I CD 9 311," what does that

13  mean?

14      A.  That is the I CD 9 code.

15      Q.  What is I CD 9?

16      A.  The medical code for that particular diagnosis.

17      Q.  What does I CD stand for?

18      A.  I don't know.

19      Q.  And what is code 311?

20      A.  Specifically, I don't know.

21      Q.  And the next line says, "OPT 31.8," what does that

22  mean?

23      A.  I don't know.

24      Q.  And next line says, "Max 365," what does that

25  mean?

15 (Pages 54 to 57)

9cbdd211-7bf3-4969-90ce-6e2d9af0f2df

Page 66

1    A.  It would be medical that was provided.
2    Q.  And more specifically, where in Exhibit 74 is the
3   medical information that you relied on to extend
4   Mr. Kouvchinov's benefits?
5    A.  Page 445.
6    Q.  And that's the note from Brenda Jackson?
7    A.  Yes.
8    Q.  And that was based on her conversation with
9   Dr. Freedburg on that date; is that right?
10    A.  Just one second.  Yes.
11    Q.  Was the extension of disability benefits that you
12   approved on December 4th based in any way on communications
13   you received from Mr. Kouvchinov?
14    A.  Not that I know of.
15    Q.  And when was Mr. Kouvchinov notified of that
16   extension?
17    A.  Specifically, I don't know.
18    Q.  Directing your attention to page 452, this is a
19   note that you authored on December 7th, 2001 at 9:39 a.m.;
20   is that right?
21    A.  Yes.
22    Q.  And you indicate in this note that Mr. Kouvchinov
23   would be denied further benefits beyond 11/30/01; is that
24   right?
25    A.  Yes.

Page 67

1    Q.  In other words, he would be paid through November
2   30th, 2001, but nothing after that; is that right?
3    A.  Yes.
4    Q.  And the next page, which is 453, reflects
5   Mr. Anderson's approval of that decision; is that right?
6    A.  Yes.
7    Q.  Showing you what has been marked as Exhibit 4.  Do
8   you recognize any portion of this exhibit?
9    A.  It's an explanation of benefits.
10    Q.  What is that?
11    A.  It's explaining what benefits they're receiving.
12    Q.  And is this something that accompanied a benefit
13   check?
14    A.  I believe it does.
15    Q.  And towards the bottom right of the explanation of
16   benefits there's an entry that says, "Payments issued
17   10/4/2001."  Do you see that?
18    A.  Okay.  Yes.
19    Q.  And is that the date that the check was issued to
20   the claimant.
21    A.  I don't know.
22    Q.  What does "payments issued" mean?
23    A.  I'm not really sure.
24    Q.  Showing you what was previously marked as Exhibit
25   48, do you recognize this document as a letter you received

Page 68

1   from Jim Boudreaux dated February 25th, 2004?
2    A.  Yes.
3    Q.  Let me show you what previously was marked as
4   Exhibit 49.  Do you recognize this as a letter that you sent
5   to the legal services center dated March 8th, 2004?
6    A.  Yes.
7    Q.  And this letter is your response to Exhibit 48; is
8   that right?
9    A.  Not as it appears.
10    Q.  I agree with that.  All right.  In your letter of
11   March 8th, 2004, you indicate that you are responding to a
12   request for information; is that right?
13    A.  Yes.
14    Q.  And there are seven bullet points in your letter?
15    A.  Yes.
16    Q.  And Exhibit 48 makes seven requests for
17   information; is that right?
18    A.  Yes.
19    Q.  All right.  If you can just compare Exhibit 48
20   with Exhibit 49, I'm going to ask if you would agree that it
21   appears that your responses here in the bullet points were
22   responding to the questions 1 through 7 in Exhibit 48?
23    A.  As it appears, yes.
24        MR. CHURCHILL:  Can you mark this as the next
25   exhibit, please.

Page 69

1        (Exhibit No. 80 marked.)
2    Q.  (BY MR. CHURCHILL)  I'm showing you what's been
3   marked as Exhibit 80.  Do you recognize this as a letter
4   that you sent to the legal services center dated July 19th,
5   2004?
6    A.  Yes.
7    Q.  Is that your signature at the bottom?
8    A.  Yes.
9    Q.  And one of the things attached to this letter is a
10   relevant excerpt from the contract; is that right?
11    A.  Yes.  It appears to be portions of the contract.
12    Q.  And that was, to your understanding at the time,
13   the contract that governed Mr. Kouvchinov's short-term
14   disability claim?
15    A.  Yes.
16        MR. CHURCHILL:  Can you mark this as 81,
17   please?
18        (Exhibit No. 81 marked.)
19    Q.  (BY MR. CHURCHILL)  I'm showing you what's been
20   marked as Exhibit 81.  Do you recognize this document?
21    A.  Yes.
22    Q.  What is it?
23    A.  It's a printout from my computer system.
24    Q.  And is this from the online claim management system
25   that you described earlier?

18 (Pages 66 to 69)

9cbdd211-7bf3-4969-90ce-6e2d9af0f2df

**EXHIBIT P**

Angela Wallace
**Case Manager**
Disability Management Solutions



EXHIBIT
K   28
SIP   11/14/05



**CIGNA** Group Insurance
Life · Accident · Disability

December 10, 2001

ALEXEI KOUVCHINOV
4881 WASHINGTON ST. #1
WEST ROXBURY, MA 02132

Routing
12225 Greenville Ave
Dallas TX 75243-9384
Telephone (800)352-0611 x5609
Facsimile (860)731-3413

Re:  Claimant  : ALEXEI KOUVCHINOV
     SS#       : 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
     Employer  : PARMETRIC TECHNOLOGY CORP.
     Policy#   : 2034160
     Company   : CONNECTICUT GENRAL LIFE INSURANCE COMPANY

Dear Mr. Kouvchinov:

We have carefully reviewed your claim for Long Term Disability benefits under the
Parametric Technology Corp's group insurance plan and advise you that we cannot consider
you totally disabled and as such, eligible to receive benefits beyond November 30, 2001.

Under the Parametric Technology Corp. Short Term disability policy, the definition of
disability is as follows:

An Employee is Disabled if, because of Injury or Sickness,

1.   He or she is unable to perform all the material duties of his or her regular
     occupation.

We were contacted on December 6, 2001 and was advised that you returned to work at
Parametric Technology Corp. as a temporary employee on December 4, 2001. As such, under
the above definition of disability, we can not consider you totally disabled under this policy.

At this time, Short Term Disability benefits are denied. We are not able to consider you
disabled under the terms and meanings of this policy. Your claim has been closed at this
time.

We realize there may be factors of which we are unaware, and if you feel this determination
is incorrect, we shall be pleased to review any objective medical evidence either you or your
attending physician may wish to submit and, if the information warrants, alter our decision.
If you will be submitting additional medical information, we respectfully request that you
have the attending physician most familiar with your condition provide you with a medical
narrative which objectively discusses the basis of the physician's opinion.

Life Insurance Company of North America
Connecticut General Life Insurance Company
CIGNA Life Insurance Company of New York
A   011

ALEXEI KOUVCHIN
Page 2

You may request a review of this denial by writing to the Life Insurance Company of North America Representative signing this letter. The written request for a review must be sent within 60 days of receipt of this letter and state the reason why you feel your claim should not have been denied. Include any documentation (e.g. medical data) that you feel supports your claim. Under normal circumstances, you will be notified of the final decision within 60 days of the date your request for review is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 120 days after your request is received.

Nothing contained in this letter should be construed as a waiver of any rights or defenses under the policy. This determination has been made in good faith and without prejudice under the terms and conditions of the contract, whether or not specifically mentioned herein. Should you have any information which would prove contrary to our findings, please submit it to us. We will be pleased to review any objective information you may wish to submit.

If you have any questions or concerns regarding the outcome or handling of your claim, please contact our office to discuss.

Sincerely,


Angela Wallace
Case Manager
1-800-352-0611 ext 8734

A 012

**EXHIBIT Q**

| | |
|---|---|
| **From:** | Wallace, Angela L    212 [Angela.Wallace@cigna.com] |
| **Sent:** | Thursday, December 06, 2001 5:39 PM |
| **To:** | 'lperry@ptc.com' |
| **Subject:** | RE: Alexel Kouvchinov short term disability |

He was paid through 11-30-01.

> -----Original Message-----
> From:    Lisa Perry [SMTP:lperry@ptc.com]
> Sent:    Thursday, December 06, 2001 4:00 PM
> To: Wallace, Angela L    212
> Subject:  RE: Alexei Kouvchinov short term disability
>
> What was the date in which Alexei was paid through?  Thanks!
>
> -----Original Message-----
> From: Wallace, Angela L 212 [mailto:Angela.Wallace@cigna.com]
> Sent: Thursday, December 06, 2001 4:40 PM
> To: 'lperry@ptc.com'
> Subject: RE: Alexei Kouvchinov short term disability
>
> Based on this information his claim is denied further benefits and will be
> closed.
>
> Thanks.
>
> > -----Original Message-----
> > From: Lisa Perry [SMTP:lperry@ptc.com]
> > Sent: Thursday, December 06, 2001 1:24 PM
> > To:    Wallace, Angela L    212
> > Subject:    RE: Alexei Kouvchinov short term disability
> >
> > Angela,
> >
> > I have been advised that Alexei is working on database repair for
> Pro/dbm
> > which is very similar to what he did previously.  Thanks!
> >
> > -Lisa
> >
> > -----Original Message-----
> > From: Wallace, Angela L 212 [mailto:Angela.Wallace@cigna.com]
> > Sent: Thursday, December 06, 2001 11:08 AM
> > To: 'lperry@ptc.com'
> > Subject: RE: Alexei Kouvchinov short term disability
> >
> > Is he performing his previous job duties?
> >
> > > -----Original Message-----
> > > From: Lisa Perry [SMTP:lperry@ptc.com]
> > > Sent: Thursday, December 06, 2001 8:24 AM
> > > To:    Wallace, Angela L 212; Anderson, Scott K 212
> > > Subject:    Alexei Kouvchinov short term disability
> > > Importance:  High
> > >
> > > Good morning,
> > >
> > > I wanted to let you know that Alexei is working at PTC as a contractor
> > > through a temp agency.  The effective date of returning to work was
> > > 12/04/01.  Please let me know what will happen at this point.  Thanks
> > and
> > > have a nice day!

1

RESP00010

**EXHIBIT R**

**Lisa Perry**

| | |
|---|---|
| **From:** | Lisa Peraner Wales [lwales@ptc.com] |
| **Sent:** | Thursday, December 06, 2001 12:00 PM |
| **To:** | Richard Bellingham; Edward Raine; Nicole B Pitchon |
| **Cc:** | Christopher J Cimitile; Don U Aviv; Aaron C. von Staats; Lisa Perry; Evelyn Flaherty; Lisa Peraner Wales |
| **Subject:** | Alexei Kouvchinov |



lwales.vcf

A
Ex. 34
11-18-05    LEA

Hi All,

as a follow up to my voicemail:

Alexei Kouvchinov was part of the August RIF. He was on vacation the week of the notifications. I handled his separation meeting on 09/10/01 when he returned. His separation date from PTC is 09/24/01.

On 09/14/01 he submitted a STD claim. I met with the Evelyn Flaherty and Lisa Perry from benefits and Aaron von Staats from legal to discuss. His put claim was submitted to Cigna for their determination since he was eligible for the STD benefit through 09/24/01. Alexie's lawyer contacted us and spoke with Aaron.

Alexei sent John Busa, SVP in SSG, an email on 09/25/01 indicating he was available to do PDM Database repair. John let him know he was not interested in his services.

Alexei signed his separation agreement and was paid his full severance on 11/09/01.

Alexei's STD claim was approved. Lisa Perry from benefits will follow up with a summary of his STD claim history.

On Tuesday of this week, 12/04/01, I ran into Alexei in the kitchenette near my office on the 2nd floor of building C. I asked him who he was working for, what kind of assignment, and for how long. He indicated that he was working on a contract assignment for Lee Lesburg. Lee Lesburg is a GSO Program Manager. Alexei was unsure of the length of his assignment.

I contacted Lee Lesburg directly. He indicated that Alexei and Sergey Denisenko, another RIFed employee, were working for him 40 hours a week, for a 3-6 month assignment, doing database repair for Pro/PDM. They were contractors through CDI.

CDI is a agency that GSO uses for consultants, not developers. For Alexei and Sergey 2 PO's were approved for 2 month assignments.

Don Aviv and I spoke today. Alexei is taking Windchill classes in our collaboration center. He has signed in as a Windchill student/visitor, but he has not registered as a contractor and followed normal procedures: received a badge, registered his vehicle, etc.

Lisa Perry confirmed today that Cigna extended Alexiei's claim through 12/16/01. Alexei started contracting here at PTC on December 4th to attend a 4 day Windchill training class. Cigna also indicated that they would be turning his case over to LTD because the 12 week STD period was complete on 12/16/01.

1

This situation is gaining high visibility in many areas. I am available
to answer any questions.

Thanks,

Lisa

--
Lisa Wales
Human Resources Representative
Ph. (781) 370-5863
Fax (781) 370-6010

2

RESP00007

**EXHIBIT S**

# In The Matter Of:

*Alexei Kouvchinov    v.*
*CDI Information Technology Services, et al.*

---

*Alexei Kouvchinov*
*Vol. 1, April 15, 2004*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File KOUVCHIN.V1, 121 Pages*
*Min-U-Script® File ID: 2061599142*

**Word Index included with this Min-U-Script®**

Case 1:04-cv-11879-MBB Document 63-20    Filed 07/06/2006    Page 3 of 8

**Page 38**

[1] month I was in Russia and Kyrgyz, and I came back to
[2] the United States September 8 or September 9, but I
[3] don't remember what day did I fly back to the United
[4] States, but it was two or three days before I have
[5] to ready.
[6] **Q:** Okay. And then you came back to work on
[7] September 10th; is that right?
[8] **A:** Yeah. It was first time after vacation
[9] when I came to PTC.
[10] **Q:** All right. And will you describe for me
[11] what happened that day?
[12] **A:** First of all, several officers arrived, and
[13] really — and I met several people and they told me
[14] that PDM — people from PDM were laid off, and
[15] afterward I spoke with my new manager — who he told
[16] me that he was my manager. I was told that he is my
[17] manager, and he just informed me that I laid off.
[18] I'm laid off.
[19] **Q:** Do you recall who the Human Resources
[20] manager was?
[21] **A:** Wait a moment. It was not — this man was
[22] not from Human Resources, to my knowledge, because I
[23] know him as a software engineer. But during my
[24] conversation with this manager, who was very short

**Page 39**

[1] period of time, and he never was before my manager,
[2] and I can say he was my manager just for one day.
[3] **Q:** Okay.
[4] **A:** During our conversation, Lisa Wales was
[5] present —
[6] **MR. TULLY:** That's Lisa Wales, W-a-l-e-s.
[7] Thank you.
[8] **A:** — during my conversation.
[9] **Q:** Okay. And did you and Ms. Wales discuss
[10] anything during that meeting?
[11] **A:** We discussed several things, of course.
[12] First of all, she gave me several papers regarding
[13] laid off.
[14] **Q:** Okay. Anything else you recall discussing
[15] with her?
[16] **A:** I was told that I have two hours to pick up
[17] my stuff.
[18] **Q:** Okay.
[19] **A:** And also I was told, I remember this, even
[20] if I would be laid off on September 24th, I
[21] shouldn't go to PTC again.
[22] **Q:** Okay. So you were told that September 10th
[23] was the last day that you were supposed to be
[24] present at PTC?

**Page 40**

[1] **A:** Yes, it's correct.
[2] **Q:** But your formal last day was actually going
[3] to be September 24th?
[4] **A:** Yes, it's correct.
[5] **Q:** Okay. And did you report to PTC on
[6] September 10th? Did you show up there prepared to
[7] work?
[8] **A:** Yes.
[9] **Q:** All right. Did you have any other
[10] conversations with Ms. Wales between September 10th
[11] and September 24th?
[12] **A:** Yes.
[13] **Q:** Do you recall those conversations?
[14] **A:** Just in general just regarding my laid off.
[15] That's it. In general, because I had a lot of
[16] questions which I wanted to have answered, so I
[17] called her several times.
[18] **Q:** With questions about the packet of
[19] documents that she had given you?
[20] **A:** Yeah, it's correct.
[21] **Q:** Okay. Did you talk to anybody else at PTC
[22] about the layoff?
[23] **A:** Yes.
[24] **Q:** Do you recall who?

**Page 41**

[1] **A:** It was several people who I met on
[2] September 10th at PTC. All of them already knew
[3] that PDM, all the people from PDM laid off.
[4] **Q:** Okay. So it was the whole PDM group that
[5] had been laid off?
[6] **A:** To my knowledge, yes, except one person.
[7] **Q:** And who was that?
[8] **A:** She was my co-worker, and to my knowledge,
[9] I'm not sure, she started to work with another group
[10] in PTC, but I'm not sure.
[11] **Q:** Okay. During the time period 1994 to
[12] September 10, 2001, did you work for only the PDM
[13] group?
[14] **A:** Yes. At least officially, yes.
[15] **Q:** Okay.
[16] **A:** I did some projects which are not directly
[17] to PDM, but it was only a few of them. Most time I
[18] worked with PDM.
[19] **MR. TULLY:** It's 20 to 1:00. This could
[20] take a while given the pace here.
[21] **MR. BUDREAU:** It's up to you.
[22] **MR. TULLY:** You want a little short break
[23] for lunch?
[24] (Discussion off the record)

Page 42

[1] **Q:** Mr. Kouvchinov, I believe you said earlier
[2] that you filed a claim for short-term disability
[3] benefits on September 17th; is that right?
[4] **A:** Yes, but I didn't understand the last
[5] conversation. When supposed to be break?
[6] (Discussion off the record)
[7] **MR. TULLY:** Let's take five minutes.
[8] (Recess taken)
[9] **BY MR. TULLY:**
[10] **A:** Could I make comment, very short.
[11] **Q:** Okay.
[12] **A:** Concord was the second town.
[13] **Q:** Say that again?
[14] **THE INTERPRETER:** The court in Concord.
[15] **MR. TULLY:** Okay. Thank you.
[16] **Q:** I appreciate that. Okay. Mr. Kouvchinov,
[17] would you describe for me please the process that
[18] you followed to file your claim for short-term
[19] disability benefits?
[20] **A:** I want to clarify the question. What is
[21] the question because I really do not understand.
[22] **Q:** Okay. What did you do to start the process
[23] of getting short-term disability benefits?
[24] **A:** I came to the doctor.

Page 43

[1] **Q:** Okay. You saw a doctor. All right. And
[2] when did you first see a doctor in connection with
[3] your conditions that you were seeking short-term
[4] disability benefits for?
[5] **A:** It was September — I don't remember
[6] exactly, but it was between September 10th and
[7] September 17th. Maybe on the 17th — I can't — but
[8] you have medical records. You can find out what
[9] exact date.
[10] **Q:** Yes. And what condition were you seeking
[11] medical help for at that point?
[12] **A:** Depression.
[13] **Q:** Okay. And what were your symptoms at that
[14] point in time?
[15] **A:** First of all, problem with sleeping, low
[16] energy.
[17] **Q:** I'm sorry. Say that again?
[18] **A:** Low energy.
[19] **Q:** Low energy. Okay?
[20] **A:** Could not concentrate. I just laying in
[21] bed. A lot of time even I did not really sleep, I
[22] did not just get up. I just — and the main problem
[23] was with sleeping and low energy.
[24] **Q:** At that point in September, between

Page 44

[1] September 10th and September 17th, did you feel that
[2] you were able to work in any capacity?
[3] **A:** Not really.
[4] **Q:** Did that change at some point?
[5] **A:** I don't understand the question. Could you
[6] clarify.
[7] **Q:** Sure. Let me ask a different question. At
[8] some point after September 17th, did you believe
[9] that you were able to work again?
[10] **A:** You know, I was hesitating about could I
[11] work or not, but it depends what kind of work can I
[12] do. For example, I was definitely not able to learn
[13] anything.
[14] **Q:** I'm sorry. You weren't able —
[15] **A:** To learn anything new.
[16] **Q:** Okay.
[17] **A:** I can — probably I could do the work which
[18] I'm very familiar with, like what was easy for me,
[19] what I was familiar with, what was easy for me, but
[20] I'm not sure about my capability — ability to work
[21] in that period of time.
[22] **Q:** Okay. Have you at any time since September
[23] 17th regained the ability to work, in your opinion?
[24] **A:** You know, I feel very good on November 29

Page 45

[1] after I sign it, the offer, but — you know, I
[2] hesitated to or not to take, but finally I decided
[3] to take, and after I sign it my mood was very good.
[4] **Q:** After —
[5] **A:** November 29th.
[6] **Q:** So on November 29th, you felt you were able
[7] to work again?
[8] **A:** Yeah, but I want to say that I'm not sure
[9] that I can start new job, but I can — I thought I
[10] was capable, I was able to take a job which I used
[11] to do for several years before. For me it's like
[12] washing dishes. Do you understand what I'm —
[13] **Q:** Yes, but are you saying the only place you
[14] could have worked was PTC?
[15] **A:** Not only PTC but with familiar — with a
[16] job which I was very familiar with. I'm not sure
[17] that I can start with new area to work. I'm not
[18] sure about that.
[19] **Q:** Well, do you mean by that that you could
[20] not have worked anywhere where you had to work with
[21] software that was different than the software at
[22] PTC?
[23] **A:** Probably. You know, I was really
[24] hesitating to take or not to take job.

Page 46

[1] **Q:** Which job are you talking about?

[2] **A:** Job at CDI.

[3] **Q:** Okay. And at what point in time did you

[4] tell your doctor that you felt that you were able to

[5] work again?

[6] **A:** My appointment, to my knowledge, with

[7] doctor was on December 18th, and I did not tell my

[8] doctor that I am able to work.

[9] **Q:** How come?

[10] **A:** Because — look, I was depressed, and I did

[11] not know I'm going to start work or not, and the

[12] next appointment was on December 18th. So after I

[13] was fired by CDI, it was like knock down or knock

[14] out, you know. It's unbelievable. It was

[15] unbelievable for me. So the period that I felt that

[16] I can work and at least I wanted to try it was

[17] between these two visits of my doctor.

[18] **Q:** Now, did something happen between September

[19] 17th and November 29th of 2001 that changed your

[20] situation, your personal situation?

[21] **A:** If I understood correctly, you're asking

[22] something happened in my personal life between

[23] September 10th and November 29th?

[24] **Q:** Yes. That made it easier for you now to

Page 47

[1] return to work?

[2] **A:** You know, I was told that I need to

[3] establish old routines which I had before, and I

[4] took medication, and I believe it was Prozac, and

[5] afterward I switched to Wellbutrin. And anyway I

[6] establish going to the gym even if I don't want to,

[7] play chess. I was told to meet a friend, and I need

[8] to come back in the situation which I was before,

[9] and I need to recover. You know, depression is

[10] pretty hard situation. You just can't do nothing

[11] really, and you feel hopeless.

[12] **Q:** Okay. So do I understand you correctly

[13] that between September 17th and November 29th you

[14] agreed or you're telling me now that during that

[15] period of time you were not able to work at all

[16] because of the depression?

[17] **A:** One more time, I can — I felt, and I think

[18] I was able to do the job about database repairing,

[19] and even I hesitated to take or not to take offer

[20] from CDI. That job was very familiar to me, and it

[21] was easiest job which I could do. Let me explain,

[22] because I was involved in PDM repair for long

[23] period of time. For me I wrote part of a code. I

[24] knew — I know all problems. I worked — nobody

Page 48

[1] worked longer with PDM corruption. I was at the

[2] very beginning to the end, and this job I did at

[3] least for five years or more. It was very familiar

[4] job. For me, just was routine. I know everything

[5] about this problem. It's like washing dishes, and

[6] even I'm not — I wasn't completely sure. I wanted

[7] to try it anyway.

[8] **Q:** Okay. And did you ever notify your

[9] short-term disability provider, CIGNA, of your

[10] belief during that time period that you could work

[11] on familiar tasks?

[12] **A:** After I sign it for offer, I called CIGNA.

[13] I came to restaurant, I sign and called CIGNA and

[14] told them that I want to stop my disability. I

[15] spoke with some representative of CIGNA.

[16] **Q:** Who was it that you spoke with?

[17] **A:** It was just on duty. I couldn't reach my

[18] manager — my caseworker.

[19] **Q:** And who was your caseworker?

[20] **A:** You know, it Wallace. It's not — it

[21] sounds, but spelling is different. It's not Wales

[22] from PTC, but it's nearly the same last name. I

[23] don't remember, but the first name was different.

[24] **Q:** Okay. So you say you spoke to somebody on

Page 49

[1] duty, and what is it you told them?

[2] **A:** I told them that I'm going to start work

[3] and I want to stop my disability benefit.

[4] **Q:** And when did you make that call?

[5] **A:** 29th, after I signed it, the offer.

[6] **Q:** Where did you make the call from?

[7] **A:** From restaurant Odessa.

[8] **Q:** Okay. Now, you had already been paid, is

[9] that right, by CIGNA for the period ending November

[10] 30?

[11] **A:** Yes, it's correct.

[12] **Q:** And did you send CIGNA a check back for the

[13] day — for November 30th?

[14] **A:** No.

[15] **Q:** How come?

[16] **A:** I just — the check was already deposited.

[17] **Q:** I understand that, but did you try to send

[18] any money back to them for the day that you

[19] shouldn't have been collecting benefits?

[20] **A:** My job should start on December 30.

[21] **Q:** I understand that, but you said — you just

[22] told me under oath that in your mind you could work

[23] as of November 29th; is that right?

[24] **A:** I wanted to try, yes.

Page 50

[1] **Q:** Why didn't you try to send money back to
[2] CIGNA for November 30th that you got paid for?
[3] **A:** While I spoke with representative told me
[4] that — remain his idea that if I receive any checks
[5] after, I shouldn't take them, but I didn't receive
[6] any checks after.
[7] **Q:** Okay. It was a man that you spoke to?
[8] **A:** Yeah. I don't — I'm not 100 percent, but
[9] it look like, but I'm not sure.
[10] **Q:** You don't remember the conversation, as you
[11] sit here today?
[12] **A:** I remember conversation. At least I
[13] remember the main idea of representative. His idea
[14] was that I should not — should not — that I
[15] shouldn't be overlap between when I started work and
[16] disability. So for CIGNA representative, the main
[17] concern was that I shouldn't deposit — I shouldn't
[18] cash the check if I receive any.
[19] **Q:** Did you understand their concern?
[20] **A:** And the second —
[21] **Q:** I'm sorry. Go ahead.
[22] **A:** And the second, I was suggested to go to a
[23] doctor.
[24] **Q:** The CIGNA representative told you to go to

Page 51

[1] your doctor?
[2] **A:** Yeah.
[3] **Q:** Did you do so?
[4] **A:** Yeah. I came to the doctor on December
[5] 18th. It was nearly impossible to change
[6] appointment.
[7] **Q:** Okay. And when you saw your doctor on
[8] December 18th, did he change his diagnosis of you?
[9] **A:** Look, at that period of time, I was very
[10] depressed on December 9th, and I asked CDI to start
[11] work with December 18th.
[12] **Q:** Why that day?
[13] **A:** Because on 17th I supposed to see a doctor.
[14] **Q:** I thought you said you were supposed to see
[15] the doctor on the 18th?
[16] **A:** No, 17th. I believe it's 17th. I just
[17] made a mistake.
[18] **Q:** Okay. And is that where you told CDI why
[19] you wanted to start on December 17th?
[20] **A:** No. CDI — under any circumstances I don't
[21] want CDI to know about my disability.
[22] **Q:** So you lied to them; is that right?
[23] **A:** Yeah, I lied to CDI. I pretend that I have
[24] now a job and ask two weeks, two weeks. They wanted

Page 52

[1] me to start on December 3rd. I wanted to start on
[2] December 18th.
[3] **Q:** Isn't it true, Mr. Kouvchinov, that your
[4] short-term disability benefits were going to expire
[5] on December 18th?
[6] **A:** I didn't — I didn't know that.
[7] **Q:** You didn't know that?
[8] **A:** Look, what I knew it was, according to the
[9] letter from CIGNA, short-term disability is 12
[10] weeks. After seven days of waiting period, if I
[11] remember correctly, I didn't count, and I didn't
[12] know the exact date when my short-term disability
[13] should be ended.
[14] **Q:** So you don't remember getting a letter from
[15] CIGNA telling you when your short-term disability
[16] would end?
[17] **A:** To my knowledge, I received a letter which
[18] says that my disability status September 17th, to my
[19] knowledge, and it would be 12 weeks with seven days
[20] waiting period. I believe you have letter, this
[21] letter, and I do not remember, and I'm not sure that
[22] the end of disability was printed in this letter,
[23] but we can check.
[24] **Q:** (Not through the interpreter) All right.

Page 53

[1] Did you understand after September 17th when you
[2] filed your claim for short-term disability benefits,
[3] did you understand that you were not supposed to be
[4] working at the same time that you were collecting
[5] short-term disability benefits?
[6] **A:** Yes.
[7] **Q:** (Not through the interpreter) You
[8] understood that CIGNA would not let you do that,
[9] right?
[10] **A:** I was pretty sure that I could not get
[11] disability benefits if I work.
[12] **Q:** All right. And at the time that you filed
[13] your claim in September for short-term disability
[14] benefits, who did you file it with at PTC?
[15] **A:** I took a form — if I remember correctly,
[16] there are three parts with this form. One of them
[17] was filled by me. I wrote it. Another part was
[18] wrote by doctor, and the third part was wrote by PTC
[19] person. To my knowledge, if I remember correctly,
[20] it was Perry, last name was Perry, but I'm not sure.
[21] **Q:** I'm sorry. What was the last name?
[22] **A:** Perry.
[23] **Q:** Perry, okay.
[24] **A:** But you have this paper, and you can't see

**Page 74**

[1] enough to go to work at CDI? I'm sorry. A month
[2] later you were able to go to CDI?
[3]     **A:** Look, I told you before I was not sure was
[4] I able to work or not, but I definitely wanted to
[5] try, and I really hesitated to work, and, really,
[6] I'm not sure that I did make decision — I did right
[7] decision.
[8]     **Q:** Okay. At any point in time during October
[9] of 2001, did you attempt to tell CIGNA that you
[10] wanted to try to return to work?
[11]     **A:** No.
[12]     **Q:** Okay. At any —
[13]     **A:** To my knowledge — wait a moment. Because
[14] I had several telephone conversation with person
[15] from CIGNA, and, to my knowledge, it was Angela
[16] Wallace, and maybe we spoke about when I'm going to
[17] work. I don't remember really, it was in 2001, and
[18] Angela Wallace several times called me, okay. I
[19] can't — I want it absolutely clear. Okay. Could
[20] we repeat last question.
[21]     **Q:** Yes. My question was, at any point in the
[22] month of October 2001 did you tell CIGNA that you
[23] were ready to try going back to work?
[24]     **A:** I really — I really don't remember, but I

**Page 75**

[1] do remember that I have several conversation with
[2] Angela Wallace during my disability, and probably we
[3] spoke in October.
[4]     **Q:** At any point in time before November 29,
[5] 2001, did you tell anybody at Parametric that you
[6] felt you were able to return to work?
[7]     **A:** Could I ask to whom I spoke with PTC?
[8]     **Q:** I'm asking, was there anybody that you
[9] recall?
[10]     **A:** First of all, I would like to point out I
[11] did not tell people that I'm on disability.
[12]     **Q:** You didn't tell who?
[13]     **A:** Okay. I tried — I tried not to tell —
[14] okay. I told about my disability only persons which
[15] I have to tell it. I don't want anybody to knew
[16] that I was on disability, okay. And so far, I
[17] believe I did not tell anybody except several people
[18] that I was on disability.
[19]     **Q:** Okay. Who do you recall telling at
[20] Parametric that you were on disability?
[21]     **A:** To my knowledge, I told that I'm on
[22] disability only Chris Ciapilla, Lily Polenov, but
[23] Chris Ciapilla already left PTC, and, to my
[24] knowledge, maybe I told somebody else, but I do not

**Page 76**

[1] remember that. I tried to keep it secret.
[2]     **Q:** Okay. And, as far as you know, are the
[3] only people at PTC who knew about your STD claim in
[4] addition to Chris Ciapilla and Lily Polenov were
[5] Lisa Wales and Lisa Perry; is that right?
[6]     **A:** It depends what time, because I believe
[7] after December 10th somebody else would know.
[8]     **Q:** No. I'm talking specifically between
[9] September 17th and November 29th.
[10]     **A:** It looks like it's true, because, to my
[11] knowledge, I didn't tell anybody else.
[12]     **Q:** Okay.
[13]     **A:** And...
[14]     **Q:** Okay. When were you first contacted by CDI
[15] about the possibility of working for CDI?
[16]     **A:** I heard about that from a friend of mine,
[17] Fedor Finkle. He's also former employee of PTC.
[18]     **Q:** I'm sorry. What was the name?
[19]     **A:** Fedor Finkle.
[20]     **Q:** Okay. Phillip?
[21]     **A:** Fedor.
[22]     **THE INTERPRETER:** F-e-d-o-r.
[23]     **A:** Fedor.
[24]     **Q:** Okay. So Mr. Finkle told you about CDI?

**Page 77**

[1]     **A:** Yes, and I believe it was in October, last
[2] October or November, but maybe I'm not sure, but I
[3] am for sure that he told me that one firm is going
[4] to hire several persons for database corruption and
[5] conversion from PDM to Intralink.
[6]     **Q:** Okay. And did you contact CDI, or did they
[7] call you?
[8]     **A:** I believe probably more likely that Finkle
[9] provide me e-mail, and I sent my resume. Look, I do
[10] not remember for sure, but more likely it goes to
[11] usual way. He gave me e-mail, and I sent it to CDI.
[12]     **Q:** All right. And at some point did you speak
[13] to somebody at CDI about working?
[14]     **A:** Yes. They contact me and tell me I am
[15] willing to work for CDI or not.
[16]     **Q:** All right. And it's true, isn't it, that
[17] at that point in time you did not tell CDI that you
[18] were collecting short-term disability benefits?
[19]     **A:** No. No. No. I never disclose that I was
[20] on disability.
[21]     **Q:** All right. And at that point in time when
[22] you had your first conversation with CDI about the
[23] possibility of working at Parametric again, did you
[24] tell anybody at CIGNA that you had interviewed with

Page 86

[1] was paid $48 or $47 per hour, and it was classes
[2] which, to my opinion, was not necessary, because I
[3] knew how to repair database corruption much better
[4] than teacher knew, and another part of the training
[5] was conversion, which I never ever would do, because
[6] after database is repaired, conversion comes
[7] successful. So these classes, which I suppose — I
[8] took only four days. For me it was just nothing. I
[9] cannot get any knowledge from the teacher who make
[10] these lessons.
[11]     **Q:** Okay. You accepted a job at CDI,
[12] obviously, right?
[13]     **A:** Yes.
[14]     **Q:** Which group at PTC was it that you were
[15] going to be supporting as an employee of CDI?
[16]     **A:** I believe you're familiar with PTC, yes?
[17]     **Q:** Reasonably, yes.
[18]     **A:** Yes. So for one period of time I worked
[19] with customer support. They have a — customer
[20] reports problem. We try to resolve them. If we
[21] cannot, we go to developers, and afterward I've got
[22] something to do, and — but after laid off,
[23] situation was changed.
[24]     To my knowledge, the responsibility for

Page 87

[1] database corruption was on PTC Global Services,
[2] which I believe is part of PTC, and I was introduced
[3] to several persons which they told me that they
[4] would control my job at PTC. These persons I saw
[5] them previously, but I never knew them by name. It
[6] was — I can say it was new people for me.
[7]     **Q:** Okay. So before your layoff, you worked
[8] for the PDM, correct?
[9]     **A:** Yes, absolutely.
[10]     **Q:** And then for CDI you were working in the
[11] GSO at Parametric, right, Global Services?
[12]     **A:** "GSO," you mean Global Services?
[13]     **Q:** Global Services, yes.
[14]     **A:** Yes. I was told that these people would be
[15] responsible for database corruption.
[16]     **Q:** Okay. And while you may have recognized
[17] some of the people from the Global Services
[18] Organization, you had never previously worked
[19] directly for them; is that right?
[20]     **A:** Okay. I saw some of them, but I did not
[21] work with them before December 3, 2001, never ever.
[22]     **Q:** Okay. Was the nature of the work that you
[23] were going to be doing for CDI the same as what you
[24] had done previously at PTC?

Page 88

[1]     **A:** Exactly. It was exactly the same job.
[2]     **Q:** Okay. The only difference was you were
[3] supporting a different organization within PTC; is
[4] that right?
[5]     **A:** Okay. Really I don't care which
[6] organization was responsible for PDM corruption.
[7] For me it was PTC. I don't know if Global Service
[8] is independent or part of PTC. I believe, and I
[9] believe you know better than me, that GSO is part of
[10] PTC. I don't know anything else about GSO.
[11]     **Q:** Okay. All right. So you said you started
[12] then at CDI on December 4th, right?
[13]     **A:** Yes.
[14]     **Q:** Am I correct that on December 4th you
[15] reported to work at PTC, right?
[16]     **A:** What does it mean I "reported"?
[17]     **Q:** That's where you drove to to go to work?
[18]     **A:** Yes. I drove my car, and I parked and
[19] came — the difference is just it was another
[20] building and another place.
[21]     **Q:** Okay. Do you recall, Mr. Kouvchinov, being
[22] asked to register your car that you parked at PTC?
[23]     **A:** I don't remember.
[24]     **Q:** Do you recall that they — that you were

Page 89

[1] asked to sign in when you reported at PTC?
[2]     **A:** Yes. Let me explain. At least on the
[3] December 4th, I was told I should be about 30
[4] minutes before lessons start, and we came — we met
[5] in the lobby, and somebody came from GSO and pick up
[6] all of us. We were — to my knowledge, we were
[7] three or four people, and we came to start lesson,
[8] and I believe — I believe a badge, a temporary
[9] badge, maybe were given or not given. Honestly, I
[10] don't remember.
[11]     But afterward we have breaks, and I went to
[12] smoke cigarette and came back to my place without
[13] any problem, and that's how it started. To my
[14] knowledge, I do not remember that I fill out any
[15] paper for a parking permit for PTC or something
[16] else. I do remember that there was conversation
[17] about temporary badge, because, you know, in PTC
[18] these badge allows you to open any door.
[19]     **Q:** Yes.
[20]     **A:** That's it. That's it what I can remember,
[21] but I pretty sure it was —
[22]     **Q:** Do you recall that the procedures at PTC
[23] had changed in light of the World Trade Center
[24] bombings on September 11th of that year?

Page 114

[1] **A:** I did not answer this letter.

[2] **Q:** Okay. But you wanted to, but you just
[3] didn't have the strength; is that right?

[4] **A:** Maybe. Maybe I wanted, maybe not. Look, I
[5] just did not want to do anything, no. I just — you
[6] know, I just — what difference does it make what
[7] you want if you cannot.

[8] **Q:** Well, I'm still trying to figure out if
[9] this is a decision you wanted to appeal.

[10] **A:** This thought cross my mind.

[11] **Q:** Why? Why did you want to appeal that
[12] decision?

[13] **A:** Because I feel terrible. I feel like I
[14] felt in September.

[15] **Q:** But why would you appeal that decision,
[16] Mr. Kouvchinov, if what you said was true, that you
[17] called CIGNA on November 29th and said, "Cut me
[18] off"?

[19] **A:** Yeah.

[20] **Q:** Why would you appeal that?

[21] **A:** That's why I did not do it.

[22] **Q:** Well, that's not what you said earlier.
[23] You said under oath that the reason you didn't do it
[24] was because you didn't feel like you had the

Page 115

[1] strength?

[2] **A:** It was — this thought cross my mind,
[3] but —

[4] **Q:** Do you understand the oath you took today
[5] to tell the truth?

[6] **A:** Wait a moment. I'm telling the truth. I
[7] did not want to do anything. You know, I just
[8] cannot do. And one of the reasons why I did not do
[9] it is because I called them and told them to stop
[10] paying, and it was unlogic to ask.

[11] **Q:** That's what I said to you. Now I see that
[12] you're changing your answer.

[13] **MR. BUDREAU:** Objection.

[14] **A:** No, I'm not. I'm not.

[15] **Q:** I'm going to show you what's been marked as
[16] Exhibit No. 8 and ask if you recognize that as a
[17] copy of your charge of discrimination.

[18] **A:** (Witness reviews document) Yeah, I
[19] remember this.

[20] **Q:** Is that your signature on the last page?

[21] **A:** Yes, it's mine.

[22] **Q:** And how about on the third page, this page
[23] here (indicating)?

[24] **A:** Yes, it's my signature.

Page 116

[1] **Q:** And do you see the sentence, "I declare
[2] under penalty of perjury that the foregoing is true
[3] and correct"?

[4] **A:** Yes.

[5] **Q:** At any point in time during your
[6] employment at CDI or any of your conversations
[7] with Ms. Pugliese of CDI, did you ask for or
[8] otherwise use the assistance of an interpreter?

[9] **A:** No.

[10] **Q:** And in any of your conversations with Lisa
[11] Wales, did you use an interpreter?

[12] **A:** No.

[13] **Q:** Okay. Other than your belief that Lisa
[14] Wales provided wrong information to somebody at PTC
[15] or somebody at CDI or both, is there anything else
[16] that you think she did that forms the basis of your
[17] claim against her?

[18] **A:** Really, I don't know what else she did.

[19] **Q:** Okay. And other than the person who might
[20] have had a conversation with somebody at CDI about
[21] your status, is there anything else that you believe
[22] an employee of PTC did that forms the basis of your
[23] claim against PTC?

[24] **A:** To my opinion —

Page 117

[1] **THE INTERPRETER:** Could you just please
[2] repeat again the last one.

[3] **Q:** Okay.

[4] **THE INTERPRETER:** And could we break it
[5] down.

[6] **Q:** I'll try to ask the whole question over
[7] again.

[8] **A:** Could you simplify.

[9] **Q:** Yes. Your claim against Parametric, can
[10] you tell me exactly the basis of your claim against
[11] Parametric?

[12] **MR. BUDREAU:** I'm going to object to all
[13] this regarding legal opinions. I mean, if you're
[14] asking for a factual basis.

[15] **MR. TULLY:** That's what I'm asking for.

[16] **MR. BUDREAU:** Answer.

[17] **Q:** What facts are you basing your claim
[18] against Parametric on?

[19] **A:** First of all, I was fired from CDI because
[20] Parametric Technology provide the wrong information
[21] about my status of disability. One more time, Nancy
[22] Pugliese told me that CDI was informed that I'm on
[23] long-term disability with PTC. I asked her who
[24] particularly, who personally told this. She did not

SUGGESTED CORRECTIONS

RE:  Alexei Kouvchinov v CDI Information, et al.
WITNESS:  Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the
testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 6 | 11 | 149 Bright Street, Waltham | mistranslation/ misunderstanding ("mistr") |
| 6 | 21 | Maya Rakhman | mistr |
| ~~8~~ 7 | 6 | Do you own the house at 149 Bright Street? | mistr |
| 7 | 18 | 149 Bright Street? | mistr |
| 7 | 22 | Bright Street? | mistr |
| 11 | 5 | Okay. And did you live with Ms. Rakhman | mistr |
| 13 | 2 | OXYCODONE | Typing error ("typo") |

A.K.

DORIS O. WONG ASSOCIATES, INC. * 50 FRANKLIN STREET * BOSTON, MA  02110 *

AK 29

SUGGESTED CORRECTIONS

RE:  Alexei Kouvchinov v CDI Information, et al.
WITNESS:  Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the
testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 13 | 17 | sure, because his address was changed recently. | Typo |
| 14 | 10 | OXYCODONE | typo |
| 14 | 14 | 2002 | mistr |
| 14 | 16 | OXYCODONE | typo |
| 15 | 9 | November 2002 | mistr |
| 16 | 7 | Okstein, I'm not sure about spelling the last name | typo |
| 16 | 8 | but pretty close, Larry Okstein | typo |

A. K

DORIS O. WONG ASSOCIATES, INC. * 50 FRANKLIN STREET * BOSTON, MA  02110 ~

SUGGESTED CORRECTIONS

RE:  Alexei Kouvchinov v CDI Information, et al.
WITNESS:  Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the
testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|---|---|---|---|
| 16 | 14 | the Oxycodone impairs your ability to recall events? | typo |
| 16 | 17 | Wellbatrin or Oxycodone in any way impair your memory | typo |
| 16 | 21 | Oxycodone makes me a bit slow | typo |
| 19 | 3 | I had my companies for about two or three | Grammatic error ("grammar") |
| 19 | 4 | years since 1998 but I didn't have any income from them since 2000 | mistk |

A. K

SUGGESTED CORRECTIONS

RE:  Alexei Kouvchinov v CDI Information, et al.
WITNESS:  Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 46 | 7 | doctor was on December 17th, and I did not tell my | mistr |
| 46 | 12 | next appointment was on December 17th. So after I | mistr |
| 49 | 20 | My job should start on December 03. | typo |
| 52 | 18 | says that my disability starts September 17th, to my | typo |
| 56 | 11 | So we met first time after we were 41 | Typo |

A. K

SUGGESTED CORRECTIONS

RE:  Alexei Kouvchinov v CDI Information, et al.
WITNESS:  Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the
testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 57 | 7 | were 41, and he did not know that I ever exist | typo |
| 60 | 19 | using PDM, and it was maybe very good for the future. | mistr |
| 68 | 16 | because it's unlikely that I faxed, because from the | typo |
| 75 | 22 | disability only Chris Chiapella, Lily Polenov, but | typo |
| 75 | 23 | Chris Chiapella already left PTC, and to my | typo |

A. K.

DORIS O. ... ... ... STREET   BOSTON, MA 02110.

SUGGESTED CORRECTIONS

RE:  Alexei Kouvchinov v CDI Information, et al.
WITNESS:  Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 76 | 4 | addition to Chris Chiapella and Lily Polenov were | typo |
| 76 | 19 | Fedor Finkel | typo |
| 76 | 24 | Okay. So Mr Finkel told you about CDI? | typo |
| 109 | 7 | fired at the same day. | mistr |

A. K.

SUGGESTED CORRECTIONS

RE: Alexei Kouvchinov v CDI Information, et al.
WITNESS: Alexei Kouvchinov, Vol. I

The above-named witness wishes to make the following changes to the testimony as originally given:

| PAGE | LINE | SHOULD READ | REASON |
|------|------|-------------|--------|
| 59 | 10 | It was Chris Chiapella. | typo |
| 59 | 12 | Chiapella, yes. | typo |
| 59 | 16 | Okay. Did you say "Chris Chiapella"? | typo |

A. K.

DORIS O. WONG ASSOCIATES, INC. * 50 FRANKLIN STREET * BOSTON, MA 02110

**EXHIBIT T**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CA NO. 04 12531 MEL


VOLUME II


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
ALEXEI KOUVCHINOV,                          *
          Plaintiff,                        *
                                            *
v.                                          *
                                            *
PARAMETRIC TECHNOLOGY CORPORATION,          *
CDI CORPORATION, LISA WALES and             *
CONNECTICUT GENERAL LIFE INSURANCE          *
CO.,                                        *
          Defendants.                       *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *



          CONTINUED INTERPRETED DEPOSITION OF
ALEXEI KOUVCHINOV, taken pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Susan L. Prokopik,
Registered Merit Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Littler Mendelson, P.C., One
International Place, suite 2700, Boston,
Massachusetts, on Tuesday, November 8, 2005, at
10:09 a.m.

          KACZYNSKI REPORTING
     72 CHANDLER STREET, SUITE 3
     BOSTON, MASSACHUSETTS 02116
          (617) 426-6060

**Page 118**

1  Q. You just responded that you asked Lisa Wales if
2     she had received your short-term disability
3     application. Do you recall what her response was
4     to that question?
5  A. Her answer was yes.
6  Q. Okay. And you just referenced several other
7     questions during your conversations with Lisa
8     Wales on the telephone between September 10th and
9     24, 2001. What were those questions?
10 A. I asked her again on the telephone about benefits
11    and unpaid days. I left several messages with
12    her about benefits. And I didn't get any answer.
13    It was a critical question for me because I
14    received no answer either from Lisa Wales or Lisa
15    Perry despite promises to answer me on the next
16    day.
17       I asked an attorney to call on my
18    behalf. It's all that I can remember. After my
19    attorney called, I received an answer. The same
20    day.
21 Q. When you completed your short-term disability
22    application on or around September 17, 2001, were
23    you able to work?
24 A. No. In my opinion, no.

**Page 119**

1       MR. TULLY: Could you read that
2  question back, please?
3       (Question read.)
4       MR. TULLY: Thank you.
5  Q. On September 25, 2001, were you able to work?
6  A. No.
7  Q. I'm going to mark a document. That will be I
8     think K 3.
9       (9/25/01 E-mail marked Exhibit No. 3.)
10 Q. Will you please review the document marked as K 3
11    that the court reporter has just handed you?
12 A. This letter I sent to Mr. Busa.
13 Q. Who is Mr. Busa?
14 A. At this time, I received information from John
15    Busa. No. John -- John Busa -- by that moment I
16    knew that John Busa would possibly be responsible
17    for repair of PDM and database corruption.
18 Q. So John Busa worked at PTC?
19 A. At this time I've never seen him personally.
20       Check that. I haven't known him
21    personally. It's possible that I've seen him. I
22    just called information that it's possible that
23    he'll be responsible for database corruption.
24 Q. Why did you send a letter to John Busa proposing

**Page 120**

1     your services for handling database corruption
2     when you knew you could not work while receiving
3     short-term disability benefits?
4  A. I wasn't going to take the job. At this time I
5     just sent this letter in order to attempt, you
6     know, I needed to do something to restore myself.
7     This letter was written by my friend, Chris
8     Cherpilla. If you read this letter, you could
9     see that it's not my English. He advised me and
10    I agreed with him completely that the sooner I
11    start looking for a job, go to the sports club,
12    restore all my routines, would be better for me,
13    you know, as far as my depression is concerned.
14       Dr. Freedberg also recommended to
15    restore all my usual routines and the loss of job
16    complicated my depression substantially.
17 Q. Did you review this letter before you sent it to
18    John Busa?
19 A. Yes. Yes. I definitely read it.
20 Q. And you understood that you could not work and
21    receive short-term benefits but you sent this
22    letter anyway?
23 A. Absolutely. I understood that I couldn't work
24    and receive short-term benefits at the same time.

**Page 121**

1  Q. And your employment officially ended at PTC on
2     September 24, 2001?
3  A. I find it difficult to answer this question
4     because on September 10th I was told that the
5     last day of my employment will be September 24th.
6     Because I was on short-term disability, I don't
7     know whether at this moment I -- was I an
8     employee of PTC or I have been already
9     terminated.
10 Q. Okay.
11 A. I would like to add one question. I didn't know
12    my legal status at PTC.
13 Q. Okay. I'm going to put a document before you
14    that's marked K 4.
15       (Explanation of Benefits marked Exhibit
16    No. 4.)
17 Q. Will you look at K 4 and let me know when you
18    have? Can you review it, please?
19 A. Yeah. I'm done.
20 Q. Looking at the first page of K 4, in the second
21    column of the chart on this page, it says
22    "Payment period."
23 A. Yes.
24 Q. And in the first line of the box under "Payment

Page 126

1    preceded this one.
2    A. Yes. Absolutely. But unfortunately I haven't
3       kept all of them.
4    Q. Do you remember, do you recall about how many
5       E-mails there were?
6    A. No.
7    Q. Okay. Do you recall when you sent your resume to
8       Ellen Shea?
9    A. I cannot name the exact date. It was -- it was
10      -- at the end of October or beginning of
11      November.
12   Q. Okay.
13   A. Maybe in the middle.
14   Q. The middle of?
15   A. Maybe in the middle of November.
16   Q. Okay. At the time you made contact with Ellen
17      Shea, could you work?
18         MR. CHURCHILL: Objection.
19   A. I wasn't sure.
20   Q. At the time you made contact with Ellen Shea for
21      the first time, were you receiving short-term
22      disability benefits?
23   A. Yes.
24   Q. Did you tell Ellen Shea that you were receiving

Page 127

1       short-term disability benefits?
2    A. No. I'm not an idiot.
3    Q. Did you ever tell anyone at CDI, did you
4       personally ever tell anyone at CDI that you were
5       receiving short-term disability benefits?
6    A. No.
7    Q. Why did you apply for employment at CDI when you
8       were receiving short-term disability benefits?
9    A. At some point I had to start working. And I
10      didn't contact just CDI. Are you satisfied with
11      the answer?
12   Q. Who else did you contact?
13   A. I don't remember. But one company I remember, it
14      was a company to my knowledge is connected to Uri
15      Varvak, who is still working at PTC. I don't
16      think that he is exactly the owner of the company
17      but I think -- I believe it might be his wife.
18      It's one of the contacts I still remember.
19         There were several others. But I don't
20      remember.
21   Q. And were these contacts all in the October,
22      November, 2001 time period?
23   A. Yes.
24   Q. If you received an offer of employment during the

Page 128

1    October, November, 2001 time period, would you
2    have been prepared to go to work at that time?
3         MR. CHURCHILL: Objection.
4    A. I'm not sure. Today -- I shouldn't -- I
5       shouldn't have accepted the offer if it was.
6            Okay. Okay. Try to tell her the
7    following:
8            At this time I believe it was a mistake
9    to accept -- to accept an offer from CDI. I
10   wasn't certain then. I was seriously uncertain.
11   And now I think it was a mistake.
12   Q. Were you still disabled at the time that you
13      applied for employment at CDI?
14         MR. CHURCHILL: Objection.
15   A. I was taking medications. And there was some
16      improvement. I still had problems with --
17      insomnia.
18   Q. Insomnia?
19   A. Insomnia. So I had problems still. It was still
20      difficult for me to concentrate. It was
21      difficult for me to learn new software. But if
22      -- to take some kind of work and a job which I've
23      been doing for more than seven years, it would be
24      the easiest one.

Page 129

1    Q. Looking at K 5, just to recap, you reviewed the
2       E-mail you sent to Ellen Shea in K 5 before you
3       sent it, correct?
4            Let me rephrase it. You reviewed the
5       E-mail that you sent to Ellen Shea on November
6       26, 2001 before you sent it, correct?
7            THE INTERPRETER: The date?
8            MS. NASH: November 26, 2001.
9    A. Of course. Of course. I wrote a draft and I
10      also read the letter after it was corrected. By
11      a friend. By a friend of mine.
12   Q. Okay. In this E-mail, it appears that, correct
13      me if I'm wrong, it appears that you are
14      negotiating with Ms. Shea. Is that correct?
15   A. Absolutely.
16   Q. Why -- I'm looking at page two. Why did you
17      propose to Ms. Shea that your employment with CDI
18      be a corporation to corporation arrangement?
19   A. I don't understand why not. Why the contract,
20      corporation to corporation, it's just as
21      legitimate as it were for W-2.
22   Q. My question was why did you propose it, not
23      whether or not it was legitimate.
24   A. I considered that it would be more profitable if

Page 134

1    health. And the last one.
2    Q. Okay.
3        MR. TULLY: Amy, I'm sorry.
4        THE INTERPRETER: "And the last one."
5        MR. TULLY: Would you mind reading that
6    question and answer back, please?
7        (Questions and answers read.)
8        MR. TULLY: Thank you.
9    Q. Did you ever tell Nancy Pugliese or anyone else
10   at CDI that you were depressed?
11   A. I just -- I just -- I just told them that -- I
12      just told you that when she called me on Friday
13      evening, you know, it was the only time I talked
14      to her about my health. Before that I didn't
15      talk about my health to her.
16   Q. In your answer, you said that you spoke to Nancy
17      Pugliese and told her that your last day of
18      short-term disability was November 29th.
19      November 30th; is that correct?
20   A. My last -- last paid date. Date.
21   Q. Okay. Other than that, did you tell her anything
22      about you being depressed?
23   A. I didn't tell --
24   Q. Wait a second. Wait a second.

Page 135

1    A. Only once I talked about my health with Miss
2       Pugliese. It was on Friday evening when I came
3       -- came from work. Came home from work. Never
4       before this telephone call I said anything about
5       my health. And I'm practically sure that the
6       question wasn't posed before that day.
7    Q. Okay. Did you say anything else about your
8       health in that conversation other than -- strike
9       that. In that conversation with Nancy Pugliese
10      on December 7, 2001, did you say anything else
11      about your health other than the fact that your
12      last day of disability benefits was November 30,
13      2001?
14       MS. NASH: Whatever he said should be
15   said.
16   A. Wait a minute.
17       I ask you, could you simplify the
18   questions? Because I still don't understand --
19   what you're asking from me.
20   Q. Do you understand that there's a difference
21      between short-term disability benefits as an
22      insurance concept and depression, which is a
23      health concept? Do you understand the
24      distinction between those two things?

Page 136

1        THE INTERPRETER: And --
2        MS. NASH: Depression as a health
3    concept.
4    A. Yes.
5    Q. Did you ever tell Miss Pugliese that you were
6       depressed?
7    A. Possibly I mentioned it in my conversation on
8       Friday night. But before that day, I never
9       talked about my health with Miss Pugliese.
10   Q. But you do not recall specifically whether or not
11      you discussed with Miss Pugliese that you were
12      depressed?
13   A. I cannot be 100 percent sure.
14   Q. Okay.
15       THE WITNESS: Could I --
16       MS. NASH: Sure. Let's take a break.
17   We've been going for a long time.
18       (Recess.)
19   Q. Why was it a mistake when you accepted -- strike
20      that. Why did you testify it was a mistake when
21      you accepted a job at CDI?
22   A. Because that's how I think now. It's from the
23      position of today, you know, of this day.
24   Q. So today you think it was a mistake to have taken

Page 137

1    a position at CDI when you did?
2    A. Today I think that.
3    Q. At the time -- I apologize if this is something
4       we covered in some way earlier. But at the time
5       you accepted the job at CDI in late November,
6       early December, 2001 --
7        THE INTERPRETER: Late November?
8        MS. NASH: Mm-hmm.
9    Q. You believed you could work; is that correct?
10   A. I wanted to try. I apologize. Sometimes it's
11      difficult for me to switch and I start to
12      speaking English.
13       I hesitated. I wanted to try. That's
14      why I wanted to start on December 18th. Because
15      I wanted to talk to a doctor.
16   Q. Okay. This is K 6.
17       (Candidate Profile marked Exhibit No.
18      6.)
19   Q. Will you just review K 6 and let me know when you
20      have?
21       (Mr. Churchill and the deponent
22      confer.)
23   A. I'm done. I'm done.
24   Q. I will represent to you that this is a document

9 (Pages 134 to 137)

Page 138

1    produced by CDI in this litigation and that it is
2    a document that CDI keeps in the regular course
3    of business. On, say, nine lines down in the
4    middle of the line, it says "Resume date,
5    10/17/01."
6         Do you see that?
7    A. Yes.
8    Q. Do you have any reason to believe that this date
9    is incorrect? Strike that. Strike that. Do you
10   have any reason to believe that CDI did not
11   receive your resume on 10/17/01?
12   A. I believe -- yeah. I believe that's correct.
13   Q. Okay. At the time you sent your resume to CDI,
14   could you work?
15   A. I already talked about it. I wasn't certain on
16   anything.
17   Q. So you weren't certain that you could work when
18   you applied?
19   A. I wasn't certain that I could work.
20   Q. You testified --
21   A. I just indicated -- I was asked the spelling of
22   my former coworker. The spelling here is
23   different.
24   Q. For Fyodor Finke?

Page 139

1    A. I just wanted to show --
2    Q. We can do that at a break.
3         When you accepted a job with CDI, I
4    believe you testified that you could do a job
5    that was very familiar to you; is that correct?
6         MR. CHURCHILL: Objection.
7    A. Could you repeat? Could you repeat, rephrase the
8    question?
9    Q. I believe you testified earlier that when you
10   applied for a job at CDI you believed you could
11   do a job that was very similar to a job you had
12   done previously at PTC.
13        MR. CHURCHILL: Objection.
14   A. Okay. I would like to -- I would like to --
15   you're talking about the time when I said it, you
16   know. You know, I would like to know what you're
17   talking about.
18   Q. This morning when we were just talking, I believe
19   you testified that when you applied to work at
20   CDI, you could only do work that was very similar
21   to the work you had done previously for PTC. Is
22   that correct?
23   A. The work at PTC on database corruption was very
24   familiar to me. And if I could work, it would be

Page 140

1    the best -- it was the best decision for me
2    because I knew everything on that subject. And
3    there was nothing new in it.
4    Q. At the time you applied to work at CDI, could you
5    have done work that was significantly different
6    from the work you did at PTC?
7         MR. CHURCHILL: Objection. Objection.
8    A. I don't think so. I wouldn't have taken a new
9    job.
10   Q. Okay. Before we broke, we were discussing a
11   conversation you had with Nancy Pugliese on
12   December 7, 2001; is that correct? Do you
13   remember that?
14   A. (Witness nods.)
15   Q. And you have to make an audible response.
16   A. Yes.
17   Q. What -- first of all, who called whom in that
18   conversation?
19   A. Nancy Pugliese called me. Called me. It was
20   unexpected. Very much unexpected.
21   Q. What did she say to you in that conversation?
22   A. She said to me that I'm -- I was laid off. She
23   said to me that PTC informed them that I am on a
24   long-term disability.

Page 141

1         THE WITNESS: One sec.
2         MS. NASH: That's all right.
3    A. Are you finished with that question? I would
4    like to --
5         THE WITNESS: There is no current
6    question.
7         MS. NASH: That's fine.
8         (Recess.)
9         MS. NASH: Can you read the last
10   question and answer back, please?
11        (Question and answer read.)
12   Q. Did you say anything in response to Ms. Pugliese?
13   A. Yes.
14   Q. What did you say?
15   A. I said that I never was on long-term disability.
16   I asked her who told her that. I received no
17   answer. I also said to her that I was through
18   the interview with Lesburg, who worked at PTC.
19   That I had an interview with -- that PTC okayed
20   on my work. For my work. I also told her that
21   my short-term disability ended.
22   Q. Didn't Ms. Pugliese tell you that if you could
23   work things out with PTC CDI would hire you back?
24   A. Yes.

10 (Pages 138 to 141)

Page 150

1    A. I understand that you don't believe me but I
2       don't understand the question.
3    Q. I believe you that you don't understand the
4       question. All you have to do if you don't
5       understand a question is say so and I will try to
6       ask a question that you do understand.
7    A. Okay.
8    Q. During your first deposition, we talked about two
9       DUIs that you were arrested for. Do you remember
10      that?
11   A. Yes.
12   Q. Okay. With respect to one DUI of the two we
13      discussed, your license was suspended for six
14      months. Is that correct?
15   A. Yes. Because I refused a breathalyzer.
16   Q. Okay.
17   A. Breathalyzer test.
18   Q. Okay. What did you plead with respect to the two
19      DUIs when you were arrested?
20   A. First one not guilty. And the other one admitted
21      to sufficient facts.
22          MS. NASH: Okay. I just have a few
23      more -- you know what? It's one o'clock. Let's
24      just break for lunch and come back in 45 minutes.

Page 151

1       Something like that?
2          MR. CHURCHILL: Up to you. We can do a
3       half hour, 45 minutes. Whatever.
4          MS. NASH: We're off the record now.
5          (Off the record.)
6          (Lunch recess.)
7
8
9
10
11         Afternoon Session
12         MS. NASH: Mark this document as K 8.
13         (CDI Employment Agreement marked
14      Exhibit No. 8.)
15   Q. Will you read K 8 and let me know when you have,
16      please?
17         MR. CHURCHILL: Do you want him to read
18      the whole thing? I just want to make sure. Or
19      are you asking him if he knows what it is?
20         MS. NASH: I mean, I want him to do the
21      best -- what he needs to do to familiarize
22      himself with the document.
23   A. Done.
24   Q. Are you familiar with this document?

Page 152

1    A. Yes. Yes.
2    Q. What is it?
3    A. It's an employment agreement.
4    Q. Looking at the last page of K 8, is that your
5       signature on the last page?
6    A. Yes.
7    Q. And it's dated 11/29/01?
8    A. Yes.
9    Q. And on each page of this document, are those your
10      initials?
11   A. Yes.
12   Q. Okay. Who gave you this document? Or strike
13      that. Yeah. Who gave you this document?
14   A. The person who signed this document.
15   Q. Did you negotiate this document or negotiate
16      about the -- strike that. Did you negotiate
17      about the terms of this document with Ellen Shea
18      in the E-mail we looked at earlier?
19   A. Through E-mail, yes.
20   Q. So yes?
21   A. Yes.
22   Q. Did you review this document carefully at the
23      time you signed it?
24   A. Yes.

Page 153

1    Q. Okay. Looking on the third page of this
2       document, look at paragraph six entitled
3       "Termination." Can you read that for me to
4       yourself?
5    A. I read it.
6    Q. You understood at the time you signed this
7       agreement that as a CDI employee you were working
8       in a temporary position at PTC; is that correct?
9    A. Could you repeat that?
10   Q. You understood at the time you signed this
11      agreement that you were working in a temporary
12      position at PTC?
13   A. I understood that, you know, I'm hired by CDI for
14      work at PTC on hourly pay.
15   Q. Well, this sentence, which you acknowledged at
16      the bottom of the page, says, "You acknowledge
17      that as our employee, you will be working in the
18      temporary staffing business" --
19   A. Yes.
20   Q. -- "and therefore, your employment may be
21      terminated when your assignment with our customer
22      ends or at any earlier time at the discretion of
23      our customer or us."
24   A. Yes, but I talked to Ellen Shea. And she told me

13 (Pages 150 to 153)

Page 154

1     and wrote me a letter that the length of the
2     assignment is approximately a year.
3 Q. Well --
4 A. In the same E-mail, which we've seen today.
5 Q. Okay. Looking at paragraph ten of this document,
6     K 8, you represented that you were not -- strike
7     that. I'm sorry. Looking at paragraph 11, would
8     you read that paragraph to yourself?
9 A. I've done it.
10 Q. Did you understand that this contract governed
11     your employment with CDI?
12 A. That my work is governed by that, this contract,
13     yeah.
14 Q. Okay.
15 A. Yes.
16        Strike that. Okay. Could we -- okay.
17     Could you repeat that?
18 Q. There's no question pending.
19 A. I have a question. Understood -- my question is
20     whether I understood that my work at CDI would be
21     governed by this document.
22 Q. That's the question.
23 A. Yes.
24 Q. After you spoke to Ms. Pugliese on December 7,

Page 155

1     2001, did you speak to her again? Did you have
2     any other conversations with her?
3 A. As far as I recall, no. But I left a message for
4     her.
5 Q. What did you say in the message you left for her?
6 A. I just asked her to call me.
7 Q. Why did you call her and leave her a message?
8 A. I don't remember exact the reason. At this
9     moment, I was in panic. I called many people.
10     And as far as I can recall, I called her and also
11     Ellen Shea. Ellen Shea.
12 Q. What did you want to talk to Ellen Shea and Nancy
13     Pugliese about?
14 A. Now I can only guess. But right now I could just
15     only guess but surely it was about my
16     reinstatement. But again, I repeat, it was very
17     difficult time for me and I was literally in
18     panic.
19 Q. You testified earlier that Ms. Pugliese told you
20     that if you could work things out with PTC CDI
21     would hire you back. Do you remember that?
22 A. Yes.
23 Q. Did you ever attempt to work things out with PTC?
24 A. Of course I did.

Page 156

1 Q. And what were the results of those efforts?
2 A. There weren't any results. I called a few
3     people. The most important calls were to Peter
4     Altieri. Peter Altieri. As far as I know, he
5     was at the very least a manager of human
6     resources. Maybe even a director of human
7     resources. And when I -- as far as I knew then,
8     he was Lisa Wales' boss.
9 Q. Okay. And why did you contact Peter Altieri?
10 A. I've known him for a long time. I hope that he
11     could -- that he could straighten things out and
12     understand things, you know, in a calm manner.
13     That he could resolve the situation.
14 Q. Forgive me if you have already said this. Did he
15     call you back?
16 A. He promised but he didn't call and I called him
17     again.
18 Q. Did you ever speak to Peter Altieri?
19 A. Twice.
20 Q. And when were these conversations?
21 A. I was terminated on Friday. I called him the
22     next Monday.
23 Q. And what did you discuss in that first
24     conversation?

Page 157

1 A. I explained the situation to him. He promised --
2     he promised to call me a few days later but he
3     never called. A few days later, I called him.
4     And he told me to contact CDI as far as my
5     employment is concerned. It was kind of -- it
6     was kind of closed circuit. So CDI told me to
7     call PTC and PTC -- CDI told me to call PTC and
8     PTC told me, Call CDI.
9 Q. Now, you said you explained the situation to
10     Peter Altieri but what situation did you explain?
11 A. The situation what happened to me. I told him
12     that. Said I've never been on long-term
13     disability. That my last payday was on the 30th.
14     That on the 29th -- so on 29th I called CIGNA.
15     And that I never, never received long-term
16     disability. And I told him that CDI informed him
17     wrongly that I'm on long-term disability.
18 Q. You say that CDI informed him that you were on
19     long-term disability?
20 A. No. I said to him that CDI was mistakenly
21     informed, wrongly informed that I am on a
22     long-term disability.
23 Q. Would it have mattered to you if Ms. Pugliese had
24     told you that PTC did not want you to work there

Page 158

1    because you were on short-term disability?
2          THE INTERPRETER:  Say it again.
3    Q.  Would it have mattered if Nancy Pugliese had said
4        that PTC informed CDI that you were on short-term
5        disability as opposed to long-term disability?
6    A.  To tell you the truth, I don't know how to answer
7        your question because I wasn't thinking about
8        that.  CDI told me that I'm on long-term
9        disability.  CDI didn't talk about short-term
10       disability.  Didn't say anything about short-term
11       disability.
12   Q.  You understood, however, that you could not work
13       for CDI and receive either short-term disability
14       or long-term disability at the same time?
15   A.  Of course.  I cannot receive at the same time
16       short-term disability and work for CDI.  Or long.
17       And I never received them at the same time.
18   Q.  Okay.  Did you expect CDI to hire you back even
19       if PTC didn't want you to work there?
20   A.  I don't know.  I don't know.  I don't know what
21       CDI was thinking and what possibilities were at
22       CDI.  I knew that CDI is sufficiently large
23       company and that they have two offices.  One in
24       Boston and one in some other town.  Because in

Page 159

1    some paper it was mentioned that the headquarters
2    are not in Massachusetts.
3    Q.  You testified earlier that you wanted to try to
4        work but that if you were going to work you
5        wanted to work in a job that was similar to what
6        you had done at PTC; is that correct?
7    A.  For me it would be the simplest job.
8    Q.  Were you capable at the time that CDI terminated
9        your employment of doing a job other than what
10       you had previously done at PTC?
11         MR. CHURCHILL:  Objection.
12   A.  I don't know.
13   Q.  Did you ever ask CDI to place you -- strike that.
14       After you were terminated from CDI on December 7,
15       2001, did you ever ask CDI to hire you into any
16       other position?
17   A.  No.
18   Q.  Did you expect CDI to investigate whether or not
19       you had terminated your short-term or long-term
20       disability benefits before working at CDI?
21   A.  Please rephrase the question.  Please -- yeah.
22       Please rephrase it.
23   Q.  Did you expect CDI to investigate whether or not
24       you had terminated your benefits before working

Page 160

1    for CDI?
2    A.  I hoped so.
3    Q.  How did you expect CDI to investigate that?
4    A.  They could have asked me directly or find out
5        whether I was receiving any checks after the
6        November 30th.
7    Q.  Why would CDI have believed you if you lied to
8        CDI about what you were doing before you started
9        working there?
10         MR. CHURCHILL:  Objection.
11   A.  To tell the way it is, you know, I just wanted to
12       hide that I'm on disability.
13   Q.  Do you understand that CIGNA denies that you
14       canceled your disability before you started
15       working for CDI?
16         Strike that.  Do you understand that
17       CIGNA denies that you canceled your disability
18       benefits before you started working at CDI?
19   A.  Yes.
20   Q.  Okay.  So if CDI had spoken to CIGNA, they would
21       have learned at least from CIGNA's perspective
22       that you were still receiving benefits at the
23       time you were working; is that correct?
24         MR. CHURCHILL:  Objection.

Page 161

1    A.  After the 30th I wasn't receiving any check.  And
2        also the checks were usually at a minimum a week
3        in advance.  So how come CIGNA wouldn't send me a
4        check if I didn't call them?
5    Q.  I'm going to mark another document.  K 9.
6          (Charge of Discrimination marked
7        Exhibit No. 9.)
8          MR. CHURCHILL:  Do you have an extra
9        copy for me?
10         MS. NASH:  Oh.  Sorry.
11         MR. CHURCHILL:  Thanks.
12   Q.  Will you review K 9 and let me know when you
13       have?
14   A.  Do you want me to read the whole thing?
15   Q.  Yes, please.
16   A.  The whole document?
17   Q.  Yes, please.  You wrote it so you should be
18       familiar with it.
19   A.  I read it.
20   Q.  On --
21         THE WITNESS:  Just one minute.
22         MS. NASH:  Sure.
23   Q.  Look -- okay.
24         Looking at the first page of the

15 (Pages 158 to 161)

Page 162

1    document --
2    A. Where?
3    Q. Of the entire document. K 9. On the first page,
4       is your signature on the bottom of that twice?
5    A. Yes.
6    Q. You understood at the time that when you signed
7       your name to this document that you were signing
8       under the pains and penalties of perjury?
9    A. Yes.
10   Q. And on the final page of this document, is that
11      your signature?
12   A. Yes.
13   Q. And you understood when you signed this last page
14      of K 9 that you were signing under the pains and
15      penalties of perjury?
16   A. Yes.
17   Q. Okay. What is this document?
18   A. This document as far as I understand is written
19      by my attorney, which I read and signed.
20   Q. So you reviewed this document carefully before
21      you signed it?
22   A. Yes.
23   Q. Was it correct to the best of your knowledge?
24   A. Yes.

Page 163

1    Q. I'll mark two documents. This is 10, I think.
2        (Acknowledgment Form marked Exhibit No.
3    10.)
4        MS. NASH: And this is 11.
5        (Equal Employment Opportunity and
6    Anti-Harassment Policy marked Exhibit No. 11.)
7    Q. Will you look at these two documents and let me
8       know when you have?
9        THE WITNESS: Excuse me. I should read
10      all document?
11   Q. Just read it so you're comfortable, familiar with
12      it.
13   A. Explain to her, please, that at least I have to
14      read this document. I have to read this
15      document.
16   Q. That's fine.
17   A. Could I use the services of the interpreter if I
18      need him?
19   Q. To the extent -- I mean, as long as it's on the
20      record, that's fine. As long as it's done on the
21      record, that's fine with me.
22       THE WITNESS: I'm going to go to the
23   bathroom.
24       MS. NASH: We're going to take a

Page 164

1    five-minute break for him to go to the bathroom.
2        (Recess.)
3    Q. I guess to --
4        MS. NASH: Are you ready, David?
5        MR. CREVIER: I'm ready.
6    Q. To sort of expedite matters, have you ever seen
7       this document before?
8    A. I don't remember. Truly. I don't remember.
9    Q. Okay. How about K 10? The other document. Have
10      you seen K 10 before?
11   A. Definitely if I sent it. If I signed it. What
12      does "tolerate" mean?
13       THE INTERPRETER: He's asking me, What
14   does "tolerate" mean?
15       MR. TULLY: What's the Russian word for
16   "tolerate"?
17       THE INTERPRETER: Okay.
18       MS. NASH: Let the record reflect that
19   the translator translated the word "tolerate"
20   into Russian for the deponent.
21       MR. CHURCHILL: Is there a question
22   pending?
23       MS. NASH: I just asked him if he had
24   seen it before. He said he doesn't remember.

Page 165

1    A. Deem.
2        THE INTERPRETER: I would like to see
3    it in context. In context.
4        MR. CHURCHILL: Can we go off the
5    record?
6        MS. NASH: Yeah.
7        (Off the record.)
8    Q. Let's look at K 10, the other document. Is that
9       your signature on the document?
10   A. Yes.
11   Q. And just for the record, I will represent that
12      these two documents, K 11 and K 10, were produced
13      by you through your attorneys as part of this
14      litigation. Right?
15       MR. CHURCHILL: There's no question.
16   A. I would love to find out. I was simply informed
17      that those papers went together with this pack.
18   Q. By whom?
19   A. By my attorney. She just mentioned that these
20      documents attached by my attorney or, you know,
21      in what?
22   Q. Let me start over.
23   A. Maybe if I ask a question in English you
24      understand?

Page 166

1  Q. For this one question, that's fine.
2       MR. CREVIER: Can we go off the record?
3       MS. NASH: Yeah. Let's go off the
4  record.
5       (Off the record.)
6       MS. NASH: Let's read back my question.
7       (Question read.)
8       (Question not translated.)
9  A. Yes. Those documents were with me.
10 Q. Okay. Did you ever make any complaints to anyone
11    at CDI about discrimination of any kind before
12    you made this charge in K 9 to the MCAD?
13 A. Could you repeat to me from the very beginning?
14    Don't ask her again.
15 Q. I'm going to ask another question. That's fine.
16       THE WITNESS: I just -- look. You
17    know, sometimes it's just hard to understand but
18    --
19 A. I would like to hear again that Russian
20    interpreting, interpretation of the question.
21 Q. Let me ask it again. It might be clearer.
22       Okay. Prior to filing this charge in K
23    9 at the MCAD, did you make any complaints to
24    anyone at CDI about discrimination?

Page 167

1  A. No.
2  Q. Okay. K 12.
3       (Complaint and Jury Demand marked
4    Exhibit No. 12.)
5  Q. Will you review K 12 and let me know when you
6    have?
7  A. I'm familiar with the document.
8  Q. What is it?
9  A. This is filings to -- filings to court.
10 Q. Did you review this document before it was filed?
11 A. Yes.
12 Q. And to your knowledge, is it an accurate
13    reflection of your allegations against the
14    defendants in this case?
15 A. Yes.
16 Q. Looking at page five, I would like you to look at
17    paragraphs 37 through 41.
18 A. If I was asked to read it from 37 through 41st,
19    I've read it.
20 Q. What is the factual basis for your claim that CDI
21    was negligent in its employment of you?
22       (Cell phone interruption.)
23       MR. CHURCHILL: Objection.
24 A. Could I turn off my phone?

Page 168

1  Q. That's fine.
2       Would you like me to state another
3  question?
4       Okay. What facts are you aware of that
5  support your claim that CDI was negligent in its
6  employment of you?
7       MR. CHURCHILL: Objection.
8  A. In my opinion, I was laid off only because --
9    only because CDI was informed that I am on a
10   long-term disability, which I never received any
11   long-term disability.
12       THE WITNESS: Benefits.
13 Q. What he said.
14 A. Benefits. Benefits.
15       THE INTERPRETER: I missed a word.
16   Benefits.
17       THE WITNESS: He missed a word.
18 A. Never received -- I never received long-term
19   disability benefits.
20 Q. So that's the entire basis of your claim that CDI
21   was negligent?
22       MR. CHURCHILL: Objection.
23 Q. Let me state it again. So those are all of the
24   facts that you're aware of that support your

Page 169

1    claim that CDI was negligent?
2       MR. CHURCHILL: Objection. Objection.
3  A. Do I have to answer?
4  Q. Yes.
5  A. Nancy Pugliese told me that I -- that I'm
6    terminated because I am on a long-term
7    disability. When I told her that it's not true,
8    despite -- despite that I never received any
9    benefit, I was terminated anyway. They didn't
10   even try to find out whether I'm receiving
11   benefits or not.
12       And another one, in one of the
13   documents, which were prepared by CDI, or their
14   attorney, they were saying that they were trying
15   to find me a job. But the situation is such that
16   they found about it on Friday on the second part
17   of the day. And Nancy Pugliese told me about
18   this, that I was terminated, sometime at 6:30.
19       So CDI had two or three hours since the
20   time they were informed and to the time when I
21   was terminated as far as I know about it while
22   reading the deposition of Lisa Wales.
23 Q. So CDI had two or three hours to do what?
24 A. Made all the conclusions. I'm afraid -- I'm

Errata.doc
VOL 1-3
- 1 —
Kouvchinov

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 039 | 15 | I believe '87 to '92. | Typo |
| 040 | 19 | Assembler as compilers . And also we use a lot of | Typo |
| 071 | 20 | Harrison is nothing as compared to Semen Petrovich Geisberg. | Mistranslation |
| 071 | 03 | themselves. Mike Pain. Yes. Semen Petrovich Geisberg. | Mistranslation |
| 074 | 15 | mistake they had already been canceled. | Mistranslation |
| 075 | 4 | Lisa Wales on September 10th about short-term | Mistranslation |
| 083 | 18 | I met my brother for the first time, | Mistranslation |
| 083 | 19 | we were over forty. | Mistranslation |
| 084 | 05 | I called in Kirgizia. My father was still alive. | Mistranslation |
| 085 | 06 | My brother was in trouble and it was | Mistranslation |
| 085 | 07 | extremely difficult for me. | Mistranslation |
| 085 | 08 | He was found not guilty but it took | Mistranslation |
| 085 | 11 | It was hard. It was my vacation. | Mistranslation |
| 099 | 08 | It is impossible. | Mistranslation |
| 111 | 02 | don't remember exactly. But three or | Mistranslation |
| 114 | 04 | far as I can remember, I could have | Mistranslation |
| 114 | 05 | been mistaken, for the year, | Mistranslation |
| 114 | 06 | back and forth. | Mistranslation |
| 120 | 13 | as far as my depression is concerned. | Mistranslation |
| 130 | 14 | a depression, severe depression. | Mistranslation |
| 130 | 15 | Replace "on the whole" with "probably" throughout deposition | Mistranslation |
| 132 | 11 | Yes. I told her that I worked for another company. | Mistranslation |
| 132 | 12 | I wanted to hide my | Mistranslation |
| 132 | 13 | disability. | Mistranslation |
| 134 | 11 | 11  A. I just told them that | Mistranslation |
| 134 | 12 | when she called me on Friday | Mistranslation |
| 134 | 13 | evening, it was the only one time I talked | Mistranslation |
| 134 | 20 | My last -- last paid day. | Mistranslation |
| 136 | 23 | position of today, of this day. | Mistranslation |
| 139 | 14-17 | Strike entire portion – this is the translator trying to figure out what to say | Mistranslation |
| 143 | 08 | negotiations with CDI, she informed me | Mistranslation |
| 143 | 19 | corruption from the very beginning, he | Mistranslation |
| 145 | 3 | technical questions, of how I would | Mistranslation |
| 149 | 18 | correct. | Mistranslation |
| 152 | 1 | A. Yes. | Mistranslation |
| 153 | 13 | I understood that, I'm hired by CDI for | Mistranslation |
| 157 | 08 | PTC told me, call CDI. | Grammatik |
| 156 | 12 | understand things, in a calm manner. | Mistranslation |
| 158 | 20 | I don't know. I don't know what | Mistranslation |
| 160 | 11 | To tell the way it is, I just wanted to | Mistranslation |
| 160 | 12 | hide that I was on disability. | Grammatik |

Signed under the penalties of perjury this 6 day of February, 2006

Alex Kuvshinov

Errata.doc

VOL 1-3

- 2 –

Kouvchinov

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 165 | 20 | documents attached by my attorney or, | Mistranslation |
| 193 | 4 | It's possible. | Mistranslation |
| 197 | 10 | Because it's just my draft.  My rough | Mistranslation |
| 199 | 3 | programming, the tools of programming changed | Mistranslation |
| 199 | 6 | Tools | Mistranslation |
| 208 | 13 | another JCHE.  Jewish Community Housing for | Typo |
| 209 | 04 | I don't remember exactly, what the | Mistranslation |
| 211 | 21 | least I gave them two or three resumes.  So one | Mistranslation |
| 214 | 22 | Russian-speaking elderly people who | Typo |
| 215 | 2 | their appointment's schedules, discussions about when | Mistranslation |
| 215 | 21 | A.  Yes.  Just to my computer. | Mistranslation |
| 215 | 8 | A.  As far as I can remember, there was a phone call but | Mistranslation |
| 225 | 04 | I have to check my lungs.  There are spots in my | Grammatik |
| 225 | 05 | lungs.  Every three months I have to | Mistranslation |
| 235 | 06 | friend.  Chris Chiapella  brought my resume | Typo |
| 235 | 13 | remember the towns, but I find | Mistranslation |
| 235 | 15 | on 495.  Route 495.  But I can ask him and he | Mistranslation |
| 237 | 11 | I worked longer with proprietary database | Typo |
| 237 | 12 | corruptions in PTC. I said | Typo |
| 237 | 23 | for -- about these issues, yes. | Mistranslation |
| 238 | 09 | Obviously I don't have -- I'm not | Mistranslation |
| 239 | 17 | PTC provided -- for a fact, that -- | Mistranslation |
| 240 | 4 | Yes, I am concerned about | Typo |
| 241 | 19 | It was a check.  Checking | Mistranslation |
| 243 | 12 | Dr. Freedberg, I was taking Wellbutrin and Sonata. | Mistranslation |
| 277 | 14 | was filed on May 24 | Mistranslation |
| 282 | 8-10 | There was no point to call CIGNA if PTC and CDI would not listen | Mistranslation |
| 283 | 01 | There were a lot of problems when I called CIGNA. I | Mistranslation |
| 282 | 09 | -- if I couldn't get to the point, that | Mistranslation |
| 288 | 09-11 | called CIGNA and left a message for Angela Wallace asking be paid until December 3rd | Mistranslation |
| 306 | 05 | question.  I came to see my friend, | Mistranslation |
| 306 | 06 | take my mail.  Maybe we smoked together or | Mistranslation |
| 306 | 07 | had a cup of tea.  I'm doing it once or twice a | Mistranslation |
| 311 | 21 | Relevant -- relevant times.  Times of | Mistranslation |
| 315 | 15 | terminated on September 10th. | Mistranslation |
| | | | |

Signed under the penalties of perjury this ____ day of February, 2006

Alex Kuvshinov

**EXHIBIT U**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CA NO. 04 12531 MEL

VOL. III

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
ALEXEI KOUVCHINOV,                          *
          Plaintiff,                        *
                                            *
v.                                          *
                                            *
PARAMETRIC TECHNOLOGY CORPORATION,          *
CDI CORPORATION, LISA WALES and             *
CONNECTICUT GENERAL LIFE INSURANCE          *
CO.,                                        *
          Defendants.                       *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


          CONTINUED INTERPRETED DEPOSITION OF
ALEXEI KOUVCHINOV, taken pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Susan L. Prokopik,
Registered Merit Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Littler Mendelson, P.C., One
International Place, suite 2700, Boston,
Massachusetts, on Wednesday, November 16, 2005,
at 10:09 a.m.

                KACZYNSKI REPORTING
          72 CHANDLER STREET, SUITE 3
          BOSTON, MASSACHUSETTS 02116
                (617) 426-6060

Page 265

1  answer me because -- because at that time an
2  overlap was possible. The final decision when I
3  signed the offer, I was -- I was supposed to go
4  to Parametrics on the 4th of December.
5  Q. But you didn't answer my question. You could
6  have left a message for Miss Wallace and then
7  called back and talked to someone else as well,
8  correct?
9  A. Yes, I could.
10  Q. And Miss Wallace was the person with whom you
11  were dealing on the claim, correct?
12  A. Yes.
13  Q. So why didn't you leave a message for her?
14      MR. CHURCHILL: Objection.
15  A. I already answered two minutes ago. That I
16  wanted for CIGNA to know that I'm beginning to
17  work as soon as possible.
18      MR. CREVIER: I'll have this marked as
19  Deposition Exhibit 27.
20      (10/5/01 letter marked Exhibit No. 27.)
21  Q. Mr. Kouvchinov, I handed you what I had marked as
22  Deposition Exhibit No. 27.
23      I'm going to take a two-minute break
24  while he reads that. Keep reading. I'll be

Page 266

1  right back.
2      (Recess.)
3  Q. Mr. Kouvchinov, I handed you what I had marked as
4  Deposition Exhibit No. 27. This is a copy of a
5  letter that you received from CIGNA dated October
6  5, 2001; is that correct?
7  A. Yes.
8  Q. Did you read this letter when you received it?
9  A. Yes.
10  Q. And in the second page of this letter, which I've
11  had marked as Deposition Exhibit No. 27, in the
12  third from the bottom paragraph, it states, "If
13  you should return to work before this date,
14  notify us immediately to avoid an overpayment of
15  benefits." Correct?
16  A. Yes. It's correct. That's correct.
17  Q. So as far as you knew, you had to notify CIGNA if
18  you in fact did return to work, correct?
19  A. Yes, of course. I was sure that I couldn't
20  receive -- I couldn't receive salary and the
21  benefit at the same time.
22  Q. But based on this letter, you knew if you did
23  return to work you had to notify CIGNA, correct?
24  A. Yes.

Page 267

1  Q. You didn't have to notify CIGNA if you were
2  merely interviewing, correct?
3  A. To my knowledge, I didn't have to because I
4  didn't receive any letters from CIGNA demanding
5  me to notify them about any interviews.
6  Q. Was this the only -- was the Deposition Exhibit
7  No. 27 the only communication that you received
8  from CIGNA concerning contacting CIGNA upon your
9  return to work?
10  A. I cannot guarantee 100 percent because there was
11  several letters from CIGNA. And I didn't even
12  keep all of them. And I'm not sure whether this
13  was the only letter or if it was possible that it
14  was mentioned in some other letters.
15  Q. Let me draw your attention back to a discussion
16  that you had with the CIGNA representative on
17  November 29, 2001. And you told me that you had
18  called the same telephone number as you had
19  called to get Miss Wallace without using the
20  extension, correct?
21  A. Yes.
22  Q. Exactly what did you say to the CIGNA
23  representative and exactly what did the CIGNA
24  representative say to you?

Page 268

1  A. I said that I'm going to go to work on the 4th of
2  December. That's all -- that's all that I said
3  to CIGNA. As far as I understand your question,
4  I have to tell you what the reply I got.
5  Q. Yes.
6  A. The CIGNA representative told me that I shouldn't
7  cash any check if I receive it. And he also
8  advised me to go and see a doctor.
9  Q. Why did he advise you to go see a doctor?
10      MR. CHURCHILL: Objection.
11  Q. If you know.
12  A. I don't know.
13  Q. Did he advise you to go see Dr. Freedberg?
14  A. No. He just told me that I should go to see the
15  doctor. He didn't know my treating physician.
16  Q. Did he know anything about you in particular at
17  the time you talked to the CIGNA representative?
18      MR. CHURCHILL: Objection.
19  A. He asked for my Social Security number. My name,
20  my last name. That's all -- that's all that he
21  asked.
22  Q. So if I can summarize, you called and spoke with
23  a CIGNA representative who asked your Social
24  Security and name and you provided that, correct?

17 (Pages 265 to 268)

KACZYNSKI REPORTING

Page 269

1   A.  Yes.
2   Q.  You then told the CIGNA representative that you
3       were going back to work on December 4th, correct?
4   A.  Yes.
5   Q.  And the CIGNA representative told you if you were
6       to receive any more checks not to cash them --
7   A.  That was the manner -- that was the main idea of
8       CIGNA representative.
9   Q.  And the CIGNA representative advised you to go
10      see a doctor?
11  A.  Yes.
12  Q.  That's all that you can remember with regard to
13      your conversation with CIGNA on November 29,
14      2001, correct?
15  A.  Yes.
16  Q.  And you have no notes of that telephone
17      conversation, correct?
18  A.  No.
19  Q.  And you never took any notes, correct?
20  A.  No, no.
21  Q.  That is correct, yes?
22  A.  I didn't take notes of this conversation.
23  Q.  Okay.  Was the person that you spoke to a male or
24      a female?

Page 270

1   A.  It's never possible to answer this question 100
2       percent guaranteed.
3   Q.  So you're not sure whether it was a male or
4       female?
5   A.  In my opinion, it was a male.  But again, I'm
6       saying it again.  When you're talking on the
7       phone, it's impossible to be sure 100 percent
8       what gender, what gender this person is.
9   Q.  And did you speak with the person in English or
10      in Russian?
11  A.  In English.
12  Q.  And you said it was around noontime, correct?
13  A.  Yes.
14  Q.  From a pay phone at the Odessa restaurant?
15  A.  Yes.
16  Q.  And you didn't discuss with the CIGNA
17      representative who your new employer would be; is
18      that correct?
19  A.  No.  I think not.
20  Q.  And you didn't discuss with CIGNA what the duties
21      of your new job would be, did you?
22  A.  No.  It was a brief -- brief conversation.
23  Q.  And did you ask the CIGNA representative if you
24      could continue to receive disability benefits

Page 271

1       while working for a different employer?
2   A.  No.  I didn't talk.
3   Q.  You've previously testified that you weren't sure
4       whether you could return to work even as of
5       November 29th but you wanted to try, correct?
6   A.  Yes.  I wanted to try.
7   Q.  If that's the case, why didn't you wait until you
8       actually did return to work to call CIGNA to tell
9       them that you had returned to work?
10  A.  I don't understand the question.
11  Q.  You didn't call CIGNA while you were
12      interviewing, correct?
13  A.  It's possible that I called because I usually
14      call when Angela was asking to call.  But I never
15      called to CIGNA referring interviews.  Regarding
16      interviews.
17  Q.  And you didn't call CIGNA when you were
18      negotiating the terms of your employment with
19      Miss Shea, correct?
20  A.  I'm repeating myself.  I'm repeating again.  I
21      didn't call CIGNA regarding my interviews.
22  Q.  Okay.  My question then is, why didn't you wait
23      until you actually did return to work on December
24      4th to call CIGNA since you were sure -- since

Page 272

1       you weren't sure whether you would be able to
2       work at all?
3   A.  The decision was made and I was going to go to
4       work on the 4th of December.  And so it was more
5       convenient for me to call right away than to call
6       from PTC.  When I didn't know anything about my
7       -- I didn't yet know which office I will be in.
8       And also the terms of the contract on the 4th of
9       December, classes would start.  So I wouldn't
10      have been alone.
11          Why shouldn't I call when no one who is
12      interested -- why should I have additional
13      troubles when the time I start taking courses?
14  Q.  Because you weren't sure whether you could return
15      to work on November 29th; isn't that correct?
16  A.  On the 29th of December when I signed the offer,
17      I already knew that I will -- I will go to work
18      on the 4th of December.  To PTC.
19          MR. CREVIER:  Can you read back that
20      answer, please?
21          (Answer read.)
22  Q.  When you said --
23          (Answer read.)
24  Q.  Did you mean 29th of November in response to the

18 (Pages 269 to 272)

Page 273

1    last question?
2         THE WITNESS: Could you repeat? Could
3    you repeat, please, what was answered?
4         (Answer read.)
5    A. No.
6    Q. That's what I was asking.
7    A. It was possibly my mistake. Or interpreter's
8       mistake.
9    Q. No. I understand. I don't care. Just want to
10      make sure that the answer is accurate. November
11      29th, correct?
12   A. Of course November.
13   Q. Okay. When did you learn that the issue of your
14      continuing receipt of short-term disability
15      benefits was being questioned by PTC?
16   A. This information I first received in the office
17      -- at the office of Harvard Legal Services.
18      Could I ask my attorney the precise name of the
19      firm he's working for?
20   Q. No. You can go ahead and answer the -- I'm
21      actually asking for the date. I don't need to
22      know where or whom.
23   A. I don't remember the complete date of course.
24      But it was already in 2002. After I had -- after

Page 274

1    I had visit Harvard Legal Services. Attorney
2    Mitchell --
3         MR. CHURCHILL: Just a second. Make
4    sure when you're answering to not reveal any
5    discussions you had with any attorneys.
6         I think there's some misunderstanding.
7         MR. CREVIER: Let's --
8    A. So in 2002, when I talked to my attorney, he
9       informed me about those documents.
10   Q. Mr. Kouvchinov, isn't it true that when CDI
11      terminated you they -- CDI informed you that you
12      had been terminated because you had been
13      receiving disability benefits at the same time as
14      you were working for them?
15   A. On December 7th when I came back from work, Lisa
16      Pugliese --
17   Q. Lisa Pugliese?
18         MS. NASH: It's Nancy Pugliese.
19   A. Nancy Pugliese called me and told me that I'm
20      terminated because -- because I'm on a long-term
21      disability with Parametrics.
22   Q. Did you tell Miss Pugliese that you had called
23      CIGNA to terminate your disability benefits?
24   A. I told Nancy Pugliese that I never was, never

Page 275

1    been on long-term disability. I told her that
2    the last day I was paid on short-term disability
3    was November 30th.
4    Q. And that's all you told Miss Pugliese about your
5       communications with CIGNA, correct?
6    A. I told her it was mistake. That I never received
7       at any time long-term disability. That's what I
8       told her. I asked her who told her that I'm
9       receiving long-term disability. She said that
10      she cannot -- that she could not answer. At the
11      very --
12         THE WITNESS: She did not answer.
13   A. She didn't answer.
14   Q. But with respect -- leaving aside for the minute
15      the long-term disability misunderstanding, the
16      only communication that you had with Miss
17      Pugliese regarding short-term disability was your
18      informing Miss Pugliese that your short-term
19      disability benefits by November 30th, correct?
20   A. I think I -- I think I told her that the last day
21      I was paid was -- the last day I was paid for was
22      November 30th and I said that -- and I said that
23      my disability is over.
24   Q. But that's all you discussed with her regarding

Page 276

1    short-term disability, correct?
2    A. It's possible that I also told her that I called
3       CIGNA.
4    Q. Possible, correct?
5    A. I'm almost sure that I told her.
6    Q. Mr. Kouvchinov, I'm going to hand you what I had
7       marked as Deposition Exhibit No. 9. I'm going to
8       draw your attention to the second to last page of
9       this exhibit.
10   A. Yes. You mean this?
11   Q. Yes.
12         THE WITNESS: Okay.
13   Q. I'm going to draw your attention to the last page
14      of this exhibit, Mr. Kouvchinov. And that's your
15      signature on the last page, correct?
16   A. Yes. Mine.
17   Q. And you signed this document on May 24, 2002,
18      correct? Under the pains and penalties of
19      perjury, correct?
20   A. Yes. Of course. Yes.
21   Q. And that was only six months, less than six
22      months after your termination by CDI?
23   A. It was more than six months.
24   Q. Between six and seven months? Okay. It was

19 (Pages 273 to 276)

Errata.doc

VOL 1-3

- 1 —

Kouvchinov

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 039 | 15 | I believe '87 to '92. | Typo |
| 040 | 19 | Assembler as compilers . And also we use a lot of | Typo |
| 071 | 20 | Harrison is nothing as compared to Semen Petrovich Geisberg. | Mistranslation |
| 071 | 03 | themselves. Mike Pain. Yes. Semen Petrovich Geisberg. | Mistranslation |
| 074 | 15 | mistake they had already been canceled. | Mistranslation |
| 075 | 4 | Lisa Wales on September 10th about short-term | Mistranslation |
| 083 | 18 | I met my brother for the first time, | Mistranslation |
| 083 | 19 | we were over forty. | Mistranslation |
| 084 | 05 | I called in Kirgizia. My father was still alive. | Mistranslation |
| 085 | 06 | My brother was in trouble and it was | Mistranslation |
| 085 | 07 | extremely difficult for me. | Mistranslation |
| 085 | 08 | He was found not guilty but it took | Mistranslation |
| 085 | 11 | It was hard. It was my vacation. | Mistranslation |
| 099 | 08 | It is impossible. | Mistranslation |
| 111 | 02 | don't remember exactly. But three or | Mistranslation |
| 114 | 04 | far as I can remember, I could have | Mistranslation |
| 114 | 05 | been mistaken, for the year, | Mistranslation |
| 114 | 06 | back and forth. | Mistranslation |
| 120 | 13 | as far as my depression is concerned. | Mistranslation |
| 130 | 14 | a depression, severe depression. | Mistranslation |
| 130 | 15 | Replace "on the whole" with "probably" throughout deposition | Mistranslation |
| 132 | 11 | Yes. I told her that I worked for another company. | Mistranslation |
| 132 | 12 | I wanted to hide my | Mistranslation |
| 132 | 13 | disability. | Mistranslation |
| 134 | 11 | 11 A. I just told them that | Mistranslation |
| 134 | 12 | when she called me on Friday | Mistranslation |
| 134 | 13 | evening, it was the only one time I talked | Mistranslation |
| 134 | 20 | My last -- last paid day. | Mistranslation |
| 136 | 23 | position of today, of this day. | Mistranslation |
| 139 | 14-17 | Strike entire portion – this is the translator trying to figure out what to say | Mistranslation |
| 143 | 08 | negotiations with CDI, she informed me | Mistranslation |
| 143 | 19 | corruption from the very beginning, he | Mistranslation |
| 145 | 3 | technical questions, of how I would | Mistranslation |
| 149 | 18 | correct. | Mistranslation |
| 152 | 1 | A. Yes. | Mistranslation |
| 153 | 13 | I understood that, I'm hired by CDI for | Mistranslation |
| 157 | 08 | PTC told me, call CDI. | Grammatik |
| 156 | 12 | understand things, in a calm manner. | Mistranslation |
| 158 | 20 | I don't know. I don't know what | Mistranslation |
| 160 | 11 | To tell the way it is, I just wanted to | Mistranslation |
| 160 | 12 | hide that I was on disability. | Grammatik |

Signed under the penalties of perjury this ⟨6⟩ day of February, 2006

*Alex Kuvshinov*

Alex Kuvshinov

Errata.doc

VOL 1-3

- 2 –

Kouvchinov

| PAGE | LINE | CORRECTION | REASON |
|------|------|------------|--------|
| 165 | 20 | documents attached by my attorney or, | Mistranslation |
| 193 | 4 | It's possible. | Mistranslation |
| 197 | 10 | Because it's just my draft.  My rough | Mistranslation |
| 199 | 3 | programming, the tools of programming changed | Mistranslation |
| 199 | 6 | Tools | Mistranslation |
| 208 | 13 | another JCHE.  Jewish Community Housing for | Typo |
| 209 | 04 | I don't remember exactly, what the | Mistranslation |
| 211 | 21 | least I gave them two or three resumes.  So one | Mistranslation |
| 214 | 22 | Russian-speaking elderly people who | Typo |
| 215 | 2 | their appointment's schedules, discussions about when | Mistranslation |
| 215 | 21 | A.  Yes.  Just to my computer. | Mistranslation |
| 215 | 8 | A.  As far as I can remember, there was a phone call but | Mistranslation |
| 225 | 04 | I have to check my lungs.  There are spots in my | Grammatik |
| 225 | 05 | lungs.  Every three months I have to | Mistranslation |
| 235 | 06 | friend.  Chris Chiapella  brought my resume | Typo |
| 235 | 13 | remember the towns, but I find | Mistranslation |
| 235 | 15 | on 495.  Route 495.  But I can ask him and he | Mistranslation |
| 237 | 11 | I worked longer with proprietary database | Typo |
| 237 | 12 | corruptions in PTC. I said | Typo |
| 237 | 23 | for -- about these issues, yes. | Mistranslation |
| 238 | 09 | Obviously I don't have -- I'm not | Mistranslation |
| 239 | 17 | PTC provided -- for a fact, that -- | Mistranslation |
| 240 | 4 | Yes, I am concerned about | Typo |
| 241 | 19 | It was a check.  Checking | Mistranslation |
| 243 | 12 | Dr. Freedberg, I was taking Wellbutrin and Sonata. | Mistranslation |
| 277 | 14 | was filed on May 24 | Mistranslation |
| 282 | 8-10 | There was no point to call CIGNA if PTC and CDI would not listen | Mistranslation |
| 283 | 01 | There were a lot of problems when I called CIGNA. I | Mistranslation |
| 282 | 09 | -- if I couldn't get to the point, that | Mistranslation |
| 288 | 09-11 | called CIGNA and left a message for Angela Wallace asking be paid until December 3rd | Mistranslation |
| 306 | 05 | question.  I came to see my friend, | Mistranslation |
| 306 | 06 | take my mail.  Maybe we smoked together or | Mistranslation |
| 306 | 07 | had a cup of tea.  I'm doing it once or twice a | Mistranslation |
| 311 | 21 | Relevant -- relevant times.  Times of | Mistranslation |
| 315 | 15 | terminated on September 10th. | Mistranslation |
|  |  |  |  |

Signed under the penalties of perjury this ‖ day of February, 2006

Alex Kuvshinov

**EXHIBIT V**

# In The Matter Of:

*Alexei Kouvchinov   v.*
*Parametric Technology Corporation, et al.*

---

*Alexei Kouvchinov*
*Vol. 4, December 19, 2005*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File KOUVCHI4.V1, 63 Pages*
*Min-U-Script® File ID: 1530018684*

# Word Index included with this Min-U-Script®

Alexei Kouvchinov
Vol. 4, December 29, 2005
Case 1:04-cv-12531-MEL    Document 63-23    Filed 07/06/2006    Page 3 of 6
Alexei Kouvchinov   v.
Parametric Technology Corporation, et al.

Page 21

[1] my back. I had three epidural shots. I have
[2] dislocated disks — desiccated and dislocated disks,
[3] L5. So after this accident, I have had acute pains
[4] in my back. So I took three epidural shots in
[5] this disk.
[6]    Q: Has the pain resulting from that accident
[7] inhibited in any way your ability to work?
[8]    A: It depends on the job. If a job is, for
[9] example, lifting heavy things, then, yes, of course.
[10]    Q: Has any doctor provided you with any
[11] medical limitations on your current ability to work?
[12]    A: No. I don't have any limitations. No, but
[13] several doctors told me that I shouldn't lift heavy
[14] things, and also I have limitations as far as
[15] exercises I can or cannot do.
[16]    Q: Which doctors have provided you an opinion
[17] that you should not do any heavy lifting?
[18]    A: Several doctors. Mostly they're
[19] specialists in orthopedic or back surgeons who told
[20] me that I shouldn't take a heavy load on my spine.
[21]    Q: Do you recall the names?
[22]    A: No.
[23]    Q: Not even one?
[24]    A: If you look into my medical record, you may

Page 22

[1] be able to find names of several doctors I was
[2] referred to about my back, but I don't remember
[3] their names. The last doctor was at St. Elizabeth's
[4] Hospital.
[5]    Q: Mr. Kouvchinov, has there been any period
[6] of time since September 1st, 2001, where you have
[7] been physically unable to work?
[8]    MR. CHURCHILL: Objection.
[9]    Q: Physically?
[10]    Q: Physically or mentally unable to work.
[11]    MR. CHURCHILL: Objection.
[12]    A: Yes.
[13]    Q: During what periods of time?
[14]    MR. CHURCHILL: Objection.
[15]    A: At the end of September — no, it was in
[16] September 2001, and I think it was for a long time
[17] when I couldn't work. And after that, after 2001
[18] there were periods of time when I didn't feel well
[19] and I couldn't work.
[20]    Q: In September of 2001, you just mentioned,
[21] you said that you were unable to work, your words
[22] were for a long time. What do you mean by for a
[23] long time?
[24]    A: Well, at least I didn't feel well in

Page 23

[1] September, October, November. I finished.
[2]    Q: What point after — you said after 2001
[3] there were periods of time when you were either
[4] physically or mentally unable to work. Can you be
[5] more specific, please.
[6]    A: After December 7th.
[7]    Q: For how long?
[8]    A: Well, at least as far as I remember, two or
[9] three months after December 7th.
[10]    Q: So is it your recollection that after that
[11] two or three months after December 7th that you were
[12] again able to work?
[13]    A: Yes.
[14]    Q: So that puts us roughly around March of
[15] 2002, correct?
[16]    A: Yes. Approximately.
[17]    Q: And have you actively looked for work on a
[18] consistent basis starting from March 2002 to today?
[19]    MR. CHURCHILL: Objection.
[20]    A: I was looking for a job even when I didn't
[21] feel well.
[22]    Q: Did you understand my question?
[23]    A: As far as understanding the question, it
[24] was if I was looking for a job since March 2002.

Page 24

[1]    Q: That's right.
[2]    A: Yes. I was looking for a job. Yes, I was
[3] looking for a job.
[4]    Q: At any point in time, Mr. Kouvchinov, since
[5] March of 2002, have you provided any volunteer
[6] services anywhere?
[7]    MR. CHURCHILL: Objection.
[8]    A: Several times I helped at Russian Orthodox
[9] church in Roslindale, but I don't know how to look
[10] at it.
[11]    Q: Look at what?
[12]    A: How is it considered when I was asked to do
[13] something to help them with something in the church.
[14]    (Document marked as K.
[15] Exhibit 48 for identification)
[16]    Q: Mr. Kouvchinov, I'm going to show you
[17] what's been marked as Exhibit No. 48. I know you've
[18] seen this document previously, because I marked it
[19] as Exhibit 9 during your MCAD deposition. Do you
[20] recall this document?
[21]    A: Frankly speaking, I don't recall this
[22] document.
[23]    Q: You don't recall asking for an explanation
[24] from CIGNA why and at what point in time your

Page 25

[1] disability benefits were terminated?
[2] **A:** I need to read it.
[3] **Q:** Go ahead.
[4] **A:** (Reviewing document)
[5] **Q:** Have you had a chance to read it?
[6] **A:** I'm reading. (Reviewing document) I did
[7] read this document, and I just recalled one thing.
[8] **Q:** What did you recall?
[9] **A:** I recall that I sent it to CIGNA or PTC about
[10] one year, probably it was at the end of 2003, and I
[11] hoped that I would be able to — at the end of 2002,
[12] and I thought that I would be able to receive
[13] short-term disability because of the depression.
[14] And from time to time since 2002 I have had
[15] depressions. Well, there is — one moment. It's
[16] not exactly how it sounds.
[17]      From time to time I feel depressed, and we
[18] can find, it is reflected in my medical records, Dr.
[19] Ginsburg — no, Freedberg, sorry.
[20] **Q:** I believe part of your answer that you just
[21] gave was that you recalled giving it to PTC. What
[22] is it that you gave to PTC?
[23] **A:** I think I sent a disability form or a
[24] letter. I don't remember exactly now which

Page 26

[1] documents I have sent. But I do remember that I
[2] think that I was eligible for short-term
[3] disability. And I think I sent it either to PTC or
[4] CIGNA.
[5] **Q:** Looking at Question No. 3 in Exhibit No.
[6] 48, your attorneys asked, "When, on what grounds,
[7] and at whose request Mr. Kouvchinov's disability
[8] benefits with CIGNA were terminated." Do you see
[9] that?
[10] **A:** Yes.
[11]      (Document marked as K.
[12] Exhibit 49 for identification)
[13] **Q:** I'm going to show you now what's been
[14] marked as Exhibit No. 49. This is a response from
[15] CIGNA to your attorneys dated March 8, 2004. In the
[16] middle of the page, the third bullet point, CIGNA
[17] has answered the third question by stating, "In
[18] response to your third request: E-mail from Lisa
[19] Perry at Parametric Technology Corp. on December 6,
[20] 2001, reporting that Mr. Kouvchinov returned to work
[21] on December 4, 2001." Do you see that?
[22] **A:** Yes.
[23] **Q:** Mr. Kouvchinov, at any time after March 8,
[24] 2004, did you contact CIGNA to say that you

Page 27

[1] disagreed with their answer in No. 3?
[2] **MR. CHURCHILL:** Objection.
[3] **A:** I didn't contact CIGNA regarding this
[4] letter. I mean the letter that is dated February
[5] 25th, 2004, that was written by attorney Jim
[6] Budreau.
[7] **Q:** He was your former lawyer; is that right?
[8] **A:** Yes.
[9] **Q:** Do you recall, Mr. Kouvchinov, that at an
[10] earlier point in your deposition you were shown the
[11] contract with CDI that you were negotiating with
[12] Ellen Shea?
[13] **A:** Yes.
[14] **Q:** Do you recall when in time you received the
[15] first draft of that contract?
[16] **A:** I don't remember when I received the first
[17] draft.
[18] **Q:** Do you recall how many drafts you did see?
[19] **A:** At least one. For sure it was one, to my
[20] knowledge. Some modifications were made, but very
[21] insignificant.
[22] **Q:** At any point in time during the interview
[23] process for the job at CDI, did anything happen that
[24] led you to believe that you could not do the job

Page 28

[1] that they were seeking to fill?
[2] **A:** Ask him please to repeat the question.
[3] **Q:** At the time that you were applying for the
[4] job with CDI to do database repair work at PTC, did
[5] you have any reason to believe you could not do that
[6] job?
[7] **MR. CHURCHILL:** Objection.
[8] **A:** Yes, I did. I had many doubts whether I
[9] should take this work or not.
[10] **Q:** Mr. Kouvchinov, do you know a gentleman by
[11] the name of Leonid Yurovitsky?
[12] **A:** I don't remember such a person. Maybe Mr.
[13] Tully did not pronounce his last name correctly.
[14] **Q:** Let me spell it for you.
[15] Y-u-r-o-v-i-t-s-k-y.
[16] **A:** Yurovitsky. I don't remember. I can't
[17] recall it. It is possible that I know this person,
[18] but I don't know his last name. Probably I don't
[19] know him. I cannot give you a definite answer,
[20] because I am not sure whether I'm acquainted with
[21] this person or not. At least the way the last name
[22] sounds, I don't know.
[23] **Q:** At any point in time prior to November
[24] 29th, 2001, did you tell CIGNA you were negotiating

Case 1:04-cv-12531-MEL    Document 63-23    Filed 07/06/2006    Page 1 of 5

Page 29

[1] a contract for employment with CDI?
[2] **A:** Before November 29th, I did not tell CIGNA
[3] about my negotiations with CDI.
[4] **Q:** Did you tell CIGNA about your negotiations
[5] and job offer with ARC?
[6] **A:** No.
[7] **Q:** At any point in time before November 29th,
[8] 2001, did you tell your doctor that you were
[9] negotiating a contract with CDI?
[10] **A:** I did tell my doctor at least that I was
[11] looking for a job.
[12] **Q:** That wasn't my question. Did you tell your
[13] doctor you were negotiating a contract with CDI?
[14] **A:** I don't remember.
[15] **Q:** Did you tell your doctor at any point in
[16] time prior to November 29th, 2001, that you had a
[17] job offer from ARC?
[18] **A:** I never received an official offer, and I
[19] mean on paper.
[20] **Q:** You were made one orally, weren't you?
[21] **A:** We were discussing this possibility.
[22] **Q:** Did you ever tell your doctor about that
[23] possibility?
[24] **A:** I don't remember, but most likely no, I did

Page 30

[1] not.
[2] **Q:** Why didn't you?
[3] **A:** I think I didn't tell him anything that I
[4] was discussing, anything with Varvax firm.
[5] **Q:** My question is, why didn't you tell him?
[6] **A:** I don't have a question (sic) to that, but
[7] the only thing I would like to look up, when I had
[8] visits to my doctor and I discussed the issue that I
[9] was looking for a job. And I don't remember that I
[10] was talking to him about Varvak's firm, and I don't
[11] know how to answer your question, why.
[12] **Q:** You don't know because you don't understand
[13] it, or you don't know what to say?
[14] **A:** One more time repeat, please.
[15] **Q:** Is the reason you don't know how to answer
[16] my question because you didn't understand it, or you
[17] don't know what to say in response?
[18] **A:** I don't know what to say. I did not
[19] discuss with my doctor anything about Uri Varvak's
[20] firm, as far as I remember.
[21] **Q:** At any time before December 7th, 2001,
[22] before December 7, 2001, did you tell anybody at PTC
[23] that you called CIGNA to say you were returning
[24] to work?

Page 31

[1] **A:** No.
[2] **Q:** And you didn't tell anybody at CDI either,
[3] did you?
[4] **A:** No, I didn't say anything at CDI. No, I
[5] didn't say anything at CDI about my disability
[6] before December 7th.
[7] **Q:** At any time before December 7th, did you
[8] tell your doctor that you had called CIGNA to say
[9] that you were coming back to work?
[10] **A:** To return to CIGNA to work?
[11] **Q:** No. At any time before December 7th, did
[12] you tell your doctor that you had called CIGNA to
[13] tell CIGNA that you were returning to work?
[14] **A:** No.
[15] **Q:** At any point in time, Mr. Kouvchinov, any
[16] point in time did you ask CIGNA to call PTC or write
[17] to PTC to tell them about the call you said you made
[18] to CIGNA on November 29th, 2001?
[19] **A:** No.
[20] **Q:** Mr. Kouvchinov, I'm going to show you
[21] what's been previously marked as Exhibit No. 27 in
[22] this deposition. Can you read to me in English,
[23] please, the third paragraph.
[24] **THE WITNESS:** "As long as you remain

Page 32

[1] totally disabled from performing the duties of your
[2] occupation, benefits will be payable for a maximum
[3] of 12 weeks, and checks will be sent at weakly
[4] intervals at the end of each benefit period."
[5] **Q:** Thank you. Do you understand what you just
[6] read?
[7] **A:** Yes.
[8] **Q:** Mr. Kouvchinov, I'm going to show you what
[9] was previously marked as Exhibit No. 12 during the
[10] deposition. Do you recall that is a copy of the
[11] Complaint filed in this action on your behalf?
[12] **A:** (Reviewing document)
[13] **Q:** Do you recall this document?
[14] **A:** Yes.
[15] **Q:** If you could turn to Page 5, please.
[16] Before we ended the last day on November 16th, I was
[17] asking questions about Count VI, the defamation
[18] claim against PTC and Lisa Wales.
[19] **A:** I have a question to the interpreter. I
[20] need help. What is a defamation? I need to
[21] understand it in Russian. I don't quite understand
[22] what the term means.
[23] **THE INTERPRETER:** Do you want me to
[24] explain?

Errata4.doc
VOL 4
1

| PAGE | LINE | CORRECTION | REASON |
|---|---|---|---|
| 08 | 01 | Well, this company belongs to Anna Varvak. Anna Varvak is Uri | Mistranslation |
| 08 | 02 | Varvak's wife. Uri Varvak and I worked together. | Mistranslation |
| 08 | 03 | This company fixed database corruption for PDM.  They called | Mistranslation |
| 09 | 24 | taking during Lisa Wales's deposition recently. | Mistranslation |
| 17 | 10 | No. But there is a medical office. | Mistranslation |
| 30 | 04 | was discussing, anything with Varvak's firm. | Mistranslation |

Signed under the penalties of perjury this 14 day of February, 2006

Alex Kuvshinov

**EXHIBIT W**

*Exh - 8*
*11|8|05*

 **CDI**®

**Information Technology Services**

## EMPLOYMENT AGREEMENT

**A.    Basic Information**

Employer: ____CDI Information Technology Services____ ("we", "us" or "our")

Employee: _____Alexei Kouvchinov_____ ("you" or "your")

Beginning Date of Employment: ____December 3, 2001_____

Compensation:    "Regular Rate" of Pay: $_48.00 from December 3, 2001 to December 30, 2001 and $52.00 from December 31, 2001 through the end of assignment_ per hour.
    "Overtime Rate" of Pay $ _same as above_ per hour.

Overtime:    All hours worked in excess of forty (40) hours in any one week.

**B.    Standard Terms**
This is an Employment Agreement ("Agreement") between you and us and it is made up of the above Basic Information, these Standard Terms and any Optional Terms which are set forth on an attached page and which are specifically made part of this Agreement.

1.    **Beginning Date of Employment.** Your employment under this Agreement will start on the Beginning Date of Employment set forth above.

2.    **Work Rules.** While working at our facility, you will follow any work rules, regulations, or policies, which have been established.

3.    **Compensation.** You acknowledge and understand that you are employed on a per hour basis and not on a per week, per month or some other basis. For each hour of work performed by you under this Agreement, we will pay you at your Regular Rate, except that for each hour of Overtime worked by you we will pay you at your Overtime Rate. Since you are employed on a per hour basis, if you fail to work any day or a part of any day you will not be paid for the time not worked.

4.    **Time Cards.** You agree to accurately maintain a time card for all time worked by you and your further agree that such time card records will be conclusive as to the time worked by you.

5.    **Confidentiality and Property Rights.** You acknowledge that in the course of your employment by us you will have access to and be exposed to valuable confidential and trade secret information of ours and our Customer. You agree, during the term of your employment and forever thereafter, to keep confidential all information and material provided by us or our Customer ("Confidential Information"), including any information and material relating to any of our employees, customers, vendors or other parties we do business with and excluding only information that is or becomes public knowledge through no fault or participation by you. You agree to keep in strictest confidence and not to disclose, use, copy or make available to others any Confidential Information except as is required in the course of your performing services hereunder or with our prior written permission.

All documents, manuals, bids, contracts, financial data, customer lists and information, employee and applicant lists and information, systems for recruitment and sales, equipment, hardware, software, source code, data bases, designs, drawings, plans, data and the like (including all copies thereof), relating to our business or our Customer's business, which you use, prepare or come into contact with, will remain our or our

Employer    Employee

Page 1 of 4

0074



Information Technology Services

Customer's exclusive property and must be returned to us promptly upon our request or upon termination of your employment with us for any reason.

Employer     Employee

0075



**Information Technology Services**

You agree that all inventions, innovations, concepts, developments, designs, processes, procedures and improvements ("Inventions") related to our or our Customer's business which are made or conceived by you, under your direction or by you jointly with others during the course of your employment by us (including Inventions created outside of working hours), whether or not patentable or copyrightable, will be our sole property. You also agree that any copyrights and other proprietary interests in such Inventions will belong to us or our Customer, and you will promptly and completely disclose and assign all those Inventions to us. For purposes of this paragraph, Inventions made or conceived by you, whether alone or with others, within six months after the termination of your employment with us, will be conclusively presumed to have been made or conceived by you during the term of your employment with us. You agree that, from time to time as we may request, you will sign all documents and do all other things (at our cost) which may be necessary to secure or establish our or our Customer's ownership of such Inventions. Inventions which you have developed prior to being employed by us and which you wish to be excluded from this paragraph must be described on an attachment to this Agreement.

You acknowledge that a breach by you of any provision of this Section may result in serious and irreparable injury to us, which may not be readily or adequately compensated by money damages. Therefore, in the event of your breach or threatened breach of any provision of this Section, we will be entitled to an injunction restraining you from disclosing any Confidential Information or from rendering any services to any person or entity to whom any Confidential Information has been or is threatened to be disclosed. Nothing in this Section should be construed as prohibiting us from pursuing any other remedies for any such breach or threatened breach by you, including the recovery of money damages from you. The provisions of this Section are for our benefit and for the benefit of our Customer and either will have all rights and remedies to enforce such provisions. The provisions of this Section are continuing and will survive indefinitely the termination of this Agreement or of your employment with us.

6.  **Termination.** The employment relationship between you and us hereunder may be terminated at any time at the will of either you or us, either before, on, or after the Reporting Date, without the need for the terminating party to give a specific reason or cause to the other party for the termination. You acknowledge that, as our employee, you will be working in the temporary staffing business and therefore your employment may be terminated when your assignment with our Customer ends or at any earlier time at the discretion of our Customer or us. In the event of termination on or after the Reporting Date, you will be entitled to receive compensation earned through the time of termination, but we shall have no other obligation or liability to you other than the payment of such earned compensation. In the event of termination before the Reporting Date, we shall have no obligation or liability to you whatsoever.

7.  **Amendment of Terms.** This Agreement can be amended by you and us signing a document containing the amended terms. The only other way this Agreement can be amended is by us giving you written notice of the amendment at least one week prior to the effective date of the amendment. If you continue to work for us after the effective date of the amendment, you will be considered as having specifically agreed to the amendment.

8.  **Obligations Following Termination.** You agree not to accept employment directly with our Customer, or indirectly with our Customer by accepting employment with a competitor of ours for assignment to our Customer, for a period of ninety (90) days following termination of your employment with us under this Agreement, unless we give our written consent to such employment. This provision will survive the termination of this Agreement or of your employment under this Agreement.

9.  **Governing Law.** This Agreement will be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, except that if our Customer enforces its rights under this Agreement, and our Customer's contract with us has a provision choosing a different state's law, then, at our Customer's option, the state law specified in our Customer's contract shall govern.

Employer    Employee

0076





**Information Technology Services**

10. <u>Other Agreements.</u> By signing this Agreement, you represent and warrant to us that you are not bound by any other agreement, written or oral, which would preclude you from entering into this Agreement. You also represent that you will not utilize, in connection with your employment under this Agreement, any materials which may be construed to be confidential to a party other than our Customer or us. In the event of a breach by you of this provision which results in damage to us, you agree to indemnify and hold us harmless with respect to such damage.

11. <u>Entire Agreement.</u> The Basic Information, Standard Terms and any Optional Terms which are specifically included constitute the entire understanding between you and us and there are no representations or agreements except as provided herein.

EMPLOYEE

By: _A. Kouvchinov_ 11/29/01

Date

Print Name: _A. Kouvchinov_

EMPLOYER

By: _Reg Glenn_ 11/29/01

Date

Title: _Branch Administrator_

Employer    Employee

0077

**EXHIBIT X**

Page 1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                            DISTRICT OF MASSACHUSETTS
 2
        ALEXEI KOUVCHINOV,              )
 3          Plaintiff,                  )
                                        )
 4      vs.                             )  DOCKET NO. 04-12531 MEL
                                        )
 5      PARAMETRIC TECHNOLOGY           )
        CORPORATION, CDI CORPORATION    )
 6      LISA WALES, and CONNECTICUT     )
        GENERAL LIFE INSURANCE CO.      )
 7          Defendants.                 )

 8                       ------------------------

 9                       ORAL DEPOSITION OF

10                          SCOTT ANDERSON

11                          March 15, 2006

12                       ------------------------

13

14

15

16

17

18            ORAL DEPOSITION OF SCOTT ANDERSON, produced as a

19      witness at the instance of the Plaintiff, and duly sworn,

20      was taken in the above-styled and numbered cause on the 15th

21      day of March, 2006, at 12:30 p.m., before Catherine Vecchio

22      Williams, CSR/RPR, in and for the State of Texas, reported

23      by machine shorthand, at the offices of Arlington Court

24      Reporting, Inc., 901 Avenue K, Grand Prairie, Texas 75050

25      pursuant to the Federal Rules of Civil Procedure.
```

Page 14

1    A.  Yes.
2    Q.  What were those standards or expectations?
3    A.  A range between 60 to 90 claims at any time.
4    Q.  Okay.  And that was true of all managers on your
5  team?
6    A.  That was the general guideline, yes.
7    Q.  How often did you interact with the claim managers
8  on your team?
9    A.  Daily.
10    Q.  Okay.  And that was true with all the claim
11  managers?
12    A.  Yes, sir.
13    Q.  And were you physically located right next to them?
14    A.  Yes.  In a team environment, yes.
15    Q.  And that means there was a cluster of cubicles per
16  team?
17    A.  Yes.
18    Q.  And did you have a cubicle or an office?
19    A.  Cubicle.
20    Q.  Was there a standard voicemail message that claim
21  managers were supposed to leave on their telephone system?
22    A.  Yes.
23    Q.  And what did that message indicate a person was
24  supposed to do if they got the message?
25    A.  The message would say to either leave a message at

Page 15

1  the tone or to press a button to go to the next available
2  case manager.
3    Q.  Okay.  So if they pressed a button to go to the
4  next available case manager, who would they be directed to?
5    A.  The next available person within that team.
6    Q.  And how would the phone system know who that was?
7    A.  I don't know how the phone system works.  It's
8  just that's the way it was set up.
9    Q.  Okay.  And were there ever any occasions when
10  there was nobody available on that team?
11    A.  Probably.
12    Q.  And what would happen in that circumstance?
13    A.  We have buddy teams, if nobody in one team was
14  available, it might roll to the next team for somebody
15  available there.
16    Q.  Okay.  And did Team High have a buddy team back in
17  September to December 2001?
18    A.  I would say yes.  I do not know who that was.
19    Q.  And did the phone message indicate when a person
20  should leave a message as opposed to when they should press
21  a button to talk to somebody else?
22    A.  To leave a message at the tone or press a button
23  before that tone.
24    Q.  Okay.  But it didn't say anything about under
25  which circumstances someone should leave a message as opposed

Page 16

1  to trying to talk to somebody else?
2    A.  No.
3    Q.  All right.  There was -- the Unilynx System was in
4  place as of September to December of 2001; is that right?
5    A.  Yes.
6    Q.  And when did that system come into place?
7    A.  I do not remember the date.
8    Q.  When it came into place, was there any training
9  provided to claim managers about it?
10    A.  Yes.
11    Q.  What type of training was provided?
12    A.  How it works and what we should be doing to
13  navigate through it.
14    Q.  How long was the training?
15    A.  I do not remember.
16    Q.  Was it more than a day?
17    A.  Yes.
18    Q.  And did you attend that training as well?
19    A.  Yes.
20    Q.  What was the purpose of the Unilynx System?
21    A.  Claim documentation.
22    Q.  And what was supposed to be documented in Unilynx?
23    A.  Information that is pertinent to that claim file.
24    Q.  Okay.  So is it the case that any information that
25  was pertinent to the claim file was supposed to be entered

Page 17

1  into Unilynx?
2    A.  Yes.
3    Q.  So, for example, if correspondence -- if Signa
4  received correspondence with respect to a claim, was that
5  correspondence supposed to be logged into Unilynx?
6    A.  If there was pertinent information, it should be
7  documented what information was received.
8    Q.  Okay.  And if Signa sent out some communication to
9  somebody, was that supposed to be documented in Unilynx?
10    A.  Again, if it was pertinent to that claim and the
11  status, yes.
12    Q.  Okay.  So as a general rule, anything that
13  happened that was pertinent to a claim was supposed to be
14  documented in Unilynx; is that correct?
15    A.  Yes.
16    Q.  All right.  So if Signa sent or received an email
17  that was pertinent to a claim, that information, or that
18  email, should be logged into Unilynx; is that right?
19    MR. CREVIER:  Objection.
20    Q.  (BY MR. CHURCHILL)  You can still answer.  Let me
21  ask it another way.  Were emails ever entered into Unilynx?
22    A.  Yes.
23    Q.  Under what circumstances?
24    A.  If a claim manager chose to document it by putting
25  it in there, otherwise, it might have a hard copy to the

5 (Pages 14 to 17)

5a24682e-8bca-49da-b94f-705b2cf19898

Page 18

1  file if it was pertinent.
2      Q.  Okay. Was there a requirement that email
3  communications be documented in Unilynx?
4      A.  Not that I can recall.
5      Q.  And so how would the email be part of a file if it
6  were not in Unilynx?
7      A.  Print it off and placed into the physical claim
8  file.
9      Q.  And that required the person who received or sent
10  the email to print it out and put it in the file; is that
11  right?
12      A.  Yes.
13      Q.  So how was it determined what information had to
14  go into Unilynx as a note and what could just be put in the
15  physical claim file?
16      A.  I do not recall the guidelines as to what would go
17  in either place.
18      Q.  In your experience, did it ever happen that claim
19  managers got behind in terms of entering information into
20  Unilynx?
21      A.  Yes.
22      Q.  Because with 60 to 90 claims, there's a lot of
23  things that can happen during the course of the day; is that
24  fair to say?
25      A.  Yes.

Page 19

1      Q.  And were you -- did you ever become aware of any
2  circumstances when claim mangers did not enter into Unilynx
3  information that they should have?
4      A.  I don't remember.
5      Q.  Okay. I'm not asking if you remember any specific
6  instances but as a general matter, has that happened that
7  you determined that claim managers have not entered into
8  Unilynx something that they should have?
9      A.  It would be possible.
10      Q.  And how would you generally learn about something
11  like that?
12      A.  I don't know.
13      Q.  Were there ever any occasions when you were
14  auditing a file and you saw some written information or a
15  printout that you thought should have been documented in
16  Unilynx?
17      A.  Could you please repeat that?
18      Q.  Sure. Is one of the things you look at when you
19  perform an audit whether the file has been properly
20  documented?
21      A.  Yes.
22      Q.  And is one the things you're considering is whether
23  appropriate notes have been entered into Unilynx?
24      A.  Yes.
25      Q.  All right. And in the course of doing those

Page 20

1  audits, have you ever determined a claim manager should have
2  entered something into Unilynx that they didn't?
3      A.  Yes.
4      Q.  How would you describe Ms. Wallace's performance?
5      A.  I do not remember five years ago.
6      Q.  Okay. When did you stop working together?
7      A.  May of 2002.
8      Q.  Do you recall anything about her performance?
9      A.  It was acceptable.
10      Q.  Would you say she was an excellent performer?
11      A.  I do not know.
12      Q.  Did you ever have any role in preparing the
13  evaluations for her?
14      A.  Other than the audits, no.
15      Q.  All right. When you performed audits of Ms.
16  Wallace's files, did you ever find any problems?
17      A.  I don't remember.
18      Q.  Let me show you what's been marked as Exhibit 74.
19  Have you seen that document before? And by "document," I
20  mean the whole exhibit.
21      A.  All the pages?
22      Q.  Yes. Well, let me hopefully move things along.
23  These are printouts from Unilynx; is that right?
24      A.  Yes.
25      Q.  And at the bottom in the center, there's something

Page 21

1  that says, "Note num equals two," placed on this first page.
2  Do you see that?
3      A.  Yes.
4      Q.  And does that mean this is note number 2 in this
5  claim?
6      A.  I don't know.
7      Q.  Okay. You recognize these though as printouts from
8  Unilynx; is that right?
9      A.  Yes.
10      Q.  And these are printouts for a claim by Alexei
11  Kouvchinov?
12      A.  Yes.
13      Q.  All right. Have you seen any of these printouts
14  before today?
15      A.  Yes.
16      Q.  Who was Melody Welch as of October 2001? What
17  position was she in?
18      A.  I do not know.
19      Q.  All right. On the second page of this exhibit --
20  and I'll refer to page numbers at the bottom right-hand
21  corner. You see it says 432?
22      A.  Yes.
23      Q.  This is the note you entered into Unilynx on
24  October 4th, 2001; is that right?
25      A.  Yes.

6 (Pages 18 to 21)

5a24682e-8bca-49da-b94f-705b2cf19898

**EXHIBIT Y**

Subject: **RE: Alexei Kouvchinov**
Date: Thu, 6 Dec 2001 16:25:00 -0500
From: "Edward Raine" <eraine@ptc.com>    **Internal**
To: "Lisa Peraner Wales" <lwales@ptc.com> , "Richard Bellingham" <rbellingham@ptc.com> ,
    "Nicole B Pitchon" <npitchon@ptc.com>
CC: "Christopher J Cimitile" <ccimitile@ptc.com> , "Don U Aviv" <daviv@ptc.com> ,
    "Aaron C. von Staats" <avonstaats@ptc.com> , "Lisa Perry" <lperry@ptc.com> ,
    "Evelyn Flaherty" <eflaherty@ptc.com>

A
Q. 35
11-18-05   LEA

My thoughts:

PTC has contracted with agencies and brought in other ex-PTC employees
immediately following their notification.  I assume that the reqs were
signed per the appropriate procedure.

The agency is contracted to perform the work.  They have provided Alexei as
the contractor.

Alexei should have signed in as required as a contractor.  If he stays this
needs to happen immediately.

>From the facts written below it seems clear that Alexei has breached
business ethics by claiming for STD while at the same time being able to
perform work as a contractor at PTC.

PTC has the right to say to the agency that we no longer wish to retain the
services of a given contractor - in this case on the basis of ethical
concerns.  The agency can find a replacement or we use another agency.

Unless others have differing opinions my recommendation is for Chris
Cimitile to discuss this situation with Lee Lesburg, explain our position on
the business ethics, seek agreement, and have Lee notify the agency of PTC's
decision.

Ed

-----Original Message-----
From: Lisa Peraner Wales [mailto:lwales@ptc.com]
Sent: Thursday, December 06, 2001 12:00 PM
To: Richard Bellingham; Edward Raine; Nicole B Pitchon
Cc: Christopher J Cimitile; Don U Aviv; Aaron C. von Staats; Lisa Perry;
Evelyn Flaherty; Lisa Peraner Wales
Subject: Alexei Kouvchinov

Hi All,

as a follow up to my voicemail:

Alexei Kouvchinov was part of the August RIF. He was on vacation the
week of the notifications. I handled his separation meeting on 09/10/01
when he returned. His separation date from PTC is 09/24/01.

On 09/14/01 he submitted a STD claim. I met with the Evelyn Flaherty and
Lisa Perry from benefits and Aaron von Staats from legal to discuss. His
put claim was submitted to Cigna for their determination since he was
eligible for the STD benefit through 09/24/01. Alexie's lawyer contacted
us and spoke with Aaron.

Alexei sent John Busa, SVP in SSG, an email on 09/25/01 indicating he
was available to do PDM Database repair. John let him know he was not

interested in his services.

Alexei signed his separation agreement and was paid his full severance on 11/09/01.

Alexei's STD claim was approved. Lisa Perry from benefits will follow up with a summary of his STD claim history.

On Tuesday of this week, 12/04/01, I ran into Alexei in the kitchenette near my office on the 2nd floor of building C. I asked him who he was working for, what kind of assignment, and for how long. He indicated that he was working on a contract assignment for Lee Lesburg. Lee Lesburg is a GSO Program Manager.
Alexei was unsure of the length of his assignment.

I contacted Lee Lesburg directly. He indicated that Alexei and Sergey Denisenko, another RIFed employee, were working for him 40 hours a week, for a 3-6 month assignment, doing database repair for Pro/PDM. They were contractors through CDI.

CDI is a agency that GSO uses for consultants, not developers. For Alexei and Sergey 2 PO's were approved for 2 month assignments.

Don Aviv and I spoke today. Alexei is taking Windchill classes in our collaboration center. He has signed in as a Windchill student/visitor, but he has not registered as a contractor and followed normal procedures: received a badge, registered his vehicle, etc.

Lisa Perry confirmed today that Cigna extended Alexiei's claim through 12/16/01. Alexei started contracting here at PTC on December 4th to attend a 4 day Windchill training class. Cigna also indicated that they would be turning his case over to LTD because the 12 week STD period was complete on 12/16/01.

This situation is gaining high visibility in many areas. I am available to answer any questions.

Thanks,

Lisa

--
Lisa Wales
Human Resources Representative
Ph. (781) 370-5863
Fax (781) 370-6010

RESP00117

12/7/01 8:19 AM

2 of 2

**EXHIBIT Z**

# In The Matter Of:

*Alexei Kouvchinov   v.*
*Parametric Technology Corporation, et al.*

---

*Leonard E. Freedberg, M.D.*
*Vol. 1, March 7, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File FREEDBER.V1, 50 Pages*
*Min-U-Script® File ID: 2103187576*

# Word Index included with this Min-U-Script®

Page 1

Volume I
Pages 1 to 50
Exhibits 62 - 73
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALEXEI KOUVCHINOV,            :
        Plaintiff,            :
vs.                           : Civil Action
                              : No. 04 12531 MEL
PARAMETRIC TECHNOLOGY         :
CORPORATION, CDI CORPORATION, :
LISA WALES, and CONNECTICUT   :
GENERAL LIFE INSURANCE CO.,   :
        Defendant             :

DEPOSITION OF LEONARD E. FREEDBERG, M.D., a
witness called on behalf of the Defendants
Parametric Technology Corporation and Lisa Wales,
taken pursuant to the Federal Rules of Civil
Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Dr. Leonard Freedberg, 2634 Washington Street,
Newton, Massachusetts, on Tuesday, March 7, 2006,
        commencing at 3:30 p.m.
        PRESENT:
        Hale and Dorr Legal Services Center
                (by Stephen Churchill, Esq.)
        Harvard Law School, 122 Boylston Street,
        Jamaica Plain, MA 02130, for the Plaintiff.
        Jackson Lewis LLP (by Guy P. Tully, Esq.)
                75 Park Plaza, Boston, MA 02116,
        for the Defendants Parametric Technology
                Corporation and Lisa Wales.
        Also Present: Alexei Kouvchinov

Page 2

INDEX

WITNESS:    DIRECT  CROSS  REDIRECT  RECROSS
Leonard E.
Freedberg, M.D.
    (by Mr. Tully)    4      37
                             47
    (by Mr. Churchill)  33       43

EXHIBITS
NO.                                      PAGE
62  Subpoena duces tecum for Dr. Freedberg's
    deposition                              5
63  Two-page typewritten version of Dr.
    Freedberg's notes headed, "Alexei
    Kouvchinov, June 21, 2000: Initial
    Evaluation,"                            6
64  One-page letter dated March 23, 2004,
    to Mr. Notis from Dr. Freedberg, with
    two-page typewritten listing of notes of
    visits of Mr. Kouvchinov                13
65  One-page claim form for Alexei Kouvchinov
    signed by him on 9/17/01                18
66  Four pages of Dr. Freedberg's handwritten
    notes re visits with Alexei Kouvchinov,
    the first being 9/17/01                 19
67  Documents Bates Nos. 380 - 386, the first
    being a Newton-Wellesley Psychiatry Fax
    Cover Sheet to CIGNA Group Ins. dated
    10-17-01                                20
68  Handwritten note by Dr. Freedberg re "Alex
    Kouvchinov" dated 10/4/01               42
69  Handwritten note by Dr. Freedberg re
    "Alexei Kouvchinov" dated 12/20/01      42

Page 3

INDEX(Continued)
NO.                              PAGE
70  Handwritten note by Dr. Freedberg re
    "Alexei Kouvchinov" dated 12/17/01      42
71  Handwritten note by Dr. Freedberg re
    "Alexei Kouvchinov" dated 11/15/01      43
72  Handwritten note by Dr. Freedberg re
    "Alexei Kouvchinov" dated 11/17/01      44
73  Handwritten note by Dr. Freedberg re
    "Alexei Kouvchinov" dated 11/28/01      44

Leonard E. Freedberg, M.D.
Vol. 1, March 2004 Case 1:04-cv-12531-MEL    Document 63-27    Filed 06/05/2006

Alexei Kouvchinov    v.
Parametric Technology Corporation, et al.
Page 4 of 7

Page 4

[1]                    **PROCEEDINGS**
[2] LEONARD E. FREEDBERG, M.D.
[3] a witness called for examination by counsel for the
[4] Defendants Parametric Technology Corporation and
[5] Lisa Wales, having been satisfactorily identified by
[6] the production of his driver's license and being
[7] first duly sworn by the Notary Public, was examined
[8] and testified as follows:
[9]                **DIRECT EXAMINATION**
[10]                   **BY MR. TULLY:**
[11]    **Q:** Good afternoon, Dr. Freedberg. My name is
[12] Guy Tully. I'm an attorney representing Parametric
[13] Technology Corporation and have been in a lawsuit
[14] that was filed against them by Alex Kouvchinov.
[15]    We're here obviously for the purpose of
[16] taking your deposition. If at any time my questions
[17] are confusing or you would like them restated or
[18] they don't make sense, simply tell me and I'll do my
[19] best to ask a better question. At any time if you
[20] need to take a break, let me know and I would be
[21] happy to go off the record.
[22]    Would you please state your full name for
[23] the record.
[24]    **A:** Leonard Freedberg.

Page 5

[1]    **Q:** And where do you work, Dr. Freedberg?
[2]    **A:** Newton Wellesley Psychiatry.
[3]    **Q:** What's your position?
[4]    **A:** I'm the managing partner.
[5]    **Q:** And would you summarize for me your
[6] education.
[7]    **A:** I graduated medical school in 1971,
[8] finished psychiatric residency in 1975, spent two
[9] years in the Navy as a psychiatrist, and have been
[10] back in Boston in hospital and private practice
[11] since then.
[12]    **Q:** And where did you go to med school?
[13]    **A:** Harvard Medical School.
[14]    **Q:** Are you board certified in psychiatry?
[15]    **A:** Yes.
[16]    **Q:** Do you have any other board certifications?
[17]    **A:** No.
[18]    **Q:** And you're here today in response to a
[19] subpoena; is that correct?
[20]    **A:** Yes.
[21]    (Document marked as Exhibit 62
[22] for identification)
[23]    **Q:** I want to show you what's been marked as
[24] Exhibit No. 62 and ask if you recognize that as a

Page 6

[1] copy of the subpoena that was issued.
[2]    **A:** Yes.
[3]    **Q:** Turning, Dr. Freedberg, to the fourth page,
[4] there was a Schedule A attached to this asking you
[5] to bring with you to the deposition today certain
[6] documents relating to treatment of Mr. Kouvchinov.
[7]    **A:** Yes.
[8]    **Q:** Do you have those with you?
[9]    **A:** I have his chart here.
[10]    **Q:** Okay. How long have you known Alex
[11] Kouvchinov?
[12]    **A:** Since June 2000.
[13]    **Q:** And how is it he came to you?
[14]    **A:** He came here for a consultation and
[15] treatment.
[16]    (Document marked as Exhibit 63
[17] for identification)
[18]    **Q:** I believe, Doctor, your office previously
[19] has provided the parties with copies of some of your
[20] consultation notes. I want to confirm today whether
[21] we have them all at this point. But what I've
[22] marked as Exhibit 63 appears be it an intake form
[23] dated June 21, 2000; is that correct?
[24]    **A:** Yes.

Page 7

[1]    **Q:** And are these a transcription of your notes
[2] of your intake with Mr. Kouvchinov?
[3]    **A:** Yes.
[4]    **Q:** If you could tell me, sir, about your
[5] standard practice when you meet with patients. Do
[6] you generally take notes during the consultation
[7] session?
[8]    **A:** No.
[9]    **Q:** When do you prepare notes of your meetings?
[10]    **A:** I dictate afterwards.
[11]    **Q:** And are those, then, at some point
[12] transcribed?
[13]    **A:** Yes.
[14]    **Q:** And what do you dictate from? Do you make
[15] any handwritten notations of any type?
[16]    **A:** No.
[17]    **Q:** And do you include, in your dictated notes,
[18] everything that is said during the session that you
[19] believe is important?
[20]    **A:** Yes.
[21]    **Q:** Certainly everything of any clinical
[22] significance would be included in your notes; is
[23] that fair?
[24]    **A:** I try to.

Page 8

[1]  **Q:** Has that always been your practice, not to
[2] utilize handwritten notes?
[3]     **A:** During the initial evaluation, yes.
[4]     **Q:** How about subsequent evaluations or
[5] meetings?
[6]     **A:** Those notes are in hand.
[7]     **Q:** Do you take those during the course of the
[8] session?
[9]     **A:** No. Right afterwards.
[10]    **Q:** And would the same be true with your
[11] handwritten notes; you try generally to include
[12] everything of importance that's said?
[13]    **A:** No. The handwritten notes are much less
[14] comprehensive.
[15]    **Q:** And why is that?
[16]    **A:** Well, merely just for time.
[17]    **Q:** What would you not include in your
[18] handwritten notes that you might include in a
[19] dictated note?
[20]    **MR. CHURCHILL:** Objection.
[21]    **A:** There is no particular pattern.
[22]    **Q:** Is there ever a scenario where you would
[23] not include something you felt was clinically
[24] significant in your handwritten notes?

Page 9

[1]     **A:** You mean deliberately not include
[2] something?
[3]     **Q:** Yes.
[4]     **A:** No.
[5]     **MR. CHURCHILL:** Can we reserve all
[6] objections except as to form?
[7]     **MR. TULLY:** Yes. Absolutely. I'm sorry.
[8] We're going to have the same stipulations we've had
[9] throughout the depositions in the case. Sorry,
[10] Steve. Thank you.
[11]    **Q:** As a result of your initial evaluation of
[12] Mr. Kouvchinov, did you reach a diagnosis?
[13]    **A:** Yes.
[14]    **Q:** And what was that?
[15]    **A:** Dysthymia.
[16]    **Q:** And what does that mean?
[17]    **A:** Mild depression.
[18]    **Q:** Did you put Mr. Kouvchinov through any sort
[19] of psychological testing during your initial
[20] meeting?
[21]    **A:** No.
[22]    **Q:** Do you ever do that with your patients?
[23]    **A:** No.
[24]    **Q:** Is it fair to say you are not a clinical

Page 10

[1] psychiatrist — I'm sorry, a forensic psychiatrist?
[2]     **A:** I'm not a forensic psychiatrist.
[3]     **Q:** Did you make any assessment, on the initial
[4] evaluation, of Mr. Kouvchinov's propensity to tell
[5] the truth?
[6]     **A:** Not specifically.
[7]     **Q:** Is it your role as a treating psychiatrist
[8] generally to assume the truth of what your patients
[9] tell you during the session?
[10]    **A:** Generally speaking, yes.
[11]    **Q:** According to your record, Doctor, when is
[12] the next time you saw Mr. Kouvchinov?
[13]    **A:** September 17, 2001.
[14]    **Q:** And how long were your sessions with Mr.
[15] Kouvchinov in general?
[16]    **A:** The initial session is 45 to 60 minutes.
[17] Subsequent meetings are approximately 15 minutes,
[18] sometimes a little longer.
[19]    **Q:** And are those — have those been done here
[20] or at your previous office location?
[21]    **A:** They were at the previous office until we
[22] moved down here.
[23]    **Q:** When was that move?
[24]    **A:** October of 2003.

Page 11

[1]     **Q:** What —
[2]     **A:** 2004, excuse me.
[3]     **Q:** Can you tell us what your notes indicate
[4] was told you by Mr. Kouvchinov on September 17th,
[5] 2001.
[6]     **A:** Do you want me to read the note?
[7]     **Q:** Yes. Why don't you read that one, please.
[8]     **A:** "Off meds for months. Depressed (very) for
[9] one or two months. Greatly decreased sleep.
[10]     (Ambien, had some left over, didn't work.) Greatly
[11] decreased concentration. (Takes 6 or 7 hours to do
[12] what used to take one or two hours.) Decreased
[13] energy. Decreased interest. Not suicidal. Only
[14] precipitant equals met his half brother (same
[15] father) a year ago. Within the last few months saw
[16] him in Kurkistan in jail. Son and half brother only
[17] relatives. No medical problems. Alcohol once
[18] weekly. Objectively severely depressed. Not
[19] psychotic, incompetent or suicidal but some despair.
[20] Profound psychomotor retardation. Plan: Prozac.
[21]     (It's worked, albeit slowly.) Restoril. Call as
[22] needed. Likely to need short-term disability from
[23] work for one to two months. See in three weeks."
[24]    **Q:** Okay. What was your understanding, if you

Page 12

[1] could tell from your notes, as to Mr. Kouvchinov's
[2] employment status on September 17th, 2001?
[3]   **A:** My understanding is that he was employed, I
[4] assume at the same job he had in June.
[5]   **Q:** And do your notes — do I read this
[6] correctly that the only precipitant that you're
[7] identifying in your notes causing the onset of the
[8] depression symptoms were the fact that he had met
[9] his half brother a year before and more recently a
[10] few months ago in Kurkistan?
[11]   **A:** That was my understanding at the time.
[12]   **Q:** And, again, the information in your notes
[13] is information you got directly from Mr. Kouvchinov;
[14] is that correct?
[15]   **A:** Yes.
[16]   **Q:** Who raised the issue of needing short-term
[17] disability on September 17th?
[18]   **A:** I don't remember.
[19]   **Q:** Is that something you might have raised or
[20] would you typically raise with a patient, the
[21] possibility of going on short-term disability?
[22]   **MR. CHURCHILL:** Objection.
[23]   **A:** I might have.
[24]   **Q:** Was there any discussion that you recall

Page 13

[1] with Mr. Kouvchinov about going on short-term
[2] disability or needing short-term disability?
[3]   **A:** My memory is that it looked like he
[4] absolutely needed short-term disability and was
[5] going to go on it.
[6]   **Q:** And how did you arrive at the one- to
[7] two-month time period?
[8]   **A:** Well, as I recall, based on how severely
[9] depressed he was and that he had responded slowly in
[10] the past to treatment.
[11]   (Document marked as Exhibit 64
[12] for identification)
[13]   **Q:** I'm going to show you what's been marked as
[14] Exhibit No. 64. This appears to be a typewritten
[15] version of your treatment notes that you — that
[16] your office prepared for Mr. Kouvchinov back on
[17] March 23rd, 2004. It relates to sessions on
[18] September 17th, October 10th, October 25th, November
[19] 8th, November 21, December 17th, 2001; and January
[20] 21, May 29, October 4 of 2002; March 17, March 31 of
[21] 2003; March 19 of 2004; is that correct?
[22]   **A:** Yes.
[23]   **Q:** When is the last time that you had seen Mr.
[24] Kouvchinov clinically?

Page 14

[1]   **A:** When is the last time I've seen him
[2] recently? (Reviewing document) February 10, 2006.
[3]   **Q:** Can you tell me, please, the dates that you
[4] saw Mr. Kouvchinov between February of '06 and March
[5] 19, 2004.
[6]   **A:** August 23rd, 2004, and April 13th, 2005.
[7]   **Q:** So since March 24, it's only been those
[8] three occasions that you've seen him?
[9]   **A:** Yes.
[10]   **Q:** Does he continue to be your patient?
[11]   **A:** Yes.
[12]   **Q:** And what do your notes indicate transpired
[13] during your session on February 10th of '06?
[14]   **A:** He complained of increased depression,
[15] wanted to go back on Prozac. He had been off for
[16] five years. Also complained of inattention, which
[17] is worsening. Started around age 42, he says.
[18] Never a problem earlier in life. Very little
[19] alcohol. Only around every three to four months.
[20] Son, 12, is the love of his life. Objectively less
[21] depressed than on the April visit in '05. "Call as
[22] needed. Add Prozac. Will call for appointment."
[23] And he was on Welbutrin SR 150 milligrams twice a
[24] day. He had occasional Remeron at the time.

Page 15

[1]   **Q:** Do I understand correctly that as of
[2] February you put him back on Prozac?
[3]   **A:** That's right.
[4]   **Q:** Why did you do that?
[5]   **A:** He was more depressed and wanted to try
[6] Prozac again, because it had worked previously. He
[7] had been off it for five years. It seemed like it
[8] might work.
[9]   **Q:** I'm sorry. Did your notes say, though, he
[10] was objectively less depressed?
[11]   **A:** Less depressed than he had been in April of
[12] 2005, but still depressed and getting more depressed
[13] according to him.
[14]   **Q:** And if you could go back to the April of
[15] '05 note and tell us what that indicates, please.
[16]   **A:** He was on Welbutrin SR 150 milligrams twice
[17] a day and Remeron 15 milligrams one or two at night.
[18] Told me about back problems. Depression was under
[19] fair control. Wasn't working. "Objectively
[20] worries, moderately depressed, not psychotic,
[21] incompetent, despairing or suicidal. Call as
[22] needed. See in six months."
[23]   **Q:** All right. And then if you could tell us
[24] what your August 23/04 note indicates.

Page 16

[1] **A:** He was on Welbutrin SR 150 twice a day and
[2] Remeron 15 milligrams one or two at bedtime. "No
[3] job. Sleep very decreased often. Mood usually low.
[4] Complains of poor memory, poor concentration. Only
[5] five episodes of alcohol in the past year. In Pine
[6] Street Inn for the past year. Question: Should
[7] apply for SSDI. Objectively mood low but not
[8] hopeless. Call. See as needed."
[9] **Q:** Did you have any opinion as to whether or
[10] not Mr. Kouvchinov should apply for SSDI at that
[11] point?
[12] **A:** I thought he should at that point, yes.
[13] **Q:** Do you know if he did?
[14] **A:** I don't know if he did.
[15] **Q:** Going back to Exhibit No. 64, which is the
[16] typewritten version of your handwritten notes, would
[17] you agree that for each consultation that the
[18] information contained in there was information
[19] obtained by you from Mr. Kouvchinov?
[20] **A:** Yes.
[21] **Q:** Did you and he ever discuss at any point in
[22] time the nature of his job at Parametric Technology
[23] Corporation, other than the initial intake?
[24] **A:** No.

Page 17

[1] **Q:** Did you have any understanding in October
[2] of 2001, looking at your notes or the typewritten
[3] summary of your notes, as to what, if anything, Mr.
[4] Kouvchinov may have been doing to secure employment
[5] or pursue employment opportunities?
[6] **A:** He was — if my memory serves me right, he
[7] was looking for work. He looked for work for at
[8] least a few years after I initially saw him.
[9] **Q:** Would that be true during the time period
[10] that he was collecting short-term disability
[11] benefits?
[12] **A:** I don't think he was able then to look, but
[13] once he felt a little better, he was able to look
[14] for work.
[15] **Q:** I'd like to draw your attention to November
[16] 21, 2001. If I'm reading this correctly, you're
[17] saying objectively he appeared less depressed. "In
[18] morning isn't good, groggy, decreased concentration
[19] and working, can't imagine working." What does that
[20] mean?
[21] **A:** Let me look at the original note. It
[22] doesn't quite make sense.
[23]     (Reviewing document) The transcriptionist
[24] transcribed it wrong. What it should say is — it

Page 18

[1] should just say, "Can't imagine working."
[2] **Q:** So the "and working" there —
[3] **A:** "Decreased concentration and decreased
[4] memory" is what the note says.
[5] **Q:** "Can't imagine working."
[6] **A:** Right.
[7] **Q:** That's Mr. Kouvchinov telling you he can't
[8] imagine working, or you suggesting that you can't
[9] imagine him working?
[10] **A:** No. This was him feeling so bad that he
[11] couldn't even imagine working.
[12] **Q:** Okay. Now, do you recall, Doctor, that Mr.
[13] Kouvchinov did submit an application for short-term
[14] disability benefits with CIGNA?
[15] **A:** Yes.
[16] **Q:** You assisted him in that regard; is that
[17] right?
[18] **A:** I filled out my part of it, yes.
[19]     (Document marked as Exhibit 65
[20] for identification)
[21] **Q:** Looking at what's been marked as Exhibit
[22] 65, I'll represent to you that this is part of a
[23] page from Mr. Kouvchinov's application for
[24] short-term disability benefits. Is any of the

Page 19

[1] handwriting on this page yours?
[2] **A:** Yes.
[3] **Q:** Which part?
[4] **A:** The part "To be completed by attending
[5] physician."
[6] **Q:** You indicate here a diagnosis, "Major
[7] depression" with a number 296.33; is that right?
[8] **A:** Yes.
[9] **Q:** And, at least on this form, you're
[10] indicating both that Mr. Kouvchinov is still
[11] disabled as of the date that you filled this out and
[12] that you were hopeful that he could return to work
[13] by November 2001, correct?
[14] **A:** Yes.
[15] **Q:** And you understood that this form was going
[16] to be submitted to CIGNA, correct?
[17] **A:** Yes.
[18] **Q:** And I assume, Doctor, you would not have
[19] made any material misrepresentations intentionally
[20] to CIGNA about your treatment and diagnosis of Mr.
[21] Kouvchinov?
[22] **A:** No.
[23]     (Document marked as Exhibit 66
[24] for identification)

Page 20

[1] **Q:** Could you look at Exhibit 66 and confirm
[2] that these are your handwritten notes of your
[3] sessions with Mr. Kouvchinov during the period
[4] September 17th, 2001, it looks like through December
[5] 17, 2001?
[6] **A:** Yes.
[7] **Q:** All that handwriting is yours?
[8] **A:** Yes.
[9] **Q:** Thank you.
[10] (Document marked as Exhibit 67
[11] for identification)
[12] **Q:** Looking now at what's been marked as
[13] Exhibit No. 67, this is a three-page compilation of
[14] documents that, it looks like according to the first
[15] page, were faxed to CIGNA by your office on or about
[16] October 26th, 2001; is that correct?
[17] **A:** Yes.
[18] **Q:** And the second page of this is another
[19] version of the disability claim form. Here you've
[20] listed — in the middle under "Frequency and Dates
[21] of Examination," you have got September 17, October
[22] 10, October 25, '01, correct?
[23] **A:** Yes.
[24] **Q:** Had your diagnosis of Mr. Kouvchinov

Page 21

[1] changed at any point — sorry, in any way as of this
[2] point?
[3] **A:** It was major depression compared to his
[4] initial diagnosis, which was dysthymia.
[5] **Q:** Now, the third page, in box No. 7, the
[6] "Extent of Disability," it says, "When was patient
[7] able to go to work?" you have indicated that he is
[8] still disabled, correct?
[9] **A:** Yes.
[10] **Q:** Would it be fair to say that this date you
[11] had no medical reason to think that Mr. Kouvchinov
[12] could return to work?
[13] **A:** Yes.
[14] **Q:** And again, your, I assume, complete
[15] understanding of Mr. Kouvchinov's condition, again,
[16] was limited to what he confided in you, correct?
[17] **A:** Yes, and what I observed.
[18] **Q:** At any point in time, Doctor, prior to
[19] December 2001, according to your notes, did Mr.
[20] Kouvchinov ever disclose to you that he had been
[21] pursuing employment opportunities or had accepted a
[22] job anywhere?
[23] **A:** Prior to December 2001?
[24] **Q:** Right.

Page 22

[1] **A:** I don't think so.
[2] **Q:** If he had done so, I assume that you would
[3] have immediately notified CIGNA of that fact?
[4] **MR. CHURCHILL:** Objection.
[5] **Q:** Is that correct? Or at least you would not
[6] have continued to represent him as being disabled?
[7] **MR. CHURCHILL:** Objection.
[8] **A:** Yes.
[9] **Q:** Has your diagnosis of Mr. Kouvchinov
[10] changed at any point in time since you've been
[11] seeing him since June of 2000?
[12] **A:** No — well, yes. It changed from dysthymia
[13] to major depression.
[14] **Q:** Is his current diagnosis still major
[15] depression?
[16] **A:** Yes.
[17] **Q:** How does his back injury factor into the
[18] diagnosis?
[19] **A:** It's a separate diagnosis.
[20] **Q:** When is the first time that Mr. Kouvchinov
[21] told you that he had gone back to work, according to
[22] your records?
[23] **A:** December 17th of 2001.
[24] **Q:** Did your — your notes don't seem to

Page 23

[1] indicate, but do you have any separate recollection
[2] of where does he return to work or what type of job
[3] he had taken?
[4] **A:** My recollection is that he returned to
[5] where he had been working, to his previous job, and
[6] was laid off.
[7] **Q:** Now, your note from December 17th indicates
[8] that Mr. Kouvchinov reported to you that he could
[9] not concentrate and felt more depressed; is that
[10] correct?
[11] **A:** He was laid off, got a job with another
[12] company, had four days of classes during which he
[13] couldn't concentrate, felt much worse and was fired
[14] and felt even worse.
[15] **Q:** Did he indicate to you why he had been
[16] fired?
[17] **A:** My recollection is because he couldn't do
[18] the job because he was so depressed.
[19] **Q:** Is that what he told you?
[20] **MR. CHURCHILL:** Objection.
[21] **A:** That's my recollection.
[22] **Q:** The last entry on December 17th says,
[23] "Question MCAD (name given) appointment."
[24] **A:** Yes.

Page 24

[1]   **Q:** Any idea what that refers to?

[2]   **A:** Yes. My recollection is that he felt that

[3] there had been some kind of discrimination. And we

[4] discussed the fact that there is in Massachusetts a

[5] Commission Against Discrimination, and I told him

[6] the name of the commission so that he could call

[7] them if he wanted to.

[8]   **Q:** Do you recall what he said to you about why

[9] he felt he had been discriminated against?

[10]   **A:** My recollection is that he felt

[11] discriminated against when he was laid off.

[12]   **Q:** Now, have you and he, in any of your

[13] sessions, discussed his lawsuit?

[14]   **A:** No.

[15]   **Q:** His litigation?

[16]   **A:** No.

[17]   **Q:** Not at all?

[18]   **A:** Never.

[19]   **Q:** Is there any particular reason why not?

[20]   **A:** He refused to tell me anything about it.

[21]   **Q:** How did you know about it?

[22]   **A:** Well, I knew because there were all kinds

[23] of legal papers for years.

[24]   **Q:** Do you think there is any clinical

Page 25

[1] significance for his refusal to discuss his case

[2] with you?

[3]   **A:** I wouldn't make anything of it.

[4]   **Q:** No?

[5]   **A:** No. He told me he was told not to discuss

[6] it with anybody.

[7]   **Q:** Have you had any conversations with any

[8] attorney representing Mr. Kouvchinov about his case?

[9]   **A:** No.

[10]   **Q:** At any point in time, Doctor, have you had

[11] any conversations with any representatives of CIGNA

[12] about Mr. Kouvchinov's short-term disability claim?

[13]   **A:** There were notes of a couple of phone

[14] calls, and I think in one of them they — it would

[15] be good if I found the actual note.

[16]   **Q:** We're going to need a copy of your notes.

[17]   **A:** You don't have it?

[18]   **Q:** No, we don't.

[19]   **A:** They were supposed to send you everything

[20] on the chart.

[21]   (Reviewing document) on November 15th,

[22] 2001 — there's actually two calls, three calls.

[23]   **Q:** Who called, can you tell?

[24]   **A:** Yes. Do you want copies of these? We can

Page 26

[1] have somebody copy them.

[2]   But, the first call is November 15th, 2001,

[3] CIGNA calling about disability. It's got an 800

[4] number, and it says, "Angela Wallace." This one —

[5] I just left a message trying to answer the

[6] questions. I don't remember what the questions

[7] were. Sometimes they leave, you know, questions,

[8] and I must have left them on voice mail. I don't

[9] remember what the questions were.

[10]   The next one was November 27, 2001. It's

[11] got an 800 number. "CIGNA. Brenda Napier - spoke."

[12] They wanted to know if he could return to work, and

[13] it just says, "Details."

[14]   And my recollection is that I said he

[15] couldn't return to work. Then on November 28th — I

[16] think this must be actually a message from Mr.

[17] Kouvchinov, that he had received a message from

[18] CIGNA that he was fired because of cutbacks and they

[19] were considering malingering, that he had been

[20] malingering.

[21]   **Q:** I'm sorry, what's the date of that note?

[22]   **A:** November 28, 2001.

[23]   **Q:** He had been contacted by CIGNA?

[24]   **A:** My recollection of this note is that Mr.

Page 27

[1] Kouvchinov had received a message from CIGNA that he

[2] had been fired because of cutbacks and "they will be

[3] considering malingering."

[4]   **Q:** What does that mean, do you know,

[5] "considering malingering"?

[6]   **A:** Yes. I think that it meant that they would

[7] be considering if he was making up that he was too

[8] depressed to work and that they were imagining he

[9] really had been able to work.

[10]   **Q:** Did you discuss that with Mr. Kouvchinov?

[11]   **A:** I think so, but I don't have any notes

[12] about it. That's the only thing, the note. But I

[13] believe this was a phone call I had with him.

[14]   **Q:** Was he disagreeing with that suggestion, do

[15] you recall, that he had been malingering?

[16]   **A:** Absolutely. And I have an exclamation

[17] point here, and I am sure I was disagreeing with it

[18] also.

[19]   **Q:** And this is as of November 28, correct?

[20]   **A:** Yes.

[21]   **THE WITNESS:** Do you want me to get

[22] somebody to copy these?

[23]   **MR. TULLY:** Please. Actually, we should

[24] probably get your whole chart, if I could. I can

---

**Page 28**

[1] have some general questions, if you want to have
[2] somebody make a copy of your chart. I don't need
[3] your handwritten notes, except for those three that
[4] came after '04.
[5]     THE WITNESS: So they didn't send a copy of
[6] all the prescriptions and so on?
[7]     MR. TULLY: No.
[8]     THE WITNESS: They were supposed to copy
[9] absolutely everything in the chart.
[10]     You've already got this (indicating), I
[11] think?
[12]     MR. TULLY: Actually, if you want, Steve
[13] and I can look through and tell you what we have.
[14]     THE WITNESS: I don't want to waste time
[15] copying.
[16]     MR. TULLY: Sure. Absolutely.
[17]     THE WITNESS: Like this kind of thing is a
[18] letter from —
[19]     MR. TULLY: Yes. That, we've got. The
[20] ones that we don't have are these, from '04 and —
[21] so these three pages in this pile (indicating).
[22]     (Discussion off the record)
[23]     BY MR. TULLY:
[24]     Q: According to your notes there, that seems

---

**Page 29**

[1] to be the only conversations you might have had with
[2] CIGNA?
[3]     A: I think so, yes.
[4]     Q: Does your file indicate, Doctor, or do you
[5] have any other independent knowledge of the status
[6] of Mr. Kouvchinov's short-term disability claim?
[7]     A: I don't.
[8]     Q: Did you have any further discussion with
[9] Mr. Kouvchinov on your December 17th session about
[10] why he didn't tell you he had returned to work?
[11]     MR. CHURCHILL: Objection.
[12]     A: He told me on December 17th he had returned
[13] to work.
[14]     Q: Right. I'm sorry, prior to that, though —
[15]     (Interruption)
[16]     Q: Let me ask you a different question. Were
[17] you at all concerned to learn on December 17th that
[18] Mr. Kouvchinov had gone back to work and not
[19] disclosed that to you?
[20]     MR. CHURCHILL: Objection.
[21]     A: He did disclose it to me on December 17th.
[22]     Q: I mean, prior to December 17th.
[23]     A: He wasn't working on November 21st, as far
[24] as I know.

---

**Page 30**

[1]     Q: And as far as even as late as November
[2] 28th, when you received the phone call from CIGNA,
[3] you had no knowledge that he had returned to work or
[4] was in the process of returning to work?
[5]     MR. CHURCHILL: Objection.
[6]     A: No.
[7]     Q: Do you have any understanding today as to
[8] when Mr. Kouvchinov actually returned to work?
[9]     A: No.
[10]     Q: Did Mr. Kouvchinov ever tell you at any
[11] point in time that he had called CIGNA to request
[12] that they stop paying him benefits?
[13]     A: No.
[14]     Q: Based upon what you know his condition was,
[15] at least as of November 28th, 2001, do you think it
[16] would be medically possible for Mr. Kouvchinov to
[17] return to work on November 30th?
[18]     MR. CHURCHILL: Objection.
[19]     A: It seems highly unlikely.
[20]     Q: How about during the first week of
[21] December? The same?
[22]     MR. CHURCHILL: Objection.
[23]     A: Well, I think it may be possible, starting
[24] to be possible by then. He was improving on

---

**Page 31**

[1] November 21st. Maybe by early December. I don't
[2] know when he went back to work, though, so...
[3]     Q: Did you and he, during your sessions, ever
[4] discuss the nature of work that he could target to
[5] try to — if he wanted to return to work at some
[6] point? Is there any recommended process that he
[7] follow in terms of tasks that he target?
[8]     A: No. I don't recall any such discussion.
[9]     Q: Did you ever have a question in your mind
[10] as to whether or not Mr. Kouvchinov was faking his
[11] symptoms?
[12]     A: No.
[13]     Q: So you believed he was not faking his
[14] symptoms?
[15]     A: Yes. I believed he was absolutely not
[16] faking his symptoms.
[17]     Q: So I assume that you were not aware that
[18] Mr. Kouvchinov was seeking to return to work or
[19] holding himself out as able to return to work one
[20] week after you filled out the STD form in September
[21] of 2001?
[22]     MR. CHURCHILL: Objection.
[23]     A: I had no knowledge of that.
[24]     Q: I assume you had no knowledge that he was

---

Page 32

[1] actively interviewing with companies during the
[2] months of October and November of 2001?
[3]     MR. CHURCHILL: Objection.
[4]     A: No.
[5]     Q: I assume that if you had known that, you
[6] would not have continued to represent him as being
[7] disabled to CIGNA?
[8]     MR. CHURCHILL: Objection.
[9]     A: Well, if he was just interviewing or
[10] talking about working, I might have continued. I
[11] might have continued filling forms out until he
[12] actually was working.
[13]     Q: Is that something you would have expected
[14] Mr. Kouvchinov to discuss with you or at least alert
[15] you to, the fact that he was interviewing?
[16]     MR. CHURCHILL: Objection.
[17]     A: Yes.
[18]     Q: What is the clinical definition of
[19] malingering or malingerer?
[20]     A: Basically, faking an illness.
[21]     Q: And that has never entered into your
[22] diagnosis of Mr. Kouvchinov, correct?
[23]     A: No.
[24]     Q: In your opinion, Doctor, during the time

Page 33

[1] period September 2001 at least through December 17,
[2] 2001, was Mr. Kouvchinov disabled from working in
[3] any capacity?
[4]     MR. CHURCHILL: Objection.
[5]     A: Yes.
[6]     MR. TULLY: Steve, I'll suspend now,
[7] pending review of these documents that are coming.
[8] If you have questions, I would be happy to let you
[9] go, if you want. I'm otherwise done, other than
[10] questions that might be derived out of these other
[11] documents.
[12]     MR. CHURCHILL: For efficiency's sake, I'll
[13] go ahead and ask some questions.
[14]     MR. TULLY: Yes. That's fine.
[15]             CROSS EXAMINATION
[16]             BY MR. CHURCHILL:
[17]     Q: Dr. Freedberg, my name is Steve Churchill,
[18] and as I mentioned before, I'm counsel to Mr.
[19] Kouvchinov in this matter.
[20]     Were you aware that Mr. Kouvchinov had been
[21] originally laid off from Parametric Technology in
[22] September of 2001?
[23]     A: I don't recall that, but now that you're
[24] mentioning it, that does sound familiar. Oh, excuse

Page 34

[1] me — no, I don't — I don't have a certain
[2] recollection of that, but that does sound familiar.
[3]     Q: Okay. And based on your experience, do you
[4] consider it more likely than not that Mr.
[5] Kouvchinov's layoff in September 2001 would have
[6] exacerbated his depression?
[7]     A: When?
[8]     Q: In September of 2001.
[9]     A: Yes. I would say it is likely.
[10]     Q: And if Mr. Kouvchinov were putting out
[11] feelers to find work during October and November of
[12] 2001, is that inconsistent with your diagnosis of
[13] depression?
[14]     A: No.
[15]     Q: And the record will reflect that Mr.
[16] Kouvchinov returned to work as a contractor on
[17] December 4th, 2001. I'm not saying that your record
[18] reflects that, but the evidence in this case will
[19] reflect that Mr. Kouvchinov returned to work on
[20] December 4th, 2001. Is that fact in any way
[21] inconsistent with what Mr. Kouvchinov told you on
[22] November 21st, 2001?
[23]     MR. TULLY: Objection.
[24]     A: No.

Page 35

[1]     Q: And the evidence in this case also will
[2] show that Mr. Kouvchinov was terminated in December
[3] of 2001 from that contractor position because he was
[4] accused of collecting disability benefits at the
[5] same time he was working. Were you aware of that
[6] fact?
[7]     A: No.
[8]     Q: Mr. Kouvchinov reported to you, in
[9] December — on December 17th, 2001, that the firing
[10] that he experienced in December 2001 made his
[11] depression worse; is that right?
[12]     A: Yes.
[13]     Q: And are you able to express any opinion
[14] with respect to that period of time, December 4th
[15] until he was terminated on December 7th, whether he
[16] was able to work?
[17]     MR. TULLY: I'm sorry. Could you read that
[18] question back, please.
[19]     (Question read)
[20]     MR. CHURCHILL: Let me ask that again. It
[21] was somewhat garbled.
[22]     Q: With respect to the period December 4th
[23] 2001, when he returned to work, and ending on
[24] December 7th, 2001, when he was terminated from that

Page 36

[1] position, are you able to express any opinion
[2] whether he was able to work during that period of
[3] time?
[4]  A: Well, the only opinion I have is that it
[5] seems slightly early, but not totally impossible,
[6] but — I mean, I could imagine him trying.
[7]  Q: And do you think — was that, with respect
[8] to his depression, contraindicated for him to try
[9] returning to work?
[10]  A: No.
[11]  Q: Back in the period October through December
[12] 2001, how many patients did you typically see in the
[13] course of a week?
[14]  A: 50.
[15]  Q: And with respect to not initial evaluations
[16] but ongoing treatment, were each of those visits
[17] approximately 15 minutes?
[18]  A: No. They vary. Some longer. None
[19] shorter.
[20]  Q: With respect to the visit that you had with
[21] Mr. Kouvchinov on November 21st, 2001, what else did
[22] you discuss with Mr. Kouvchinov with respect to his
[23] work situation, other than what's contained in your
[24] notes?

Page 37

[1]  A: I don't remember anything else we
[2] discussed.
[3]  Q: Is it fair to say that you discussed more
[4] with Mr. Kouvchinov during that visit than is
[5] reflected in your notes?
[6]  A: Yes.
[7]  Q: With respect to the visits you had with Mr.
[8] Kouvchinov, how did those visits typically proceed
[9] in terms of who directed the conversation that you
[10] and Mr. Kouvchinov had?
[11]  A: I think mainly I would take the lead asking
[12] questions.
[13]  Q: So you would typically ask him questions,
[14] and he would answer them?
[15]  A: Yes. Often a little bit tersely.
[16]  MR. CHURCHILL: I don't have any further
[17] questions prior to seeing the documents.
[18]  MR. TULLY: Right. I had a couple more
[19] while we're waiting.
[20]  **REDIRECT EXAMINATION**
[21]  **BY MR. TULLY:**
[22]  Q: With respect to the fact that you may have
[23] led the session by asking Mr. Kouvchinov questions,
[24] that does not mean — I assume, that if there was

Page 38

[1] something else that Mr. Kouvchinov wanted to raise
[2] on his own with you, that he certainly had the
[3] ability to do so, didn't he, during the sessions?
[4]  A: Yes.
[5]  Q: And, again, anything that he might have
[6] raised that you felt was clinically significant
[7] would be reflected in your notes?
[8]  A: Well, the handwritten notes are very brief
[9] and really aren't a complete record in any way of
[10] what went on during those sessions.
[11]  Q: But relative to his diagnosis of being
[12] disabled, you understood that CIGNA was relying on
[13] your representations as to his medical condition,
[14] didn't you?
[15]  A: Yes.
[16]  Q: Certainly anything, I assume, that Mr.
[17] Kouvchinov may have disclosed during any of your
[18] sessions relative to his ability to return to work
[19] either would be reflected in your handwritten notes
[20] or would be reflected in information you provided to
[21] CIGNA, correct?
[22]  A: Yes.
[23]  Q: If Mr. Kouvchinov, during any of your
[24] sessions, told you that he believed he was ready and

Page 39

[1] able to return to work, would that have been in your
[2] notes?
[3]  MR. CHURCHILL: Objection.
[4]  A: Not necessarily.
[5]  Q: Is that something you would have
[6] communicated to CIGNA, though?
[7]  MR. CHURCHILL: Objection.
[8]  A: Well, if I was sure that he was ready to go
[9] back to work, of course.
[10]  Q: How would you have made that determination
[11] as to whether or not — how would you have become
[12] sure that he was ready to return to work?
[13]  A: Well, he would have had to appear much less
[14] depressed in a session and been interested in going
[15] back to work and doing something about going back to
[16] work.
[17]  Q: So nothing in the November treatment, I'm
[18] sorry, your notes for November indicate that he had
[19] reached that point, correct?
[20]  A: That's right.
[21]  Q: You certainly, as of November 28th, had no
[22] reason to think that he had reached that point, did
[23] you?
[24]  A: I did not.

Page 40

[1]  **Q:** Certainly as of December 17th, 2001, you
[2] had not reached that conclusion, had you?
[3]  **A:** December 17th, he was back — he had gone
[4] back to work. So by December 17th, as far as I
[5] could tell, he was able — he had been able to go
[6] back to work, but then everything happened that's
[7] reflected in the notes.
[8]  **Q:** Well, he told you he had gone back to work
[9] on December 17th?
[10]  **A:** He told me, that's right.
[11]  **Q:** But your diagnosis of him hadn't changed?
[12]  **A:** No. His condition had changed.
[13]  **Q:** Did you have an opinion, as of December
[14] 17th, as to Mr. Kouvchinov's ability to return to
[15] work in some capacity as of December 17th?
[16]  **A:** As of December 17th he looked like a person
[17] who could not possibly work.
[18]  **Q:** At any point since December 17th, 2001,
[19] have you reached a conclusion as to whether or not
[20] Mr. Kouvchinov can return to work in some capacity?
[21]  **A:** Initially I kept hoping that he would be
[22] able to get back to work. As time has gone on, I
[23] have felt less and less hopeful that he could ever
[24] work.

Page 41

[1]  **Q:** Why is that?
[2]  **A:** Because of chronic depression.
[3]  **Q:** Are you the only doctor that prescribes
[4] psychiatric medication for Mr. Kouvchinov, to your
[5] knowledge?
[6]  **A:** There's a couple of prescriptions written
[7] by my partners, but other than that, I am not aware
[8] of anyone else prescribing psychiatric medications.
[9]  **Q:** Are those prescription notes maintained in
[10] your chart of him?
[11]  **A:** Yes.
[12]  **Q:** That's going to be reflected, presumably,
[13] in the documents that are being copied?
[14]  **A:** Yes.
[15]  **Q:** At any point in time did Mr. Kouvchinov ask
[16] you to contact CIGNA to clarify that he was
[17] medically cleared to return to work as of November
[18] 30th?
[19]  **A:** I don't remember that.
[20]  **Q:** If he had done so, would you have made such
[21] a call on his behalf?
[22]  **MR. CHURCHILL:** Objection.
[23]  **A:** Yes.
[24]  **MR. TULLY:** That's all I have, pending...

Page 42

[1]  (Discussion off the record)
[2]  (Documents marked as Exhibits 68
[3] through 70 for identification)
[4]  **BY MR. TULLY:**
[5]  **Q:** Doctor, I'm going to show you what's been
[6] marked as Exhibit No. 68. This appears to be a note
[7] dated October 4, 2001. Could you read that to me,
[8] please.
[9]  **A:** "617-469-1963. Question, CIGNA contacted
[10] me. Spoke. Question about disability company.
[11] Sounds okay." It's a note of a phone call from
[12] October 4th with Mr. Kouvchinov.
[13]  **Q:** And what was the substance of the
[14] conversation?
[15]  **A:** He was asking me if the insurance company,
[16] CIGNA, had contacted me, and we spoke about that.
[17] And I don't remember, I would have to look back at
[18] the other messages to see whether I actually talked
[19] to them by that time.
[20]  **Q:** Here is another one I had marked as Exhibit
[21] No. 69. This is another note. If you would read
[22] that.
[23]  **A:** It's a phone call from the patient, October
[24] 20th, and I left him a message, and he didn't call

Page 43

[1] back.
[2]  **MR. CHURCHILL:** Doctor, did you say October
[3] 20th or December?
[4]  **THE WITNESS:** Excuse me. December 20th,
[5] 2001.
[6]  **Q:** Exhibit 70 appears to be a note, I believe,
[7] either from November 17th or December 17th of 2001.
[8] I ask, first, if you could verify the date.
[9]  **A:** December 17th, 2001.
[10]  **Q:** And that is a note concerning what?
[11]  **A:** That I gave a copy of Mr. Kouvchinov's
[12] clinical notes and disability form to him.
[13]  **MR. TULLY:** That's all I have. Thank you.
[14]  **RECROSS EXAMINATION**
[15]  **MR. CHURCHILL:** Could you mark that.
[16]  (Document marked as Exhibit 71
[17] for identification)
[18]  **BY MR. CHURCHILL:**
[19]  **Q:** Doctor, showing you what's been marked as
[20] Exhibit 71, this is your notes from your
[21] conversation with CIGNA on November 15th, 2001?
[22]  **A:** I didn't actually have a conversation. I
[23] received a message with some questions and left a
[24] message trying to answer the questions. I never

Page 44

[1] actually spoke to Ms. Wallace.
[2]    (Document marked as Exhibit 72
[3] for identification)
[4]    **Q:** Showing you now what's been marked as
[5] Exhibit 72, these are your notes from a conversation
[6] with CIGNA on November 27th, 2001?
[7]    **A:** Yes.
[8]    **Q:** And did you call Mr. Kouvchinov and tell
[9] him about this conversation?
[10]    **A:** I don't remember doing so. I may well have
[11] done so, but I don't have that recollection.
[12]    **Q:** You don't have any notes that indicate that
[13] you did call him, do you?
[14]    **A:** No.
[15]    **Q:** And when communicating with CIGNA on this
[16] date, November 27th, 2001, the most recent
[17] information that you had from Mr. Kouvchinov was
[18] based on your visit with him on November 21st, 2001;
[19] is that correct?
[20]    **A:** Yes.
[21]    (Document marked as Exhibit 73
[22] for identification)
[23]    **Q:** First of all, Dr. Freedberg, it appears
[24] that it was your practice to write, at the top of

Page 45

[1] your notes, Mr. Kouvchinov's name; is that right?
[2]    **A:** Yes.
[3]    **Q:** And that didn't mean that you were talking
[4] with him; that meant that it had to do with his
[5] case; is that right?
[6]    **A:** That's right.
[7]    **Q:** And with respect to Exhibit 72 — I'm
[8] sorry, 73, can you just read for the record what
[9] those notes say.
[10]    **A:** "November 21st, 2001. Message from CIGNA.
[11] Patient fired because of cutbacks and they will be
[12] considering malingering, exclamation point."
[13]    **Q:** Is it November 21st or November 28th?
[14]    **A:** The date is November 28th.
[15]    **Q:** Now —
[16]    **A:** I believe this is a message from the
[17] patient.
[18]    **Q:** Well, that was going to be my question.
[19] This does not — the note does not indicate that it
[20] was a message from Mr. Kouvchinov, does it?
[21]    **A:** No.
[22]    **Q:** In fact, it says, "Message from CIGNA"?
[23]    **A:** Yes.
[24]    **Q:** So is it possible that you were recording a

Page 46

[1] message that you received from CIGNA?
[2]    **A:** Well, it's remotely possible. It seems
[3] very unlikely.
[4]    Can I say something?
[5]    **Q:** Sure.
[6]    **A:** Actually, I think it's highly unlikely,
[7] because I can't imagine anyone at CIGNA would have
[8] said that he had been fired because of cutbacks.
[9] That just sounds completely wrong, unlike anything a
[10] disability company would ever say.
[11]    **Q:** What the record will reflect happened in
[12] this case is that in September 2001, PTC,
[13] Parametric, laid off Mr. Kouvchinov based on budget
[14] cutbacks, and after that Mr. Kouvchinov filed a
[15] claim for disability benefits.
[16]    I guess what I'm asking more generally is,
[17] do you have any way to be certain whether this note
[18] reflects a call from Mr. Kouvchinov or a call from
[19] CIGNA?
[20]    **A:** I cannot be completely certain.
[21]    **MR. CHURCHILL:** Do you have any more
[22] questions, Guy?
[23]    **MR. TULLY:** Just one.
[24]    **MR. CHURCHILL:** Before I finish, I just

Page 47

[1] want to consult briefly with Alexei, but — why
[2] don't you go ahead.
[3]    **FURTHER REDIRECT EXAMINATION**
[4]    **BY MR. TULLY:**
[5]    **Q:** Just back on this Exhibit 73, are those
[6] your initials at the bottom there?
[7]    **A:** Yes.
[8]    **Q:** I'm curious about the use of the word
[9] "malingering." Is that your word, or is that what
[10] was reported to you by Mr. Kouvchinov?
[11]    **MR. CHURCHILL:** Objection.
[12]    **Q:** That specific word?
[13]    **A:** I don't remember exactly. I don't know.
[14]    **MR. TULLY:** Thank you.
[15]    **MR. CHURCHILL:** Let me just consult quickly
[16] with Alexei.
[17]    (Brief recess)
[18]    **MR. CHURCHILL:** I have no further
[19] questions.
[20]    **MR. TULLY:** Okay. We're all set.
[21]    We typically have been asking the deponents
[22] to read and sign. At some point, Doctor, you will
[23] have a transcript with questions and answers. We
[24] will ask you to take a quick review. If there are

Page 48

[1] any misspellings to be corrected, you will have a
[2] sheet that you can indicate those changes.
[3]     (Whereupon the deposition was
[4] concluded at 4:40 p.m.)
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 49

[1]
[2]                    **CERTIFICATE**
[3] I, Leonard E. Freedberg, M.D., do hereby certify
[4] that I have read the foregoing transcript of my
[5] testimony, and further certify under the pains and
[6] penalties of perjury that said transcript
[7] (with/without) suggested corrections is a true and
[8] accurate record of said testimony.
[9]     Dated at __, this day of ,
[10] 2006.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 50

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                         )
[3]     I, Carol H. Kusinitz, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 7th day of March,
[7] 2006, at 3:30 p.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]   I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]   In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this  day of March,
[21] 2006.
[22]
[23]            Notary Public
[24]        My commission expires  6/2/06

<u>SUGGESTED CORRECTIONS</u>

RE:  **Alexei Kouvchinov v. Parametric Technology Corporation, et al.**
WITNESS:  **Leonard E. Freedberg, Vol. I**

The above-named witness wishes to make the following changes to the
testimony as originally given:

| <u>PAGE</u> | <u>LINE</u> | <u>SHOULD READ</u> | <u>REASON</u> |
|------|------|------------|--------|
| 25 | 20 | (IN) THE CHART | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

DORIS O. WONG ASSOCIATES, INC. * 50 FRANKLIN STREET * BOSTON, MA  02110

Page 48

[1] any misspellings to be corrected, you will have a
[2] sheet that you can indicate those changes.
[3]     (Whereupon the deposition was
[4] concluded at 4:40 p.m.)
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 50

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                    )
[3]     I, Carol H. Kusinitz, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 7th day of March,
[7] 2006, at 3:30 p.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15] I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19] In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this  day of March,
[21] 2006.
[22]
[23]        Notary Public
[24]     My commission expires  6/2/06

Page 49

[1]              CERTIFICATE
[2] I, Leonard E. Freedberg, M.D., do hereby certify
[3] that I have read the foregoing transcript of my
[4] testimony, and further certify under the pains and
[5] penalties of perjury that said transcript
[6] (with/without) suggested corrections is a true and
[7] accurate record of said testimony.
[8]     Dated at ___, this day of ,  *March 30*
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

**EXHIBIT AA**

Mar. 15. 2004 4:41PM    Melissa Riedell

Exh. 9
1/8/05

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☐ EEOC | |

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION                   and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) Mr. Alexei Kouvchinov | HOME TELEPHONE (Include Area Code) 617-323-1296 | |
|---|---|---|
| STREET ADDRESS 182 Church Street, West Roxbury, MA 02132 | CITY, STATE AND ZIP CODE | DATE OF BIRTH 7-16-56 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME CDI Information Technology Services | NUMBER OF EMPLOYEES, MEMBERS more than 100 | TELEPHONE (Include Area Code) 781-356-3000 | |
|---|---|---|---|
| STREET ADDRESS 75 Braintree Hill Park, Ste. 206, Braintree, MA 02184 | CITY, STATE AND ZIP CODE | | COUNTY Norfolk |

| NAME    Parametric Technology Corporation and Lisa Wales (as an employee and individually) | TELEPHONE NUMBER (Include Area Code) 1-888-727-6832 | |
|---|---|---|
| STREET ADDRESS 140 Kendrick Street, Needham, MA 02494 (both for PTC and Ms. Wales) | CITY, STATE AND ZIP CODE | COUNTY Norfolk |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA)    LATEST (ALL) 12/7/02 |
|---|---|

| ☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ AGE | |
|---|---|
| ☐ RETALIATION ☐ NATIONAL ORIGIN ☒ DISABILITY ☒ OTHER (Specify) perceived disability | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s).)

PLEASE SEE ATTACHED SHEETS

RECEIVED
MAY 24 2002
COMMISSION AGAINST DISCRIMINATION

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.    YES | NOTARY - (When necessary for State and Local Requirements) NOTARY : |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT Alexei Kouvchinov : *Alexei Kouvchinov* |
| DATED: 05/24/02    *Alexei Kouvchinov* Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) DATED: 5/24/02 |

EEOC FORM 5 (Test 10/94)

MY COMMISSION EXPIRES : 2/20/2009

## Continuation Page to Charge of Discrimination

My name is Alexei Kouvchinov. I am a 45-year-old male. For several years I have suffered from clinical depression. Over the years, the severity of my depression has varied. On December 7, 2001 I was terminated from my job with CDI Information Technology Services ("CDI"), where I had started working several days earlier. During the time I worked for CDI, I was not suffering from clinical depression, and I was fully able to work. During the few days I worked for CDI, I performed my job in a satisfactory manner. I was terminated because CDI found out about my disability, my depression, and fired me due to my disability and/or its perception of my disability, in violation of MGL Chapter 151B, 42 U.S. Code section 2000e, and the Americans With Disabilities Act.

I was employed by respondent Parametric Technology Corporation (hereinafter, "PTC") as a software engineer from August 15, 1994, until September 24, 2001. My main responsibility was to repair Product Data Management databases, an area in which I am an expert. On September 10, 2001, I was informed by my manager at PTC that I would be laid off on September 24 due to a reduction in force. Lisa Wales from the PTC Human Resources Department gave me the paperwork regarding my layoff, and brought me to the meeting in which I was informed of my being laid off. On September 17, 2001, I applied for and later received short-term disability insurance benefits in relation to a recurrence of my clinical depression. I was terminated from my employment at PTC while on short-term disability leave related to my depression. I recuperated from this particular recurrence of my disability, my depression, by late November 2001. I received my last disability benefit payment on November 30.

On December 3, 2001, I was hired to work for Respondent CDI Information Technology Services ("CDI"). CDI had a contract with PTC, my former employer, to provide software consultations. My first assignment as a CDI employee, was to repair Product Data Management databases for PTC; the same function I had previously performed for PTC when I was a PTC employee. Pursuant to an agreement between my new employer CDI and my former employer PTC, I was to perform my work for PTC, at the offices of PTC.

While working for CDI at PTC's offices on December 4, 2001, I encountered PTC employee Lisa Wales, who knew me from my former work as a PTC employee, and who had been involved in my layoff in her capacity as an employee in the Human Resources Department. Through her position and prior interaction with me while I had been a PTC employee, Ms. Wales knew about my disability (clinical depression), my short-term disability claim, and the termination of my employment with PTC. When she ran into me at PTC on

1

Continuation Page to Charge of Discrimination

December 4, 2001, Ms. Wales asked me why I was present at PTC, and I explained why I was there. I worked at PTC the remainder of the week.—

On the evening of Friday, December 7, 2001, Nancy Pugliese of CDI telephoned me at home. Ms. Pugliese told me that CDI had terminated my employment. When I asked Ms. Pugliese why my employment was terminated, Ms. Pugliese said that I had "been on long term disability with PTC," and that I was being terminated because of it. Ms. Pugliese then asked me words to the effect of why had I not disclosed my disability (or possibly, I am not sure, why I had not disclosed information that I was "on" disability) to CDI when I was hired, and I explained that no one had asked me about these issues. Clearly, Ms. Wales and/or other PTC employees had contacted CDI and improperly informed them of my disability and/or perceived disability, as well as my having taken a medical leave of absence and having received disability benefits due to my disability.

I further explained to Ms. Pugliese that I had been on leave and receiving short-term disability benefits when working for PTC, but that my disability and my receipt of benefits had both ended by November 30. I also informed Ms. Pugliese that Mr. Lee Lesburg of PTC's Global Services Department had interviewed me before I took the job with CDI, and that Mr. Lesburg had approved my working for CDI at PTC, knowing that I had previously been a PTC employee. Ms. Pugliese told me to contact PTC and that, if I "straightened out" the "problem" with PTC, then CDI would hire me back.

The following week, I telephoned Mr. Peter Altieri, Director of Human Resources at PTC. Mr. Altieri was Lisa Wales' superior. I explained the situation, and Mr. Altieri told me that he would get back to me in a few days. After four days with no word, I tried to reach Mr. Altieri. When I was finally able to contact Mr. Altieri, Mr. Altieri told me that I would have to "deal with CDI". I left messages for Nancy Pugliese and another CDI employee who knew me, but they would not return my phone calls. CDI would not rehire me.

The actions of CDI taken against me as set forth above, in terminating my employment, constitute illegal discrimination against me on the basis of a real or perceived disability. CDI's actions against me constitute intentional discrimination on the basis of a real or perceived disability. Ms. Wales' actions as set forth above constitute aiding and abetting in illegal and intentional discrimination against me on the basis of a real or

2

### Continuation Page to Charge of Discrimination

perceived disability. PTC is liable and responsible for the actions of Ms. Wales set forth herein, and for the actions of any other PTC employees who were involved in improperly informing CDI of my disability and the other matters set forth in this charge, as people aiding and abetting illegal discrimination. The actions of CDI, PTC and Ms. Wales were intentional, knowing and willful, in violation of MGL Chapter 151B, 42 U.S. Code section 2000e, and the Americans With Disabilities Act.

As a result of the actions taken against me by CDI, PTC and Ms. Wales, I have suffered much financial harm, as well as emotional pain and suffering.

I demand that I be awarded damages against CDI, PTC and Ms. Wales, in an amount to compensate me for lost back pay, lost front pay, injury to my career, punitive damages, emotional pain and suffering, lost benefits, attorneys fees, interest, lost future earning capacity, and such other and further relief as the Massachusetts Commission Against Discrimination finds to be appropriate.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS __24__ DAY OF MAY, 2002.

Alexei Kouvchinov

3

**EXHIBIT BB**

140 Kendrick Street
Needham, MA 02494
USA

781.370.5000 T
781.370.5735 F
www.ptc.com

 **PTC**

September 10, 2002

Sunila Thomas-George, Esq.
Supervisor
Attorney Assisted Unit
The Commonwealth of Massachusetts
    Commission Against Discrimination
One Ashburton Place
Boston, MA 02108

> Re: ***Alexei Kouvchinov v. CDI Information Technology Services, Parametric Technology Corporation, and Lisa Wales***
>
> ***MCAD Docket Number: 02BEM02308***
> ***EECO/HUD Number: 16CA202589***

Dear Attorney Thomas-George:

This letter is the response of both Parametric Technology Corporation ("PTC") and Lisa Wales ("Ms. Wales") to the charge of aiding and abetting discrimination on the basis of a "real or perceived" disability filed by Alexei Kouvchinov ("Kouvchinov"). At the time in question, Kouvchinov (a former PTC employee) was employed by CDI Information Technology Services ("CDI") and no longer had any employment relationship with PTC or Ms. Wales. As a CDI employee, Kouvchinov had been assigned on a temporary contract basis to provide certain services at PTC. Shortly after Kouvchinov's assignment at PTC began, PTC requested of CDI that the assignment be terminated. PTC took this action after discovering that Kouvchinov had failed to terminate his short-term disability coverage with PTC's disability carrier prior to commencing employment with CDI.

Kouvchinov's charge of discrimination should be dismissed because PTC's actions were based solely on its assessment that it was unethical for Kouvchinov to be actively working while simultaneously receiving disability benefits. PTC's actions were not motivated in any manner by Kouvchinov's actual or perceived disability (if any). Indeed, PTC does not concede that Kouvchinov is disabled at all. Accordingly, Kouvchinov's complaint should be administratively dismissed.

Sunila Thomas-George, Esq.                                    September 10, 2002
Massachusetts Commission Against Discrimination                        Page 2 of 6

## Background

PTC is a leading global supplier of computer software tools and related services used by manufacturers to design and build manufactured products. Prior to commencing employment with CDI in or about December 2001, Kouvchinov had worked for several years at PTC. Kouvchinov began his employment with PTC in August 1994 as a Software Engineer, and eventually became employed in PTC's Software Solutions Group doing database repair until September 2001.

In September 2001, Kouvchinov's position with PTC was eliminated as part of a corporate restructuring that resulted in PTC laying off over 500 employees. Kouvchinov was notified of his layoff on September 10, 2001, with his separation to become effective September 24, 2002.

As was the case with all PTC employees that were laid off as a result of the corporate restructuring, Kouvchinov was offered – and he accepted – a comprehensive severance package (including outplacement assistance). In exchange, Kouvchinov executed a general release of claims in favor of PTC.[1]

### 1.    Kouvchinov's Disability Claim

As discussed above, Kouvchinov was notified on September 10, 2001 that he was being laid off as of September 24, 2001. Within a few days after receiving notice of his layoff (but prior to his last day of employment), Kouvchinov suddenly submitted a claim for short-term disability benefits to PTC's disability carrier, CIGNA. Here it must be noted that, in the previous 7+ years that Kouvchinov was employed at PTC, he had never made any other such claim, nor ever otherwise raised any issue regarding any disability, including depression. Nevertheless, PTC did not challenge or question Kouvchinov's application, but instead left it to the disability carrier to evaluate Kouvchinov's claim.

Despite the fact that he apparently was representing to CIGNA that he was unable to work in any capacity, on September 25, 2001 (which was while his application for disability benefits was pending with CIGNA) Kouvchinov contacted John Busa, a Vice President in PTC's Software Solutions Group, and informed Mr. Busa in writing that Kouvchinov was available to perform database repair services for PTC on an independent contractor basis. (See Tab 1 hereto.) Mr. Kouvchinov stated:

"I would like to propose my services for handling database corruptions for existing customers. I believe that I with [the] help of one other person I can guarantee the

---

[1]    The instant matter is unrelated to Kouvchinov's separation from his employment with PTC.

PTC  ptc.com

Sunila Thomas-George, Esq.                                      September 10, 2002
Massachusetts Commission Against Discrimination                        Page 3 of 6

quality and timely response to all customers problems. I am confident that I can provide excellent service and contribute to the continuous success of the company I spent so many years with."

See Tab 1. Mr. Busa did not attempt to engage Kouvchinov. Thereafter, CIGNA did indeed approve Kouvchinov's disability benefits, payable through October 12, 2001, and so notified Kouvchinov by letter dated October 5, 2001. (See Tab 2 hereto.) In that letter, CIGNA also indicated that it would require additional information from Kouvchinov if he wished to extend his benefits beyond October 12th. On the basis of such additional information from Kouvchinov, his short term disability benefits were in fact eventually extended through Friday, November 30, 2001.

In its October 5th letter initially approving Kouvchinov's claim for disability benefits, CIGNA made clear that "[a]s long as you remain totally disabled from performing the duties of your occupation, benefits will be payable for a maximum of twelve weeks." CIGNA also advised Kouvchinov that he was required to contact CIGNA should he return to work, in order to avoid any overpayment of benefits. Kouvchinov never made any such contact with CIGNA.[2]

### 2.    Kouvchinov's Apparent Fraud

On Monday, December 3, 2001, Kouvchinov was back at work as a full-time employee of CDI, and was assigned to PTC to perform the same database repair work that he had done for PTC just prior to his claim of disability.

On December 4, 2001, Ms. Wales, a PTC Human Resources representative, encountered Kouvchinov in an employee lounge on the premises at PTC. Because of her job duties in the Human Resources Department, Ms. Wales was aware both that Kouvchinov had been laid off from PTC and that he had claimed and received disability benefits from CIGNA. Upon being questioned by Ms. Wales as to why he was present at PTC that day, Kouvchinov confirmed that he was working as a CDI employee on a 3-6 month assignment. Meanwhile, **on that same day**, PTC received notification from CIGNA that Kouvchinov's short-term disability benefits had been further extended through December 16, 2001 (the maximum 12-week benefit period), and that Kouvchinov had been referred for long-term disability coverage. (See Tab 4 hereto.)

---

2       In his charge, Kouvchinov implies otherwise, stating: "I recuperated from this particular recurrence of my disability, my depression, by late November 2001. I received my last disability benefit payment on November 30." In fact, as discussed below, the only reason that November 30 was the last day benefits were paid to Kouvchinov was because PTC later informed CIGNA (on December 6, 2001) that Kouvchinov had returned to work. (See Tab 3 hereto.)

 PTC  ptc.com

Sunila Thomas-George, Esq.                                      September 10, 2002
Massachusetts Commission Against Discrimination                        Page 4 of 6

On December 6, 2001, after learning that Kouvchinov was working at PTC without having first terminated his disability coverage with CIGNA, Ms. Wales contacted Ed Raine, a PTC Human Resources Vice President, to apprise him of the situation.  (See Tab 5 hereto.)  In response, Mr. Raine expressed his concern about the apparent breach of business ethics by Kouvchinov, and recommended that PTC inform CDI of this concern.  (See Tab 6 hereto.)

On December 7, 2001, PTC informed CDI of its concerns regarding Kouvchinov's apparent breach of ethics and indicated that, on that basis, it did not want Kouvchinov working at PTC.  CDI thereafter removed Kouvchinov from the PTC project.  To the extent that CDI thereafter also terminated Kouvchinov, PTC had no role in that decision.  By his own admission in his charge, Kouvchinov did not reveal to CDI that he was collecting disability benefits at the time of his hire by CDI because "no one had asked him" about it (See Complaint, at 2).

## Argument

Neither PTC nor Ms. Wales aided or abetted in any discrimination.  Further, PTC took no action based upon any alleged disability.

### 1. *Kouvchinov's claim for aiding and abetting discrimination fails because he has failed to substantiate underlying discrimination by CDI.*

As a threshold matter, Kouvchinov has failed in the first instance to show that any disability discrimination actually took place on the part of CDI.  Rather, he makes the somewhat disjointed allegation that CDI informed him that he was being terminated because he had "'been on long term disability with PTC'" (see Complaint, at 2, emphasis added), and that CDI questioned him as to why he had not "disclosed my disability (or possibly, I am not sure, why I had not disclosed information that I was 'on' disability) to CDI when I was hired." Id.  Clearly, if these assertions are true, they are consistent with legitimate conduct by CDI; namely, terminating Kouvchinov's assignment due to his apparent ethical transgression, as relayed by PTC, and not due to any unlawful discrimination.  Moreover, it does not automatically follow that, because PTC requested Kouvchinov's removal from PTC due to ethical concerns, that CDI terminate Kouvchinov altogether (although PTC supports CDI's decision to do so).  Rather, CDI was free to employ Kouvchinov as a contractor with another CDI client company.  Any such reassignment would have been of no interest to PTC.

 PTC  ptc.com

    2.    *Kouvchinov's claims against PTC and Ms. Wales fail because PTC's actions were
not motivated in any manner by any actual or perceived disability.*

In the only factual allegation in his charge that provides the alleged basis for his claims against Ms. Wales and PTC, Kouvchinov makes the utterly conclusory statement that "[c]learly, Ms. Wales and/or other PTC employees had contacted CDI and improperly informed them of my disability and/or perceived disability, as well as my having taken a medical leave of absence and having received disability benefits due to my disability" (See Complaint, at 2).

    **a.    There is no basis for any claim against Ms. Wales.**

First, Kouvchinov's deliberate use of the phrase "and/or" in the above allegation confirms that, in fact, he has no idea whether Ms. Wales ever personally communicated anything to CDI. As such, naming Ms. Wales personally in this matter borders on abuse of process. In point of fact, Ms. Wales never had any communication with CDI on any subject at any time.

    **b.    PTC's actions were not based on Kouvchinov's actual or perceived disability.**

Second, and as discussed above, the actual reason for PTC's communications with CDI had absolutely nothing to do with Kouvchinov's claimed disability. In this sense, Kouvchinov's conclusory allegations only reveal half the context. PTC does not dispute, of course, that it informed CDI that Kouvchinov had claimed a disability and received benefits as a result. What Kouvchinov does not state is that PTC did so only insofar as it legitimately believed that Kouvchinov had acted unethically by commencing employment with CDI without first terminating his disability benefits. Thus, quite the opposite from impugning Kouvchinov to CDI for a real or perceived disability, PTC's communications with CDI were motivated by PTC's impression that Kouvchinov in fact was **not** disabled, but was fully abled while receiving disability benefits. PTC was quite justified in informing CDI of its legitimate concerns on this issue. While it happens to be true that the particular ethical issue in question involved Kouvchinov's attempt to exploit PTC's "disability" coverage, the "disability" aspect is utterly ancillary to the overarching concern as expressed by Mr. Raine, which was Kouvchinov's ethical breach. Any connection to "disability" is simply a red herring here, and an artifice without which Kouvchinov could not support this action at all.

Finally, by all appearances, the instant charge by Kouvchinov is only one more in a string of attempts by him to "play the system" unfairly. Immediately after learning of his impending layoff he applied for disability benefits, notwithstanding the fact that he had never before in his many years as a PTC employee raised any issue regarding any disability. As noted above, PTC did not challenge this action by Kouvchinov at the time; however, PTC in no way concedes and, in fact, reserves the

PTC  ptc.com

Sunila Thomas-George, Esq.                                    September 10, 2002
Massachusetts Commission Against Discrimination                      Page 6 of 6

right to dispute that Kouvchinov is disabled in any way befitting the protections of M.G.L. c. 151B. Kouvchinov continued to submit additional information to CIGNA in order to extend his short-term disability payments for the maximum 12 weeks, while simultaneously actively seeking and ultimately securing employment.  Now, after PTC rightfully called into question this ethical issue, Kouvchinov has responded by concocting the discrimination claims contained in his charge.

<div align="center"><u>Conclusion</u></div>

Kouvchinov's charge of aiding and abetting disability discrimination is contrary to the facts. At no time did Ms. Wales herself communicate with CDI in any way.  Furthermore, PTC's communications with CDI were based on PTC's legitimate ethical concerns. Disability was never a factor in PTC's thinking; indeed, it merely happened to be the context of Kouvchinov's apparent fraud.  Accordingly, Kouvchinov's complaint should be administratively dismissed in its entirety.

Finally, this is to advise that PTC and Ms. Wales specifically assert and may rely on any or all of the affirmative defenses of waiver, estoppel, statute of limitations, failure to state a claim, failure to mitigate damages, that Kouvchinov was not actually or perceived to be handicapped or disabled, that Respondents complied with any obligation they had to reasonably accommodate Kouvchinov, and that all actions taken with respect to Kouvchinov were taken for legitimate business reasons.  This is also to advise that PTC and Ms. Wales reserve the right to a trial by jury.

Affirmed on behalf of Parametric Technology
Corporation and Lisa Wales to the best of my
knowledge and belief under the pains and penalties of
perjury,

PARAMETRIC TECHNOLOGY CORPORATION
and
LISA WALES

Paul M. Cimino
Senior Staff Counsel

cc:    Mitchell Jay Notis, Esq.
       Guy P. Tully, Esq.