*04-12531*

# United States Court of Appeals
## For the First Circuit

No. 07-2395

ALEXEI KOUVCHINOV,

Plaintiff, Appellant,

v.

PARAMETRIC TECHNOLOGY CORPORATION ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,* U.S. District Judge]

Before

Torruella, Selya and Howard,
Circuit Judges.

Yelana Konanova, Student Advocate,** with whom Stephen S. Churchill and WilmerHale Legal Services Center of Harvard Law School were on brief, for appellant.
Guy P. Tully, with whom Jackson Lewis LLP was on brief, for appellees.

August 8, 2008

*Of the Southern District of New York, sitting by designation.

**Appearing pursuant to 1st Cir. R. 46(f).

**SELYA, Circuit Judge.**     This is an employment discrimination action brought by plaintiff-appellant Alexei Kouvchinov against his quondam employer, Parametric Technology Corporation (PTC), and Lisa Wales, a PTC functionary.   The plaintiff's overarching claim is that the defendants cashiered him in retaliation for his exercise of the right to receive short-term disability (STD) benefits under an employee benefit plan, thereby violating the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1101-1461, and tortiously interfering with an advantageous business relationship.   The district court granted summary judgment for the defendants.  After careful consideration, we affirm.

## I.  BACKGROUND

We rehearse here only those facts needed to place this appeal in perspective.  We recount them in the light most agreeable to the plaintiff, consistent with record support.   The relevant events occurred in 2001.

PTC hired the plaintiff as a software engineer in 1994. He remained in that position without incident until September 10, 2001.  At that juncture, PTC notified him that he, along with approximately 500 others, was slotted to be part of a reduction in force. On September 17 — exactly one week before the layoffs were to become effective — the plaintiff filed for STD benefits, citing a disabling depression.

Wales, a human resources officer, fielded the plaintiff's claim. She had never handled an STD claim filed by an employee who had just been furloughed, and she found the timing "odd." Her concern prompted a consultation with PTC's in-house counsel. Despite this precaution she forwarded the claim, like any other claim, to the plan administrator, Connecticut General Life Insurance Company (CIGNA). CIGNA approved the payment of STD benefits.

While receiving his STD stipend, the plaintiff began looking for work. On November 29, he signed an employment agreement with CDI Corporation. Ironically, the job entailed contract work for PTC — work that was substantially the same as he had been performing when he received the layoff notice.

At that point, the facts exhibit some disarray. The plaintiff was on track to receive STD benefits through December 16. He claims that he called CIGNA on November 29 to report that he would be returning to work, but CIGNA has no record of the call. In any event, it did not cancel the plaintiff's benefits then.

On December 4, the plaintiff started work for CDI. That same day, Wales saw him on PTC's premises and inquired as to his presence. The plaintiff told Wales that he was working for PTC through CDI. Cognizant of the disability claim, Wales decided to investigate. In the course of her probe, she learned that CIGNA had approved the payment of STD benefits through December 16. She

also learned that CIGNA professed to have no knowledge anent the plaintiff's resumption of gainful employment.

CIGNA reacted predictably to the news that Wales imparted: it cancelled the STD benefits flat, so that the flow of payments ceased as of November 30. Meanwhile, Wales relayed what she had learned to a PTC vice-president, Ed Raine. Based on Wales's report, Raine concluded that the plaintiff was guilty of "double-dipping," that is, representing himself to CIGNA as disabled while simultaneously representing himself to CDI as able to work. Because of this perceived ethical breach, PTC notified CDI that the plaintiff's services would no longer be welcome at PTC. CDI then terminated the plaintiff's employment.

Following certain administrative skirmishing (not relevant here), the plaintiff brought suit in the federal district court. His original complaint contained seven statements of claim against PTC, Wales, CIGNA, and CDI. He subsequently dropped three of these counts, including all the claims against CIGNA and CDI. The four remaining claims, against PTC and Wales, charged disability discrimination, ERISA discrimination, interference with advantageous relations, and negligence. The defendants denied liability and discovery ensued.

In due course, the district court granted the defendants' motion for summary judgment on all claims. Kouvchinov v. PTC, No. 04-CV-12531, slip op. at 11 (D. Mass. July 31, 2007) (unpublished).

This timely appeal followed.  In it, the plaintiff presses only the ERISA discrimination and tortious interference claims.

## II.  ANALYSIS

We review de novo a district court's entry of summary judgment.  Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).  In conducting that tamisage, we consider the record and all reasonable inferences therefrom in the light most hospitable to the summary judgment loser (here, the plaintiff).  Id.  If — and only if — the record, viewed in this light, discloses the absence of any genuine issue of material fact and reveals the movants' entitlement to judgment as a matter of law, we will affirm the summary judgment order.  See Fed. R. Civ. P. 56(c).

In an employment discrimination case, a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination. He cannot rely exclusively on naked assertions, unsupported conclusions, or optimistic surmise.  See Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  To the extent that the plaintiff has the burden of proof, the evidence adduced on each of the elements of the asserted cause of action must be significantly probative. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Dávila v. Corporación De Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).

In this instance, the plaintiff mounted both an ERISA discrimination claim, 29 U.S.C. § 1140, and a state-law claim for tortious interference with advantageous relations.  We address the ERISA claim first.

## A.   The ERISA Claim.

Section 510 of ERISA provides in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140.[1]  An employee who claims to have been dismissed in violation of section 510 normally must carry the burden of proving that the firing "was taken with the specific intent of interfering with the employee's ERISA benefits."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995).  Here, however, the plaintiff suggests that proof of specific intent is not required because the discrimination complained of is retaliatory rather than preemptive.

_____

[1]Of course, the plaintiff was on the payroll of CDI, not PTC, when fired.  For purposes of their summary judgment motion, however, the defendants made the arguendo assumption that the plaintiff could establish that PTC and CDI were his joint employers.  We accept this temporary concession in formulating our analysis.

We reject that suggestion. The plaintiff fails to appreciate that, without a specific intent requirement, every terminated employee who has exercised his or her right to benefits would, ipso facto, have a potential retaliation claim against the employer. See id. That would destroy ERISA's carefully calibrated balance of rights, remedies, and responsibilities in the workplace. Presumably for this reason, every federal court of appeals to have addressed the question has demanded a showing of specific intent in ERISA retaliation cases. See, e.g., Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C., 277 F.3d 882, 892 (7th Cir. 2001); McGann v. H & H Music Co., 946 F.2d 401, 404 (5th Cir. 1991); Kimbro v. Atl. Richfield Co., 889 F.2d 869, 881 (9th Cir. 1989). Accordingly, we hold that a plaintiff must make a plausible showing of specific intent in order to survive summary judgment on an ERISA retaliation claim.

In the case at hand, the plaintiff has failed to satisfy this criterion. Having produced no direct evidence of discrimination, he must rely on the familiar burden-shifting framework characteristic of cases involving circumstantial proof of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); Barbour, 63 F.3d at 37-38; Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991). Adapted to the ERISA milieu, this paradigm requires that the employee first set forth a prima facie case of discrimination. See Barbour, 63 F.3d at 38.

The burden of production then shifts, and the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Id. Once the employer satisfies this burden of production, the plaintiff can no longer rest on the initial inference of discrimination but must show that the reasons given by the employer are a pretext for discrimination. Id. at 39. In this context, pretext "means more than an unusual act; it means something worse than business error; pretext means deceit used to cover one's tracks." Ronda-Pérez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005) (internal quotation marks omitted).

When assessing a charge of pretext in an employment discrimination case, the focus is on the mindset of the actual decisionmaker. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007); Mesnick, 950 F.2d at 824. This holds true even when the decisionmaker is relying on information that may later prove to be inaccurate. In other words, it is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception. See Bennett, 507 F.3d at 31. Instead, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action. See id. This is as it should be: the anti-discrimination laws do not insure against inaccuracy or flawed business judgment on the employer's part; rather, they

are designed to protect against, and to prevent, actions spurred by some discriminatory animus. See Ronda-Pérez, 404 F.3d at 47.

Here, the plaintiff alleges that he was wrongfully terminated as a result of his exercise of an entitlement to STD benefits.[2] The defendants assert that the plaintiff's evidence was insufficient either to establish a prima facie case or to impugn PTC's proffered explanation for its actions. For simplicity's sake, we assume without deciding that the plaintiff established a prima facie case and turn directly to the circumstantial evidence that the plaintiff argues is sufficient to create a trialworthy issue as to pretext and discriminatory purpose.

The explanation offered by the defendants for its communication to CDI centers on Raine's perception that the plaintiff disregarded business ethics in accepting work while simultaneously drawing disability benefits. The plaintiff does not seriously challenge the notion that double-dipping, if it occurred, would constitute a legitimate, nondiscriminatory reason for dismissal. Instead, he advances several reasons why, in his view, that charge was pretextual. Those reasons include Wales's reaction to the plaintiff's initial STD benefits claim, the process followed by the defendants after learning of the plaintiff's engagement by CDI (including the nature of Wales's investigation), and the

_____

[2]The termination complained of is not the initial layoff by PTC but, rather, the December dismissal by CDI at PTC's instigation.

-9-

plaintiff's avowed innocence of the suspected double-dipping.

Considering all of this evidence, we agree with the lower court that the plaintiff has not made out a genuine issue of material fact either as to pretext or as to discriminatory intent. We explain briefly.

To begin, the plaintiff reads too much into Wales's reaction to the initial benefits claim. In this regard, he relies mainly on her stated intuition that the claim was "odd," her decision to discuss it with in-house counsel, and her overall skepticism about the bona fides of the plaintiff's disability. The first and third facts reflect no more than a cautious — and perfectly appropriate — response to an employee's claim for benefits. ERISA does not impose upon an employer a duty to buy a pig in a poke, and caution is a far cry from discriminatory animus.

The second fact adds nothing to the equation. Although Wales's decision to contact in-house counsel was unprecedented — she had never before consulted in-house counsel about an employee's filing of a disability benefits claim — that decision cannot be wrested from its contextual moorings. The record makes pellucid that the claim also was unprecedented: Wales never before had encountered a situation in which an employee initiated a claim for benefits during the interval between receiving notice of a layoff and the effective date of that layoff. A personnel officer faced with a novel situation hardly can be faulted for opting to secure

the advice of counsel concerning that situation.  At any rate, such a consultation was readily understandable here, not only because of the novelty of the situation but also because Wales had been working clcsely with PTC's legal department in planning for the reduction in force.  Without more, the prudent step of seeking a lawyer's advice is not the stuff on which a finding of discriminatory intent can be premised.[3]

The plaintiff next maintains that PTC had a policy of hearing an employee's side of the story before terminating him, yet failed to adhere to that policy in this instance.  We agree with the plaintiff that pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices.  See, e.g., Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir. 1998); Lattimore v. Polaroid Corp., 99 F.3d 456, 466-67 (1st Cir. 1996).  But that rule has no applicability here.

The most obvious flaw in the fabric of this argument is that the plaintiff has not produced any competent evidence establishing that PTC had a standard policy or practice of hearing employees out before discharging them.  More specifically, the plaintiff adduced no evidence that any other PTC employee thought

---

[3]We add a coda.  Even if Wales's skeptical reaction to the initial submission of the benefits claim was somehow significant, it had no cognizable consequence.  There is simply no evidence in the record that Wales flagged the claim, requested that CIGNA give it special scrutiny, or prejudiced its future course.

to have committed an ethical breach or to have been guilty of some peccadillo comparable to double-dipping was treated any differently.

In an effort to blunt the force of this reasoning, the plaintiff points to testimony of Wales and Raine.  In our view, however, that testimony is not especially helpful to his cause.

Wales testified that "it is only fair" to let an employee know what is expected vis-à-vis employee performance issues.  That testimony does not hint at, much less establish, a corporate policy or practice of the kind limned by the plaintiff.  Raine's statements are closer to the mark; he testified that PTC generally tried to treat employees fairly — it is difficult to imagine that any executive of any company would testify otherwise — and that in most cases in which an employee was accused of wrongdoing the employee would be asked for his or her side of the story. Nevertheless, Raine was careful to note that PTC had no specific policy in this regard but, rather, took a case-by-case approach, based on the circumstances of each individual case.

None of this is enough to establish a trialworthy issue as to the existence of a policy or practice.  PTC's approach was quite clearly flexible and discretionary — and where an employer's approach to personnel matters is flexible or discretionary, there is by definition no standard practice from which to deviate.  See Pottenger v. Potlatch Corp., 329 F.3d 740, 746-47 (9th Cir. 2003);

-12-

Fortier v. Ameritech Mobile Commc'ns, Inc., 161 F.3d 1106, 1114 (7th Cir. 1998).

The plaintiff next posits that Wales, during her investigation, ignored evidence that proved the plaintiff had not been double-dipping. The "evidence" consists of information that Wales received from CIGNA to the effect that the plaintiff's last benefit payment actually occurred on November 30. The plaintiff asserts that Wales, armed with this information, knew that he could not have been double-dipping when he returned to work on December 4, and that her failure to report as much to the PTC decisionmakers supports an inference of discriminatory intent.

Close study of the record reveals that this claim rests on a porous foundation. Wales did not ignore anything: the record makes manifest that CIGNA had approved the plaintiff's STD benefits through December 16, yet the plaintiff returned to work on December 4. This is precisely what Wales reported to her superiors. It was only later that she learned that the plaintiff's payments had not extended past November 30 — and she knew that circumstance to be a direct result of CIGNA having been informed that he had resumed work. From Wales's coign of vantage, then, it was reasonable to believe that even though the plaintiff had not technically double-dipped, he had tried to do so. The fact that she did not forward

a supplementary report to her superiors does not support in any way

a reasonable inference of discriminatory intent.[4]

Finally, the plaintiff suggests that PTC got it wrong:

that he was a straight shooter, not a person who was endeavoring to

double-dip.  The plaintiff claims both that he called CIGNA to

inform it that he had accepted employment and that he had no

control over CIGNA's ensuing failure to cancel his benefits.

Relatedly, he insists that CIGNA never told him that it was

extending his benefits past November 30.

These facts are only marginally relevant to our analysis.

Even if we assume that this account is true,[5] it only makes the

cause of the firing an unfortunate misunderstanding, not an act of

unlawful discrimination.  In the Watergate phrase, where pretext is

in issue an inquiring court's focus must be on what the

decisionmaker knew and when he or she knew it.  After all, it is

the decisionmaker's reasonable belief that guides the inquiry, not

whether the employee was or was not guilty of the suspected

---

[4]The plaintiff faults Wales for her failure to preserve her
investigative notes. He suggests that Wales purposely destroyed
evidence that she knew was relevant to this litigation.  The
record, however, does not allow such an inferential leap.  The
notes were in an all-purpose notebook that Wales used to log calls;
the notebook was thrown out because she left PTC's employ; and
there was no showing that the notes, if retained, would have
impeached or contradicted Wales's testimony.

[5]For the sake of completeness, we note that CIGNA has no
record that the plaintiff ever made the call upon which he relies.

-14-

misconduct.   See Bennett, 507 F.3d at 31.   Because the plaintiff
has failed to make out a genuine issue as to the reasonableness of
PTC's belief that he had committed a serious breach of business
ethics, the charge of pretext fails.

That ends this aspect of the matter.   In the absence of
some significantly probative evidence showing discriminatory
intent, the district court did not err in entering summary judgment
for the defendants on the ERISA discrimination claim.

### B.   **The Tortious Interference Claim**.

The plaintiff's lament that Wales and PTC tortiously
interfered with advantageous relations need not occupy us for long.
To survive a motion for summary judgment on such a claim, a
plaintiff must make out a genuine issue of material fact with
respect to each of the elements of the tort.   Here, Massachusetts
law supplies the substantive rules of decision, so we look to that
body of jurisprudence.

Under Massachusetts law, the elements of the tort are (i)
the existence of a business relationship, (ii) of which the
defendant is aware and (iii) with which the defendant intentionally
and improperly interferes, (iv) causing impairment of the
relationship to the plaintiff's detriment.   See Bennett, 507 F.3d
at 33 (applying Massachusetts law).   Actual malice must be shown to
prove improper means.   Id.   Unlawful discrimination or retaliation
may be used to demonstrate the malice necessary to ground a

tortious interference claim.  See Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 77 (1st Cir. 2001) (applying Massachusetts law).

In this instance, the only basis advanced for a claim of actual malice is a contention that the defendants unlawfully discriminated against the plaintiff.  We already have determined that the plaintiff has failed to make out a viable discrimination claim.  See supra Part II(A).  Consequently, there is no cognizable evidence of actual malice.  It follows inexorably that the claim for tortious interference with advantageous relations cannot prosper.

## III.   CONCLUSION

We need go no further.  For the reasons elucidated above, we uphold the entry of summary judgment in the defendants' favor.

**Affirmed**.